Exhibit I

.iT BY:Xerox Telecopier 7020 ; 5-17-94 ; 4:25PM ;                    →              7209216;#

## SUTHERLAND, ASBILL & BRENNAN
### 999 PEACHTREE STREET, N.E.
### ATLANTA, GEORGIA  30309-3996

### FACSIMILE REQUEST AND TRANSMITTAL INFORMATION FORM

Time of Request:    a.m.    p.m.        Date: May 17, 1994

TO:
> **NAME OF INDIVIDUAL:**  Donald Hutchins
> **NAME OF FIRM:**
> **CITY & STATE/COUNTRY:**
> **AREA CODE/TELEPHONE NO:**  413-739-4060
> **REFERENCE:**
> **NUMBER OF PAGES, INCLUDING TRANSMITTAL PAGE:**
> **TELEPHONE NO. FOR CONFIRMATION OF TRANSMISSION:**  413-734-2625

RO
> **NAME OF INDIVIDUAL:**  Mark D. Kaufman
> **DIRECT DIAL NUMBER:**  (404) 853-8107
> **FACSIMILE MACHINE:**  XEROX 7021 (CCITT Groups 2 & 3) (404) 853-8806 (Auto)

THIS MESSAGE AND ITS ATTACHMENTS ARE INTENDED TO BE RECEIVED ONLY BY THE ADDRESSEE ABOVE.  If you are not the addressee and you are not responsible for delivering messages to the addressee, you have received

BY:Xerox Telecopier 7020 ; 5-17-94 ; 4:26PM ;                                           7209218;# 2

# Sutherland, Asbill & Brennan

EL: (404) 853-8000
AX: (404) 853-8806

999 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30309-3996

ATLANTA
AUSTIN
NEW YORK
WASHINGTON

MARK D. KAUFMAN
IRECT LINE: (404) 853-8107

**MEMORANDUM**

## VIA TELECOPIER

To:          Donald Hutching

SAB DRAFT--5/16/94

## LICENSE AGREEMENT

This License Agreement is entered into as of May __, 1994, by and between County Line Limited Partnership, a Delaware limited partnership having its principal place of business at 4543 Taylor Lane, Warrensville Heights, Ohio 44128 (hereinafter "LICENSEE"), CPR PROMPT Corporation, a Massachusetts corporation having its principal place of business at 60 Brookdale Drive, Springfield, Massachusetts 01104 (hereinafter "CPR PROMPT"), and Donald C. Hutchins, an individual having an address at 60 Brookdale Drive, Springfield, Massachusetts 01104 (hereinafter collectively referred to as "LICENSOR").

### WITNESSETH:

WHEREAS, LICENSOR represents that Donald C. Hutchins and/or CPR PROMPT are the owners of U.S. Patent No. 4,583,524, as well as any corresponding foreign patents, disclosing and claiming a method for using, and a device for providing, rescue aid instructions to trained individuals concerning cardiopulmonary resuscitation ("CPR") and first aid for choking;

WHEREAS, Donald C. Hutchins ("Hutchins") and/or CPR PROMPT are the owners of the trade name and trademark "CPR PROMPT" together with any trade dress, copyrights, logos or other trademarks used in connection with the sale of a device for providing such rescue aid instructions, together with the goodwill of the business associated therewith; and

WHEREAS, LICENSEE desires to obtain, and LICENSOR is willing to grant, an exclusive license to the device as disclosed and claimed in U.S. Patent No. 4,583,524, and the corresponding foreign patents, and certain other rights therein, under the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

### I.  DEFINITIONS

1.1  "Affiliate" of any person or entity means any person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with first mentioned person or entity; and for purposes hereof the term "control" means the possession, directly or indirectly or as a trustee, executor or administrator, of the power to direct or cause direction of the management or policies of a person or entity, either

through the ownership of stock or other securities, by contract or otherwise.

1.2 "CPI Fraction" shall mean a fraction, the numerator of which shall be the Consumer Price Index for All Urban Consumers, as published monthly by the United States Department of Labor, for the month immediately preceding the start of each new twelve-month period of this Agreement, and the denominator of which shall be such Consumer Price Index for May 1994, or, in the event such Consumer Price Index shall no longer be published, a similar fraction based upon a similar consumer price index selected by LICENSOR.

1.3 "Confidential Information and Trade Secrets" means information including, but not limited to, technical or non-technical data, formulae, a pattern, compilation, program, device, method, technique, drawing or process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers of Licensed Products whether currently existing or otherwise developed or acquired by LICENSOR during the term of this Agreement, that derive economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts which are reasonable under the circumstances to maintain its secrecy and any other information that is a trade secret under applicable law and any other information relating to the Licensed Products that is material to LICENSOR and not generally available to the public.

1.4 "Consumer Version" means a type of Licensed Product which is manufactured at a cost of $45.00 or less per device, times the CPI Fraction.

1.5 "Copyrights" means any copyrights, registered or unregistered, used in connection with manufacture and sale of the Licensed Products.

1.6 "Know-How" means all the Licensed Product concepts, sketches, prototypes, ideas, designs, layouts, models, tooling patterns, mechanical drawings, production planning, techniques, formulae, processes, procedures, specifications, inventions, patent applications, Confidential Information and Trade Secrets, documents, data, records, notes, technical writings, computer programs, manuals, pictorial reproductions, drawings, graphics, and other information now existing or hereafter developed, created, produced, possessed or invented by LICENSOR.

1.7 "Licensed Patents" means U.S. Patent No. 4,583,524, and any divisions or continuations in whole or in part, reissues,

118351.2                                    2

reexaminations or extensions thereof, and any foreign counterparts or extensions thereof, including, without limitation, those patents and applications listed in Exhibit A attached hereto and incorporated herein by reference and any other patent which applies to this product category, whether listed or not on such Exhibit A.

1.8 "Licensed Products" means a device for providing rescue aid instructions to trained individuals concerning CPR as disclosed and claimed in U.S. Patent No. 4,583,524, which is also the subject of certain of the Confidential Information and Trade Secrets and Know-How which are now owned and used by LICENSOR, or which may in the future be owned, licensed or controlled by LICENSOR, and any modifications or improvements thereto, which now exist or which may exist in the future and are owned, licensed or controlled by LICENSOR, covering or relating to the design, manufacture and/or use of a device for providing rescue aid instructions to trained individuals concerning CPR, or component or material thereof.

1.9 "Marks" means the name and mark "CPR PROMPT," any trade dress, logos or other trademarks used in connection with the Licensed Products, and any applications or registrations therefor, including, without limitation, the registrations listed in Exhibit B attached hereto and incorporated herein by reference.

1.10 "Net Sales" means the gross selling price or gross lease proceeds of the Licensed Products sold or leased by or on behalf of LICENSEE, less accepted returns from LICENSEE's customers, including but not limited to, breakage which LICENSEE credits to its customers; excise or other sales taxes paid or absorbed by or on behalf of LICENSEE; customs, duties and consular fees; transportation, insurance charges and special packaging fees paid or absorbed by or on behalf of LICENSEE; external sales commissions, including but not limited to, fees paid to sales representatives, and any other commercially acceptable promotional, quantity, trade or cash discounts, refunds, credits, and other sales adjustments paid or granted by or on behalf of LICENSEE in connection with or on account of Licensed Products.

1.11 "Professional Version" means a type of Licensed Product which is manufactured at a cost of more than $45.00 per device, times the CPI Fraction.

1.12 "Sublicensee" means the third party recipient of a Sublicense from LICENSEE.

1.13 "Sublicense" means any agreement by LICENSEE with any third party which relates to all or any part of the Licensed

118351.2                                3

Products which grants to such third party the right to practice the Licensed Patents, Confidential Information and Trade Secrets or Know-how, or to make, lease, use, loan and sell, individually or collectively, products, apparatus, methods or processes covered by the Licensed Patents, but does not include any agreements for the loan, use, sale or lease of the Licensed Products between LICENSEE and any one or more distributors or other persons or entities.

1.14  "Sublicensee Payments" means payments made by Sublicensees.

1.15  "Tooling, Inventory and Other Materials" means LICENSOR's tooling used for manufacture of the Licensed Products, LICENSOR's inventory of the Licensed Products, as well as any other materials listed in Exhibit C attached hereto and incorporated herein by reference.

## II.  GRANT OF RIGHTS

2.1  LICENSOR hereby grants to LICENSEE a worldwide, exclusive right and license to make, have made, use, sell, lease and have sold and leased the Licensed Products pursuant to the Licensed Patents, Confidential Information and Trade Secrets and Know-how.  Additionally, LICENSEE shall have the right to grant Sublicenses with respect to all rights and licenses granted herein upon such terms and conditions as LICENSEE deems appropriate; provided, however, that without the prior written consent of LICENSOR no such Sublicense shall be granted by LICENSEE to any Affiliate of LICENSEE. Additionally, LICENSEE shall have the right to assign this Agreement and all of its rights, licenses and obligations hereunder to any person or entity, and in the event of such an assignment the term "LICENSEE" as used herein shall mean and refer to such assignee.

2.2  LICENSOR has and will disclose to LICENSEE all information regarding the Licensed Products, Confidential Information and Trade Secrets, Know-How and Licensed Patents, in order to enable LICENSEE to secure the rights and license granted herein and to fully evaluate and exploit the design and sales potential of the Licensed Products.

2.3  LICENSOR hereby grants to LICENSEE a worldwide, exclusive right and license in and to the Copyrights, including the right to reproduce, make derivatives, distribute and to display the Licensed Products or other sales materials containing the Copyrights.

2.4  LICENSOR hereby sells, assigns and transfers to LICENSEE all right, title and interest in and to the Marks for use in connection with, the manufacture, marketing, distribution and sale or lease of the Licensed Products.  Payment for the

Marks is included in the initial payment made by LICENSEE to LICENSOR.

2.5 LICENSOR hereby sells, assigns and transfers to LICENSEE all right, title and interest in and to the Tooling, Inventory and Other Materials. Payment for the Tooling and Other Materials is included in the initial payment made by LICENSEE to LICENSOR. Upon execution of this Agreement, an additional payment shall be made by LICENSEE to LICENSOR for the Inventory in an amount equal to LICENSOR's cost for such Inventory.

### III. ROYALTIES/PAYMENTS

3.1 In consideration for the rights and licenses granted herein, LICENSEE shall pay LICENSOR an initial payment of One Hundred Thousand Dollars ($100,000.00) upon execution of this Agreement.

3.2 Additionally, during each of the first twelve (12) months of this Agreement, LICENSEE shall pay LICENSOR Four Thousand Dollars ($4,000.00) per month on or before the last day of each month, which payments shall constitute an advance against royalties payable under Sections 3.3 and 3.4 and shall be deducted from the royalties which become payable thereunder by LICENSEE.

3.3 In further consideration for the rights and license granted herein, LICENSEE shall pay either of the following amounts to LICENSOR based on sales of the Licensed Products in any country in which any of the Licensed Patents are in effect:

(a) With respect to Net Sales of the Professional Version of the Licensed Products:

| Agreement Year | Royalty Percentage |
|---|---|
| 1 | 5% |
| 2 and thereafter | 3 1/2% |

(b) With respect to Net Sales of the Consumer Version of the Licensed Products:

| Agreement Year | Royalty Percentage |
|---|---|
| During the term of this Agreement | 2% |

3.4 LICENSEE shall make minimum royalty payments (which include Sublicensee Payments) to LICENSOR with respect to each full or partial fiscal year of LICENSEE during which this Agreement is in effect commencing with the effective date

hereof and shall be pro rated for partial fiscal years. Such minimum royalty payments shall be Ten Thousand Dollars ($10,000.00) per fiscal year. In the event that the royalties payable with respect to each full or partial fiscal year following the effective date of this Agreement do not aggregate such minimum royalty payments, then LICENSEE shall, within thirty (30) days following the end of such fiscal year or part thereof, pay to LICENSOR the difference between the royalties actually paid to LICENSOR and the minimum royalty payment amount for that year or part thereof.

3.5  With respect to Sublicenses granted by LICENSEE under this Agreement, LICENSEE shall pay to LICENSOR fifty percent (50%) of any amounts actually received from its Sublicensees, after deducting LICENSEE's out-of-pocket costs for such licensing.

3.6  LICENSEE shall submit to LICENSOR (i) within sixty (60) days of the close of each of its first three (3) fiscal quarters of each fiscal year and (ii) within ninety (90) days of the close of its last fiscal quarter of each fiscal year, a written report setting forth the Net Sales for the Licensed Products sold by or on behalf of LICENSEE and the Sublicensee Payments for that quarter, together with the royalties due to LICENSOR for that quarter. The report shall be submitted by LICENSOR regardless of whether royalties are due for that quarter.

3.7  LICENSEE shall keep at its office in Cleveland, Ohio true and accurate accounts of all Licensed Products sold or leased hereunder and all Sublicensee Payments. Such records shall show the number of Licensed Products sold or leased and the dollar sales of Licensed Products sold or leased by or on behalf of LICENSEE. LICENSOR is hereby given the right to access through an independent public accountant to those books of LICENSEE involving transactions covered by this Agreement for the purpose of verifying reports received by it, such access to be at reasonable business hours upon providing reasonable advance notice, and at the sole expense of LICENSOR. Such right of access shall be limited to once during each year this Agreement is in effect.

3.8  All statements, accounts and records provided by LICENSOR pursuant to this Agreement are deemed to be confidential and proprietary information of LICENSEE, and shall not be disclosed without LICENSEE's prior written consent.

3.9  LICENSEE shall reimburse LICENSOR, according to LICENSEE's policies, for reasonable travel and living expenses incurred by Donald C. Hutchins in connection with providing

assistance, at the request of LICENSEE, in the development, manufacture and sale of the Licensed Products.

3.10  LICENSEE will cause each shareholder of LICENSEE who purchases common stock of LICENSEE directly from LICENSEE to agree to pay to LICENSOR seven and one-half percent (7.5%) of the net proceeds of any sale of any or all of such common stock to any person or entity which is not an Affiliate of such selling shareholder.  "Net proceeds" shall mean the proceeds received by such selling shareholder for such sale after deduction of an amount equal to the sum of (a) the legal, accounting, travel and all other expenses attributable to the sale, (b) brokers' commissions, finders' fees and similar costs attributable to the sale, (c) federal and state income taxes attributable to gain on the sale, and (d) all other costs and expenses attributable to the sale. If the net proceeds from the sale are paid other than in cash, such shareholder may elect in satisfaction of the obligations to LICENSOR under this Section 3.10 to have LICENSOR receive either (i) the same type of consideration that such shareholder receives from the sale, or (ii) cash equal to the fair market value of such consideration on the date of the closing of the sale.

## IV.  REPRESENTATIONS AND WARRANTIES; LICENSED PATENTS AND MARKS

4.1  LICENSOR represents and warrants that:

(a)  Hutchins has the full legal right and capacity to execute, deliver and perform this Agreement;

(b)  CPR PROMPT has the full corporate power and authority to execute, deliver and perform this Agreement;

(c)  the execution, delivery and performance of this Agreement by CPR PROMPT have been duly authorized by all requisite corporate action on the part of CPR PROMPT (copies of which actions have been provided to LICENSEE);

(d)  this Agreement has been duly and validly executed and delivered by LICENSOR and constitutes the legal, valid and binding obligation of LICENSOR, enforceable against LICENSOR in accordance with its terms; and

(e)  CPR PROMPT's aggregate liabilities to all persons or entities are less than $20,000 on the date hereof.

Simultaneously with LICENSOR's execution and delivery of this Agreement LICENSOR has delivered to LICENSEE an opinion of LICENSOR's counsel, dated as of the date hereof, with respect to the matters set forth in this Section 4.1.

116351.2                                7

**4.2** LICENSOR hereby represents and warrants that:

(a) they are the sole and exclusive owner of the entire right, title and interest in and to the Licensed Patents, Marks, Copyrights, Licensed Products, Confidential Information and Trade Secrets, Know-How and Tooling, Inventory and Other Materials, free and clear of all liens, claims, and encumbrances and restrictions of any kind, and have full right and capacity to grant the license set forth herein;

(b) they have not granted or transferred any rights in the Licensed Patents, Marks, Copyrights, Licensed Products, Confidential Information and Trade Secrets, Tooling, Inventory and Other Materials and Know-How;

(c) CPR PROMPT has all necessary licenses, permits and other authorizations and approvals necessary to manufacture and sell the Licensed Products and to enter into and perform this Agreement, including, without limitation, all necessary approvals from the United States Food and Drug Administration;

(d) to their knowledge, no prior art exists which would invalidate any of the claims of the Licensed Patents; and

(e) the Licensed Patents, Marks, Copyrights, Confidential Information and Trade Secrets, Know-How and sale or lease of the Licensed Products do not and will not infringe upon or violate any other letters patent heretofore issued or registered in the United States or any foreign country or any other proprietary rights of any third party, and that there are no third party infringers or potential infringers of the Licensed Patents, Marks, Copyrights, Confidential Information and Trade Secrets and Know-How except the potential infringement by the owner of the U.S. Patent No. 4,863,385 to Richard Pierce, of which LICENSOR and LICENSEE are currently aware, and the claims of such patent are not superior to the claims of the Licensed Patents.

**4.3** LICENSOR has not at any time filed, or caused to be filed, applications for other patents, in their own names or in the name of a third party, in the United States or elsewhere, for any of the Licensed Products or a similar product, other than the Licensed Patents.

**4.4** LICENSOR shall, without further consideration therefor, do all acts reasonably necessary to maintain, sustain, reexamine, reissue, or extend the Licensed Patents. In the

event LICENSOR fails to take any such action LICENSEE is hereby authorized to do so as attorney-in-fact or otherwise on behalf of LICENSOR and to deduct all costs and expenses incurred from amounts payable by it hereunder. LICENSOR further acknowledges that it has heretofore furnished to LICENSEE a schedule of the maintenance fees payable by it with respect to the Licensed Patents, and shall pay all such fees at least thirty (30) days in advance of their due date (without regard to any applicable grace period) and to provide LICENSEE with evidence of such payment.

4.5    LICENSEE will properly affix the statutory patent, copyright and trademark notices to the Licensed Products.

4.6    If, while this Agreement is in effect, LICENSOR makes further improvements to the Licensed Products, or similar products, or becomes the owner of any such improvements or similar products, then LICENSOR shall communicate such improvements or similar products to LICENSEE. At LICENSEE's option, such improvements or similar products shall then be incorporated into the Licensed Patents, Confidential Information and Trade Secrets, Know-How and Licensed Products without further consideration from LICENSEE therefor, and LICENSOR shall give LICENSEE full information regarding such improvements or similar products.

4.7    LICENSEE shall prepare, file and prosecute at LICENSEE's expense, insofar as it is deemed appropriate in the sole judgment of LICENSEE, applications for letters patent in the United States on all improvements hereafter made by LICENSOR or LICENSEE, as well as corresponding foreign applications of letters patent, which applications are and shall be incorporated into the Licensed Patents without further consideration from LICENSEE. If LICENSEE elects not to prosecute an application for letters patents in any country, then LICENSOR in its discretion and at its expense may prosecute such application but shall not be obligated to do so. LICENSEE shall bear the expense of obtaining any additional patents or completing any patent applications which LICENSEE elects to prepare, file or prosecute under this provision and shall bear the expense of any patent fees associated with such additional patents or applications as well as any costs of maintaining the patents, including taxes thereon. LICENSOR shall similarly bear the expense of any patents or patent applications which they elect to prepare, file or prosecute and the expense of any such patent fees as well as any costs of maintaining such patents, including taxes thereon. LICENSOR shall, without further consideration therefor, at the request of LICENSEE, do all acts necessary or appropriate in connection with such applications for letters patent. In the event that any administrative agency responsible for granting any of the

patent applications denies one or more of the patent applications, LICENSEE may in its discretion appeal such decision, but shall not be obligated to do so. If LICENSEE elects not to appeal such decision, LICENSOR may, in their discretion and at their expense, appeal such decision, but shall not be obligated to do so.

4.8  LICENSOR further represents and warrants that they have provided to LICENSEE all information concerning communications with any governmental agency, including without limitation, the Food and Drug Administration, the past and current regulatory approval status, and any past or current regulatory violations, concerning the Licensed Products, and that such information is true, complete and correct

## V.   ENFORCEMENT AGAINST THIRD PARTIES

5.1  Upon either party to this Agreement learning of any actual or threatened infringement or misappropriation by any third party of any claim of the Licensed Patents, Marks, Copyrights, or any Confidential Information and Trade Secrets or Know-How, such party shall promptly notify the other party in writing of such actual or threatened infringement or misappropriation, giving details thereof. With respect to such infringement or misappropriation, LICENSEE shall have the right to take whatever action it deems appropriate, including bringing a suit at its own expense against such third party, and to retain any damage recovery obtained.  In any such suit brought by LICENSEE, LICENSOR shall, if required by law, join as party plaintiff at its own expense.  In the event that LICENSEE elects not to take action against such third party, then LICENSOR shall have the right to take action on its own behalf against such third party, and shall retain any damage recovery obtained.

5.2  When either LICENSOR or LICENSEE brings an infringement or misappropriation suit, the other party shall cooperate and assist in the preparation and prosecution of the suit, including the execution of necessary documents and providing requested testimony.  The party bringing the suit shall pay all reasonable travel expenses of the other party.

## VI.   INDEMNITY

6.1  In the event a claim is made against LICENSEE alleging that any claim of the Licensed Patents is invalid or unenforceable or that the sale or lease of the Licensed Products infringes any patent or patents or other superior rights of any third party, LICENSEE shall, at its option, commence the defense of LICENSEE and its Sublicensees, by bringing or defending a lawsuit or settling the claim, and

LICENSOR will cooperate with LICENSEE in such defense and settlement and shall take no action inconsistent therewith. In the event that LICENSEE elects not to defend against any such claim or elects to terminate such defense, then LICENSOR may commence such defense by bringing a lawsuit or settling the claim, and LICENSEE will cooperate with LICENSOR in such defense and settlement and shall take no action inconsistent therewith. In either such event LICENSEE shall have the right to deposit the payments accrued and not theretofore paid to LICENSOR resulting from the sales or leases of Licensed Products which are the subject of such alleged invalidity, unenforceability or infringement and all payments thereafter accruing under this Agreement resulting from the sales or leases of such Licensed Products in an escrow account in a national bank selected by LICENSEE. If such claim is finally resolved favorably to LICENSEE, all such payments in the escrow account, including interest thereon, will immediately be paid to LICENSOR. If such claim is finally resolved adversely to LICENSEE, all funds in such account, including interest thereon, shall be paid to LICENSEE and its Sublicensees.

6.2   If any claim of the Licensed Patents is held invalid or unenforceable or held to infringe any patent or patents or other superior rights of any third party by a decision of any tribunal of competent jurisdiction, then with respect to any such claim so held invalid or unenforceable or held to infringe the superior rights of any third party, the decision of such tribunal shall be followed from the date of entry of such decision and with respect to any such claim, LICENSEE shall, in addition to any other rights or remedies it may have, thereafter be relieved from making any payments with respect to such claim, and from including in its reports hereunder any items covered solely by such claim; provided, however, that if there are conflicting final decisions by courts of equal jurisdiction, the one of latest date shall be controlling.

6.3   Subject to Sections 6.1 and 6.2, LICENSOR shall jointly and severally defend, indemnify and hold LICENSEE and its Sublicensees harmless from any and all losses, damages or expenses (including reasonable attorneys' fees) incurred by Licensee or any of its Sublicensees as a result of or relating to any breach or threatened breach of LICENSOR's representations, warranties, or obligations hereunder.

VII.   CONFIDENTIALITY

7.1   LICENSOR and LICENSEE shall not use or permit use of any Confidential Information and Trade Secrets and Know-How except in accordance with the licenses herein granted, and

shall not disclose any Confidential Information and Trade Secrets and Know-How to others except to the extent such disclosure is necessary to perform this Agreement.

7.2  Neither LICENSOR nor LICENSEE shall be under an obligation of confidentiality to the extent any Confidential Information and Trade Secrets and Know-How:

   (i)     has previously been made public in writing;
   (ii)    was already known to the other party in writing at the time the disclosure was made by the disclosing party;
   (iii)   becomes public knowledge other than by breach of this Agreement; or
   (iv)    becomes otherwise available in writing from a third party not bound by any confidential relationship.

## VIII.   TERM AND TERMINATION OF AGREEMENT

8.1  Subject to earlier termination as provided for in this Agreement, the licenses provided for in this Agreement shall be effective from the date of this Agreement and shall continue for as long as LICENSOR wishes to use the Licensed Patents, Confidential Information and Trade Secrets and Know-How.  Subject to earlier termination as provided for in this Agreement, the obligation of LICENSEE to pay royalties shall terminate upon expiration of the Licensed Patents and its obligations to pay royalties in a particular country shall terminate upon the expiration of the last of the Licensed Patents in force in such country.

8.2  Either LICENSOR or LICENSEE is entitled to terminate this Agreement upon ninety (90) days' written notice in the event of a material breach of this Agreement by the other party. If the breach is cured within such ninety (90) day period, or if the breach is incapable of being cured within such ninety (90) day period and the party in breach in good faith initiates *bona fide* performance of a cure within such period and completes such cure not later than one hundred eighty (180) days from the date of notice of termination, then such notice of termination shall be null and void.  For purposes of this Agreement, a material breach by LICENSOR giving rise to rights of termination shall be limited to a breach of Sections 3.1 through 3.7.

8.3  In the event of termination of this Agreement, no further minimum royalty payments shall be due from LICENSEE to LICENSOR.  Termination of this Agreement shall not relieve LICENSEE of its obligation to pay other royalties accrued prior to such termination.

118351.2                       12

8.4    Upon termination of this Agreement, LICENSEE shall have the
right to complete any and all contracts for the sale of the
Licensed Products that it may then have upon its books or
for which it has become obligated, and may work up and sell
such uncompleted parts of the Licensed Products as it may
have on hand at such termination date; provided, however,
that all such contracts and such sales must be completed
within one (1) year after such termination.

8.5    This Agreement shall terminate as of the date specified in a
written notice from LICENSEE to LICENSOR indicating that
after such date LICENSEE shall cease its efforts to actively
make, have made, use, sell or have sold the Licensed
Products and that it terminates this Agreement for that
reason.

8.6    Any cause of action or claim of a party arising from any
breach of this Agreement by the other party shall survive
termination of this Agreement.

8.7    in the event LICENSEE terminates this Agreement pursuant to
Section 8.5 prior to the expiration of the Licensed Patents,
any existing Sublicensee of LICENSEE may elect to continue
its Sublicense with LICENSOR by advising LICENSOR within
sixty (60) days of Sublicensee's receipt of written notice
of such termination of its election to continue such
Sublicense.  LICENSOR shall be bound by the terms of such
Sublicense and to remit to LICENSEE fifty percent (50%) of
any amounts received from such Sublicensee payable
thereunder within thirty (30) days following receipt thereof
by LICENSOR.

8.8    In the event LICENSEE terminates this Agreement pursuant to
Section 8.5 prior to the expiration of the Licensed Patents,
the Tooling component of Tooling, Inventory and Other
Materials and the Marks owned by LICENSEE at that time shall
be transferred back to LICENSOR at no cost to LICENSOR.

## IX.   GENERAL PROVISIONS

9.1    Any notice or other required communication to either party
to this Agreement required or permitted to be given
hereunder shall be in writing and shall be either delivered
in person or sent by registered or certified mail, return
receipt requested, postage prepaid, to the address of such
party as set forth herein or to such other address as such
party shall have communicated to the other.  Any such notice
or communication shall be deemed to have been served when
delivered or, if delivery is not accepted by reason of the
fault of the addressee, when mailed.

9.2   If a clause of this Agreement is or becomes ineffective or
      null and void, such ineffectiveness will not prejudice the
      remaining provisions of the Agreement.

9.3   If either party should at any time waive its rights due to a
      material breach by the other party of any of the provisions
      of this Agreement, such waiver is not to be construed as a
      continuing waiver of other breaches of the same or other
      provisions of this Agreement.

9.4   This Agreement shall be deemed to be executed in the State
      of Ohio, and shall be governed by and construed in
      accordance with the laws of the State of Ohio, without
      regard to its principles of conflicts of law.  The parties
      expressly submit themselves to the jurisdiction of the U.S.
      District Court for the Northern District of Ohio for the
      determination of any controversy arising under or in
      connection with this Agreement.

9.5   This Agreement may be executed in multiple counterparts,
      each of which shall be deemed an original, and all of which
      together shall constitute one and the same document.

9.6   This Agreement supersedes all prior negotiations, agreements
      and understandings between LICENSOR and LICENSEE and
      constitutes the entire agreement between LICENSOR and
      LICENSEE as to the subject matter hereof.  This Agreement
      may not be altered or amended except in writing signed by
      the parties hereto.

9.7   This Agreement shall be binding upon and inure to the
      benefit of the parties hereto and their successors, legal
      representatives and assigns.

          IN WITNESS WHEREOF, each of the parties has caused this
Agreement to be executed as set forth below.

**LICENSEE:**                    COUNTY LINE LIMITED PARTNERSHIP


                          By: _____
                               Steven W. Lindseth, President



**LICENSOR:**


                          _____
                          Donald C. Hutchins


118351.2                    14

**CPR PROMPT:**                          CPR PROMPT CORPORATION

                                         By: _____
                                         Name: _____
                                         Title: _____

                            *        *        *

## EXHIBIT A - LICENSED PATENTS

U.S. Patent No. 4,583,524

U.S. Patent Application Ser. No. _____

Canadian Patent No. _____

## EXHIBIT C - TOOLING, INVENTORY AND OTHER MATERIALS

1.    **TOOLING**

2.    **INVENTORY**

3.    **OTHER MATERIALS**

116351.2

## EXHIBIT B - MARKS

U.S. Registration No. 1,398,334 for CPR PROMPT

116951.2