UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD C. HUTCHINS ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action: 04-30126-MAP |
| v. ) | |
| ) | |
| CARDIAC SCIENCE, INC. ) | |
| ) | |
| Defendant ) | |
| ) | |

## PLAINTIFF'S EX PARTE, EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

The Plaintiff, Donald C. Hutchins respectfully requests that this Honorable Court grant Plaintiff an Ex Parte, Emergency Motion for Temporary Restraining Order. In support thereof, the Plaintiff submits the attached Memorandum in Support of the Plaintiff's Motion for an Ex Parte Motion for a Temporary Restraining Order.

A proposed Order is attached hereto.

                                    The Plaintiff
                                    Donald C. Hutchins, Pro Se

                                    _____
                                    1047 Longmeadow Street
                                    Longmeadow, Massachusetts 01106
                                    (413) 567-0606

Dated: August 18, 2004

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONALD C. HUTCHINS ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action: 04-30126-MAP |
| v. ) | |
| ) | |
| CARDIAC SCIENCE, INC. ) | |
| ) | |
| Defendant ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EX PARTE, EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

The Plaintiff, Donald C. Hutchins files this memorandum in support of the Plaintiff's Ex Parte, Emergency Motion for a Temporary Restraining Order.

**I.   SUMMARY OF POSITION**

As a publicly traded corporation Cardiac Science, Inc. ("Cardiac Science") is obligated to file an Annual Report ("Form 10-K") under Section 13 of the Securities Exchange Act of 1934. The Cardiac Science Form 10-K Report attached herein as Exhibit #1 is published on the Securities and Exchange Commission web site. Raymond W. Cohen, CEO and Chairman of Cardiac Science signed this Form 10-K and attests,

"On October 21, 2003, the Company acquired substantially all the assets and certain liabilities of Cleveland-based Complient Corporation, a privately-held company that is the nation's leading independent provider of AED and CPR training and comprehensive AED program management. As consideration, the Company issued to Complient 10,250,000 shares of its common stock. The common stock is subject to a lock-up agreement and a general indemnification escrow. The resale of the shares will be registered with the SEC and 1,325,000 shares will become available for resale on the effective date of the registration statement. The balance of the shares issued are subject to a "lock-up" agreement pursuant to which they will be released from the "lock-up" in

12 equal monthly installments of 743,750 shares, beginning on the effective date of the registration statement."

The SEC web site also contains a Prospectus for this transfer of stock to Complient attached herein as Exhibit 2. The Prospectus clearly specifies Complient's plan of liquidation and dissolution. With the liquidation of the Complient Corporation the Prospectus directs the distribution of the Cardiac Science common stock to over 60 Complient shareholders effectively ending the existence of Complient.

10 of the 12 "lock-up" installments have already been dispersed to the Complient shareholders. The last two disbursements will be released from the "lock-up" trust in the months of August and September 2004. It is imperative that the Court order Cardiac Science and the "lock-up" trustee under it's control to cease further disbursements of Cardiac Science common stock to Complient shareholders pending resolution of Civil Action: 04-30126-MAP.

A review of the facts shows that irreparable harm to Hutchins far outweighs any harm that may be suffered by Cardiac Science. Such "lock-up" agreements are intended to protect all parties involved in mergers and acquisitions in the event of unforeseen contingencies such as this patent action.

## II. FACTS

Donald C. Hutchins ("Hutchins") filed a Complaint in this Court against Cardiac Science, Inc. on July 2, 2004. Cardiac Science has not answered the Complaint, however Attorney Randall T. Skaar, who is representing Cardiac Science, has stated that the Answer from Cardiac Science is being prepared. During previous discussions with

Hutchins, Attorney Skaar has recognized that Hutchins' position has merit, and suggested that the patent issues can be negotiated.

Counts III, IV, V and VI of the Complaint involve the sale of Complient Corporation to Cardiac Science. Attorney Skaar did not participate in the due diligence activity for the Cardiac Science purchase of Complient and is unfamiliar with the obligations of the parties under the Purchase Agreement. He has acknowledged that statements about Hutchins and Hutchins' intellectual properties are included as part of the Cardiac Science/Complient Purchase Agreement.

Paragraph 51 in Count IV of Hutchins' Complaint states,

"When the payment of the $47,000,000 acquisition cost is paid by Cardiac Science to Complient stockholders it will be impossible for Hutchins to chase down every one of these stockholders to recover his 7-1/2% share from each of them. Therefore it is incumbent upon Cardiac Science to retain sufficient funds from the stock transfer trust account to pay Hutchins this 7-1/2%. If this trust account is depleted, the Cardiac Science management must search-out each Complient investor to reclaim the funds owed to Hutchins."

The Cardiac Science Form 10-K (Exhibit 1) discloses that Cardiac Science lost money in each of the past five years and is low on working capital. Their independent auditor, *Price, Waterhouse, Coopers, LLP,* reports, "the Company has suffered recurring losses from operations which raises substantial doubt about the Company's ability to continue as a going concern."

Hutchins is faced with the certainty that Complient Corporation is being dissolved after the last two "lock-up" installments are paid. The auditors indicate that Cardiac Science would be hard pressed to pay damages to Hutchins. It will be impossible for Hutchins to collect from the over 60 individual Complient investors. The only logical source of funds remains as the last two installments in the "lock-up" account. This

3

common stock does not belong to Cardiac Science. It is locked up to underwrite contingent liabilities such as this Action.

## III. ARGUMENT

### A. Hutchins is Entitled to Injunctive Relief

The standard used to consider a request for a temporary restraining order is the same as that used for a preliminary injunction. See Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 640 F.Supp. 1159,1160 (D.Mass.1986). To issue injunctive relief correctly, a judge initially must consider whether the plaintiff has demonstrated that without the relief he would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass, 6117 n. 11 (1980). The Plaintiff also must show that there is a likelihood that he would prevail on the merits of the case at trial. See id. The judge then must balance these two factors against the showing of irreparable harm which would ensue from the issuance, or the denial, of an injunction and the 'chance of success on the merits' presented by the defendant. See id. at 617. An injunction may issue properly only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of the chances of success on his claim, outweigh[s] the defendant's probable harm and likelihood of prevailing on the merits of the case." See Commonwealth v. Mass. CRINC, 392 Mass. 79,87-88 (1984).

In support of the Plaintiff's Motion, the Plaintiff will show that he is entitled to injunctive relief as he can demonstrate 1) a likelihood of success on the merits; 2) a risk of irreparable harm; and 3) the potential harm to the plaintiff outweighs the potential harm to the defendant. See Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609,616-617(1980).

4

1. **<u>Hutchins is likely to succeed on the merits of the case</u>.**

   As outlined above, the defendant in this case, Cardiac Science, owed a duty to Hutchins to use due diligence in the purchase of his intellectual properties as part of the purchase of Complient. Cardiac Science was negligent in not reading or understanding the Patent License Agreement. Hutchins is likely to succeed on the merits of the case. The only question is whether Cardiac Science, Complient or the Complient investors are liable to Hutchins. Resolution of this Action and payment of damages will be much easier if the remaining installments are available in the "lock-up" trust.

2. **<u>There is a great risk of irreparable harm if Hutchins' request for a temporary restraining order is denied.</u>**

   If the plaintiff, Hutchins, is not granted the relief that has been requested, he will suffer irreparable harm. If the Court's restraining order is either denied or delayed, all the common stock involved in the Complient purchase will be disbursed. As a consequence, Hutchins will be unable to retrieve damages from the 60 individual stockholders. Complient Corporation will be dissolved. The only possible relief could come from a judgment for damages against Cardiac Science. Unfortunately for Hutchins, *Price, Waterhouse* questions if Cardiac Science will continue to be an ongoing concern.

3. **<u>The potential harm to Cardiac Science is outweighed by the potential harm to the Plaintiff.</u>**

   The action sought by Hutchins will not harm the Defendant in any way. A review of the facts will show that irreparable harm to Hutchins far outweighs any harm that may be suffered by Cardiac Science. This Court Order will give Cardiac Science the time and opportunity to review the due diligence in conjunction with Complient. A fresh look

5

should furnish both Complient as seller and Cardiac Science as buyer, the opportunity to meet the obligations to Hutchins as found in the Patent License Agreement. Such action should remove any concerns that might arise before the Security and Exchange Commission. It will also help prevent future litigation between the parties and investors such as Massachusetts Mutual that recently participated in Cardiac Science's latest Private Offering.

The sworn Affidavit of Donald C. Hutchins attesting to these facts is included herein as Exhibit #3.

## CONCLUSION

For all of the foregoing reasons, the Plaintiff's Motion for an Ex Parte, Emergency Temporary Restraining Order should be granted.

The Plaintiff<br>
Donald C. Hutchins, Pro Se<br>
<br>
_____<br>
1047 Longmeadow Street<br>
Longmeadow, Massachusetts 01106<br>
(413) 567-0606

Dated: August 18, 2004

**EXHIBIT "1"**

Case 3:04-cv-30126-MAP     Document 7     Filed 08/18/2004     Page 8 of 15

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ Annual Report Under Section 13 or 15(d) of The Securities Exchange Act of 1934

For the fiscal Year Ended December 31, 2003

**OR**

☐ Transition Report Under Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission File Number 0-19567

# CARDIAC SCIENCE, INC.
(Exact Name of registrant as specified in its Charter)

| Delaware | 33-0465681 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1900 Main Street, Suite 700, Irvine, CA 92614**
(Address of Principal Executive Offices) (Zip Code)

Issuer's telephone number (949) 797-3800

Securities registered under Section 12(b) of the Exchange Act:

None.

Securities registered under Section 12(g) of the Exchange Act:

**Common Stock, $0.001 Par Value**
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days:  Yes ☒  No ☐

Indicate by check mark if there is no disclosure of delinquent filers pursuant to Item 405 of Regulation S-K contained in this form, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K: ☒

Indicate by check mark if the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).  Yes ☒  No ☐

Table of Contents

## ITEM 6. SELECTED FINANCIAL DATA.

The following selected financial information is derived from our consolidated financial statements. You should read this summary financial information in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Consolidated Financial Statements and related notes.

**Statement of Operations Data:**
**(In thousands, except share and per share data)**

|  | For the Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2001 | 2000 | 1999 |
| Net revenue | $ 61,982 | $ 50,043 | $ 10,651 | $ 4,242 | $ 103 |
| Gross profit | 33,439 | 25,306 | 2,676 | 417 | 5 |
| Gross profit % | 54% | 51% | 25% | 10% | 5% |
| Operating expenses: | | | | | |
|   Sales and marketing | 18,616 | 17,325 | 8,972 | 4,371 | 1,370 |
|   Research and development | 5,538 | 6,053 | 8,575 | 8,248 | 4,406 |
|   General and administrative | 14,720 | 11,474 | 6,935 | 5,159 | 1,853 |
|   Acquired in-process research and development | — | — | — | 13,587 | — |
|   Amortization of goodwill and intangibles | 1,656 | 2,111 | 1,740 | 1,063 | — |
|   Amortization of restricted stock | — | — | — | 1,551 | — |
|   Impairment of assets | — | — | 1,438 | — | — |
|   Gain on Settlement | — | (832) | — | — | — |
|     Total Operating Expenses | 40,530 | 36,131 | 27,660 | 33,979 | 7,629 |
| Loss from operations | (7,091) | (10,825) | (24,984) | (33,562) | (7,624) |
| Interest income (expense), net | (5,891) | (4,142) | (538) | 618 | 21 |
| Loss on sale of marketable securities | — | — | (707) | — | — |
| Minority interest in (income) loss of subsidiary | (48) | (33) | 16 | — | — |
| Loss in unconsolidated affiliate | — | — | — | — | (115) |
| Provision for income taxes | — | — | (2) | (2) | (2) |
|  | (5,939) | (4,175) | (1,231) | 616 | (96) |
| Loss from continuing operations | (13,030) | (15,000) | (26,215) | (32,946) | (7,720) |
| Income (loss) from discontinued operations | 493 | (52) | — | — | — |
| Net loss | $(12,537) | $(15,052) | $(26,215) | $(32,946) | $(7,720) |
| Basic and diluted loss per share: | | | | | |
|   Continuing operations | $ (0.19) | $ (0.22) | $ (0.78) | $ (1.82) | $ (0.85) |
|   Discontinued operations | 0.01 | — | — | — | — |

Table of Contents

# REPORT OF INDEPENDENT AUDITOR

The Board of Directors and Stockholders
Cardiac Science, Inc.
Irvine, California

In our opinion, the consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of Cardiac Science, Inc. and Subsidiaries (the "Company") at December 31, 2003 and 2002 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 3 to the consolidated financial statements, the Company adopted the provisions of Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets." Accordingly effective January 1, 2002, the Company ceased amortization of its goodwill.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2, the Company has suffered recurring losses from operations which raises substantial doubt about the Company's ability to continue as a going concern. Management's plans with regard to this matter are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ PRICEWATERHOUSECOOPERS LLP

PricewaterhouseCoopers LLP
Orange County, California
February 27, 2004 (except for Note 23, as to which the date is March 15, 2004)

33

Table of Contents

## CARDIAC SCIENCE, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(In thousands, except share and per share data)

### 1. Organization and Description of the Business

Cardiac Science, Inc. (the "Company") was incorporated in May 1991 and develops, manufactures and markets portable public access defibrillators and a fully-automatic in-hospital bedside defibrillator-monitor that continuously monitors cardiac patients, instantly detects the onset of life-threatening abnormal heart rhythms, and, when appropriate, delivers defibrillation shocks within seconds and without human intervention to convert the heart back to its normal rhythm. The Company's core technology platform consists of its proprietary arrhythmia detection and discrimination software ("RHYTHMx®"), which is combined with its proprietary STAR® Biphasic defibrillation hardware and electrode technology to create the only fully automatic in-hospital cardioverter defibrillator (the "Powerheart® CRM®" or "CRM") and a unique semi-automatic, or automated defibrillator, (the "Powerheart AED" or "AED") for use in out-of-hospital settings. The Company's Powerheart® Cardiac Rhythm Module™ and Powerheart® brand AEDs along with Diascope G2® patient monitoring products are marketed by its direct sales force and distribution network in the United States and by international distributors around the world.

On July 1, 2000, the Company acquired Cadent Medical Corporation, a privately held company, for an aggregate of 4,500,000 shares of the Company's common stock.

On September 26, 2001, the Company acquired Survivalink Corporation, a privately held company, for $10,500 in cash, $25,800 in senior secured promissory notes, and 18,150,000 shares of the Company's common stock.

On November 30, 2001, the Company acquired 94.7% of Artema Medical AB and Subsidiaries ("Artema") for 4,150,975 shares of common stock and approximately $215 in cash. During 2003, the Company acquired the remaining minority interest for $843 in cash. On September 1, 2003, the Company transferred ownership of the shares in Cardiac Science International A/S, its Danish operations and a subsidiary of Artema, from Artema to Cardiac Science, Inc. in exchange for forgiveness of intercompany debt. Then on September 21, 2003, the Company sold 100% of its shares in Artema to an outside party for $600 in cash.

On May 29, 2003, the Company acquired Lifetec Medical Limited, its U.K. distributor, for $383 in cash.

On October 21, 2003, the Company acquired substantially all of the assets and liabilities of Complient Corporation, a privately held company, for 10,250,000 shares of the Company's common stock.

### 2. Continued Existence

Based on achieving its internal revenue growth targets, the Company believes its current cash balances, combined with net cash that it expects to generate from operations, will sustain its ongoing operations for at least twelve months. In the event that the Company requires additional cash to support its operations during the next twelve months, it will attempt to raise the required capital through either debt or equity arrangements. The Company cannot provide any assurance that the required capital will be available on acceptable terms, if at all, or that any financing activity will not be dilutive to current stockholders of the Company. If the Company is not able to raise additional funds, it may be required to significantly curtail its operations and this would have an adverse effect on its financial position, results of operations and cash flows.

### 3. Summary of Significant Accounting Policies

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly-owned and majority-owned subsidiaries. All inter-company accounts and transactions have been eliminated in consolidation.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management

Table of Contents

### 6. Other Assets

In July 2002, the Company entered into preliminary negotiations regarding a possible transaction with Medical Research Laboratories, Inc. ("MRL"), a privately-held medical device manufacturer. The Company made an initial investment in the common stock of the manufacturer in the amount of $1,000 and placed $2,001 into an escrow account pending the outcome of further negotiations. On December 3, 2002, the Company filed a Complaint in Orange County Superior Court against Medical Research Laboratories, Inc. ("MRL") alleging declaratory relief and breach of contract arising out of a July 29, 2002 letter of intent entered into between the parties. The Company alleged that MRL failed to comply with certain conditions of closing set forth in the letter of intent whereby the Company would acquire all of MRL's stock. MRL filed a cross-complaint, also seeking breach of contract and declaratory relief arising out of the same letter of intent. On February 25, 2003, the Company filed suit against MRL for patent infringement in the United States District Court for the District of Minnesota. The Company alleged that MRL's LifeQuest JumpStart AED infringed the Company's patented disposable electrode pre-connect technology. The Company settled both law suits with MRL on June 24, 2003. Under the terms of the confidential settlement agreement, the Company received a settlement amount from MRL and MRL received the right to license two of the Company's patents for additional royalties.

On December 18, 2000, the Company entered into a non-binding letter of intent to acquire Inovise Medical, Inc., a privately held Oregon based corporation, which potential acquisition was terminated in February 2001. In connection with this proposed transaction, the Company advanced funds for a bridge loan to support working capital requirements. The bridge loan was collateralized by all assets of Inovise, excluding certain receivables from royalty payments, accrued interest at 6% and was convertible into equity of Inovise. The total amount advanced to Inovise was $1,038. In February 2002, the Company's convertible bridge loan was converted into 13,000,000 shares of Inovise's Series D convertible preferred stock. As there is currently no market for these shares and there is no foreseeable recovery of the initial investment, the Company has determined that these shares have no value. Accordingly, the Company was fully reserved for this investment at December 31, 2003 and 2002.

### 7. Accrued Expenses

Accrued expenses consist of the following as of December 31:

|                                                   | 2003    | 2002    |
|---------------------------------------------------|---------|---------|
| Accrued warranty                                  | $ 836   | $1,604  |
| Accrued commissions                               | 961     | 694     |
| Accrued lease obligations and deferred rent       | 1,895   | —       |
| Accrued plant closure cost and severances         | 209     | 2,122   |
| Accrued accounts receivable factoring costs       | —       | 366     |
| Accrued bonus                                     | 315     | 360     |
| Accrued vacation and payroll tax                  | 965     | 716     |
| Accrued other expenses                            | 1,361   | 1,326   |
|                                                   | $6,542  | $7,188  |

### 8. Business Combinations

*Complient Corporation*

On October 21, 2003, the Company acquired substantially all of the assets and certain liabilities of Cleveland-based Complient Corporation, a privately-held company that is the nation's leading independent provider of AED and CPR training and comprehensive AED program management. As consideration, the Company issued to Complient 10,250,000 shares of its

46

Table of Contents

common stock. The common stock is subject to a lock-up agreement and a general indemnification escrow. The resale of the shares will be registered with the Securities and Exchange Commission and 1,325,000 shares will become available for resale on the effective date of the registration statement. The balance of the shares issued are subject to a lock-up agreement pursuant to which they will be released from the "lock-up" in 12 equal monthly installments of 743,750 shares, beginning on the effective date of the registration statement.

The acquisition was accounted for as a purchase under SFAS No. 141, *Business Combinations*. In accordance with SFAS No. 141, the Company allocated the purchase price based on the fair value of the assets acquired and liabilities assumed. Portions of the purchase price, including intangible assets, were identified by an independent appraiser. These intangible assets include approximately $42.5 million for goodwill, $2.9 million in customer relationships, $726 for covenants not to compete, and $128 for custom-developed software. The customer relationships are being amortized over 7 years, and the covenants not to compete and the software are being amortized over 3 years.

The components of the purchase price allocation are as follows:

| | |
|---|---:|
| Purchase Price: | |
| Stock consideration (10,250,000 shares @ $4.42/share) | $45,305 |
| Acquisition costs | 894 |
| Total | $46,199 |
| | |
| Allocation of Purchase Price: | |
| Current assets | $ 2,569 |
| Property and equipment, net | 2,685 |
| Current liabilities | (3,053) |
| Deferred revenue | (2,257) |
| Customer relationships | 2,907 |
| Covenants not to compete | 726 |
| Software | 128 |
| Goodwill | 42,494 |
| Total | $46,199 |

The following unaudited pro forma data summarizes the results of operations for the periods indicated as if the Complient acquisition had been completed as of the beginning of the periods presented. The pro forma data gives effect to actual operating results prior to the acquisition, adjusted to include the pro forma effect of amortization of identified intangible assets and the elimination of sales to Complient prior to the acquisition.

| | 2003 | 2002 |
|---|---:|---:|
| | (unaudited) | |
| Net sales | $ 70,069 | $ 62,629 |
| Net loss | $ (15,493) | $ (20,061) |
| Pro forma net loss per share (basic and diluted) | $ (0.20) | $ (0.26) |
| Pro forma weighted-averaged shares | 78,104,179 | 77,449,419 |

*Lifetec Medical Limited*

On May 29, 2003, the Company acquired Lifetec Medical Limited, its U.K. distributor. The purchase price was $383 in cash and $61 in acquisition costs. The acquisition was accounted for as a purchase under SFAS No. 141. The Company allocated the purchase price based on the fair value of the assets and liabilities assumed. Current assets acquired were valued at

Table of Contents

## SIGNATURES

PURSUANT TO THE REQUIREMENTS OF SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934, THE REGISTRANT HAS DULY CAUSED THIS REPORT TO BE SIGNED ON ITS BEHALF BY THE UNDERSIGNED, THEREUNTO DULY AUTHORIZED.

CARDIAC SCIENCE, INC.

By: /s/ RAYMOND W. COHEN

Raymond W. Cohen
Chairman & Chief Executive Officer

By: /s/ RODERICK DE GREEF

Roderick de Greef
Chief Financial Officer & Secretary
(Principal Financial and Accounting Officer)

## POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints each of Raymond W. Cohen and Roderick de Greef as his attorney-in-fact, with full power of substitution, in any and all capacities, to sign any amendments to this Form 10-K, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each attorney-in-fact, or his substitute, may do or cause to be done by virtue hereof.

Date: March 15, 2004

PURSUANT TO THE REQUIREMENTS OF THE SECURITIES EXCHANGE ACT OF 1934, THIS REPORT HAS BEEN SIGNED BELOW BY THE FOLLOWING PERSONS ON BEHALF OF THE REGISTRANT AND IN THE CAPACITIES AND ON THE DATES INDICATED.

| Signature | Title | Date |
|---|---|---|
| /s/ RAYMOND W. COHEN<br>Raymond W. Cohen | Director | March 15, 2004 |
| /s/ RAY E. NEWTON, III<br>Ray E. Newton, III | Director | March 15, 2004 |
| /s/ PETER CROSBY<br>Peter Crosby | Director | March 15, 2004 |
| /s/ HOWARD L. EVERS<br>Howard Evers | Director | March 15, 2004 |