*Filed 12/22/*

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD C. HUTCHINS )<br><br>    Plaintiff )<br>              )<br>v.                 )<br>              )<br>CARDIAC SCIENCE, INC. )<br>    and          )<br>              )<br>COMPLIENT CORPORATION )<br>              )<br>    Defendants )| Civil Action 04-30126-MAP |

## AMENDED COMPLAINT
## PER ENDORSED ORDER entered 11/18/2004

### Parties

1.)     The plaintiff, Donald C. Hutchins ("Hutchins") is an individual residing at 1047

Longmeadow Street, Longmeadow, Hamden County, Massachusetts and a citizen of the

United States.

2.)     The defendant, Cardiac Science, Inc. ("Cardiac Science") is incorporated in the

State of Delaware with a principal place of business at 1900 Main Street, Suite 700,

Irvine, California 92614.

3.)     The defendant, Complient Corporation ("Complient") is joined to this action per

ENDORSED ORDER entered 11/18/2004.  The Complient Corporation is incorporated

in the State of Delaware.  There is no place of business listing by the State of Ohio.  The

given address is Complient Corporation, c/o Calfee, Halter & Griswold LLP, 1400

McDonald Investment Center, 800 Superior Avenue, Cleveland, Ohio 44114-2688,
Attention: Gerald A. Monroe, Esq.

The Complient Corporation's plan of liquidation and dissolution pursuant to an
instrument dated January 20, 2004 indicates that certain stockholders are beneficiaries as
listed in a *Cardiac Science Prospectus Supplement No. 1* herein attached as Exhibit M.
These listed Beneficiaries are enjoined as Defendants as successors to Complient.

CPR LLP is a limited partnership organized in the State of Ohio. CPR LLP has no
"place of business" listing by the State of Ohio. The given address for CPR LLP is, c/o
Calfee, Halter & Griswold LLP, 1400 McDonald Investment Center, 800 Superior
Avenue, Cleveland, Ohio 44114-2688, Attention: Gerald A. Monroe, Esq. The
Complient Corporation claims a 99% ownership interest in CPR LLP. As a result CPR
LLP is not an independent entity and its financial records must be joined to the
Complient Corporation.

### Jurisdiction

4.)    The court has jurisdiction over this matter pursuant to Section 271 U.S.C.

5.)    Hutchins lives in Longmeadow, Massachusetts and is a citizen of the United States.

6.)    Cardiac Science Inc. is a corporation with its headquarters in Irvine, California.

7.)    The Complient Corporation is in the state of dissolution and the predecessor to
Cardiac in marketing CPR Prompt products through the Channing Bete Company/
Distributor of American Heart Association Products. The Channing Bete Company is a
Massachusetts company headquartered at One Community Place, South Deerfield, MA
01373.

2

**Background**

8.)    On April 22, 1986 Hutchins was issued U.S. Patent Number 4,583,524-titled

"CARDIOPULMONARY RESUSCITATION PROMPTING" attached herein as part of

Exhibit A.

9.)    On November 29, 1994 Hutchins was issued U.S. Reissued Patent Number

Re.34,800-titled "CARDIOPULMONARY RESUSCITATION PROMPTING" attached

herein as part of Exhibit B  The Patent ABSTRACT states in part, "A portable, self

powered electronic cardiopulmonary resuscitation prompting system. . . ." This Reissue

Patent Number Re.34,800 is a reissue of Hutchins' original Patent Number 4,583,524.

Patent Numbers 4,583,524 and Re.34,800 can be found on over 300,000 CPR Prompting

devises that have been marketed since 1984 and continue today as the standard of the

industry.

10.) On June 22, 1999 Hutchins was issued U.S. Patent Number 5,913,685-titled "CPR

Computer Aiding" attached herein as part of Exhibit C  The Patent ABSTRACT states in

part, "a processing unit responsive to the information signals and for providing output

signals representative of proper steps to be taken in resuscitating the victim . . ."

11.) In 1985 Donald C. Hutchins was issued Copyright Registration Number TXu-210-

208 that covered the script and word list for "CPR-PROMPT," 1V. and Copyright

Registration Number TXu-859 – that covers the assembler software program for "CPR-

PROMPT," Rev. 1.0 by the U.S. Copyright Office at the Library of Congress.  These

copyrights are Hutchins' property and have never been licensed to any entity for use

without Hutchins' consent.

12.) On June 24, 1986 the United States Patent and Trademark Office registered the trademark "CPR PROMPT" in the name of Donald C. Hutchins attached herein as Exhibit D.

13.) In May of 2004 Hutchins realized that he had received no royalty payments or reports from The Complient Corporation ("Complient") since late summer in 2003. When he telephoned the Complient headquarters he learned that Complient had closed its operation.

14.) Hutchins was advised by the law office of Fish & Richardson that Complient had also failed to pay the most recent patent fees to Fish & Richardson as they had done on a regular basis since 1995. The accounts receivable department of Fish & Richardson determined that Complient was no longer in business and suggested that Hutchins pay the fees so the patents would not lapse. It was evident that Complient had abandoned the intellectual properties they had licensed from Hutchins as successor to County Line Limited and that the properties could be reclaimed by Hutchins.

15.) After learning that Complient was no longer in business, Hutchins made several efforts to contact Complient to reclaim his intellectual properties, marketing materials and tooling under terms of the June 1, 1994 License Agreement. There is no longer a listing for Complient in the Cleveland area and all notices from Hutchins to Complient management were left unanswered. At this point Hutchins had no recourse but to declare his intellectual properties abandoned by the Jon Lindseth group, reclaim them as specified in the Agreement and discuss licensing these properties to the Zoll Corporation.

16.) On April 29, 2004 Hutchins received a phone call from Attorney Randall T. Skaar who stated that he was a patent attorney representing Cardiac Science, Inc. Attorney

4

Skaar said that Mr. William Parker had filed a patent infringement against Cardiac
Science that involved patents that Hutchins had licensed to Complient Corporation. He
followed the telephone conversation with a letter he sent the next day herein attached as
Exhibit E.

17.)  Hutchins had received no notification from Complient about the acquisition by
Cardiac Science and was told by his patent attorneys that Complient had abandoned his
patents, trademarks, and copyrights. Hutchins learned that since November of 2003
Cardiac Science has been and continues to manufacture and sell products covered by
Hutchins' patents and is using the CPR Prompt® trademark on goods that it markets. As
a result Cardiac Science is infringing on these patents and trademark.

18.)  Hutchins telephoned the Channing Bete Company/ Distributor of American Heart
Association Products. The Channing Bete Company is a Massachusetts company
headquartered at One Community Place, South Deerfield, MA 01373. Channing Bete
confirmed that since November of 2003 the CPR Prompt® product line had been
manufactured and marketed by the Cardiac Science company of Irvine, CA. as disclosed
on a printout of their web site herein attached as Exhibit F.

19.)  Attorney Skaar sent e-mail attachments to Hutchins herein attached as Exhibit G
that showed that Cardiac Science expected to use Hutchins' Patent #5,913,685. Cardiac
Science has no legal claim to this patent. Its use by Cardiac Science would also infringe
on Hutchins' properties. At the same time Attorney Skaar said that he knew of no patent
attorney that had done due diligence on the Complient/Cardiac Science acquisition.

20.)  Searches on the Internet provided Hutchins with press releases, security analyst
reports, and Security and Exchange Commission Forms 8-K and 10-K that conveyed

terms of the acquisition.  A report from Wedbush Securities contained herein as Exhibit

H condenses terms of the acquisition with these words, "Last week (October 21, 2003)

Cardiac Science announced the acquisition of privately-held Complient Corporation for

$47 million using 10.25 million shares of common stock."

21.)  Hutchins developed and contracted with Texas Instruments, Inc. to manufacture the

CPR Prompt® in the early 1980s.  Realizing that he lacked the financial resources to

bring a consumer model of the CPR Prompt® devise to market, Hutchins negotiated with

a venture capitalist, Jon Lindseth, to license and develop a consumer version of CPR

Prompt®.

22.)  While Jon Lindseth operates a privately owned Cleveland company named Kindt-

Collins, he became better known through his success with two ventures that he founded,

the *Interplak* toothbrush and *Thermoscan* thermometer.  *Interplak*, under the corporate

name, Dental Research, sold to Bausch & Lomb in 1988 for $133 million dollars and

*Thermoscan* to *Gillette* for an estimated $178 million dollars around 1993.

23.)  Jon Lindseth suggested that he would start a new company and raise $14 million, as

the minimum investment needed to bring CPR Prompt® to the consumer market.  Jon's

son, Steve Lindseth would manage this new venture that the Lindseths predicted could

exceed the success Jon had with *Interplak* and *Thermoscan*.

24.)  Negotiations with Steve Lindseth to license Hutchins' Patents for a consumer

version of CPR Prompt® came to an impasse in February of 1994, because Steve wanted

to pay a very low royalty percentage of 2%.  A week after Hutchins ended negotiations,

Jon and Steve called to re-open negotiations.  Jon explained that the Lindseth's success

with products like *Interplak* and *Thermoscan* came upon exiting the projects.  Their plan

6

would be to build a company around CPR Prompt®, develop the market and divest with

an IPO or sale in about three years.

25.) While Jon Lindseth wanted to retain the low 2% royalty, he sweetened the deal by

offering Hutchins and Hutchins' CPR Prompt Corporation 7-1/2% of the receipts when

the venture was sold or went public as an IPO. If the new company had the same success

as *Thermoscan* and *Interplak*, the share for the CPR Prompt Corporation and Hutchins

could equal over $10 million. Jon said that this was the first time they had ever offered a

patent owner participation in their exit strategy. He was willing to do the 7-1/2% deal if

the royalty payments were low and the Lindseths took total control of the US and foreign

patents and the "CPR Prompt®" trademark.

26.) Hutchins agreed to the 7-1/2% deal and Jon Lindseth communicated the terms to his

attorney, Mark Kaufman of Southland, Asbill and Brennan of Atlanta, Georgia. On May

17, 1994, Attorney Kaufman sent a first draft of the Agreement to Attorney Gary

Martinelli and Hutchins. This draft, attached herein as Exhibit I, correctly stated the

terms that Jon Lindseth and Hutchins had negotiated earlier. Paragraph 3:10 states:

> **"3:10    LICENSEE will cause each shareholder of LICENSEE who
> purchases common stock of LICENSEE directly from LICENSEE to
> agree to pay to LICENSOR seven and one-half percent (7-1/2)
> of the net proceeds of any sale of any or all of such common
> stock to any person or entity which is not an Affiliate of
> such selling stockholder. . ."**

27.) Section 3.10 was later changed in a subsequent draft to accommodate the fact that

County Line Limited was a partnership that continued to include the bird feeder and

Christmas tree product lines. It was understood that County Line would eventually divest

itself from the bird feeder and Christmas tree stand products as separate companies and

build a new entity around CPR Prompt®. The 7-1/2% exit strategy would apply to that

new CPR Prompt® entity or continue to apply to County Line Limited and it successors if CPR Prompt® were not divested and remained with County Line Limited or its successors and affiliates.

28.)  Section 3.10 was changed in the final draft of the Agreement signed June 1, 1994 to accommodate the fact that County Line Limited was a partnership that continued to include the bird feeder and Christmas tree product lines.  Pending divestiture of the bird feeder and Christmas tree stand lines; Hutchins agreed to allow the Patents to be held in a separate entity.  When the divestiture occurred and CPR Prompt LLC succeeded County Line, the License Agreement would be held by and the 7-1/2% applied to the shareholders of CPR Prompt LLC.  When the Complient Corporation succeeded CPR Prompt LLC the same terms and exit strategy would apply to the new shareholders because all these companies were affiliates.

29.)  In 1995 Hutchins developed the consumer CPR 100 under contract to County Line Limited.  This model was marketed by County Line and the instruction and warrantee book carried the CPR Prompt Trademark, copyrights and the U.S., Canadian and European patents owned by Hutchins as herein attached as Exhibit J.

30.)  In September of 1994, Attorney Scott Wilson of Calfee, Halter and Griswold of Cleveland, Ohio sent a License Agreement to Attorney Martinelli requesting Hutchins' signature both as patent owner and as President of the CPR Prompt Corporation. Recognizing that this License Agreement was a fabrication that completely distorted the intention of section 3:10 and the 7-1/2% exit distribution formula, Attorney Martinelli advised against Hutchins signing or recognizing this Agreement.  Hutchins never signed or accepted the validity of the Agreement dated September 19, 1994.

8

31.) CPR Prompt LLC succeeded County Line Limited after County Line Limited

divested itself of the Christmas tree and bird feeder product lines. At that point, all the

products marketed by CPR Prompt Limited carried the CPR Prompt logo. CPR Prompt

LLC submitted the quarterly reports to Hutchins and paid the quarterly royalty payments

under terms of the License Agreement signed June 1, 1994. The original shareholders of

County Line Limited continued to participate as shareholders of CPR Prompt LLC.

32.) CPR Prompt LLC was succeeded by the Complient Corporation. The Complient

Corporation continued to assume the responsibilities for royalty payments and quarterly

reports to Hutchins (dba CPR Prompt Corporation) as per Exhibit K.

33.) On January 15, 2001 Attorney Gary Martinelli wrote a letter to Steven Lindseth, the

President of the Complient Corporation, that expressed concerns with the actions taken

by Lindseth that did not comply with the wording of the License Agreement dated June 1,

1994. The letter is herein attached as Exhibit N.

34.) In an unexpected and confrontational reply, on February 3, 2001, Lindseth engaged

the law firm of Calfee, Halter and Griswold to file a Demand for Arbitration listing

Donald C. Hutchins as a Respondent.

35.) While the issues stated in Attorney Martinelli's letter to Steven Lindseth were

addressed in Count I of the Demand, Count II of the Demand petitioned the arbitrators to

award the Lindseth party all rights to Hutchins' Patent No. 5913685. This Patent was

issued in 1999 and covered an invention that Jon Lindseth had been offered three years

earlier under terms of the License Agreement of 1994. Using written correspondence Jon

Lindseth declined to participate and suggested Hutchins file for what became Patent No.

5913685 on his own.

36.) The Lindseth controlled Claimant, CPR LLP had no legal right to Patent 5913685 and for 18 months since it was issued had shown no interest or made no claim for it. Count II was simply used as a stratagem to hammer Hutchins into submission so he would submit to the Claimant's demands found in Count I of the Demand for Arbitration.

37.) After reviewing the written evidence, herein attached as Exhibit P, that Jon Lindseth had declined any rights to the Patent, the arbitrators pressed CPR LLP for proof of their claims described in Count II of the Demand. When CPR LLP as Claimant failed to provide any evidence that supported their claims, the arbitrators realized that the Claimant had fabricated these allegations.

38.) In the month of October 2002, when the evidence pointed to the fact that the Claimant had no claim to Hutchins' Patent and the allegations contained in Count I were unfounded, the Claimant quietly abandoned the Demand for Arbitration.

39.) Hutchins has sold products, developed a valuable wireless product and negotiated license arrangements for Patent #5913685. He was appalled when Attorney Skaar E-mailed documentation that indicated that Complient had misled Cardiac Science into believing that Cardiac Science had purchased rights to this valuable Patent as part of the Asset Purchase Agreement.

40.) Using Hutchins' trademark, patents, copyrights and trade secrets as the primary asset, the Jon Lindseth group raised over $54 million in venture capital in various stages through the succession of County Line Limited, CPR Prompt LLC and Complient Corporation.

10

41.)  Using Hutchins' trademark, patents, copyrights and trade secrets as the primary
asset, the Jon Lindseth group in October 2003 was able to sell these assets to Cardiac
Science for a reported $47 million.

42.)  The $54 million in venture capital plus the $47 million from Cardiac Science
produced over $100 million in gross income for the Lindseth group.  The trademark,
patents, copyrights and trade secrets that he placed in the hands of the Lindseth group,
has returned nothing to Hutchins.

43.)  On June 5, 2004 Hutchins sent a letter to Cardiac Science's representative, Attorney
Randall Skaar, to inform Cardiac Science of the infringement, negligence and breach of
contract violations.  This effort by Hutchins to resolve these issues received no response
from Cardiac Science or Attorney Skaar.

44.)  These allegations are testified to and supported by an affidavit by Donald C.
Hutchins included herein as Exhibit L.

## Count I

(Copyright Infringement)

45.)    Hutchins adopts by reference the allegations of paragraphs 1 through 44.

46.)    The software design of the CPR Prompt® currently being sold by the Cardiac
Science, Inc. through Channing Bete and other distributors violates the Copyright Act of
1976 with the use of a series of images and voice commands originally created as
algorithms used for CPR Prompting software copyrighted by Hutchins as TXu-213-859.

47.)    Such terms as "Are you OK" and "Call for help" and graphic instructions
depicting proper compressions, opening of airways, chin lifts and breathing are identical

to the series of images created by Hutchins in his copyrighted material. The "script and word list" are covered by Hutchins' Copyright TXu-210-208.

48.)    Cardiac Science has used Hutchins' copyrighted expression in the CPR Prompt® units that they are currently distributing in violation of the Copyright Act of 1976. Cardiac Science engineers knew of Hutchins' speech and graphic CPR prompting software because this software has controlled over 300,000 *CPR Prompt*® units that have been sold in the past 18 years.

## Count II

### (Patent Infringement by Means of Sales)

49.)    Hutchins adopts by reference the allegations of paragraphs 1 through 48.

50.)    Cardiac Science has not licensed or sub-licensed any intellectual properties from Hutchins.

51.)    Hutchins has not agreed to any transfer of his intellectual properties to Cardiac Science by Complient or any other licensee of Hutchins' intellectual properties.

52.)    Cardiac Science has infringed Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 of Patent RE 34,800 through the illegal sale of CPR Prompt® units not authorized by Hutchins as patent owner.

## Count III

### (Patent Infringement by Means of Manufacture)

53.)    Hutchins adopts by reference the allegations of paragraphs 1 through 52.

54.)    Cardiac Science has infringed Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 of Patent RE 34,800 through the illegal manufacture of CPR Prompt® units not authorized by Hutchins as patent owner.

## Count IV

### (Fraud)

55.)    Hutchins adopts by reference the allegations of paragraphs 1 through 54.

56.)    The Complient Corporation fraudulently misrepresented the June 1, 1994 License Agreement between Country Line Limited and Hutchins to induce the asset sale to Cardiac Science through the use of false and unsigned documents to which Hutchins was not a party.

57.)    The Complient Corporation failed to notify Hutchins of the negotiations and sale of assets to Cardiac Science. Complient also failed to apply to Hutchins for permission to transfer Hutchins' intellectual properties to Cardiac Science as required under terms of the June 1, 1994 License Agreement.

58.)    Management of the Complient Corporation understood and an independent auditor has confirmed that the Complient Corporation at the time of the sale to Cardiac Science owned few fixed assets with any value. The asset sale value for the Complient Corporation was attributed to what the independent auditor for the transaction called, "good will." This "good will" was based primarily in Hutchins' CPR Prompt intellectual properties. Complient falsely represented to Cardiac Science that Hutchins' properties were under the control of CPR LLP and could be legally transferred to Cardiac Science. As a result Complient's managers were able to raise $47 million from the sale of these "good will" assets. The Complient stockholders will divide this $47 million derived from the asset sale when the transaction is completed and the Complient Corporation is dissolved

13

59.)    By fraudulently misleading Cardiac Science on the terms of the License Agreement dated June 1, 1994, the Complient Corporation has caused great financial damage to Hutchins. Hutchins has received no royalties due from Complient since the fall of 2003. Hutchins has received no payment due him by Complient through the asset sale to compensate for loss of his valuable intellectual properties.

60.)    The deceit of Complient is such that Hutchins has been forced to undertake the cost and effort of this legal action against Cardiac Science to regain his properties. When the Complient Corporation is dissolved, Hutchins will be forced to take legal action against over 60 Complient's stockholders to gain restitution.

**Count V**

(Fraudulent Misappropriation and Sale of Patent)

61.)    Hutchins adopts by reference the allegations of paragraphs 1 through 60.

62.)    The Complient Corporation deceived Cardiac Science to believe that Cardiac Science purchased rights to Hutchins' Patent No 5913685 as part of the Asset Purchase Agreement.

63.)    Neither the Complient Corporation, the Complient affiliates nor the Lindseths own or control Patent No. 5913685. These entities have misappropriated this Patent from Hutchins and attempted to sell it for their personal gain.

64.)    Complient's fraudulent act of misappropriation has forced Hutchins to defend his ownership rights. Prior to the asset sale to Cardiac Science, Hutchins was negotiating the sale of Patent No. 5913685 for over $3 million. The confusion created by Complient has deflated the value of Patent No. 5913685 as an asset that can be licensed or sold by Hutchins.

14

**Count VI**

(Abuse of Process)

65.)     Hutchins adopts by reference the allegations of paragraphs 1 through 64.

66.)     Defendant/Counterclaimant Cardiac Science's Counterclaims are intended to
intimidate Donald C. Hutchins, diminish his resources and destroy his will to defend his
intellectual properties.  As a consequence to this tortious behavior, Donald C. Hutchins
has no recourse but to amend his Complaint to answer Defendant's Counterclaims.

67.)     Should the Court accept the unfounded position, that Cardiac Science is the
successor to Complient in terms of the License Agreement dated June 1, 1994; the Court
should understand that Cardiac Science has not met and is not meeting the terms of that
contract.

68.)     Cardiac Science has not met the terms of the License Agreement dated June 1,
1994 with regard to royalty payments, minimum yearly payments, and quarterly reports
to Hutchins.

69.)     Cardiac Science has failed to pay patent fees to Fish & Richardson as Complient
and its predecessors have done since 1995.  Hutchins has been forced to accept this
burden to prevent having the patents lapse.

70.)     As the successor to Complient, Cardiac Science is responsible for guaranteeing
that the terms of the Agreement are being met.  In the event of a sale of the License to a
party not related to the Jon Lindseth group, the Agreement states that Hutchins will
receive 7-1/2 % of proceeds from the sale from each individual stockholder. This
obligation could easily be met by Cardiac Science by diverting 7-1/2% of the stock that
they are transferring to the Complient Corporation, to Hutchins. It is the responsibility of

15

Cardiac Science as the successor to County Line/CPR Prompt LLC and Complient to fulfill this obligation.

## Count VII

(Tortuous Interference with Contract)

71.)    Donald C. Hutchins adopts by reference the allegations of paragraphs 1 –70.

72.)    Defendant, Cardiac Science admits that it has filed a demand for indemnity to Complient pursuant to terms of the October 21, 2003 Asset Purchase Agreement.

73.)    With regard to the June 1, 1994 License Agreement, the letter from Stradling, Yocca, Cartlson & Rauth attached herein as Exhibit O, states, "As to Mr. Hutchins' first substantive point, the alleged "7-1/2% exit strategy" allegedly "negotiated by the Lindseths in 1994" does not touch or concern Cardiac Science."

74.)    Defendant, Cardiac Science has made no attempt to perform the due diligence that it should have performed prior to signing the October 21, 2003 Asset Purchase Agreement to determine the legitimacy of Hutchins' claims in the Complaint.

75.)    Paragraphs 1, 3, 4, 9, 11, 12, 15, 16, 18, 19, 20, 22, 23, 24, 25, 27, 29, 30, 31, 33, 38, and 58, of Defendant's Counterclaims contain allegations related to the Complient Corporation and the June 1, 1994 License Agreement. In each of these paragraphs Defendant Cardiac Science states that it is without sufficient knowledge and information to form a belief as to the truth of Hutchins' allegations.

76.)    Cardiac Science relies on the fabrications of Steven Lindseth and the Complient Corporation contained in the October 21, 2003 Asset Purchase Agreement rather than perform the due diligence required to discover the truth. Cardiac Science substitutes due

diligence with the answer that, "They are without sufficient knowledge and information to form a belief as to the truth of Hutchins' allegations."

77.)     When terms of the October 23, 2003 Asset Purchase Agreement are fulfilled and the stock diverted to the Complient stockholders, the Complient Corporation will be dissolved.

78.)     When the Complient Corporation is dissolved, Donald C. Hutchins will have no recourse to the $3,525,000 owed him under terms of the June 1, 1994 License Agreement. Realistically, the Court will recognize it is cost prohibitive and an impossible undertaking for Hutchins to chase down over 100 Complient stockholders after the Complient Corporation is dissolved.

79.)     The Defendant's Counterclaims as contained in paragraph 95 and its legal obstructions have delayed the Complient Corporation meeting its obligation to pay Hutchins $3,525,000 under terms of the June 1, 1994 License Agreement.

80.)     The Defendant, Cardiac Science owes a duty to Hutchins to investigate the June 1, 1994 License Agreement on which it relies in its Counterclaims rather than to respond with the statement that these matters do not "concern Cardiac Science."

81.)     Defendant's Counterclaims and delay tactics constitute a tortious interference with the June 1, 1994 License Agreement between Donald C. Hutchins and County Line Limited and its successor Complient Corporation.

## Count VIII

(Breach of Contract)

82.)     Hutchins adopts by reference the allegations of paragraphs 1 through 81.

83.)    Donald C. Hutchins and the Complient Corporation as successor to County Line Limited are both parties to the June 1, 1994 License Agreement.

84.)    The June 1, 1994 License Agreement carries specific instructions for the parties with regard to: Dispute resolution through the AAA; Abandonment of registrations and patents; Notification or transfer of intellectual properties; Sub-licensing; Payment of royalties; Quarterly reports; Return of properties to patent owner; Transfer of license between affiliated parties; Sale of License to foreign entities.

85.)    The Complient Corporation has never provided written notice to Donald C. Hutchins of the transfer of assets to Cardiac Science.

86.)    As we have learned during the Enron scandal, the partnership CPR L.P. established by Steven Lindseth is not an independent entity. CPR L.P. can not operate independently from Complient because under accounting and legal standards ownership by the Complient Corporation is 99%. This exceeds the 97%. limit required for an entity to claim independence.

87.)    Since September of 2003, the Complient Corporation has paid no royalties or sent any quarterly reports to Hutchins breaching the June 1, 1994 Agreement.

88.)    Since September of 2003 the Complient Corporation has paid no patent license fees as required by the June 1, 1994 Agreement.

89.)    The Complient Corporation has not paid the $10,000 minimum royalty payment to Hutchins breaching the June 1, 1994 Agreement.

90.)    The Complient Corporation has never provided Hutchins with written notice that it intended to close its Cleveland office and suspend its sales of Hutchins' licensed products in breach of the June 1, 1994 Contract.

18

91.)    The Complient Corporation as successor to County Line Limited did not notify

Hutchins of the existence and terms of the APA between Cardiac Science and Complient.

They did not notify Hutchins about the illegal transfer of Hutchins' properties to Cardiac

Science either prior to, during or after October of 2003 thereby breaching the June 1,

1994 Agreement.

92.)    Steven Lindseth and Complient are well aware that Section 3.10 of the June 1,

1994 Agreement entitles Hutchins to 7.5% of the return upon divestiture to a non-

affiliated party.

93.)    Reports filed with the Security and Exchange Commission indicate that Cardiac

Science paid a $47,000,000 acquisition price to the Complient Corporation.  As a result

Hutchins is due 7-1/2% of the proceeds, which equals $3,525,000.

94.)    As a result of this breach, Donald C. Hutchins has suffered damages in excess of

$3,525,000

        WHEREFORE, (Hutchins) prays that judgment be entered in his favor as

follows:

        (a)     On Count I, that a judgment be entered against the Defendant, Cardiac

                Science, Inc. in the sum of $270,000 plus interest and costs as fixed by the

                Court and that the Defendant, Cardiac Science Inc. be ordered to cease any

                further infringement of Hutchins' Copyrights.

        (b)     On Count II, that a judgment be entered against the Defendant, Cardiac

                Science, Inc. in the sum of $360,000 plus interest and costs as fixed by the

                Court and that the Defendant, Cardiac Science, Inc. be ordered to cease

                any further infringement of Hutchins' Patents RE 34,800 and 5,913,685.

(c)     On Count III, that a judgment be entered against the Defendant, Cardiac Science, Inc. in the sum of $360,000 plus interest and costs as fixed by the Court and that the Defendant be ordered to cease any further infringement of Hutchins' Patents RE 34,800 and 5,913,685.

(d)     On Count IV, that a judgment be entered against the Defendant, Complient Corporation and its affiliates and stockholders for damages in the sum of $2,400,000 plus interest and costs as fixed by the Court.

(e)     On Count V, that a judgment be entered against the Defendant, Complient Corporation and its affiliates and stockholders for damages in the sum of $3,000,000 plus interest and costs as fixed by the Court.

(f)     On Count VI, that a judgment be entered to Dismiss Defendant, Cardiac Science's Counterclaims with prejudice.

(g)     On Count VII, that a judgment be entered against the Defendant, Cardiac Science, Inc. ordering Cardiac Science to transfer 768,750 shares of Cardiac Science stock from the Cardiac Science treasury stock account to the account of Donald C. Hutchins. 768,750 shares represent 7-1/2% of the 10,250,000 shares allocated to the Complient Corporation stockholder as part of the APA Agreement.

(h)     On Count VIII, that a judgment be entered against Defendant Complient Corporation and its affiliates and stockholders for damages in the sum of $3,525,000 plus interest and costs as fixed by the Court. This figure represents 7-1/2% of the proceeds of the asset sale to Cardiac Science.