IP Summary for Complient Corporation



    Schedule 5.1(p) also includes a listing of the Hutchins license agreement dated June 1, 1994, and notes that Mr. Hutchins retains the right to use the mark "CPR Prompt" with reference to the name of his business only. The underlying patent to the Hutchins license, US 4,583,524 is in force until November, 2004, as are most of the related foreign patents. Apparently the Japanese patent application listed in the schedule at the end of the license agreement was never issued. Hutchins has a subsequently issued U.S. patent (No. 5,913,685) related to the technology of the license agreement, which, according to section 4.6 of the license, can be included in the license. Complient is of the opinion that this patent is already included in the license.

<u>IP Assignment</u>

## INTELLECTUAL PROPERTY ASSIGNMENT

WHEREAS, Complient Corporation, a Delaware Corporation, the ASSIGNOR herein, having an ownership interest in the intellectual property described on attached Schedule A; and WHEREAS, Cardiac Science, Inc., a Delaware Corporation, the ASSIGNEE herein, desires to acquire the entire right, title and interest in and to said intellectual property;

NOW, THEREFORE, for consideration disclosed in the Asset Purchase Agreement entered into between ASSIGNOR and ASSIGNEE on the date of _____ , said ASSIGNOR, has sold and does hereby sell, assign, transfer and set over unto said ASSIGNEE, its successors and assigns, the entire right, title and interest in and to said intellectual property listed on Schedule A attached hereto, including any divisional and continuing applications and continuations-in-part related to the patents or patent applications listed in Schedule A, as well as the goodwill and portion of the business associated with the marks listed on Schedule A which is assigned to ASSIGNOR pursuant to the Asset Purchase Agreement indicated above.

And for the above-named consideration, ASSIGNOR does hereby agree to, at the request of said ASSIGNEE, execute any and all papers and documents and do all other and further lawful acts that said ASSIGNEE may deem necessary or desirable to perfect and vest in the ASSIGNEE the entire right, title and interest in the intellectual property being assigned.

DATED at _____, this ____ day of _____, 20____

_____
Name
Title
For Complient Corporation

STATE OF OHIO   )
                ) ss.
COUNTY OF       )

On this _____ day of _____, before me personally appeared_____ to me known or proved on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same.

(SEAL)      Notary Public

# WEDBUSH MORGAN SECURITIES

Equity Research

LOS ANGELES | NEW YORK | PARIS | SAN FRANCISCO

October 29, 2003

Price (as of close on 10/28/03)
**$4.07**

Rating
**BUY**

12- Month Target Price
**$4.50**

Keay Nakae, CFA
+1 213 688 4344
keay.nakae@wedbush.com

Mariela I. Clark
+1 213 688 4355
mariela.clark@wedbush.com

## Cardiac Science (DFIB)
Company reports solid results. Raising price target to $4.50

| | | | | | |
|---|---|---|---|---|---|
| 52-Week Range | $1.77-$5.10 | Long-Term Debt (million) | | | $46.0 |
| Shares Outstanding | 69.9 million | Debt/Capital (Q3:03) | | | 31.8% |
| Institutional/Insider | 27%/20% | ROE (trailing 1 yr) | | | N/M |
| Public Float | 69.1 million | Cash & Inv/Share (Q3:03) | | | $0.20 |
| Market Capitalization | 285 million | Book Value/Share (Q3:03) | | | $1.41 |

| FYE DEC EPS($)* | 2002A ACTUAL | 2003E CURRENT | 2003E PREVIOUS | 2004E CURRENT | 2004E PREVIOUS |
|---|---|---|---|---|---|
| Q1 Mar | (0.05) | $(0.04)A | - | $(0.02)E | $0.00E |
| Q2 Jun | (0.06) | (0.03)A | - | (0.01)E | 0.01E |
| Q3 Sep | (0.06) | (0.02)A | - | 0.03E | 0.03E |
| Q4 Dec | (0.05) | (0.02)E | 0.00 | 0.04E | 0.05E |
| Year** | (0.22) | $(0.11)E | $(0.09) | $0.05E | $0.08E |
| P/E Ratio | N/A | N/A | | 81x | |
| Change | N/A | N/A | | N/A | |

| FYE DEC Revenue (mil) | 2002A ACTUAL | 2003E CURRENT | 2003E PREVIOUS | 2004E CURRENT | 2004E PREVIOUS |
|---|---|---|---|---|---|
| Q1 Mar | $9.4 | $14.0A | - | $19.7E | $16.8E |
| Q2 Jun | 12.8 | 14.5A | - | 22.5E | 18.4E |
| Q3 Sep | 13.6 | 15.7A | - | 26.2E | 20.3E |
| Q4 Dec | 14.3 | 18.5E | 17.1E | 29.5E | 22.1E |
| Year** | $50.0 | $62.8E | 61.1E | $98.0E | $77.7E |
| Change | 370% | 26% | | 56% | |

* Both Revenue and EPS are on a GAAP (Generally Accepted Accounting Principles) basis.
** Numbers may not add up due to rounding.

## ACTION ITEMS

- For the full-year 2003, we are increasing our revenue estimate by $1.7 million to $62.8 million. However, we are also increasing our net loss by $0.02 from $(0.09) to $(0.11). We now expect the company to achieve positive net income in the third quarter of 2004.

- For the full-year 2004, we are increasing our revenue estimate by $20.3 million to $98 million, but are decreasing our EPS estimate by $0.03 to $0.05.

- We maintain our BUY rating and are establishing a new 12-month price target of **$4.50**.

## KEY POINTS

**Company Description**
Cardiac Science develops, manufactures, and markets automatic external defibrillators (AEDs) used to treat patients at risk of sudden cardiac arrest. The company is headquartered in Irvine, CA.

- Third quarter revenue increased 15% to $15.7 million, which was slightly above our estimate of $15.3 million.

- Reported net loss per share of $0.02 was in-line with our estimate and consensus.

- AED sales grew robust 57% to $15.0 million, which was above our estimate of $13.9 million. Unit sales climbed 82% year-over-year, while ASPs remained essentially unchanged.

Please refer to the end of this report to obtain important disclosure information.

- Gross margin improved sequentially by 330 basis points to 60.5%, as a result of reduced cost of goods sold and favorable shift in the product mix, while overall company profitability slightly declined.
- Management pushed profitability further out by two quarters.
- The Complient acquisition will add significantly to revenue growth but will depress gross margins. We view this acquisition favorably and believe it is a sound strategic move.

## THIRD-QUARTER REVIEW

Cardiac Science has reported solid third-quarter results that were overall in-line with our expectations. Revenue increased by 15% to $15.7 million, which was slightly above our estimate of $15.3 million. The reported net loss per share of $0.02 was in-line with our estimate and consensus. Gross margin continued to exhibit improvement, increasing sequentially by 330 basis points to 60.5%, which exactly matched our estimate. Gross margin improvement was primarily attributable to the increasing sales of the new higher-margin G3 AED units representing a greater proportion (~60%) of total AED sales mix. Selling and marketing expense, at 29.0% of sales, was significantly higher than our estimate because of a higher commission payout tied to increased revenue and additional recurring marketing expenditures related to the new product lines. General and administrative expense was 21.5%, which was 130 basis points higher than our estimate due to increased facility and overhead expenses needed to support the rapid sales growth of new products. G&A also included $450,000 in litigation expenses associated with the patent lawsuit against Philips Medical Systems, a subsidiary of Philips Electronics (PHG – Not Rated). R&D expense of $1.4 million was slightly below our estimate. The company provided fourth quarter revenue guidance in the range of $18 to $21 million (including revenue of $1.8 to $2.5 million from recently acquired Complient Corp.) and gross margin in the range of 59% to 62%. Furthermore, management now expects to achieve net income profitability by the second quarter of next year versus previous guidance of net income profitability in the fourth quarter of this year. This push out is due to the initial dilutive effects of the Complient acquisition.

AED sales totaled $15.0 million, which represented robust 57% growth year-over-year. The company sold approximately 8,050 AED units during the quarter, with the U.S. corporate workplace market segment and municipalities accounting for over 78% of total domestic AED units sold. International AED sales were up 100% and accounted for 17% (or $2.6 million) of total AED sales. U.S. average selling price (ASP) for AEDs in the third quarter remained flat sequentially at approximately $1,900.

### AED REVENUE BREAKDOWN

| Domestic (by market segment) | | ($ mil) |
|---|---|---|
| Corporate | 52% | 6.4 |
| PAD Programs & Government | 26% | 3.2 |
| Fire, Police and EMS | 7% | 0.9 |
| Medical & Dental | 8% | 1.0 |
| Schools | 7% | 0.9 |
| Total Domestic | 100% | $ 12.4 |
| International (by region) | | |
| Japan and U.K. | 40% | 1.0 |
| Other | 60% | 1.6 |
| | 100% | 2.6 |
| Total AED sales | | $ 15.0 |

Source - Company reports

Sales of *Powerheart CRM* units and disposable defibrillator pads to hospital customers contributed $238,000 versus $296,000 in the same period last year. Sales of equipment, which consists primarily of the *Diascope G2* hospital patient-monitors, contributed only $210,000 and continued to be adversely impacted by the volatile geopolitical conditions in the Middle East. In addition, the company shut down its Denmark manufacturing facility, sold off the gas monitoring unit of Artema for $0.6 million, and completed the phase out of its Artema legacy patient monitoring inventory.

WEDBUSH MORGAN SECURITIES

### Litigation

This past February, the company filed a patent infringement lawsuit against Philips Medical Systems, a subsidiary of Philips Electronics, regarding certain patents related to its AED technology. The company alleges that Philips's AEDs sold under the names "*HeartStart* OnSite Defibrillator" and "*HeartStart* Home Defibrillator" infringe on at least seven patents held by Cardiac Science, which include patents associated with features such as pre-connected disposable defibrillation electrodes and daily self-testing of electrodes and batteries. We believe that the company's recent success (Zoll settlement) in this area bodes well for an eventual positive outcome to this litigation. However, legal expenses of up to several hundred thousand dollars per quarter related to this litigation represent the biggest wildcard to G&A expenses for the next several quarters.

### ANALYSIS

The launch of the new *Powerheart AED G3* and *Firstsave AED G3* are off to a strong start. Demand for the new units exceeded supply as the company exited the quarter with an order backlog of $0.63 million. Unit growth of 83% was quite impressive, we estimate growing at more than twice the rate of the market. The *G3* AEDs sport a new industrial look in a lighter weight package, and feature a more intuitive voice prompt system. However, while the full-featured *Powerheart* (which lists at $2,495) retains all of the bells and whistles, the *Firstsave* (which lists at $1,995), lacks the LED screen, escalating energy shocks, and programmability features. We believe this tiered product strategy help to prevent further erosion in ASPs during the quarter. From our perspective, the most compelling feature of the new *G3* AEDs are the product-engineering initiatives that have resulted in a further 30% reduction in AED component costs. Since we expect that AED ASPs will continue to decline going forward, we are encouraged by the likelihood that AED gross margins will improve in the near-term and potentially can be preserved in the longer-term. Despite the G3's representing only 60% of the AED mix in the quarter, this was enough to allow gross margin to increase sequentially by 330 basis points to 60.5%.

### OEM Agreement With GE

Cardiac Science announced last quarter that it has entered into new multi-year strategic OEM, distribution and development agreements with GE Medical Systems Information Technologies. Under the agreement, GE will market Cardiac Science automated external defibrillators (AEDs) and fully-automatic in-hospital defibrillator-monitors (CRMs) under the GE name in Europe, Asia (excluding Japan), the Middle East and other international markets. Cardiac Science will also develop and manufacture a line of biphasic external defibrillators for exclusive sale by GE on a worldwide basis.

The company shipped its first *Powerheart G3* AEDs, which was branded as the GE *Responder*, at the end of the third quarter. For now GE will only sell AEDs outside of the U.S., except in Japan, where Nihon Koden sells the *Powerheart AED* as it owns branded product. While the agreement does not specify a minimum purchase agreement, we believe that GE is capable of selling at least 1,000 units in the first 12 months. We believe that it is also possible that GE could elect to begin U.S. sales of the Cardiac Science AEDs at some point in the future within certain market segments. GE currently is a distributor in the U.S. of the Zoll (ZOLL:Not Rated) *AED+* in the non-hospital medical sector of the market.

Cardiac Science has initiated development of a new external hospital defibrillator for GE. GE currently sells its *Cardioserve* external defibrillator in Europe, but currently does not sell defibrillators in the U.S. despite its large presence in the hospital monitor market. Cardiac Science will provided updated technology, including its *RhythmX* software, and *Star* biphasic energy delivery system, for a new external defibrillation device that will be marketed as the GE

WEDBUSH MORGAN SECURITIES

*Responder 2000.* We anticipate that this device will be available for international sales by the third quarter of 2004, and for U.S. commercial sales to commence at the beginning of the fourth quarter in 2004. The company has hired 30 additional people to its R&D staff to work on this project.

Finally, the agreements include the development of other products. This would include the future development of a defibrillation module, which would then be sold as a plug-in feature of GE's hospital monitors.

At this time, we anticipate that the GE agreement will have a minimal financial impact in the near-term, adding perhaps an additional $0.5 million in Q4 revenue. However, we expect the revenue impact in 04 to be $8 million.

### Acquisition of Complient

Last week the company announced the acquisition of privately-held Complient Corporation for $47 million using 10.25 million shares of its common stock. Complient is the nation's leading provider of AED and CPR training and comprehensive program management. Essentially, Complient offers a turn-key after-sales service package that makes it easier for customers to deploy these products. The service package includes: medical direction for obtaining the prescription for the AED, coordination of all aspects of AED deployment including site surveys, AED/CPR training for customer employees, and web-based software for record-keeping.

Complient has been generating annual revenue of approximately $12 million but was losing money. Since Complient did not manufacture its own AEDs, we believe that it lacked the scale necessary to grow this service business profitably. Cardiac Science has had an existing, non-exclusive, relationship with Complient for over a year. We believe the ability to offer a complete package of these services is a value added component of the sale. Thus we believe this acquisition is a sound strategic move by Cardiac Science, which is as much defensive as it is offensive. Cardiac Science can continue to provide this value-added service, which it can tailor to meet its specific needs, and likely can increase the profitability of this service. However, it forces its competitors, who have either previously used Complient's services or were considering using them, to now find their own resources to accomplish these tasks, providing Cardiac Science, we believe, with a competitive advantage for now. While on the surface there would appear to be few barriers to prevent someone else from establishing this same type of business, we doubt that logistically it is something that can be established, at the same level as Complient, overnight, let alone within a couple of years.

The company has already taken steps to integrate and improve this business. They immediately reduced the headcount from 50 to 42 people. The next step is to streamline certain aspects of the service package to make it even more attractive to customers. This includes reducing the term of the service contract from three years to twelve months, and eliminating periodic site visits to inspect the AED, which given the self-check features of the company's AEDs is likely unnecessary.

The company estimates that Complient will add additional revenue of $15 to 20 million in 2004. The only drawback is that the current gross margins generated by this business are at the 50% level, which will have the effect of depressing the overall gross margins of the company.

Finally, we believe that there are implications associated with the issuance of the 10.25 million shares to purchase this company. This common stock will be subject to a lock-up agreement. The resale of the shares shall be registered with the SEC and 1.325 million shares will become available for resale on the effective date of the registration statement, which we expect to occur sometime in January. The balance of the shares issued are subject to a lock-up agreement pursuant to which they shall be released for sale in 12 equal monthly installments or 743,750 shares per month, beginning on the effective date of the registration statement. Previously, the

# EXHIBIT I

T BY:Xerox Telecopier 7020 ; 5-17-94 ; 4:25PM ; → 7209216;# 1

## SUTHERLAND, ASBILL & BRENNAN
### 999 PEACHTREE STREET, N.E.
### ATLANTA, GEORGIA 30309-3996

### FACSIMILE REQUEST AND TRANSMITTAL INFORMATION FORM

Time of Request:  a.m.  p.m.        Date: May 17, 1994

TO:
- **NAME OF INDIVIDUAL:** Donald Hutchins
- **NAME OF FIRM:**
- **CITY & STATE/COUNTRY:**
- **AREA CODE/TELEPHONE NO:** 413-739-4060
- **REFERENCE:**
- **NUMBER OF PAGES, INCLUDING TRANSMITTAL PAGE:**
- **TELEPHONE NO. FOR CONFIRMATION OF TRANSMISSION:** 413-734-2625

- **NAME OF INDIVIDUAL:** Mark D. Kaufman
- **DIRECT DIAL NUMBER:** (404) 853-8107
- **FACSIMILE MACHINE:** XEROX 7021 (CCITT Groups 2 & 3) (404) 853-8806 (Auto)

THIS MESSAGE AND ITS ATTACHMENTS ARE INTENDED TO BE RECEIVED ONLY BY THE ADDRESSEE ABOVE. If you are not the addressee and you are not responsible for delivering messages to the addressee, you have received...

# Sutherland, Asbill & Brennan

(404) 853-8000
(404) 853-8806

999 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30309-3996

ATLANTA
AUSTIN
NEW YORK
WASHINGTON

MARK D. KAUFMAN
T LINE: (404) 853-8107

**MEMORANDUM**

VIA TELECOPIER

To: Donald Hutchins

SAB DRAFT--5/16/94

## LICENSE AGREEMENT

This License Agreement is entered into as of May __, 1994, by and between County Line Limited Partnership, a Delaware limited partnership having its principal place of business at 4543 Taylor Lane, Warrensville Heights, Ohio 44128 (hereinafter "LICENSEE"), CPR PROMPT Corporation, a Massachusetts corporation having its principal place of business at 60 Brookdale Drive, Springfield, Massachusetts 01104 (hereinafter "CPR PROMPT"), and Donald C. Hutchins, an individual having an address at 60 Brookdale Drive, Springfield, Massachusetts 01104 (hereinafter collectively referred to as "LICENSOR").

### WITNESSETH:

WHEREAS, LICENSOR represents that Donald C. Hutchins and/or CPR PROMPT are the owners of U.S. Patent No. 4,583,524, as well as any corresponding foreign patents, disclosing and claiming a method for using, and a device for providing, rescue aid instructions to trained individuals concerning cardiopulmonary resuscitation ("CPR") and first aid for choking;

WHEREAS, Donald C. Hutchins ("Hutchins") and/or CPR PROMPT are the owners of the trade name and trademark "CPR PROMPT" together with any trade dress, copyrights, logos or other trademarks used in connection with the sale of a device for providing such rescue aid instructions, together with the goodwill of the business associated therewith; and

WHEREAS, LICENSEE desires to obtain, and LICENSOR is willing to grant, an exclusive license to the device as disclosed and claimed in U.S. Patent No. 4,583,524, and the corresponding foreign patents, and certain other rights therein, under the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

### I. DEFINITIONS

1.1 "Affiliate" of any person or entity means any person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with first mentioned person or entity; and for purposes hereof the term "control" means the possession, directly or indirectly or as a trustee, executor or administrator, of the power to direct or cause direction of the management or policies of a person or entity, either

116351.2

through the ownership of stock or other securities, by contract or otherwise.

1.2 "CPI Fraction" shall mean a fraction, the numerator of which shall be the Consumer Price Index for All Urban Consumers, as published monthly by the United States Department of Labor, for the month immediately preceding the start of each new twelve-month period of this Agreement, and the denominator of which shall be such Consumer Price Index for May 1994, or, in the event such Consumer Price Index shall no longer be published, a similar fraction based upon a similar consumer price index selected by LICENSOR.

1.3 "Confidential Information and Trade Secrets" means information including, but not limited to, technical or non-technical data, formulae, a pattern, compilation, program, device, method, technique, drawing or process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers of Licensed Products whether currently existing or otherwise developed or acquired by LICENSOR during the term of this Agreement, that derive economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts which are reasonable under the circumstances to maintain its secrecy and any other information that is a trade secret under applicable law and any other information relating to the Licensed Products that is material to LICENSOR and not generally available to the public.

1.4 "Consumer Version" means a type of Licensed Product which is manufactured at a cost of $45.00 or less per device, times the CPI Fraction.

1.5 "Copyrights" means any copyrights, registered or unregistered, used in connection with manufacture and sale of the Licensed Products.

1.6 "Know-How" means all the Licensed Product concepts, sketches, prototypes, ideas, designs, layouts, models, tooling patterns, mechanical drawings, production planning, techniques, formulae, processes, procedures, specifications, inventions, patent applications, Confidential Information and Trade Secrets, documents, data, records, notes, technical writings, computer programs, manuals, pictorial reproductions, drawings, graphics, and other information now existing or hereafter developed, created, produced, possessed or invented by LICENSOR.

1.7 "Licensed Patents" means U.S. Patent No. 4,583,524, and any divisions or continuations in whole or in part, reissues,

116351.2                               2

reexaminations or extensions thereof, and any foreign counterparts or extensions thereof, including, without limitation, those patents and applications listed in Exhibit A attached hereto and incorporated herein by reference and any other patent which applies to this product category, whether listed or not on such Exhibit A.

1.8 "Licensed Products" means a device for providing rescue aid instructions to trained individuals concerning CPR as disclosed and claimed in U.S. Patent No. 4,583,524, which is also the subject of certain of the Confidential Information and Trade Secrets and Know-How which are now owned and used by LICENSOR, or which may in the future be owned, licensed or controlled by LICENSOR, and any modifications or improvements thereto, which now exist or which may exist in the future and are owned, licensed or controlled by LICENSOR, covering or relating to the design, manufacture and/or use of a device for providing rescue aid instructions to trained individuals concerning CPR, or component or material thereof.

1.9 "Marks" means the name and mark "CPR PROMPT," any trade dress, logos or other trademarks used in connection with the Licensed Products, and any applications or registrations therefor, including, without limitation, the registrations listed in Exhibit B attached hereto and incorporated herein by reference.

1.10 "Net Sales" means the gross selling price or gross lease proceeds of the Licensed Products sold or leased by or on behalf of LICENSEE, less accepted returns from LICENSEE's customers, including but not limited to, breakage which LICENSEE credits to its customers; excise or other sales taxes paid or absorbed by or on behalf of LICENSEE; customs, duties and consular fees; transportation, insurance charges and special packaging fees paid or absorbed by or on behalf of LICENSEE; external sales commissions, including but not limited to, fees paid to sales representatives, and any other commercially acceptable promotional, quantity, trade or cash discounts, refunds, credits, and other sales adjustments paid or granted by or on behalf of LICENSEE in connection with or on account of Licensed Products.

1.11 "Professional Version" means a type of Licensed Product which is manufactured at a cost of more than $45.00 per device, times the CPI Fraction.

1.12 "Sublicensee" means the third party recipient of a Sublicense from LICENSEE.

1.13 "Sublicense" means any agreement by LICENSEE with any third party which relates to all or any part of the Licensed

116351.2                                  3

Products which grants to such third party the right to practice the Licensed Patents, Confidential Information and Trade Secrets or Know-how, or to make, lease, use, loan and sell, individually or collectively, products, apparatus, methods or processes covered by the Licensed Patents, but does not include any agreements for the loan, use, sale or lease of the Licensed Products between LICENSEE and any one or more distributors or other persons or entities.

1.14 "Sublicensee Payments" means payments made by Sublicensees.

1.15 "Tooling, Inventory and Other Materials" means LICENSOR's tooling used for manufacture of the Licensed Products, LICENSOR's inventory of the Licensed Products, as well as any other materials listed in Exhibit C attached hereto and incorporated herein by reference.

## II.  GRANT OF RIGHTS

2.1 LICENSOR hereby grants to LICENSEE a worldwide, exclusive right and license to make, have made, use, sell, lease and have sold and leased the Licensed Products pursuant to the Licensed Patents, Confidential Information and Trade Secrets and Know-how. Additionally, LICENSEE shall have the right to grant Sublicenses with respect to all rights and licenses granted herein upon such terms and conditions as LICENSEE deems appropriate; provided, however, that without the prior written consent of LICENSOR no such Sublicense shall be granted by LICENSEE to any Affiliate of LICENSEE. Additionally, LICENSEE shall have the right to assign this Agreement and all of its rights, licenses and obligations hereunder to any person or entity, and in the event of such an assignment the term "LICENSEE" as used herein shall mean and refer to such assignee.

2.2 LICENSOR has and will disclose to LICENSEE all information regarding the Licensed Products, Confidential Information and Trade Secrets, Know-How and Licensed Patents, in order to enable LICENSEE to secure the rights and license granted herein and to fully evaluate and exploit the design and sales potential of the Licensed Products.

2.3 LICENSOR hereby grants to LICENSEE a worldwide, exclusive right and license in and to the Copyrights, including the right to reproduce, make derivatives, distribute and to display the Licensed Products or other sales materials containing the Copyrights.

2.4 LICENSOR hereby sells, assigns and transfers to LICENSEE all right, title and interest in and to the Marks for use in connection with, the manufacture, marketing, distribution and sale or lease of the Licensed Products.  Payment for the

116351.2                                    4

Marks is included in the initial payment made by LICENSEE to LICENSOR.

2.5 LICENSOR hereby sells, assigns and transfers to LICENSEE all right, title and interest in and to the Tooling, Inventory and Other Materials. Payment for the Tooling and Other Materials is included in the initial payment made by LICENSEE to LICENSOR. Upon execution of this Agreement, an additional payment shall be made by LICENSEE to LICENSOR for the Inventory in an amount equal to LICENSOR's cost for such Inventory.

## III. ROYALTIES/PAYMENTS

3.1 In consideration for the rights and licenses granted herein, LICENSEE shall pay LICENSOR an initial payment of One Hundred Thousand Dollars ($100,000.00) upon execution of this Agreement.

3.2 Additionally, during each of the first twelve (12) months of this Agreement, LICENSEE shall pay LICENSOR Four Thousand Dollars ($4,000.00) per month on or before the last day of each month, which payments shall constitute an advance against royalties payable under Sections 3.3 and 3.4 and shall be deducted from the royalties which become payable thereunder by LICENSEE.

3.3 In further consideration for the rights and license granted herein, LICENSEE shall pay either of the following amounts to LICENSOR based on sales of the Licensed Products in any country in which any of the Licensed Patents are in effect:

  (a) With respect to Net Sales of the Professional Version of the Licensed Products:

| Agreement Year | Royalty Percentage |
|---|---|
| 1 | 5% |
| 2 and thereafter | 3 1/2% |

  (b) With respect to Net Sales of the Consumer Version of the Licensed Products:

| Agreement Year | Royalty Percentage |
|---|---|
| During the term of this Agreement | 2% |

3.4 LICENSEE shall make minimum royalty payments (which include Sublicensee Payments) to LICENSOR with respect to each full or partial fiscal year of LICENSEE during which this Agreement is in effect commencing with the effective date

116351.2                                    5

hereof and shall be pro rated for partial fiscal years. Such minimum royalty payments shall be Ten Thousand Dollars ($10,000.00) per fiscal year. In the event that the royalties payable with respect to each full or partial fiscal year following the effective date of this Agreement do not aggregate such minimum royalty payments, then LICENSEE shall, within thirty (30) days following the end of such fiscal year or part thereof, pay to LICENSOR the difference between the royalties actually paid to LICENSOR and the minimum royalty payment amount for that year or part thereof.

3.5 With respect to Sublicenses granted by LICENSEE under this Agreement, LICENSEE shall pay to LICENSOR fifty percent (50%) of any amounts actually received from its Sublicensees, after deducting LICENSEE's out-of-pocket costs for such licensing.

3.6 LICENSEE shall submit to LICENSOR (i) within sixty (60) days of the close of each of its first three (3) fiscal quarters of each fiscal year and (ii) within ninety (90) days of the close of its last fiscal quarter of each fiscal year, a written report setting forth the Net Sales for the Licensed Products sold by or on behalf of LICENSEE and the Sublicensee Payments for that quarter, together with the royalties due to LICENSOR for that quarter. The report shall be submitted by LICENSOR regardless of whether royalties are due for that quarter.

3.7 LICENSEE shall keep at its office in Cleveland, Ohio true and accurate accounts of all Licensed Products sold or leased hereunder and all Sublicensee Payments. Such records shall show the number of Licensed Products sold or leased and the dollar sales of Licensed Products sold or leased by or on behalf of LICENSEE. LICENSOR is hereby given the right to access through an independent public accountant to those books of LICENSEE involving transactions covered by this Agreement for the purpose of verifying reports received by it, such access to be at reasonable business hours upon providing reasonable advance notice, and at the sole expense of LICENSOR. Such right of access shall be limited to once during each year this Agreement is in effect.

3.8 All statements, accounts and records provided by LICENSOR pursuant to this Agreement are deemed to be confidential and proprietary information of LICENSEE, and shall not be disclosed without LICENSEE's prior written consent.

3.9 LICENSEE shall reimburse LICENSOR, according to LICENSEE's policies, for reasonable travel and living expenses incurred by Donald C. Hutchins in connection with providing

116351.2                              6

assistance, at the request of LICENSEE, in the development, manufacture and sale of the Licensed Products.

3.10 LICENSEE will cause each shareholder of LICENSEE who purchases common stock of LICENSEE directly from LICENSEE to agree to pay to LICENSOR seven and one-half percent (7.5%) of the net proceeds of any sale of any or all of such common stock to any person or entity which is not an Affiliate of such selling shareholder. "Net proceeds" shall mean the proceeds received by such selling shareholder for such sale after deduction of an amount equal to the sum of (a) the legal, accounting, travel and all other expenses attributable to the sale, (b) brokers' commissions, finders' fees and similar costs attributable to the sale, (c) federal and state income taxes attributable to gain on the sale, and (d) all other costs and expenses attributable to the sale. If the net proceeds from the sale are paid other than in cash, such shareholder may elect in satisfaction of the obligations to LICENSOR under this Section 3.10 to have LICENSOR receive either (i) the same type of consideration that such shareholder receives from the sale, or (ii) cash equal to the fair market value of such consideration on the date of the closing of the sale.

IV. **REPRESENTATIONS AND WARRANTIES; LICENSED PATENTS AND MARKS**

4.1 LICENSOR represents and warrants that:

(a) Hutchins has the full legal right and capacity to execute, deliver and perform this Agreement;

(b) CPR PROMPT has the full corporate power and authority to execute, deliver and perform this Agreement;

(c) the execution, delivery and performance of this Agreement by CPR PROMPT have been duly authorized by all requisite corporate action on the part of CPR PROMPT (copies of which actions have been provided to LICENSEE);

(d) this Agreement has been duly and validly executed and delivered by LICENSOR and constitutes the legal, valid and binding obligation of LICENSOR, enforceable against LICENSOR in accordance with its terms; and

(e) CPR PROMPT's aggregate liabilities to all persons or entities are less than $20,000 on the date hereof.

Simultaneously with LICENSOR's execution and delivery of this Agreement LICENSOR has delivered to LICENSEE an opinion of LICENSOR's counsel, dated as of the date hereof, with respect to the matters set forth in this Section 4.1.

116351.2

7

4.2 LICENSOR hereby represents and warrants that:

(a) they are the sole and exclusive owner of the entire right, title and interest in and to the Licensed Patents, Marks, Copyrights, Licensed Products, Confidential Information and Trade Secrets, Know-How and Tooling, Inventory and Other Materials, free and clear of all liens, claims, and encumbrances and restrictions of any kind, and have full right and capacity to grant the license set forth herein;

(b) they have not granted or transferred any rights in the Licensed Patents, Marks, Copyrights, Licensed Products, Confidential Information and Trade Secrets, Tooling, Inventory and Other Materials and Know-How;

(c) CPR PROMPT has all necessary licenses, permits and other authorizations and approvals necessary to manufacture and sell the Licensed Products and to enter into and perform this Agreement, including, without limitation, all necessary approvals from the United States Food and Drug Administration;

(d) to their knowledge, no prior art exists which would invalidate any of the claims of the Licensed Patents; and

(e) the Licensed Patents, Marks, Copyrights, Confidential Information and Trade Secrets, Know-How and sale or lease of the Licensed Products do not and will not infringe upon or violate any other letters patent heretofore issued or registered in the United States or any foreign country or any other proprietary rights of any third party, and that there are no third party infringers or potential infringers of the Licensed Patents, Marks, Copyrights, Confidential Information and Trade Secrets and Know-How except the potential infringement by the owner of the U.S. Patent No. 4,863,385 to Richard Pierce, of which LICENSOR and LICENSEE are currently aware, and the claims of such patent are not superior to the claims of the Licensed Patents.

4.3 LICENSOR has not at any time filed, or caused to be filed, applications for other patents, in their own names or in the name of a third party, in the United States or elsewhere, for any of the Licensed Products or a similar product, other than the Licensed Patents.

4.4 LICENSOR shall, without further consideration therefor, do all acts reasonably necessary to maintain, sustain, reexamine, reissue, or extend the Licensed Patents. In the

116351.2                                    8

event LICENSOR fails to take any such action LICENSEE is hereby authorized to do so as attorney-in-fact or otherwise on behalf of LICENSOR and to deduct all costs and expenses incurred from amounts payable by it hereunder. LICENSOR further acknowledges that it has heretofore furnished to LICENSEE a schedule of the maintenance fees payable by it with respect to the Licensed Patents, and shall pay all such fees at least thirty (30) days in advance of their due date (without regard to any applicable grace period) and to provide LICENSEE with evidence of such payment.

4.5 LICENSEE will properly affix the statutory patent, copyright and trademark notices to the Licensed Products.

4.6 If, while this Agreement is in effect, LICENSOR makes further improvements to the Licensed Products, or similar products, or becomes the owner of any such improvements or similar products, then LICENSOR shall communicate such improvements or similar products to LICENSEE. At LICENSEE's option, such improvements or similar products shall then be incorporated into the Licensed Patents, Confidential Information and Trade Secrets, Know-How and Licensed Products without further consideration from LICENSEE therefor, and LICENSOR shall give LICENSEE full information regarding such improvements or similar products.

4.7 LICENSEE shall prepare, file and prosecute at LICENSEE's expense, insofar as it is deemed appropriate in the sole judgment of LICENSEE, applications for letters patent in the United States on all improvements hereafter made by LICENSOR or LICENSEE, as well as corresponding foreign applications of letters patent, which applications are and shall be incorporated into the Licensed Patents without further consideration from LICENSEE. If LICENSEE elects not to prosecute an application for letters patents in any country, then LICENSOR in its discretion and at its expense may prosecute such application but shall not be obligated to do so. LICENSEE shall bear the expense of obtaining any additional patents or completing any patent applications which LICENSEE elects to prepare, file or prosecute under this provision and shall bear the expense of any patent fees associated with such additional patents or applications as well as any costs of maintaining the patents, including taxes thereon. LICENSOR shall similarly bear the expense of any patents or patent applications which they elect to prepare, file or prosecute and the expense of any such patent fees as well as any costs of maintaining such patents, including taxes thereon. LICENSOR shall, without further consideration therefor, at the request of LICENSEE, do all acts necessary or appropriate in connection with such applications for letters patent. In the event that any administrative agency responsible for granting any of the

118351.2

9

patent applications denies one or more of the patent applications, LICENSEE may in its discretion appeal such decision, but shall not be obligated to do so. If LICENSEE elects not to appeal such decision, LICENSOR may, in their discretion and at their expense, appeal such decision, but shall not be obligated to do so.

4.8 LICENSOR further represents and warrants that they have provided to LICENSEE all information concerning communications with any governmental agency, including without limitation, the Food and Drug Administration, the past and current regulatory approval status, and any past or current regulatory violations, concerning the Licensed Products, and that such information is true, complete and correct

## V. ENFORCEMENT AGAINST THIRD PARTIES

5.1 Upon either party to this Agreement learning of any actual or threatened infringement or misappropriation by any third party of any claim of the Licensed Patents, Marks, Copyrights, or any Confidential Information and Trade Secrets or Know-How, such party shall promptly notify the other party in writing of such actual or threatened infringement or misappropriation, giving details thereof. With respect to such infringement or misappropriation, LICENSEE shall have the right to take whatever action it deems appropriate, including bringing a suit at its own expense against such third party, and to retain any damage recovery obtained. In any such suit brought by LICENSEE, LICENSOR shall, if required by law, join as party plaintiff at its own expense. In the event that LICENSEE elects not to take action against such third party, then LICENSOR shall have the right to take action on its own behalf against such third party, and shall retain any damage recovery obtained.

5.2 When either LICENSOR or LICENSEE brings an infringement or misappropriation suit, the other party shall cooperate and assist in the preparation and prosecution of the suit, including the execution of necessary documents and providing requested testimony. The party bringing the suit shall pay all reasonable travel expenses of the other party.

## VI. INDEMNITY

6.1 In the event a claim is made against LICENSEE alleging that any claim of the Licensed Patents is invalid or unenforceable or that the sale or lease of the Licensed Products infringes any patent or patents or other superior rights of any third party, LICENSEE shall, at its option, commence the defense of LICENSEE and its Sublicensees, by bringing or defending a lawsuit or settling the claim, and

116351.2                             10