LICENSOR will cooperate with LICENSEE in such defense and settlement and shall take no action inconsistent therewith. In the event that LICENSEE elects not to defend against any such claim or elects to terminate such defense, then LICENSOR may commence such defense by bringing a lawsuit or settling the claim, and LICENSEE will cooperate with LICENSOR in such defense and settlement and shall take no action inconsistent therewith. In either such event LICENSEE shall have the right to deposit the payments accrued and not theretofore paid to LICENSOR resulting from the sales or leases of Licensed Products which are the subject of such alleged invalidity, unenforceability or infringement and all payments thereafter accruing under this Agreement resulting from the sales or leases of such Licensed Products in an escrow account in a national bank selected by LICENSEE. If such claim is finally resolved favorably to LICENSEE, all such payments in the escrow account, including interest thereon, will immediately be paid to LICENSOR. If such claim is finally resolved adversely to LICENSEE, all funds in such account, including interest thereon, shall be paid to LICENSEE and its Sublicensees.

6.2  If any claim of the Licensed Patents is held invalid or unenforceable or held to infringe any patent or patents or other superior rights of any third party by a decision of any tribunal of competent jurisdiction, then with respect to any such claim so held invalid or unenforceable or held to infringe the superior rights of any third party, the decision of such tribunal shall be followed from the date of entry of such decision and with respect to any such claim, LICENSEE shall, in addition to any other rights or remedies it may have, thereafter be relieved from making any payments with respect to such claim, and from including in its reports hereunder any items covered solely by such claim; provided, however, that if there are conflicting final decisions by courts of equal jurisdiction, the one of latest date shall be controlling.

6.3  Subject to Sections 6.1 and 6.2, LICENSOR shall jointly and severally defend, indemnify and hold LICENSEE and its Sublicensees harmless from any and all losses, damages or expenses (including reasonable attorneys' fees) incurred by Licensee or any of its Sublicensees as a result of or relating to any breach or threatened breach of LICENSOR's representations, warranties, or obligations hereunder.

## VII.  CONFIDENTIALITY

7.1  LICENSOR and LICENSEE shall not use or permit use of any Confidential Information and Trade Secrets and Know-How except in accordance with the licenses herein granted, and

shall not disclose any Confidential Information and Trade
Secrets and Know-How to others except to the extent such
disclosure is necessary to perform this Agreement.

7.2 Neither LICENSOR nor LICENSEE shall be under an obligation
of confidentiality to the extent any Confidential
Information and Trade Secrets and Know-How:

(i)     has previously been made public in writing;
(ii)    was already known to the other party in writing at
        the time the disclosure was made by the disclosing
        party;
(iii)   becomes public knowledge other than by breach of
        this Agreement; or
(iv)    becomes otherwise available in writing from a
        third party not bound by any confidential
        relationship.

### VIII.   TERM AND TERMINATION OF AGREEMENT

8.1 Subject to earlier termination as provided for in this
Agreement, the licenses provided for in this Agreement shall
be effective from the date of this Agreement and shall
continue for as long as LICENSOR wishes to use the Licensed
Patents, Confidential Information and Trade Secrets and
Know-How.  Subject to earlier termination as provided for in
this Agreement, the obligation of LICENSEE to pay royalties
shall terminate upon expiration of the Licensed Patents and
its obligations to pay royalties in a particular country
shall terminate upon the expiration of the last of the
Licensed Patents in force in such country.

8.2 Either LICENSOR or LICENSEE is entitled to terminate this
Agreement upon ninety (90) days' written notice in the event
of a material breach of this Agreement by the other party.
If the breach is cured within such ninety (90) day period,
or if the breach is incapable of being cured within such
ninety (90) day period and the party in breach in good faith
initiates *bona fide* performance of a cure within such period
and completes such cure not later than one hundred eighty
(180) days from the date of notice of termination, then such
notice of termination shall be null and void.   For purposes
of this Agreement, a material breach by LICENSOR giving rise
to rights of termination shall be limited to a breach of
Sections 3.1 through 3.7.

8.3 In the event of termination of this Agreement, no further
minimum royalty payments shall be due from LICENSEE to
LICENSOR.  Termination of this Agreement shall not relieve
LICENSEE of its obligation to pay other royalties accrued
prior to such termination.

8.4   Upon termination of this Agreement, LICENSEE shall have the right to complete any and all contracts for the sale of the Licensed Products that it may then have upon its books or for which it has become obligated, and may work up and sell such uncompleted parts of the Licensed Products as it may have on hand at such termination date; provided, however, that all such contracts and such sales must be completed within one (1) year after such termination.

8.5   This Agreement shall terminate as of the date specified in a written notice from LICENSEE to LICENSOR indicating that after such date LICENSEE shall cease its efforts to actively make, have made, use, sell or have sold the Licensed Products and that it terminates this Agreement for that reason.

8.6   Any cause of action or claim of a party arising from any breach of this Agreement by the other party shall survive termination of this Agreement.

8.7   In the event LICENSEE terminates this Agreement pursuant to Section 8.5 prior to the expiration of the Licensed Patents, any existing Sublicensee of LICENSEE may elect to continue its Sublicense with LICENSOR by advising LICENSOR within sixty (60) days of Sublicensee's receipt of written notice of such termination of its election to continue such Sublicense.  LICENSOR shall be bound by the terms of such Sublicense and to remit to LICENSEE fifty percent (50%) of any amounts received from such Sublicensee payable thereunder within thirty (30) days following receipt thereof by LICENSOR.

8.8   In the event LICENSEE terminates this Agreement pursuant to Section 8.5 prior to the expiration of the Licensed Patents, the Tooling component of Tooling, Inventory and Other Materials and the Marks owned by LICENSEE at that time shall be transferred back to LICENSOR at no cost to LICENSOR.

## IX.  GENERAL PROVISIONS

9.1   Any notice or other required communication to either party to this Agreement required or permitted to be given hereunder shall be in writing and shall be either delivered in person or sent by registered or certified mail, return receipt requested, postage prepaid, to the address of such party as set forth herein or to such other address as such party shall have communicated to the other.  Any such notice or communication shall be deemed to have been served when delivered or, if delivery is not accepted by reason of the fault of the addressee, when mailed.

9.2  If a clause of this Agreement is or becomes ineffective or null and void, such ineffectiveness will not prejudice the remaining provisions of the Agreement.

9.3  If either party should at any time waive its rights due to a material breach by the other party of any of the provisions of this Agreement, such waiver is not to be construed as a continuing waiver of other breaches of the same or other provisions of this Agreement.

9.4  This Agreement shall be deemed to be executed in the State of Ohio, and shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to its principles of conflicts of law.  The parties expressly submit themselves to the jurisdiction of the U.S. District Court for the Northern District of Ohio for the determination of any controversy arising under or in connection with this Agreement.

9.5  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

9.6  This Agreement supersedes all prior negotiations, agreements and understandings between LICENSOR and LICENSEE and constitutes the entire agreement between LICENSOR and LICENSEE as to the subject matter hereof.  This Agreement may not be altered or amended except in writing signed by the parties hereto.

9.7  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, legal representatives and assigns.

        IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as set forth below.


**LICENSEE:**                    COUNTY LINE LIMITED PARTNERSHIP


                         By: _____
                             Steven W. Lindseth, President



**LICENSOR:**


                         _____
                         Donald C. Hutchins


116351.2                    14

**CPR PROMPT:**                            CPR PROMPT CORPORATION

                                           By: _____
                                           Name: _____
                                           Title: _____


                              *        *        *


116351.2                              15

## EXHIBIT A - LICENSED PATENTS

U.S. Patent No. 4,583,524

U.S. Patent Application Ser. No. _____

Canadian Patent No. _____

116551.2

## EXHIBIT C - TOOLING, INVENTORY AND OTHER MATERIALS

1.   TOOLING

2.   INVENTORY

3.   OTHER MATERIALS

116351.2

## EXHIBIT B - MARKS

U.S. Registration No. 1,398,334 for CPR PROMPT

116351.2

# EXHIBIT J





RESCUE AND PRACTICE AID

# USE AND CARE BOOK



**Any Questions?**
Call Us Toll-Free at
1-888-SAV-LIFE
(1-888-728-5433)

**Model CPR100**

An FDA Registered Class I
Medical Device

# LIMITED WARRANTY

County Line Limited® One-Year Limited Warranty

1. WARRANTY COVERAGE. County Line Limited offers a LIMITED WARRANTY against any defects in workmanship or materials under normal use with respect to its CPR PROMPT® Rescue and Practice Aid (the "CPR PROMPT") (but not with respect to the batteries, if any, included with the CPR PROMPT).

2. WARRANTY PERIOD. County Line warrants the CPR PROMPT for one (1) year from the date of purchase. Any component of the CPR PROMPT which proves defective within twelve (12) months from date of purchase will be repaired or replaced, at County Line's option, free of charge to the owner. The owner is responsible for shipping and handling fees to the place which County Line designates.

3. WARRANTOR'S RESPONSIBILITIES. County Line will repair or replace (at County Line's option) a defective warranted component subject to the provisions of Section 2 without charge except for transportation costs. OWNER'S SOLE AND EXCLUSIVE REMEDY AGAINST COUNTY LINE SHALL BE FOR THE REPAIR OR REPLACEMENT OF DEFECTIVE GOODS AS PROVIDED HEREIN. Repair or replacement of any component of any CPR PROMPT does not extend this limited warranty or begin a new limited warranty period.

4. CIRCUMSTANCES NEGATING WARRANTY AND OTHER LIMITATIONS.
   (a) County Line reserves the right to refuse warranty service or replacement when product failure is due to misuse, mishandling, misapplication, accident, neglect, improper installation, modification, use of unauthorized parts or attachments, adjustment or repair performed by anyone other than County Line or its authorized agent, or any causes other than defective workmanship or material.
   (b) This limited warranty does not cover abrasion, abnormal use, damage caused by mishandling, neglect or unauthorized modification. This warranty is void if the CPR PROMPT is structurally altered.
   (c) Owner must provide proof of the date of purchase, place of purchase and the purchase price in order to obtain service under this limited warranty.
   (d) County Line makes no warranty other than as contained herein. No agent, representative, dealer, or employee of County Line has the authority to alter the obligations or limitations of this limited warranty.
   (e) COUNTY LINE MAKES NO WARRANTY, EXPRESSED OR IMPLIED, ORAL OR WRITTEN, INCLUDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO ANY BATTERIES INCLUDED WITH ANY CPR PROMPT.

5. LIMITATIONS ON IMPLIED WARRANTIES AND DAMAGES.
   (a) ANY AND ALL IMPLIED WARRANTIES ON THE CPR PROMPT, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SHALL NOT EXCEED IN DURATION THE RESPECTIVE TERMS OF THIS LIMITED WARRANTY WHICH BEGIN WITH DATE OF PURCHASE. Some states do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you.
   (b) COUNTY LINE SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF THE CPR PROMPT OR THE BREACH OF THIS OR ANY OTHER EXPRESSED OR IMPLIED WARRANTY. Some states do not allow the exclusion or limitation of incidental or consequential damages, so damages awarded for any breach of this limited warranty shall be limited to the amount of the purchase price.

6. CPR PROMPT DISCLAIMER. CPR PROMPT is classified by the United States Food and Drug Administration as a Class I Medical Device. As a customer, you understand that CPR PROMPT is designed to prompt rescuers who have received instruction in CPR.

7. WARRANTY SERVICE. To obtain warranty service or information about CPR PROMPT, contact County Line Limited's Health and Safety Products Division at 4543 Taylor Lane, Warrensville Heights, Ohio 44128, or call toll-free 1-888-SAV-LIFE (1-888-728-5433).

8. RIGHTS UNDER STATE LAW. This warranty gives you specific legal rights, and you may have other rights which vary from State to State.

CPR PROMPT™ is a Registered Trademark of County Line Limited. CPR Prompt is covered by the following patents: U.S.A. Re. 34,800; Canada 1249368; and Europe 0183462. Software is protected under copyrights © 1985, 1992 and 1996.

PART NO. 2065-700

- 12 -

# EXHIBIT K



053045

| E | INVOICE NO. | COMMENT | AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| 003 | QTR 1/2004 | | | | |

ECK: 053045    12/04/2003    CPR PROMPT    TOTAL

**COMPLI€NT**™

COMPLIENT CORPORATION
27070 MILES RD.  PH. 440-498-8800
SOLON, OHIO 44139

NationalCity.
National City Bank
Ashland, Ohio
56-389
412

053045

053045

*ONE THOUSAND TWO HUNDRED FIFTEEN AND 41 / 100

00-0001657

CPR PROMPT CORPORATION
1047 LONGMEADOW STREET
LONGMEADOW, MA 01106

| DATE | CHECK AMOUNT |
|---|---|
| 12/04/2003 | *****1,215.41* |

⑈053045⑈ ⑆041203895⑆ 0144653⑈

# EXHIBIT L

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD C. HUTCHINS )<br><br>     Plaintiff )<br><br>v. )<br><br>CARDIAC SCIENCE, INC. )<br><br>     Defendant ) | **AFFIDAVIT OF**<br>**DONALD C. HUTCHINS** |

NOW COMES DONALD C. HUTCHINS and upon being duly sworn, states that:

1.  I am over 18 years of age and have personal knowledge of the matters attested to herein.

2.  On November 29, 1994 I was issued U.S. Reissue Patent Number Re34,800-titled "CARDIOPULMINARY RESUSCITATION PROMPTING". The Patent Abstract states in part, "A portable, self powered electronic cardiopulmonary resuscitation prompting system . . ." This Reissue Patent Number Re34 ,800 is a reissue of my original Patent 4,583,524, that was issued November 21, 1984.

3.  Patent Numbers 4,583,524 and Re.34,800 can be found on over 300,000 CPR Prompting devises that been marketed since 1984 and continue today as the standard in the industry.

4.  On June 22, 1999 I was issued U.S. Patent Number 5,913,685-titled "CPR Computer Aiding". The Patent ABSTRACT states in part, "a processing unit responsive to the information signals and for providing output signals representative of proper steps to be taken in resuscitating the victim . . ."

5.  I registered CPR prompting software in the form of written instructions, program printouts and computer disk to the U.S. Copyright Office at the Library of

Congress in 1986. The copyrighted software included logic, graphics and voice commands found in my U.S. Patent #4,583,524 "reduced to practice".

6.  On June 1, 1994, I signed a License Agreement with a venture group headed by Jon Lindseth of Cleveland, Ohio. I Licensed the CPR Prompt® trademark, copyright, U.S. Patent # Re 43,800, plus Canadian and European patents in exchange for a very small royalty and 7-1/2% of the proceeds when this venture was sold or did an IPO.

7.  Jon Lindseth's venture group held the license through a succession of companies: County Line Limited, CPR Prompt LLC and finally, the Complient Corporation.

8.  In May of 2004 I realized that I had received no royalty payments or reports from The Complient Corporation ("Complient") since late summer in 2003. When I telephoned the Complient headquarters I learned that Complient had closed its operation.

9.  I was advised by the law office of Fish & Richardson that Complient had also failed to pay the most recent patent fees to Fish & Richardson as they had done on a regular basis since 1995. The accounts receivable department of Fish & Richardson determined that Complient was no longer in business. They suggested that I pay the fees so the foreign patents would not lapse. I determined that Complient had abandoned the intellectual properties they had licensed from me as successor to County Line Limited and that I should reclaim my properties.

10.  I made several efforts to contact Complient to reclaim my intellectual properties, marketing materials and tooling under terms of the June 1, 1994 License Agreement. There is no longer a listing for Complient in the Cleveland area and all notices from me to Complient's management were left unanswered. At this point I had no recourse but to declare his intellectual properties abandoned by the Jon Lindseth group, reclaim them as specified in the Agreement and discuss licensing these properties to the Zoll Corporation.

11.  On April 29, 2004 I received a phone call from Attorney Randall T. Skaar who stated that he was a patent attorney representing Cardiac Science, Inc. Attorney Skaar said that Mr. William Parker had filed a patent infringement against Cardiac Science that involved patents that Hutchins had licensed to Complient

Corporation. He followed the telephone conversation with a letter he sent the next day.

12. I had received no notification from Complient about the acquisition by Cardiac Science and was told by my patent attorneys that Complient had abandoned his patents, trademarks, and copyrights. Since November of 2003 Cardiac Science has been and continues to manufacture and sell products covered by my patents and is using the CPR Prompt® trademark on goods that it markets. As a result Cardiac Science is infringing on these patents and trademark.

13. I telephoned the Channing Bete Company, a national distributor of American Heart Association Products. The Channing Bete Company is a Massachusetts company headquartered at One Community Place, South Deerfield, MA 01373. Channing Bete confirmed that since November of 2003 the CPR Prompt® product line had been manufactured and marketed by the Cardiac Science company of Irvine, California.

14. In an attempt to received further information on a cross-license agreement I had made with William Parker, Attorney Skaar and I exchanged a number of e-mail messages. An attachment to one of these messages showed that Complient told Cardiac Science that the License Agreement would give Cardiac Science the right to use my Patent #5,913,685. This is not true and Cardiac Science has no legal claim to this patent. Its use by Cardiac Science would also infringe on my properties. At the same time Attorney Skaar said that he knew of no patent attorney that had done due diligence on the Complient/Cardiac Science acquisition.

15. Searches on the Internet provided me with press releases, security analyst reports, and Security and Exchange Commission Forms 8-K and 10-K that conveyed terms of the acquisition. A report from Wedbush Securities contained herein as Exhibit I condenses terms of the acquisition with these words, "Last week (October 21, 2003) Cardiac Science announced the acquisition of privately-held Complient Corporation for $47 million using 10.25 million shares of common stock."

3

16.   Under terms of the License Agreement dated June I, 1994 that I signed as patent owner and as President of the CPR Prompt Corporation, I have the right to reclaim my intellectual properties. I have done so.

17.   Cardiac Science, Inc. is infringing on my Patent #Re 34,800, my copyright and the trademark CPR Prompt®, through the manufacture and sale of its line of safety products through distributors such as the Channing Bete Company.


FURTHER AFFIANT SAYETH NAUGHT.

DONALD C. HUTCHINS


Sworn to before me and subscribed in my presence the 1st day of July, 2004

NOTARY PUBLIC
Comm-Exp. 8/20/04

4

# EXHIBIT M

424B3 1 d424b3.htm CARDIAC SCIENCE PROSPECTUS SUPPLEMENT

**PROSPECTUS SUPPLEMENT NO. 1**      Filed Pursuant to Rule 424(b)(3)

(To Prospectus Dated December 19, 2003)      Registration No. 333-110898

# CARDIAC SCIENCE, INC.

## 26,638,319 Shares of Common Stock
### ($0.001 par value)

    This prospectus supplement supplements information contained in that certain prospectus dated December 19, 2003 of Cardiac Science, Inc., relating to the offer and sale from time to time of up to (i) 12,483,334 shares of our outstanding common stock and (ii) 14,154,985 shares of our common stock issuable upon exercise of warrants, which are held by certain stockholders and warrant holders named in the prospectus under the section entitled "Selling Stockholders." This prospectus supplement is not complete without, and may not be delivered or utilized except in connection with, the prospectus, including any amendments or supplements thereto. Capitalized terms used in this prospectus supplement but not defined shall have the meanings assigned to such terms in the prospectus.

    Subsequent to the date of the prospectus, an aggregate of 7,534,911 shares of our common stock set forth in the prospectus as being owned by Complient Corporation were assigned to certain of Complient Corporation's stockholders in connection with Complient Corporation's plan of liquidation and dissolution. The following table amends and restates in its entirety the table set forth in the prospectus under the caption "Selling Stockholders" to reflect the foregoing assignments (no additional shares of our common stock are being offered for resale hereunder):

| Selling Stockholder | Number of Shares of Common Stock Beneficially Owned Prior to Offering(1) | Number of Shares of Common Stock Offered for Sale Hereunder | Number of Shares of Common Stock Beneficially Owned Assuming Sale of All Shares offered Hereunder | Percentage of Common Stock Beneficially Owned Assuming Sale of All Shares Offered Hereunder |
|---|---|---|---|---|
| Perseus Acquisition/ Recapitalization Fund, LLC(2) | 5,731,039 | 5,731,039 | — | * |
| Perseus Market Opportunity Fund, LP(3) | 5,334,109 | 5,334,109 | — | * |