## LICENSE AGREEMENT

This License Agreement is entered into as of June $\underline{1}$, 1994, by and between County Line Limited Partnership, a Delaware limited partnership having its principal place of business at 4543 Taylor Lane, Warrensville Heights, Ohio 44128 (hereinafter "LICENSEE"), CPR-PROMPT Corporation, a Massachusetts corporation having its principal place of business at 60 Brookdale Drive, Springfield, Massachusetts 01104 (hereinafter "CPR-PROMPT"), and Donald C. Hutchins ("Hutchins"), an individual having an address at 60 Brookdale Drive, Springfield, Massachusetts 01104 (CPR-PROMPT and Hutchins hereinafter collectively referred to as "LICENSOR").

### WITNESSETH:

WHEREAS, LICENSOR represents that Hutchins and/or CPR-PROMPT are the owners of U.S. Patent No. 4,583,524, as well as any corresponding foreign patents, disclosing and claiming a method for using, and a device for providing, rescue aid instructions to trained individuals concerning cardiopulmonary resuscitation ("CPR") and first aid for choking;

WHEREAS, Hutchins and/or CPR-PROMPT are the owners of the trade name and trademark "CPR-PROMPT" together with any trade dress, copyrights, logos or other trademarks used in connection with the sale of a device for providing such rescue aid instructions, together with the goodwill of the business associated therewith; and

WHEREAS, LICENSEE desires to obtain, and LICENSOR is willing to grant, an exclusive license (subject to the Parker Agreement (defined below)) to the device as disclosed and claimed in U.S. Patent No. 4,583,524, and the corresponding foreign patents, and certain other rights therein, under the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

### I.   DEFINITIONS

1.1   "Affiliate" of any person or entity means any person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with first mentioned person or entity; and for purposes hereof the term "control" means the possession, directly or indirectly or as a trustee, executor or administrator, of the power to direct or cause direction of the management or policies of a person or entity, either

through the ownership of stock or other securities, by contract or otherwise.

1.2    "CPI Fraction" shall mean a fraction, the numerator of which shall be the Consumer Price Index for All Urban Consumers, as published monthly by the United States Department of Labor, for the month immediately preceding the start of each new twelve-month period of this Agreement, and the denominator of which shall be such Consumer Price Index for May 1994, or, in the event such Consumer Price Index shall no longer be published, a similar fraction based upon a similar consumer price index selected by LICENSOR.

1.3    "Confidential Information and Trade Secrets" means information including, but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing or process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers of Licensed Products whether currently existing or otherwise developed or acquired by LICENSOR during the term of this Agreement, that derive economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts which are reasonable under the circumstances to maintain its secrecy, and any other information that is a trade secret under applicable law, and any other information relating to the Licensed Products that is material to LICENSOR and not generally available to the public.

1.4    "Consumer Version" means a type of Licensed Product which is manufactured at a cost of $45.00 or less per device, times the CPI Fraction.

1.5    "Copyrights" means any copyrights, registered or unregistered, used in connection with manufacture and sale of the Licensed Products.

1.6    "Inventory" means LICENSOR's inventory of the Licensed Products.

1.7    "Know-How" means all the Licensed Product concepts, sketches, prototypes, ideas, designs, layouts, models, tooling patterns, mechanical drawings, production planning, techniques, formulae, processes, procedures, specifications, inventions, patent applications, Confidential Information and Trade Secrets, documents, data, records, notes, technical writings, computer programs, manuals, pictorial reproductions, drawings, graphics, and other information now existing or hereafter developed, created, produced, possessed or invented by LICENSOR.

118331.5                              2

1.8  "Licensed Patents" means U.S. Patent No. 4,583,524, and any divisions or continuations in whole or in part, reissues, reexaminations or extensions thereof, and any foreign counterparts or extensions thereof, including, without limitation, those patents and applications listed in Exhibit A attached hereto and incorporated herein by reference and any other patent now or hereafter owned, licensed or controlled by LICENSOR which applies to this product category, whether listed or not on such Exhibit A and any patents incorporated herein pursuant to Section 4.6.

1.9  "Licensed Products" means devices for providing rescue aid instructions to trained individuals concerning CPR as disclosed and claimed in U.S. Patent No. 4,583,524 or any other Licensed Patents, which may also be the subject of certain of the Confidential Information and Trade Secrets and Know-How which are now owned and used by LICENSOR, or which may in the future be owned, licensed or controlled by LICENSOR, and any modifications or improvements thereto, which now exist or which may exist in the future and are owned, licensed or controlled by LICENSOR, covering or relating to the design, manufacture or use of a device for providing rescue aid instructions to trained individuals concerning CPR, or component or material thereof.

1.10  "LICENSEE Improvements" means any idea, information, invention, development, discovery, design, method or process or other innovation, whether patentable or not, hereafter conceived or made or otherwise acquired by LICENSEE or a Sublicensee or both.

1.11  "Marks" means the name and mark "CPR-PROMPT," any trade dress, logos or other trademarks used in connection with the Licensed Products, and any applications or registrations therefor, including, without limitation, the registrations listed in Exhibit B attached hereto and incorporated herein by reference.

1.12  "Net Sales" means the gross selling price or gross lease proceeds of the Licensed Products sold or leased by or on behalf of LICENSEE, less accepted returns from LICENSEE's customers, including but not limited to, breakage which LICENSEE credits to its customers; excise or other sales taxes paid or absorbed by or on behalf of LICENSEE; customs, duties and consular fees; transportation, insurance charges and special packaging fees paid or absorbed by or on behalf of LICENSEE; external sales commissions, including but not limited to, fees paid to non-employee sales representatives, and any other commercially acceptable promotional, quantity, trade or cash discounts, refunds, credits, and other sales adjustments paid or granted by or on behalf of LICENSEE in connection with or on account of Licensed Products.

1.13 "Parker" means William S. Parker, a party to the Parker Agreement.

1.14 "Parker Agreement" means that certain Settlement Agreement dated July 9, 1993 among LICENSOR and Parker, which grants to Parker and certain future Affiliates of Parker a non-exclusive, royalty-free license, without the right to sublicense, under the claims of U.S. Patent No. 4,583,524 and under the claims of any U.S. patent issuing on reissue application Serial No. 06/983,409 or any continuations or divisions thereof, subject to the terms and conditions in such agreement.

1.15 "Pierce Patent" means U.S. Patent No. 4,863,385 issued to Richard Pierce.

1.16 "Professional Version" means a type of Licensed Product which is manufactured at a cost of more than $45.00 per device, times the CPI Fraction.

1.17 "Sublicense" means any agreement by LICENSEE with any third party which relates to all or any part of the Licensed Products which grants to such third party the right to practice the Licensed Patents, Confidential Information and Trade Secrets and Know-how, or to make, lease, use, loan and sell, individually or collectively, products, apparatus, methods or processes covered by the Licensed Patents, but does not include (1) any agreements for the loan, use, sale or lease of the Licensed Products between LICENSEE and any one or more distributors or other persons or entities or (2) any assignment of all of LICENSEE's rights, licenses and obligations under this Agreement.

1.18 "Sublicensee" means the third party recipient of a Sublicense from LICENSEE.

1.19 "Sublicensee Payments" means payments made by Sublicensees.

1.20 "Tooling" means LICENSOR's tooling used for manufacture of the Licensed Products.

## II.  GRANT OF RIGHTS

2.1 LICENSOR hereby grants to LICENSEE a worldwide, exclusive right and license to make, have made, use, sell, lease and have sold and leased the Licensed Products pursuant to the Licensed Patents, Confidential Information and Trade Secrets and Know-how.  Additionally, LICENSEE shall have the right to grant Sublicenses with respect to all rights and licenses granted herein upon such terms and conditions as LICENSEE deems appropriate; provided, however, that without the prior written consent of LICENSOR no such Sublicense shall be

granted by LICENSEE to any Affiliate of LICENSEE.
Additionally, LICENSEE shall have the right to assign this
Agreement and all of its rights, licenses and obligations
hereunder to any person or entity, and in the event of such
an assignment the term "LICENSEE" as used herein shall mean
and refer to such assignee. Notwithstanding the foregoing,
the foregoing license and rights are granted subject to the
Parker Agreement. This license does not include or cover
LICENSEE Improvements, the sole right and title to which are
owned by LICENSEE.

2.2   LICENSOR has disclosed and will disclose to LICENSEE all
      information regarding the Licensed Products, Confidential
      Information and Trade Secrets, Know-How and Licensed
      Patents, in order to enable LICENSEE to secure the rights
      and license granted herein and to fully evaluate and exploit
      the design and sales potential of the Licensed Products.

2.3   LICENSOR hereby grants to LICENSEE a worldwide, exclusive
      right and license in and to the Copyrights, including the
      right to reproduce, make derivatives, distribute and to
      display the Licensed Products or other sales materials
      containing the Copyrights, with the same rights of
      sublicense and assignment set forth in Section 2.1.

2.4   LICENSOR hereby sells, assigns and transfers to LICENSEE all
      right, title and interest in and to the Marks for use in
      connection with, the manufacture, marketing, distribution
      and sale or lease of the Licensed Products. Payment for the
      Marks is included in the initial payment made by LICENSEE to
      CPR-PROMPT.

2.5   LICENSOR hereby sells, assigns and transfers to LICENSEE all
      right, title and interest in and to the Inventory, and
      LICENSEE shall pay to CPR-PROMPT for up to 350 units of
      Inventory an amount equal to CPR-PROMPT's cost for such
      units of Inventory.

2.6   LICENSOR hereby leases to LICENSEE all of the Tooling for
      four (4) years from the date of this Agreement for $1.00 per
      year, payable to CPR-PROMPT, and hereby grants an option to
      LICENSEE to acquire all the Tooling at any time during the
      term of this lease for the greater of $100,000.00 or the
      depreciated book value of the Tooling as reflected on
      Exhibit C attached hereto, payable to CPR-PROMPT. If such
      option is exercised prior to March 31, 1997 on other than
      March 31 of any year, the book value on such date will be
      pro-rated based upon the values set forth on Exhibit C.
      LICENSEE will be responsible for taxes, insurance and
      maintenance with respect to the Tooling during the term of
      this lease, and LICENSEE will maintain the Tooling in
      accordance with its general standards for maintenance of tooling.

2.7   LICENSOR hereby assigns to LICENSEE all of LICENSOR's right, title and interest in that certain Custom Manufacturing Services Agreement between LICENSOR and Texas Instruments Incorporated ("TI") dated October 25, 1991, and hereby represents and warrants that it has obtained the oral consent of TI (from Scott Nathisen) to such assignment, subject to TI's credit approval of LICENSEE. LICENSEE hereby assumes all of LICENSOR's obligations under such agreement arising on or after the date hereof.

2.8   LICENSEE will name LICENSOR as an additional insured with respect to its insurance covering the Tooling and its product liability insurance and will furnish to LICENSOR from time to time when requested an insurance certificate to this effect.

## III.  ROYALTIES/PAYMENTS

3.1   In consideration for the rights and licenses granted herein, LICENSEE shall deliver to CPR-PROMPT as an initial payment a check for One Hundred Thousand Dollars ($100,000.00) upon execution of this Agreement. CPR-PROMPT will hold such check until it obtains shareholder approval for the transactions contemplated by this Agreement, which it will seek as soon as practicable and which it covenants it will receive. If when it obtains such shareholder approval, (a) less than eleven percent (11%) of the outstanding stock of CPR-PROMPT has failed to vote in favor of such transactions, and (b) no litigation relating to this Agreement or such transactions is pending or threatened, CPR-PROMPT shall cash such check; however, if within thirty (30) days from the date of this Agreement, it has not received such approval, or if when it obtains such approval, the conditions set forth above in (a) and (b) are not met, it shall so notify LICENSEE and LICENSEE shall have the right within ten (10) days after receipt of such notice to terminate this Agreement pursuant to Section 8.5 and receive back the $100,000.00 check.

3.2   Additionally, during each of the first twelve (12) months of this Agreement, LICENSEE shall pay CPR-PROMPT Four Thousand Dollars ($4,000.00) per month on or before the last day of each month, which payments shall constitute an advance against royalties payable under Sections 3.3 and 3.4 and shall be deducted from the royalties which become payable thereunder by LICENSEE.

3.3   In further consideration for the rights and license granted herein, LICENSEE shall pay either of the following amounts to CPR-PROMPT based on sales of any Licensed Products in any country in which any of the Licensed Patents are in effect and which Licensed Products are covered by one or more non-

invalidated claims of any of the Licensed Patents in such
country:

(a)    With respect to Net Sales of the Professional Version
       of the Licensed Products:

|  | Royalty Percentage |
|---|---|
| For the first twelve months of this Agreement | Five Percent (5%) |
| Thereafter | Three and One-Half Percent (3 1/2%) |

(b)    With respect to Net Sales of the Consumer Version of
       the Licensed Products, during the term of this
       Agreement, the royalty percentage shall be two percent
       (2%).

In the event any Licensed Products are sold for resale to an
Affiliate of LICENSEE, the royalties to be paid in respect
thereto shall be computed on the Net Sales price at which
the Affiliate resells such Licensed Products rather than on
the Net Sales price of LICENSEE.

3.4    LICENSEE shall make minimum royalty payments (which include
       Sublicensee Payments) to CPR-PROMPT with respect to each
       twelve-month period during which this Agreement is in effect
       commencing with the effective date hereof.  Such minimum
       royalty payments shall be Forty Eight Thousand Dollars
       ($48,000.00) for the first twelve months of this Agreement
       and Ten Thousand Dollars ($10,000.00) for each twelve-month
       period of this Agreement thereafter.  In the event that the
       royalties payable with respect to each twelve-month period
       following the effective date of this Agreement pursuant to
       Sections 3.2, 3.3 and 3.5 do not aggregate such minimum
       royalty payments, then LICENSEE shall, within thirty (30)
       days following the end of such twelve-month period, pay to
       CPR-PROMPT the difference between the royalties actually
       paid to CPR-PROMPT and the minimum royalty payment amount
       for that twelve-month period.  In the event Hutchins fails
       to perform his obligations under Section 3.9, no minimum
       royalties shall be due for the first twelve months of this
       Agreement.

3.5    With respect to Sublicenses granted by LICENSEE under this
       Agreement, LICENSEE shall pay to CPR-PROMPT fifty percent
       (50%) of any amounts actually received from its
       Sublicensees, after deducting LICENSEE's actual and
       documented out-of-pocket costs for such sublicensing.

3.6  LICENSEE shall submit to LICENSOR (i) within sixty (60) days
     of the close of each of its first three (3) fiscal quarters
     of each fiscal year and (ii) within ninety (90) days of the
     close of its last fiscal quarter of each fiscal year, a
     written report setting forth the gross sales and the
     deductions taken to determine the Net Sales of the
     Professional Version and the Net Sales of the Consumer
     Version sold by or on behalf of LICENSEE and the Sublicensee
     Payments for that quarter, together with the royalties due
     to CPR-PROMPT for that quarter.  The report shall be
     submitted by LICENSEE regardless of whether royalties are
     due for that quarter.

3.7  LICENSEE shall keep at its office in Warrensville Heights,
     Ohio true and accurate accounts of all Licensed Products
     sold or leased hereunder and all Sublicensee Payments.  Such
     records shall show the number of Licensed Products sold or
     leased and the dollar sales of Licensed Products sold or
     leased by or on behalf of LICENSEE.  LICENSOR is hereby
     given the right to access through an independent public
     accountant to those books of LICENSEE involving transactions
     covered by this Agreement for the purpose of verifying
     reports received by it, such access to be at reasonable
     business hours upon providing reasonable advance notice, and
     at the sole expense of LICENSOR.  Such right of access shall
     be limited to once during each year this Agreement is in
     effect. LICENSEE will retain for at least five (5) years all
     relevant records concerning sales of the Licensed Products.

3.8  All statements, accounts and records provided by LICENSEE
     pursuant to this Agreement are deemed to be confidential and
     proprietary information of LICENSEE, and shall not be
     disclosed without LICENSEE's prior written consent, except
     to LICENSOR's accountants and attorneys who are under a duty
     of confidentiality and except pursuant to a valid court
     order or, if required, in legal proceedings.

3.9  During the first twelve months of this Agreement, Hutchins
     shall provide to LICENSEE at no charge up to 500 hours of
     his time, at such times and places as are mutually agreed
     upon, to assist LICENSEE in connection with the development
     and sale of the Licensed Products; provided that LICENSEE
     shall reimburse Hutchins, according to LICENSEE's policies,
     for reasonable travel and living expenses incurred by
     Hutchins in connection with providing such assistance.

3.10 After the date of this Agreement, LICENSEE will assign all
     of its rights and obligations under this Agreement to an
     Affiliate of LICENSEE.  Such Affiliate will cause each
     partner of such Affiliate who purchases or otherwise
     acquires a partnership interest of such Affiliate directly
     ^rom such Affiliate to agree to pay to CPR-PROMPT seven and

one-half percent (7.5%) of the net proceeds of any sale of
any or all of such partnership interest to any person or
entity which is not an Affiliate of such partner.  "Net
proceeds" shall mean the proceeds received by such partner
for such sale after deduction of an amount equal to the sum
of (a) the actual and documented legal, accounting, travel
and all other expenses attributable to the sale, (b) the
actual and documented brokers' commissions, finders' fees
and similar costs attributable to the sale, and (c) all
other actual and documented costs and expenses attributable
to the sale.  In the event the 7.5% payment contemplated
hereby is neither (a) deductible for federal or state income
tax purposes by the selling partner nor (b) a proper
adjustment in the tax basis of the selling partner, the "net
proceeds" of such partner shall be further reduced by the
federal or state income taxes attributable to the gain on
such sale.  If the net proceeds from the sale are paid other
than in cash, such partner may elect in satisfaction of the
obligations to CPR-PROMPT under this Section 3.10 to have
CPR-PROMPT receive its 7.5% payment either in (i) the same
type of consideration that such partner receives from the
sale, or (ii) a cash payment based upon the fair market
value of such consideration on the date of the closing of
the sale.  After the sale of all such partnership interests
to a single purchaser (which is not an Affiliate) in a
single transaction, whether by direct sale, merger,
consolidation or other transaction pursuant to which CPR-
PROMPT receives 7.5% payments, the obligation to cause each
partner thereafter to agree to make such payments shall
expire.  If such Affiliate conducts a public offering under
the Securities Act of 1933, no person or entity purchasing
stock in such offering or from such Affiliate thereafter
shall be required to agree to make such payments.  If such
Affiliate is a corporation, limited liability company or
other business entity, all references in this Section 3.10
to "partner" shall mean "shareholder" and all references to
a "partnership interest" shall mean an "equity interest."
The payments contemplated by this Section 3.10 shall be in
addition to and not in lieu of the royalties payable
pursuant to Sections 3.1 through 3.5.

## IV.  REPRESENTATIONS AND WARRANTIES; LICENSED PATENTS AND MARKS

4.1  LICENSOR represents and warrants that:

    (a)  Hutchins has the full legal right and capacity to
        execute, deliver and perform this Agreement and he and
        his Affiliate own more than the minimum number of
        shares necessary to approve the transactions
        contemplated hereby on behalf of CPR-PROMPT;

116351.8                              9

(b)  CPR-PROMPT has the full corporate power and authority
     to execute, deliver and perform this Agreement;

(c)  the execution, delivery and performance of this
     Agreement by CPR-PROMPT have been duly authorized by
     all requisite corporate action on the part of CPR-
     PROMPT, other than shareholder approval, which will be
     obtained within thirty (30) days from the date of this
     Agreement (copies of which actions will be provided to
     LICENSEE);

(d)  this Agreement has been duly and validly executed and
     delivered by LICENSOR and constitutes the legal, valid
     and binding obligation of LICENSOR, enforceable against
     LICENSOR in accordance with its terms;

(e)  LICENSOR will indemnify LICENSEE against any failure of
     LICENSOR to comply with the bulk sales law of any state
     in connection with the transactions contemplated by
     this Agreement and Hutchins hereby waives any claim he
     has against CPR-PROMPT or LICENSEE or its assets under
     any such law;

(f)  CPR-PROMPT's aggregate liabilities to all persons or
     entities other than Hutchins are less than $20,000 on
     the date hereof; and

(g)  the claims of LICENSOR under the Licensed Patents would
     prevail over the claims of the patent and patent
     application of Parker which are described in the Parker
     Agreement.

Simultaneously with LICENSOR's execution and delivery of
this Agreement LICENSOR has delivered to LICENSEE an opinion
of LICENSOR's counsel, dated as of the date hereof, with
respect to the matters set forth in this Section 4.1 other
than Sections 4.1(e), (f) and (g).

4.2  LICENSOR hereby represents and warrants that:

(a)  they are the sole and exclusive owner of the entire
     right, title and interest in and to the Licensed
     Patents, Marks, Copyrights, Licensed Products,
     Confidential Information and Trade Secrets, Know-How,
     Tooling and Inventory, free and clear of all liens,
     claims, and encumbrances and restrictions of any kind,
     other than, with respect to the Licensed Patents, the
     Parker Agreement, and have full right and capacity to
     grant the license set forth herein;

(b)  they have not granted or transferred any rights in the
     Licensed Patents, Marks, Copyrights, Licensed Products,

Confidential Information and Trade Secrets, Tooling and
Inventory and Know-How other than, with respect to the
Licensed Patents, the Parker Agreement;

(c)  CPR-PROMPT has all necessary licenses, permits and
other authorizations and approvals from the United
States Food and Drug Administration and Federal
Communications Commission necessary to manufacture and
sell the Licensed Products and to enter into and
perform this Agreement, and to their best knowledge has
all other necessary licenses, permits and other
authorizations and approvals;

(d)  to their knowledge, no prior art exists which would
invalidate any of the claims of the Licensed Patents;
and

(e)  in each case to the best knowledge of LICENSOR, the
Licensed Patents, Marks, Copyrights, Confidential
Information and Trade Secrets, Know-How and sale or
lease of the Licensed Products do not and will not
infringe upon or violate any other letters patent
heretofore issued or registered in the United States or
any foreign country or any other proprietary rights of
any third party, and there are no third party
infringers or potential infringers of the Licensed
Patents, Marks, Copyrights, Confidential Information
and Trade Secrets and Know-How except the potential
infringement by the owner of the Pierce Patent, and the
claims of such patent are not superior to the claims of
the Licensed Patents.

4.3  LICENSOR has not at any time filed, or caused to be filed,
applications for other patents, in their own names or in the
name of a third party, in the United States or elsewhere,
for any of the Licensed Products or a similar product, other
than the Licensed Patents.

4.4  LICENSOR shall do all acts reasonably necessary to maintain,
sustain, reexamine, reissue, or extend the Licensed Patents.
For the first twelve months of this Agreement, LICENSOR
shall do so at its expense; thereafter LICENSEE shall pay or
reimburse LICENSOR for their reasonable expenses in so
doing.  In the event LICENSOR fails to take any such action
LICENSEE is hereby authorized to do so as attorney-in-fact
or otherwise on behalf of LICENSOR and, during the first
twelve months of this Agreement, to deduct all costs and
expenses incurred from amounts payable by it hereunder.  In
addition, LICENSOR further acknowledges that they have
heretofore furnished to LICENSEE a schedule of the
maintenance fees payable by them with respect to the
Licensed Patents, and, during the first twelve months of

this Agreement, LICENSOR shall pay all such fees at least thirty (30) days in advance of their due date (without regard to any applicable grace period) and to provide LICENSEE with evidence of such payment.

4.5   LICENSEE will properly affix the statutory patent, copyright and trademark notices to the Licensed Products.

4.6   If, while this Agreement is in effect, LICENSOR makes further improvements to the Licensed Products, or similar products, or becomes the owner of any such improvements or similar products, then LICENSOR shall communicate such improvements or similar products to LICENSEE.  At LICENSEE's option, such improvements or similar products shall then be incorporated into the Licensed Patents, Confidential Information and Trade Secrets, Know-How and Licensed Products without further consideration from LICENSEE therefor, and LICENSOR shall give LICENSEE full information regarding such improvements or similar products.

4.7   LICENSEE shall prepare, file and prosecute at LICENSEE's expense, insofar as it is deemed appropriate in the sole judgment of LICENSEE, applications for letters patent in the United States on all improvements hereafter made by LICENSOR, as well as corresponding foreign applications of letters patent, which applications are and shall be incorporated into the Licensed Patents without further consideration from LICENSEE.  If LICENSEE elects not to prosecute an application for letters patents in any country, then LICENSOR in its discretion and at its expense may prosecute such application but shall not be obligated to do so.  LICENSEE shall bear the expense of obtaining any additional patents or completing any patent applications which LICENSEE elects to prepare, file or prosecute under this provision and shall bear the expense of any patent fees associated with such additional patents or applications as well as any costs of maintaining the patents, including taxes thereon.  LICENSOR shall similarly bear the expense of any patents or patent applications which they elect to prepare, file or prosecute and the expense of any such patent fees as well as any costs of maintaining such patents, including taxes thereon.  LICENSOR shall, without further consideration therefor, at the request of LICENSEE, do all acts necessary or appropriate in connection with such applications for letters patent.  In the event that any administrative agency responsible for granting any of the patent applications, LICENSEE may in its discretion appeal such decision, but shall not be obligated to do so.  If LICENSEE elects not to appeal such decision, LICENSOR may, in their discretion and at their expense, appeal such decision, but shall not be obligated to do so.

4.8   LICENSOR further represents and warrants that they have
      provided to LICENSEE all information concerning
      communications with any governmental agency, including
      without limitation, the Food and Drug Administration, the
      past and current regulatory approval status, and any past or
      current regulatory violations, concerning the Licensed
      Products, and that such information is true, complete and
      correct.

4.9   LICENSEE represents and warrants that:

      (a)   LICENSEE has the full legal right and capacity to
            execute, deliver and perform this Agreement;

      (b)   the execution, delivery and performance of this
            Agreement by LICENSEE have been duly authorized by all
            requisite partnership action on the part of LICENSEE
            (copies of which actions have been provided to
            LICENSOR);

      (c)   this Agreement has been duly and validly executed and
            delivered by LICENSEE and constitutes the legal, valid
            and binding obligation of LICENSEE, enforceable against
            LICENSEE in accordance with its terms; and

      (d)   for purposes of Section 3.10, the Affiliate referred to
            therein shall provide CPR-PROMPT with a list of the
            names and addresses and resulting ownership percentage
            of each of the partners or shareholders of such
            Affiliate and shall update such list whenever such
            Affiliate sells or otherwise issues additional
            partnership or equity interests.

                V.   ENFORCEMENT AGAINST THIRD PARTIES

5.1   Upon either party to this Agreement learning of any actual
      or threatened infringement or misappropriation by any third
      party of any claim of the Licensed Patents, Marks,
      Copyrights, or any Confidential Information and Trade
      Secrets or Know-How, such party shall promptly notify the
      other party in writing of such actual or threatened
      infringement or misappropriation, giving details thereof.
      With respect to such infringement or misappropriation,
      LICENSEE shall have the right to take whatever action it
      deems appropriate, including bringing a suit at its own
      expense against such third party, and to retain any damage
      recovery obtained. In any such suit brought by LICENSEE,
      LICENSOR shall, if required by law, join as party plaintiff
      at its own expense. In the event that LICENSEE elects not
      to take action against such third party, then LICENSOR shall
      have the right to take action on its own behalf against such
      third party, and shall retain any damage recovery obtained.

116351.8                          13

5.2  When either LICENSOR or LICENSEE brings an infringement or
misappropriation suit, the other party shall cooperate and
assist in the preparation and prosecution of the suit,
including the execution of necessary documents and providing
requested testimony.  The party bringing the suit shall pay
all reasonable travel expenses of the other party.

## VI.  INDEMNITY

6.1  In the event a claim is made against LICENSEE or any
Sublicensee alleging that any claim of the Licensed Patents,
Marks, Copyrights or Confidential Information and Trade
Secrets or Know-How is invalid or unenforceable or that the
sale or lease of the Licensed Products infringes any patent
or patents or other superior rights of any third party,
LICENSEE shall, at its option, commence the defense of
LICENSEE and its Sublicensees, by bringing or defending a
lawsuit or settling the claim, and LICENSOR will cooperate
with LICENSEE in such defense and settlement and shall take
no action inconsistent therewith.  In the event that
LICENSEE elects not to defend against any such claim or
elects to terminate such defense, then LICENSOR may commence
such defense by bringing a lawsuit or settling the claim,
and LICENSEE will cooperate with LICENSOR in such defense
and settlement and shall take no action inconsistent
therewith.  In either such event LICENSEE shall have the
right to deposit the payments accrued and not theretofore
paid to LICENSOR resulting from the sales or leases of
Licensed Products which are the subject of such alleged
invalidity, unenforceability or infringement and all
payments thereafter accruing under this Agreement resulting
from the sales or leases of such Licensed Products in an
escrow account in a national bank selected by LICENSEE.  If
such claim is finally resolved favorably to LICENSEE, all
such payments in the escrow account, including interest
thereon, will immediately be paid to LICENSOR.  If such
claim is finally resolved adversely to LICENSEE, all funds
in such account, including interest thereon, shall be paid
to LICENSEE and its Sublicensees.

6.2  If any claim of the Licensed Patents is held invalid or
unenforceable or held to infringe any patent or patents or
other superior rights of any third party by a decision of
any tribunal of competent jurisdiction, then with respect to
any such claim so held invalid or unenforceable or held to
infringe the superior rights of any third party, the
decision of such tribunal shall be followed from the date of
entry of such decision and with respect to any such claim,
LICENSEE shall, in addition to any other rights or remedies
it may have, thereafter be relieved from making any payments
with respect to such claim, and from including in its
reports hereunder any items covered solely by such claim;

provided, however, that if there are conflicting final decisions by courts of equal jurisdiction, the one of latest date shall be controlling.

6.3 Subject to Sections 6.1 and 6.2, LICENSOR shall jointly and severally defend, indemnify and hold LICENSEE and its Sublicensees harmless from any and all losses, damages or expenses (including reasonable attorneys' fees) incurred by LICENSEE or any of its Sublicensees as a result of or relating to any breach or threatened breach of LICENSOR's representations, warranties, or obligations hereunder.

### VII.   CONFIDENTIALITY

7.1 LICENSOR and LICENSEE shall not use or permit use of any Confidential Information and Trade Secrets and Know-How except in accordance with this Agreement, and shall not disclose any Confidential Information and Trade Secrets and Know-How to others except to the extent such disclosure is necessary to perform or enforce this Agreement.

7.2 Neither LICENSOR nor LICENSEE shall be under an obligation of confidentiality to the extent any Confidential Information and Trade Secrets and Know-How:

    (i)        has previously been made public in writing;

    (ii)       was already known to the other party in writing at the time the disclosure was made by the disclosing party;

    (iii)     becomes public knowledge other than by breach of this Agreement; or

    (iv)     becomes otherwise available in writing from a third party not bound by any confidential relationship.

### VIII.   TERM AND TERMINATION OF AGREEMENT

8.1 Subject to earlier termination as provided for in this Agreement, the licenses provided for in this Agreement shall be effective from the date of this Agreement and shall continue for as long as LICENSEE wishes to use the Licensed Patents, Confidential Information and Trade Secrets and Know-How. Subject to earlier termination as provided for in this Agreement, the obligation of LICENSEE to pay royalties shall terminate upon expiration of the Licensed Patents and its obligation to pay royalties in a particular country shall terminate upon the expiration of the last of the Licensed Patents in force in such country.

8.2 Either LICENSOR or LICENSEE is entitled to terminate this Agreement upon ninety (90) days' written notice in the event of a material breach of this Agreement by the other party.

If the breach is cured within such ninety (90) day period, or if the breach is incapable of being cured within such ninety (90) day period and the party in breach in good faith initiates *bona fide* performance of a cure within such period and completes such cure not later than one hundred eighty (180) days from the date of notice of termination, then such notice of termination shall be null and void. For purposes of this Agreement, a material breach by LICENSEE giving rise to rights of termination shall be limited to a breach of Sections 3.1 through 3.7, 3.10 and 4.9.

8.3    In the event of termination of this Agreement, no further minimum royalty payments shall be due from LICENSEE to CPR-PROMPT. Termination of this Agreement shall not relieve LICENSEE of its obligation to pay other royalties accrued prior to such termination.

8.4    Upon termination of this Agreement, LICENSEE shall have the right to complete any and all contracts for the sale of the Licensed Products that it may then have upon its books or for which it has become obligated, and may work up and sell such uncompleted parts of the Licensed Products as it may have on hand at such termination date; provided, however, that all such contracts and such sales must be completed within one (1) year after such termination.

8.5    This Agreement shall terminate as of the date specified in a written notice from LICENSEE to LICENSOR indicating that after such date LICENSEE shall cease its efforts to actively make, have made, use, sell or have sold the Licensed Products and that it terminates this Agreement for that reason.

8.6    Any cause of action or claim of a party arising from any breach of this Agreement by the other party shall survive termination of this Agreement.

8.7    In the event LICENSEE terminates this Agreement pursuant to Section 8.5 prior to the expiration of the Licensed Patents, any existing Sublicensee of LICENSEE may elect to continue its Sublicense with LICENSOR by advising LICENSOR within sixty (60) days of Sublicensee's receipt of written notice of such termination of its election to continue such Sublicense. LICENSOR shall be bound by the terms of such Sublicense but shall be entitled to retain and not remit to LICENSEE any amounts received from such Sublicensee payable thereunder after such termination.

8.8    In the event LICENSEE terminates this Agreement pursuant to Section 8.5 prior to the expiration of the Licensed Patents, the Marks and all sales and marketing materials relating to

the Licensed Products owned by LICENSEE at that time shall be transferred back to CPR-PROMPT at no cost to CPR-PROMPT.

## IX.   GENERAL PROVISIONS

9.1   Any notice or other required communication to either party to this Agreement required or permitted to be given hereunder shall be in writing and shall be either delivered in person or sent by registered or certified mail, return receipt requested, postage prepaid, to the address of such party as set forth herein or to such other address as such party shall have communicated to the other.   Any such notice or communication shall be deemed to have been served when delivered or, if delivery is not accepted by reason of the fault of the addressee, when mailed.

9.2   If a clause of this Agreement is or becomes ineffective or null and void, such ineffectiveness will not prejudice the remaining provisions of the Agreement.

9.3   If either party should at any time waive its rights due to a material breach by the other party of any of the provisions of this Agreement, such waiver is not to be construed as a continuing waiver of other breaches of the same or other provisions of this Agreement.

9.4   Any disputes under this Agreement shall be submitted to and settled by arbitration in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association.   Such arbitration shall be held in the Cleveland, Ohio area before a panel of three arbitrators, one selected by each of the parties and the third selected by mutual agreement of the first two.   The decision of the arbitrators shall be final and binding as to any matter submitted under this Agreement.   Judgment upon any award rendered by the arbitrators may be entered in any court of competent jurisdiction.

9.5   Any late payments under this Agreement shall bear interest at one and one-half percent (1-1/2%) per month or if lower, the highest rate allowed by applicable law.

9.6   This Agreement shall be deemed to be executed in the State of Ohio, and shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to its principles of conflicts of law.

9.7   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

118351.8                                  17

9.8   This Agreement supersedes all prior negotiations, agreements
      and understandings between LICENSOR and LICENSEE and
      constitutes the entire agreement between LICENSOR and
      LICENSEE as to the subject matter hereof.  This Agreement
      may not be altered or amended except in writing signed by
      the parties hereto; provided, however, that if CPR-PROMPT is
      dissolved, any alteration or amendment shall be signed by
      Hutchins, LICENSEE and by those persons or entities who
      formerly owned a majority of the outstanding stock of CPR-
      PROMPT.

9.9   This Agreement shall be binding upon and inure to the
      benefit of the parties hereto and their successors, legal
      representatives and assigns.  Upon any assignment, the
      assignor shall remain bound by this Agreement in accordance
      with applicable law except that Section 3.10 shall apply
      only to interests in the Affiliate referred to therein and
      not to interests in County Line Limited Partnership.

          IN WITNESS WHEREOF, each of the parties has caused this
Agreement to be executed as set forth below.


**LICENSEE:**                       COUNTY LINE LIMITED PARTNERSHIP

                                    By: CATALOG PRODUCTS, INC.,
                                        General Partner

                                    By: _____
                                    Name: Steven W. Lindseth
                                    Title: President


**HUTCHINS:**

                                    _____
                                    Donald C. Hutchins


**CPR-PROMPT:**                     CPR-PROMPT CORPORATION

                                    By: _____
                                    Name: Donald C. Hutchins
                                    Title: President

                          *       *       *

118351.8                        18

## EXHIBIT A - LICENSED PATENTS

U.S. Patent No. 4,583,524

U.S. Patent Reissue Application Ser. No. 06/935,409

Canadian Patent No. ___1249368___

Japan Patent Application No. 80967/86

European Patent No. 0183462

(Annuities paid for in:    Belgium
                             France
                             Germany
                             Italy
                             Luxembourg
                             Switzerland
                             United Kingdom)

118351.8

## EXHIBIT B - MARKS

U.S. Registration No. 1,398,334 for CPR-PROMPT

## EXHIBIT C - TOOLING AND INVENTORY

### 1.  TOOLING

Miscellaneous tooling required to manufacture the Licensed Products.

### Book Value

| | |
|---|---|
| 3/31/94 | $385,945.00 |
| 3/31/95 | $254,296.00 |
| 3/31/96 | $122,648.00 |
| 3/31/97 and thereafter | $      1.00 |

### 2.  INVENTORY

All inventory of finished products of CPR-PROMPT on the date of this Agreement.

116351.8