of the stockholders of Seller.

## ARTICLE VII

## COVENANTS OF SELLER

7.1    **Confidentiality.** Seller shall, and shall cause its Affiliates, officers, employees, representatives, consultants and advisors to, hold in confidence and not use all confidential information which remains after the Effective Date in the possession of Seller or its Affiliates and which relates to the Business ("*Confidential Information*"). Seller shall not release or disclose any Confidential Information to any Person other than Buyer and its authorized representatives, except for any Confidential Information which Seller is or becomes required by law or valid legal process to disclose. Notwithstanding the foregoing, "Confidential Information" shall not be deemed to include information:

(a)    which can be shown to have been generally available to the public other than as a result of a breach of this Section; or

(b)    which can be shown to have been provided to Seller by a third party who obtained such information other than from Seller or other than as a result of a breach of this Section; or

(c)    which relates to the Oxygen Business.

7.2    **Maintenance of Insurance.** Seller will after the Effective Date use all reasonable efforts to maintain any policies of insurance which cover liabilities associated with the operation of the Business prior to the Effective Date; provided, that after the Effective Date, Seller shall not be required to renew or pay any additional premiums in respect of such policies or obtain or maintain in effect any insurance coverage in addition to the coverage in effect as of the Effective Date.

7.3    **Trade Names.** To the extent the Retained Names appear on (a) any plant, building or equipment, or (b) any stationery, business form, packaging, container, sign or other property (real or personal) included in the Acquired Assets, Seller grants, and/or confirms the grant by its Affiliates of, a royalty free license to Buyer to use the Retained Names on such Acquired Assets until removal can be effected from such Acquired Assets or until such materials are used and exhausted; provided, that Buyer shall use its reasonable efforts in a timely fashion to effect obliteration of the Retained Names from all Acquired Assets and cease, in any event, using the Retained Names no later than one year following the Effective Date.

7.4    **Maintenance of, and Access to, Records.** After the Effective Date, Seller shall provide Buyer with access (with an opportunity to make copies), during normal business hours, and upon reasonable notice, to any records relating solely to the Business which are retained by it; provided, however, that nothing herein shall constitute a waiver of any applicable privilege. Seller shall preserve and maintain any books and records relating to the Business and retained by Seller for at least three years after the Effective Date.

7.5    **Name Change Filings.** Seller shall, within seven (7) days after the Effective Date, take such actions and file such documents as shall be necessary to (a) change the trademarks, service marks, trade names and domain names associated with any products (other than Products) available

through Seller to discontinue the use of the trademark, service marks, trade names and domain names "Complient" and "CPR Prompt" and (b) otherwise discontinue the use of such trademarks, service marks, trade names and domain names, in connection with Seller's business operations; provided, however, that Seller shall cause any such names to be removed from any inventory, business forms, business cards, signage, literature or other property of SOS or the Oxygen Business within six (6) months after the date of any sale of the stock of SOS held by Complient or a sale of all or substantially all of the assets of SOS, or within twelve (12) months after the Effective Date, whichever is sooner. Until the first anniversary of the Effective Date, Seller shall be entitled to continue to have the name "Complient Corporation" as its corporate name in its Certificate of Incorporation and execute contracts, instruments and correspondence in such name, but shall not use such name in connection with the sale of goods or services or other commercial activity or any Internet services.

7.6     **Plant Closing Obligations.** If Seller or any of its Affiliates takes any action which could be construed as a "plant closing" or "mass layoff," or which results in any employee suffering or deeming to have suffered any "employment loss," as those terms are defined in the federal WARN Act and any applicable state plant-closing laws, Seller and such Affiliates shall be solely responsible for providing any notice required by the federal WARN Act and any applicable state plant-closing laws and for making payments, if any, which may be required under such WARN Act and such state laws for failure to provide appropriate notice.

7.7     **Further Assurances; Customer and Supplier Relationships; Assertion of Claims.**

(a)     Seller shall use its reasonable efforts to implement the provisions of this Agreement, and for such purpose Seller, at the request of Buyer, at or after the Effective Date, shall, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Buyer such deeds, assignments, bills of sale, Consents and other instruments in addition to those required by this Agreement, in form and substance satisfactory to Buyer, and at Buyer's expense take all such other actions, as Buyer may reasonably deem necessary or desirable to implement any provision of this Agreement or to more effectively transfer, convey and assign to Buyer good and marketable title to, and to put Buyer in actual possession and operating control of, all of the Acquired Assets, free and clear of all Liens.

(b)     From and after the Effective Date, Seller shall use its reasonable efforts to assist in and shall in no way impede the transfer to Buyer of the goodwill and reputation associated with the Business, and of Seller's personnel, suppliers, manufacturer's representatives and customer relationships. Seller shall use its reasonable efforts to cause Seller's current customers and suppliers to do business with Buyer in accordance with the terms and for the periods of time set forth in any contract, agreement, commitment or undertaking (including the Contracts), whether oral or written, and whether currently in effect or proposed to be entered into by Seller; provided, however, that Seller shall not be required to incur any material expense in making such efforts.

(c)     Seller covenants and agrees with Buyer that after the Effective Date, Seller shall give Buyer thirty (30) days' prior written notice of any intent on the part of Seller to assert any claim against any former customer or supplier of Seller relating to the Business.

7.8     {Intentionally omitted.}

**7.9     Non-Competition.**

(a)     _Period and Conduct._ As further consideration for the purchase and sale of the Acquired Assets and the transactions contemplated by this Agreement, during the period commencing on the Effective Date, and ending on the date which is five (5) years thereafter, Seller shall not:

(i)     compete with Buyer in the manufacture, production, design, engineering, importation, purchase, marketing, sale, distribution, research or development of any Products (**"_Product Activity_"**);

(ii)     solicit, or accept orders or business of any kind relating to the manufacture, production, design, engineering, importation, purchase, marketing, sale, distribution, research or development of any Products from any customer or active prospect of Buyer, or any former customer of Seller, including the Customers;

(iii)     solicit any employee of Buyer or former employee of Seller hired by Buyer to terminate his or her employment with Buyer; or

(iv)     use, or incorporate or otherwise create any business organization utilizing any name which uses, the words "Complient" or "CPR Prompt" or which are confusingly similar to the words "Complient" or "CPR Prompt."

(b)     _Territory._ Seller shall refrain from engaging in the activities described in this Section 7.9 during the period specified in Section 7.9(a) hereof anywhere in the world.

(c)     _Definition._ Seller shall be deemed to be competing with Buyer if Seller is engaged or participates in any activity or activities described in subsection (a) of this Section 7.9, directly or indirectly, whether for its own account or for that of any other Person, firm or corporation, and whether as a shareholder, partner or investor controlling any such entity or as principal, agent, representative, proprietor, or partner, or in any other capacity.

(d)     _Remedies._ Inasmuch as a breach, or failure to comply with, Section 7.9 of this Agreement will cause serious and substantial damage to Buyer, if Seller should in any way breach, or fail to comply with, the terms of this Section 7.9, Buyer shall be entitled to an injunction restraining Seller from any such breach or failure. All remedies expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity. Buyer shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained herein. Resort to any remedy provided for hereunder or provided for by law shall not preclude or bar the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude the recovery by Buyer or monetary damages and compensation.

(e)     _Subsidiaries, Divisions and Affiliates._ For the purpose of this Section 7.9, "**_Buyer_**" shall include its subsidiaries, divisions and Affiliates as they may exist from time to time, and any Person deriving title to the goodwill of the Business or the Acquired Assets from Buyer.

(f)     _Severability._ Each subsection of this Section 7.9 constitutes a separate and distinct provision hereof. In the event that any provision of this Section 7.9 shall finally be judicially

determined to be invalid, ineffective or unenforceable, such determination shall apply only in the jurisdiction in which such adjudication is made and every other provision of this Section 7.9 shall remain in full force and effect. The invalid, ineffective or unenforceable provision shall, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective or unenforceable provision; provided, however, that such amendment shall apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

(g)    Oxygen Business. It is understood and agreed that Seller's continued ownership of SOS after the Effective Date and the continued conduct of the Oxygen Business after the Effective Date shall not be prohibited or restricted by this Section 7.9.

7.10    **Accounts Receivable.**

(a)    In the event that Seller or any of its Affiliates receives any payment relating to any Account Receivable included in the Acquired Assets and outstanding on or after the Effective Date, such payment shall be the property of, and shall be immediately forwarded and remitted to, Buyer. Seller or such Affiliate will promptly endorse and deliver to Buyer any cash, checks or other documents received by Seller on account of any such Accounts Receivable included in the Acquired Assets. Seller or such Affiliate shall advise Buyer (promptly following Seller's becoming aware thereof) of any counterclaims or set-offs that may arise subsequent to the Effective Date with respect to any Account Receivable.

(b)    After the Effective Date, Buyer shall use reasonable efforts, consistent with prior ordinary course business practices of Seller, to collect all Accounts Receivable included in the Acquired Assets; provided, however, that Buyer shall not be obligated to continue to do business with any Person if Buyer believes such continuation will not be in its best interests, and shall not be obligated to initiate litigation or to turn any of such Accounts Receivable over to a collection agency or attorney.

7.11    **Material Adverse Audit Adjustment.** If the Year-End Financial Statements, excluding adjustments to goodwill and options expense and excluding any other adjustment to the extent it is limited to the Oxygen Business, differs materially from the audited financial statements for the same period, Buyer shall be indemnified for such difference pursuant to Section 11.2(a) hereof, solely from the General Escrow Fund and not from Seller, in an amount equal to (a) the sum of all unfavorable such differences, minus (b) the sum of all favorable such differences, but not less than zero.

## ARTICLE VIII

## COVENANTS OF BUYER

8.1    **Maintenance of, and Access to, Records.** From and after the Effective Date, Buyer shall, upon adequate notice whenever reasonably requested by Seller, permit Seller and its representatives to have access to such business records turned over to Buyer pursuant to this Agreement as may be reasonably requested by Seller. Buyer shall preserve and maintain the records relating to the Business which are part of the Acquired Assets for at least three years after the Effective Date. Seller shall be entitled, at its expense, to make extracts and copies of such books and records and shall use reasonable efforts not to disturb the Business operations in so doing. Buyer

shall not, during such three-year period, destroy or cause or permit to be destroyed any such business records without first obtaining the written consent of Seller or providing at least thirty (30) days' notice to Seller of such intent and a reasonable opportunity to copy such books or records prior to such destruction.

8.2    **Closing.** Buyer shall use its reasonable efforts to cause the conditions set forth in Section 6.2 to be satisfied by the Effective Date.

## ARTICLE IX

## CERTAIN ADDITIONAL COVENANTS

9.1    **Expenses; Transfer Taxes.** Each party hereto will bear the legal, accounting and other expenses and taxes incurred by such party in connection with the negotiation, preparation and execution of this Agreement, the Transaction Documents, and the transactions contemplated hereby.

9.2    **Press Releases and Disclosure.** The parties agree that neither Seller, Buyer nor their respective Affiliates shall issue or cause publication of any press release or other announcement or public communication with respect to this Agreement or the transactions contemplated hereby or otherwise disclose this Agreement or the transactions contemplated hereby to any third party (other than attorneys, advisors and accountants to Seller or Buyer) without the consent of the other party hereto, which consent shall not be unreasonably withheld; provided, that nothing herein shall prohibit any party from issuing or causing publication of any press release, announcement or public communication to the extent that such party deems such action to be required by law or stock exchange; provided further that such party shall, whenever practicable consult with the other party concerning the timing and content of such press release, announcement or communication before the same is issued or published.

9.3    **Cooperation in the Defense of Claims.** In the event that a claim is asserted against Buyer, any of its direct or indirect subsidiaries or Affiliates, with respect to events or conditions occurring or existing in connection with, or arising out of, the operation of the Business prior to the Effective Date, or the ownership, possession, use or sale of the Acquired Assets prior to the Effective Date, Seller shall cooperate with Buyer in the defense of any such claim.

9.4    **Regulatory Approvals.** Seller will, and will cause its appropriate Affiliates to, and Buyer will, use, in each case, its reasonable efforts to obtain any authorizations, consents, orders and approvals of any Governmental Authority necessary for the performance of its respective obligations pursuant to this Agreement and any of the other transaction documents, and the consummation of the transactions contemplated hereby and thereby, and will cooperate fully with each other in all reasonable respects in promptly seeking to obtain such authorizations, consents, orders and approvals. Neither Seller nor Buyer will knowingly take any action that will have the effect of delaying, impairing or impeding the receipt of any required regulatory approvals.

9.5    **Employee Matters.**

(a)    <u>Employee Benefits.</u> Seller shall retain all liabilities and obligations in respect of its past, present and future employees under the Employee Plans and applicable laws. Without limiting the generality of the foregoing or of Section 2.2(c), Buyer shall have no liability or obligation whatsoever under the Employee Plans, nor shall Buyer have any obligation to provide any

notice under the federal WARN Act or any applicable state plant-closing laws or to provide any employee benefits to any Persons employed in the Business as of or at any time prior to the Effective Date ("*Employees*"). Seller shall offer to all employees of the Business at the time of the Effective Date the right to continue their coverage under Seller's group health plan(s) (as defined in Section 5000(b)(1) of the Code), such offers to be made in accordance with the continuation coverage requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and the regulations thereunder. Any other provision of this Agreement notwithstanding, Seller shall not be obligated to Buyer or to any other Person to continue to maintain any health insurance or other employee benefit plans after the Effective Date and shall have the right to discontinue any such plans at any time thereafter.

(b)    Future Employment. Buyer will offer employment from and after the Effective Date to at least thirty (30) of those individuals who were Employees of the Business immediately prior to the Closing, on terms and conditions as of the Effective Date which are substantially similar to those applicable to such individuals prior thereto. Buyer will have no liability whatsoever for any failure of any such individual to accept such offer of employment.

(c)    Employee Information.

(i)    Subject to applicable legal restrictions, Buyer and Seller shall provide each other in a timely manner any information which the other may reasonably request with respect to any Employee of Seller or, after the Effective Date, any Person employed by Buyer in the Business, his employment with and compensation from Seller or Buyer, or rights or benefits under any Employee Plan or any personnel policy of Seller or Buyer relating to the Business.

(ii)    Without in any way limiting the generality of Sections 9.5(c)(i), and to the extent they may legally do so, Seller shall afford Buyer and its representatives such access to the medical, workers' compensation and other health-related records of the Employees (the "*Employee Health Records*") as are maintained by or available to Seller and as Buyer shall deem reasonably necessary or desirable, and Buyer shall be permitted, to the extent Seller may legally give such permission, to make copies of such Employee Health Records as it may deem reasonably necessary or desirable. Promptly upon request by Buyer, Seller shall use all reasonable efforts to obtain or cause to be obtained any consent of any Employee, health care provider, workers' compensation authority or other Person as may be necessary in order to permit Seller to afford Buyer and its representatives with access to and permission to copy Employee Health Records as provided in this Section 9.6(c). Buyer shall maintain in accordance with all applicable laws the confidentiality of any and all Employee Health Records to which it may receive access, and shall not disclose or use any such records in any manner or for any purpose contrary to law or the rights of any Person.

9.6    **Restrictions on Transfer; Lock-up.** The offer and sale to Seller of the Buyer shares have not been registered under the 1933 Act, or registered or qualified under applicable state securities or "Blue Sky" laws, and, therefore, the Shares cannot be reoffered and resold unless either the reoffer and resale thereof are subsequently registered and qualified under the 1933 Act and said Blue Sky laws or an exemption from such registration and qualification is available. Except as provided in the Registration Rights and Lock-up Agreement, Buyer has no intention of registering or qualifying under the 1933 Act or any such Blue Sky laws Seller's reoffer and resale of any of the Shares and no exemption from registration or qualification may be available under the 1933 Act or such Blue Sky laws to Seller at the time it wishes to dispose of such Shares; accordingly, Seller may have to bear the economic risk of holding the Buyer Shares for an indefinite period of time.

However, nothing herein is intended to derogate from any of Buyer's covenants and obligations contained in the Registration Rights and Lock-up Agreement or any of Seller's rights or remedies thereunder.

9.7    **Fairness.** No Federal or state agency has passed upon the Buyer Shares, nor made any finding or determination as to the fairness of the transaction set forth herein, or passed on the adequacy of the information received by Seller.

9.8    {Intentionally omitted.}

9.9    **2002 Audit.** Seller will use all reasonable efforts to cause the audit of the Year-End Financial Statements to be completed and an audit report with respect thereto to be rendered by the firm of Deloitte LLP by November 12, 2003, and will promptly deliver a copy of such audit report, when rendered, to Buyer. In the event that such report is delayed, Buyer shall be indemnified pursuant to Section 11.2(a) hereof, solely out of the General Escrow Fund and not from Seller, for (a) one-half (50%) of any damages actually incurred by Buyer solely as a result of such delay in the first month after such date, up to a maximum of $42,000 of such damages, and (b) 100% of any damages actually incurred by Buyer solely as a result of such delay which continues each subsequent month, up to a maximum of $84,000 of such damages in each such month.

## ARTICLE X

### ESCROW

**10.1    Escrow Arrangements.** The General Escrow Fund and the Oxygen Escrow Fund (as each such term is defined below) shall be established and maintained as set forth in the General Escrow Agreement and the Oxygen Escrow Agreement, respectively.

**10.2    Escrow Funds.**

(a)    On the Effective Date, Buyer will deposit on behalf of Seller the General Escrow Shares (the *"General Escrow Amount"*) with the Escrow Agent without any act of Seller. On the Effective Date, the General Escrow Amount, without any act of Seller, will be deposited with the Escrow Agent, such deposit to constitute an escrow fund (the *"General Escrow Fund"*) to be governed by the terms and provisions set forth in the General Escrow Agreement, at Buyer's cost and expense. The General Escrow Amount shall be available, subject to the terms of the General Escrow Agreement and this Agreement, to satisfy claims by Buyer for indemnification pursuant to Sections 11.2(a) and 11.2(b) of this Agreement.

(b)    On the Effective Date, Buyer will deposit on behalf of Seller the Oxygen Escrow Shares (the *"Oxygen Escrow Amount"*) with the Escrow Agent without any act of Seller. On the Effective Date, the Oxygen Escrow Amount, without any act of Seller, will be deposited with the Escrow Agent, such deposit to constitute an escrow fund (the *"Oxygen Escrow Fund"*) to be governed by the terms and provisions set forth in the Oxygen Escrow Agreement, at Buyer's cost and expense. The Oxygen Escrow Amount shall be available, subject to the terms of the Oxygen Escrow Agreement and this Agreement, to satisfy claims by Buyer for indemnification pursuant to Section 11.2(c) of this Agreement.

## ARTICLE XI

## INDEMNIFICATION

**11.1    Indemnification by Buyer.** From and after the Effective Date, Buyer shall indemnify, defend and hold Seller harmless from and against any and all claims, actions, suits, demands, assessments, judgments, losses, liabilities, damages, costs and expenses (including, without limitation, interest, penalties, reasonable attorneys' fees to the extent permitted by law, and reasonable accounting fees and investigation costs) (collectively, *"Liabilities"*) that may be incurred by Seller resulting or arising from or related to: (a) the failure of Buyer to assume, pay, perform and discharge the Assumed Liabilities, (b) the failure of Buyer to report the purchase of the Acquired Assets in accordance with the allocations required by Section 3.3, and, (c) a breach of any representation, warranty, covenant, obligation or agreement of Buyer  contained in this Agreement or in any other agreement or instrument executed and delivered or to be executed and delivered by Buyer in connection herewith.

**11.2    Indemnification by Seller.**

(a)    General. From and after the Effective Date, Seller shall indemnify, defend and hold Buyer harmless from and against any and all Liabilities that may be incurred by Buyer resulting or arising from, or related to: (i) the failure of Seller to assume, pay, perform and discharge the Retained Liabilities, (ii) the failure of Seller to report the sale of the Acquired Assets in accordance with the allocations required by Section 3.3, (iii) a breach of any representation, warranty, covenant, obligation or agreement of Seller contained herein or in any other Transaction Document, and (iv) any failure to comply with the laws of any jurisdiction relating to bulk transfers which may be applicable in connection with the transfer of the Acquired Assets to Buyer. This Section 11.2(a) and Section 11.2(b) shall not apply to claims for indemnification covered by Section 11.2(c).

(b)    Environmental Indemnification. From and after the Effective Date, Seller agrees to indemnify, defend, reimburse and hold Buyer harmless from and against any and all environmental damages arising from the presence, use, generation, storage, treatment, discharge, release or disposal (including off-site disposal), prior to the Effective Date, of hazardous substances upon, about, from or beneath the Property or migrating to or from the Property prior to the Effective Date, or arising in any manner whatsoever prior to the Effective Date out of the violation of any Environmental Laws pertaining to the Property and the activities thereon. This obligation to indemnify shall include, but not be limited to, the expense of defending all claims, suits and administrative proceedings (with counsel designated by Buyer), and paying and discharging, when and as the same become due in connection therewith. Buyer will be entitled, but not obligated, to control any clean-up or remediation, and any related proceeding. Such indemnification shall be available to Buyer solely out of the General Escrow Fund and not from Seller. In the event Buyer makes any claim for indemnification pursuant to this Section 11.2(b), Buyer shall be deemed hereby to have assigned, and does hereby assign, to Seller all contractual, statutory, common-law or other rights of indemnification or contribution which Buyer has or may then have as against third parties with respect to the environmental matter which is the subject of such claim.

(c)    Oxygen Indebtedness. From and after the Effective Date, Seller shall indemnify, defend and hold Buyer harmless from and against any Liabilities that may be incurred by Buyer resulting or arising from, or related to, the Oxygen Debt or the non-payment thereof, including

any actual, attempted, purported or claimed acceleration in connection with any such indebtedness. The non-payment by Seller of any Oxygen Debt which results in a Third-Party Claim against Buyer shall be deemed to be "Liabilities" for purposes of this subsection. This Section 11.2(c) shall not apply to claims for indemnification covered by Section 11.2(a) or 11.2(b). Any other provision of this Agreement notwithstanding, claims for indemnification relating in any way to the Oxygen Debt or any purported or claimed acceleration thereof shall be made exclusively pursuant to this Section 11.2(c), and Sections 11.2(a) and 11.2(b) shall not apply or be available with respect to such claims.

11.3    Notice of Claim; Right to Participate in and Defend Third Party Claim.

(a)    If any indemnified party receives notice of the assertion of any claim, the commencement of any suit, action or proceeding, or the imposition of any penalty or assessment by a third party in respect of which indemnity may be sought hereunder, including, without limitation, any claim for Taxes by any Governmental Authority (a "*Third Party Claim*"), and the indemnified party intends to seek indemnity hereunder, then the indemnified party shall promptly provide the indemnifying party with prompt written notice of the Third Party Claim. The failure by an indemnified party to notify an indemnifying party of a Third Party Claim shall not relieve the indemnifying party of any indemnification responsibility under this Article XI, except to the extent such failure materially prejudices the ability of the indemnifying party to defend such Third Party Claim (and except that the indemnifying party shall not be liable for any expenses incurred during the period in which the indemnified party failed to give such notice). Thereafter, the indemnified party shall deliver to the indemnifying party without undue delay copies of all notices and documents, including court papers received by the indemnified party, relating to the Third Party Claim.

(b)    If a Third Party Claim is made against an indemnified party, the indemnifying party shall be entitled to participate in the defense thereof and, if it so chooses and admits to the indemnified party in writing its obligation to indemnify the indemnified party therefor, to assume the defense thereof with counsel selected by the indemnifying party, provided that such counsel is not reasonably objected to by the indemnified party. Should the indemnifying party so assume the defense of a Third Party Claim, the indemnifying party shall not be liable to the indemnified party for legal expenses subsequently incurred by the indemnified party in connection with the defense thereof. If the indemnifying party assumes such defense, the indemnified party shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by the indemnifying party), at its own expense, separate from the counsel employed by the indemnifying party, it being understood that the indemnifying party shall control such defense. The indemnifying party shall be liable for the fees and expenses of counsel employed by the indemnified party for any period during which the indemnifying party has failed to assume the defense thereof (other than during the period prior to the time the indemnified party shall have given notice of the Third Party Claim as provided above), provided, however, that the right of a party to contest the right of the other party to receive indemnification hereunder with respect to a claim shall not be extinguished.

(c)    If the indemnifying party so assumes the defense of any Third Party Claim, the indemnified party shall cooperate with the indemnifying party in the defense or prosecution thereof. Such cooperation shall include, at the expense of the indemnifying party, the retention and (upon the indemnifying party's request) the provision to the indemnifying party of records and information which are reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. If the indemnifying party shall have assumed the defense of a Third

Party Claim, the indemnified party shall not admit any liability with respect to, or settle, compromise or discharge such Third Party Claim without the indemnifying party's prior written consent (which shall not be unreasonably withheld). If the indemnifying party shall have assumed the defense of a Third Party Claim, the indemnified party shall agree to any settlement, compromise or discharge of a Third Party Claim which the indemnifying party may recommend and which by its terms obligates the indemnifying party to pay the full amount of the liability in connection with such Third Party Claim, and releases the indemnified party from all liability in connection with such Third Party Claim.

**11.4    Time Limitations on Claims for Indemnification.** The right of Buyer to indemnification for any breach of any representation or warranty contained in this Agreement shall apply only to those claims for indemnification which are given pursuant to this Agreement on or before the respective dates set forth below:

(a)    Any claim for indemnification relating to any breach of the representations and warranties set forth in Section 5.1(v) shall be made on or before forty-five (45) days after the expiration of the applicable statute of limitations (and any waivers or extensions thereof) applicable to any claim arising in connection with any breach of any such representations and warranties;

(b)    No time limit shall apply to any right to indemnification with respect to any breach of any representation or warranty contained in Sections 5.1(a), 5.1(b) and the fourth sentence of 5.1(d); and

(c)    Any claim for indemnification with respect to any breach of any representation or warranty set forth in any subsection of Section 5.1 not referred to in subsections (a) or (b) of this Section 11.4 shall be made on or before the date which is twelve (12) months following the Effective Date.

**11.5    Submission of Claims.** Any claim for indemnification hereunder must be made in writing. Such written notice shall be provided to the party from whom indemnification is sought for such claim and, in the case of claims covered by the General Escrow Agreement or the Oxygen Escrow Agreement, a copy of such notice shall be delivered concurrently to the Escrow Agent thereunder. Such notice, to be effective, shall set forth with reasonable specificity the alleged factual basis for the claim, the amount of such claim or a good-faith estimate of the amount thereof, and identify the provision or provisions of this Agreement alleged to have been breached.

**11.6    Maximum and DeMinimis Amounts.**

(a)    Seller shall not be required to indemnify, defend or hold Buyer harmless with respect to any breach of any representation or warranty unless and until the amount of such Liabilities equals $25,000 individually or $100,000 in the aggregate (the "*Threshold Amount*") in which event Seller shall be obligated to indemnify Buyer, and Buyer may assert its right to indemnification hereunder to the full extent of all Liabilities relating to such claims or breaches, including Liabilities that are less than the Threshold Amount.

(b)    Notwithstanding any other provision of this Agreement, Seller's obligations to indemnify Buyer for breaches of any representation or warranty shall be payable and satisfied solely from the General Escrow Fund.

**11.7    Exclusions.** No limitation set forth in Sections 11.4 or 11.6 shall apply with respect to any fraudulent and intentional breach of a representation or warranty made by Seller in Section 5.1 of this Agreement.

**11.8    Exclusive Remedy.** Each party acknowledges and agrees that such party's sole and exclusive remedy for breaches of this Agreement shall be pursuant to the provisions set forth herein.

**11.9    Tax Effect of Indemnification Payments.** The parties agree that any indemnification payments made (and/or any payments or adjustments) under this Agreement or the Escrow Agreement shall be treated for all Tax purposes as an adjustment to the Purchase Price, unless otherwise required by applicable law. In determining the amount of claims against an indemnifying party for breach of any representation and warranty, there shall be deducted from the amount to be paid by the indemnifying party an amount equal to the excess (if any) of (a) the present value of any tax benefit realized or reasonably expected to realized by the indemnified party by reason of such claims, over (b) a present value of any tax detriment that is, or is reasonably expected to be, incurred by the indemnified party as a consequence of the receipt of any indemnity payment pursuant to Article XI, subject to adjustment upon receipt of any applicable refund or payment of any additional tax, as the case may be. This Section 11.7 shall apply only to claims for amounts in excess of the Threshold Amount unless otherwise required by law, and shall not apply for purposes of calculating whether and at what point the Threshold Amount shall have been reached.

## ARTICLE XII

## MISCELLANEOUS

**12.1    Amendments.** This Agreement may be amended only by a writing executed by all of the parties hereto.

**12.2    Entire Agreement.** This Agreement and the other agreements expressly provided for herein, set forth the entire understanding of the parties hereto with respect to the subject matter hereof, and supersede all prior contracts, agreements, arrangements, communications, discussions, letters of intent, negotiations, representations and warranties, whether oral or written, between the parties.

**12.3    Governing Law; Venue and Jurisdiction.** This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.   Any action or proceeding against any party hereto arising out of or based upon or relating in any way to this Agreement shall be brought only in a state or federal court of competent jurisdiction located in Delaware, and each party hereby expressly waives any and all objections to venue or personal jurisdiction in any action or proceeding so commenced.

**12.4    Notices.** Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when received if personally delivered, (b) within 5 days after being sent by registered or certified mail, return receipt requested, postage prepaid, (c) within 12 hours after being sent by telecopy, with confirmed answerback, or (d) within 1 business day of being sent by priority delivery by established overnight courier, to the parties at their respective addresses set forth below.

To Seller:          Complient Corporation
c/o 4670 Richmond Road
Suite 300
Warrensville Heights, Ohio 44128
Telecopier: (440) 519-3764
Attention: Steven W. Lindseth

With a copy to:      Calfee, Halter & Griswold LLP
1400 McDonald Investment Center
800 Superior Avenue
Cleveland, OH 44114-2688
Telecopier: (216) 241-0816
Attention: Gerald A. Monroe, Esq.

To Buyer:          Cardiac Science, Inc.
1900 Main Street, Suite 700
Irvine, California 92614
Telecopier: (949) 951-7315
Attention: Chief Executive Officer

With a copy to:      Stradling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660
Telecopier: (949) 725-4000
Attention: Shivbir S. Grewal, Esq.

Any party by written notice to the others given in accordance with this Section 12.4 may change the address or the Persons to whom notices or copies thereof shall be directed.

**12.5    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together will constitute one and the same instrument.

**12.6    Assignment.** This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each party hereto.

**12.7    Waivers.** Except as otherwise provided herein, Buyer or Seller (acting on behalf of itself and its appropriate Affiliates), may waive in writing compliance by any of the other parties hereto (to the extent such compliance is for the benefit of the party giving such waiver) with any of the terms, covenants or conditions contained in this Agreement or in any of the other Transaction Documents (except such as may be imposed by law). Any waiver by any party of any violation of, breach of, or default under, any provision of this Agreement or any of the other Transaction Documents, by any other party shall not be construed as, or constitute, a continuing waiver of such provision, or waiver of any other violation of, breach of or default under any other provision of this Agreement or any of the other Transaction Documents.

**12.8    Third Parties.** Nothing in this Agreement is intended, or shall be construed, to confer upon or give any Person or entity other than Buyer and Seller any rights or remedies under or by reason of this Agreement, except as may otherwise be expressly set forth herein.

**12.9  Schedules, Addenda and Exhibits.**  The Schedules, Addenda and Exhibits attached to this Agreement are incorporated herein and shall be part of this Agreement for all purposes.

**12.10  Headings.**  The headings in this Agreement are solely for convenience of reference and shall not be given any effect in the construction or interpretation of this Agreement.

**12.11  Certain Definitions.**

(a)  For purposes of this Agreement, the term *"Affiliate"* shall mean any Person that directly, or indirectly through one or more Persons, controls, is controlled by, or is under common control with, the Person specified or, directly or indirectly, is related to or otherwise associated with any such Person or entity.

(b)  For purposes of this Agreement and of any other Transaction Document, the phrase, "to the best of the Seller's knowledge" or "Seller's knowledge" shall be deemed to include all information that is actually known by each of the following individuals:  Steven W. Lindseth, Robert I. Thompson, and Brian D. Catlett, Michael A. Bush, John T. Pastrick, Frank J. Swiger, Frank Powers and Neil Glazer (collectively, *"Seller's Officers"*).

**12.12  Remedies Not Exclusive.**  No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each remedy shall be cumulative and shall be in addition to every other remedy given hereunder or hereafter existing at law or in equity or by statute or otherwise. No remedy shall be deemed to be a limitation on the amount or measure of damages resulting from any breach of this Agreement. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**12.13  Gender and Number.**  The masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

[REST OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Asset Purchase Agreement as of the Effective Date first above written.

"Seller"

COMPLIENT CORPORATION

By: _____
Name: ROBERT I. THOMPSON
Title: PRESIDENT & CEO

"CPR L.P."

CPR LIMITED PARTNERSHIP

By: **Complient Corporation**, its general partner

By: _____
Name: ROBERT I. THOMPSON
Title: PRESIDENT & CEO

"Buyer"

CARDIAC SCIENCE, INC.

By: _____
Name: RAYMOND W. COHEN
Title: CHAIRMAN & CEO

B

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| COMPLIENT CORPORATION | ) | CASE NO: 429394 |
| Plaintiff, | ) | |
| | ) | JUDGE MATIA |
| v. | ) | |
| | ) | |
| CPR PROMPT CORPORATION, *et al.*, | ) | __JUDGMENT ENTRY__ |
| Defendants. | ) | |

This matter came on for hearing upon Plaintiff Complient Corporation's ("Complient") Motion for Default Judgment ("Plaintiff's Motion") against Defendant CPR Prompt Corporation ("CPR Prompt") pursuant to Civ. R. 55(A). Upon consideration of Plaintiff's Motion, the proof of service of the Complaint upon CPR Prompt, and the Affidavit of Steven Lindseth, this Court finds that service has been perfected against Defendant CPR Prompt, that CPR Prompt has failed to answer the Complaint within the time set forth in the Ohio Rules of Civil Procedure, that CPR Prompt is in default of answering the Complaint and, therefore, that Complient is entitled to a default judgment against CPR Prompt pursuant to Civ. R. 55(A).

WHEREFORE, this Court hereby grants Plaintiff Complient Corporation's Motion for Default Judgment against CPR Prompt Corporation. It is the order of this Court that Plaintiff Complient Corporation is hereby granted a default judgment pursuant to Civ. R. 55(A) against Defendant CPR Prompt Corporation as follows:

Pursuant to Section 3.10 of the License Agreement, in the event that the partners of CPR L.P., including, but not limited to Plaintiff Complient Corporation, sell all r part of their respective partnership interest in CPR L.P. to an unrelated third party, Defendant CPR Prompt is entitled to 7.5%

)OCKETED

JUN 28 2001

J AAR...182.DOC)    VOL 2601 PG 1449

of the net proceeds of that sale. Section 3.10 of the License Agreement does not entitle CPR Prompt to 7.5% of the sale of any or all assets of any entity other than CPR L.P.

IT IS SO ORDERED.

JUDGE DAVID MATIA

RECEIVED FOR FILING

MAY 3 0 2001

GERALD E. FUERST, CLERK

BY _____ DEP.

VOL 2601 PG 450

{JAB2482.DOC;1}                                    2

C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

U.S. DISTRICT COURT

|  |  |
|---|---|
| DONALD C. HUTCHINS | ) |
| Plaintiff | ) |
| v. | ) |
| CARDIAC SCIENCE, INC. | ) |
| Defendant | ) |

Civil Action:  04-30126-MAP

## AFFIDAVIT OF STEVEN LINDSETH IN SUPPORT OF COMPLIENT'S MOTION FOR DEFAULT JUDGMENT

| STATE OF OHIO | ) | |
| | ) | SS: |
| COUNTY OF CUYAHOGA | ) | |

NOW COMES STEVEN LINDSETH and upon first being duly sworn, states that:

1.     I am over the age of eighteen years and I have personal knowledge of the matters stated herein.

2.     I am the President of Complient Corporation ("Complient"), a defendant in the subject action.  On October 21, 2003, substantially all of the assets of Complient were sold to an entity known as Cardiac Science, Inc. by and through an Asset Purchase Agreement entered into on that date (the "Asset Purchase Agreement") by and among Complient, Cardiac Science and CPR Limited Partnership ("CPR L.P.").  In my capacity as President of Complient, I oversee the winding up and liquidation of Complient.

3.    On June 1, 1994, County Line L.P. entered into a License Agreement with Donald Hutchins and his company, CPR Prompt, Inc. I signed the License Agreement on behalf of County Line L.P. County Line L.P. then, per the terms of the License Agreement, transferred its interest to an Affiliate under the License Agreement, CPR Limited Partnership ("CPR L.P."). Complient is the 99% general partner of CPR L.P.

4.    In 2001, Complient filed a lawsuit in the State of Ohio, Cuyahoga County Court of Common Pleas as a result of Hutchins' efforts to terminate the License Agreement and, moreover, his claims to a portion of the assets and/or proceeds of Complient. Complient won that lawsuit. Complient expended $29,664.52 in attorney fees while pursuing these claims.

5.    In the Spring of 2001, Hutchins sued certain shareholders in the United States District Court for the District of Massachusetts alleging RICO violations. These claims against Complient's shareholders were, in reality, claims for 7.5% of the assets and/or proceeds of Complient. Complient's shareholders prevailed in this case. Complient spent $70,400 in attorney fees in defending the interests of its shareholders in this case Complient's shareholders were forced to spend similar amounts.

6.    The partnership interests in CPR L.P. were not sold to Cardiac Science pursuant to the Asset Purchase Agreement entered into by and among Complient, CPR L.P. and Cardiac Science on October 21, 2003. To date, the partnership interests in CPR L.P. have not been sold to any third party.

7.    On June 28, 2004, Complient received a Demand for Indemnity from Cardiac Science based on Donald Hutchins' Complaint in this case against Cardiac Sciences.

8.    Certain of the shares of Cardiac Science common stock, specifically 1,025,000 shares, tendered by Cardiac Science as payment under the Asset Purchase Agreement were to be

held in escrow until October 21, 2004, to cover claims for indemnification, if any, made by Cardiac Science against Complient. Because of the Demand for Indemnity and this lawsuit, the shares held in escrow were not released to Complient on October 21, 2004. The closing price per share on NASDAQ for Cardiac Science common stock on October 20, 2004 (the date of valuation under the contract with Cardiac Science) was $1.67 per share.

9.      Complient received a second indemnification claim from Cardiac Science on October 20, 2004, unrelated to this case, in the amount of $836,366.

10.     The price per share of Cardiac Science common stock declined after October 20, 2004. In order to maximize the value of the Cardiac Science common stock held in escrow for Complient and its shareholders, Complient resolved the Demand for Indemnity with Cardiac Science and agreed to a payment of only one-half the shares of stock held in escrow, or 512,500 shares of stock. Cardiac Science tendered the 512,500 shares of stock to Complient on March 1, 2005. On March 1, 2005, the closing price per share on NASDAQ was $1.36 per share.

11.     As a result of this lawsuit and the resulting Demand for Indemnity, Complient has lost a significant amount of money. Had Complient received the 1,025,000 shares of Cardiac Science common stock on October 21, 2004, this stock would have had a value of $1,711,750, less the $836,366, which equals $875,384. However, Complient, due to Hutchins' pursuit of this lawsuit, received only one-half of these shares on March 1, 2005, which had a value of $697,000. As a result, Complient suffered a loss in the value of Cardiac Science stock of $178,384.

12.     In addition, Complient was forced to expend attorney fees to respond to the Demand for Indemnity and negotiate its resolution as well as to defend this litigation. The fees incurred by Complient in this regard are in excess of $38,150.51.

13.    Due to Hutchins filing of this Complaint, Complient, in order to protect its interests and those of CPR L.P. and Cardiac Science, filed claims against Hutchins in the State of Ohio, Cuyahoga County Court of Common Pleas, named <u>Complient v. Hutchins</u>, Case No. 540066. To date, and as a result of Hutchins' conduct in filing this case, Complient has incurred $36,007 in attorney fees in pursuing its claims in the pending Ohio case.

14.    To date, Complient has had to expand in excess of $160,890.22 in attorney fees for the numerous lawsuits involving Hutchins' claims for 7.5% of the value of Complient.

FURTHER AFFIANT SAYETH NAUGHT.

_____
STEVEN LINDSETH

Sworn to before me and subscribed in my presence this ___ day of July, 2005.

_____
NOTARY PUBLIC

**Harry W. Heise**
**Notary Public, State of Ohio**
**My Commission Expires**
**March 19, 2010**