# EXHIBIT B

Filed Pursuant to rule 424(b)(3)<br>
Registration Number 333-124514

To the stockholders of Quinton Cardiology Systems, Inc. and Cardiac Science, Inc.:

Quinton and Cardiac Science have entered into an agreement pursuant to which they have agreed to combine their respective businesses, which we refer to as the "transaction" or the "merger transaction." The combination will be accomplished by means of the mergers of Quinton and Cardiac Science with wholly-owned subsidiaries of CSQ Holding Company, which we refer to as "Newco," "we," "us" or "our" in this joint proxy statement/prospectus. Newco is expected to be renamed "Cardiac Science Corporation" upon the completion of the transaction.

When the transaction is completed, Quinton common stockholders will receive 0.77184895 shares of Newco common stock for each share of Quinton common stock they own and Cardiac Science common stockholders will receive 0.10 shares of Newco common stock for each share of Cardiac Science common stock they own. In addition, Cardiac Science senior note holders have agreed to convert senior notes having an approximately aggregate principal and accrued interest at February 28, 2005 of approximately $61 million, together with related warrants to purchase approximately 13.4 million shares of Cardiac Science common stock held by them, into an aggregate of $20 million in cash, payable by us, and 2,843,915 Newco common shares, as more fully discussed on page 104, which we refer to as the "note and warrant conversion transaction." The completion of the note and warrant conversion transaction is conditioned upon, and will take place concurrently with, the completion of the merger transaction. If the merger transaction is not approved, then the note and warrant conversion transaction will not be consummated. Based on the respective exchange ratios and the capitalization of each company as of February 28, 2005, the date we signed the merger agreement, former stockholders of Quinton will hold approximately 48.7%, and former stockholders and senior note holders of Cardiac Science will collectively hold approximately 51.3%, of our outstanding common stock immediately following the transaction. In addition, each outstanding stock option, warrant (other than the warrants held by the Cardiac Science senior note holders related to the senior notes) and right to purchase common stock issued by Quinton and Cardiac Science prior to the transaction will be assumed by us and will become a right to purchase Newco common stock, as more fully discussed in the section entitled "Quinton and Cardiac Science options, warrants and purchase rights" on page 87. We have applied to list our common stock on The Nasdaq National Market under the symbol "CSCX."

The attached joint proxy statement/prospectus provides you with detailed information concerning Quinton, Cardiac Science, Newco, the note and warrant conversion transaction and the merger transaction. Please give all the information contained in the joint proxy statement/prospectus your careful attention.

**In particular, you should carefully consider the discussion in the section entitled "RISK FACTORS" beginning on page 26 of the joint proxy statement/prospectus.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued in connection with the transaction or determined if this joint proxy statement/prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

Sincerely,

*Raymond W. Cohen*

Raymond W. Cohen
Chief Executive Officer
Cardiac Science, Inc.

Sincerely,

*John R. Hinson*

John R. Hinson
Chief Executive Officer
Quinton Cardiology Systems, Inc.

This joint proxy statement/ prospectus is dated August 1, 2005 and was first mailed to stockholders on or about August 3, 2005.

Table of Contents

transaction, on July 14, 2005, the record date for Quinton's and Cardiac Science's special meetings of stockholders, and on July 28, 2005, the latest practicable trading day before the printing of this joint proxy statement/prospectus:

|  | Quinton | Cardiac Science |
|---|---|---|
| February 28, 2005 | $ 9.74 | $ 1.83 |
| July 14, 2005 | $ 8.24 | $ 1.07 |
| July 28, 2005 | $ 8.95 | $ 1.15 |

Quinton, Cardiac Science and Newco urge you to obtain current market quotations. See page 23 for a comparison of Quinton's and Cardiac Science's common stock market prices and the pro forma equivalent of our per share value.

**Q: Where will my shares of Newco common stock be listed? (see page 92)**

**A:** We have applied to list our common stock on The Nasdaq National Market under the symbol "CSCX."

**Q: Will I recognize an income tax gain or loss on the transaction? (see page 89)**

**A:** Subject to the limitations, qualifications and assumptions described in "Material United States federal income tax consideration of the transaction," beginning on page 89, for both Quinton stockholders and Cardiac Science stockholders, you will not recognize gain or loss for United States federal income tax purposes in connection with the transaction, except with respect to cash received for fractional shares. All Quinton and Cardiac Science stockholders are urged to consult their own tax advisors to determine their particular tax consequences.

**Q: What is the intended accounting treatment of the transaction? (see page 90)**

**A:** We expect to account for the transaction as a purchase of Cardiac Science by Quinton, using the purchase method of accounting

**Q: Are there any regulatory consents or approvals that are required to complete the transaction? (see page 90)**

**A:** Both Quinton and Cardiac Science have made filings with the Federal Trade Commission and the Antitrust Division of the Department of Justice as required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, in connection with the transaction and have been granted early termination of the requisite waiting period specified by such Act. None of Quinton, Cardiac Science or Newco is aware of the need to obtain any other regulatory approvals in order to consummate the transaction other than the following:

• effectiveness of the registration statement of which this joint proxy statement/ prospectus is a part; and

• approval to list the shares of our common stock to be issued in connection with the transaction on The Nasdaq National Mark

Quinton, Cardiac Science and Newco intend to obtain these approvals and any additional regulatory approvals that may be required. However, none of the parties can assure you that all of the approvals will be obtained.

**Q: Are there contractual conditions to completion of the transaction? (see page 99)**

**A:** Yes. Quinton's and Cardiac Science's obligations to complete the transaction are subject to the satisfaction or waiver of closing conditions. The conditions that must be satisfied or waived before the completion of the transaction include the following, subje to certain exceptions and qualifications:

• Quinton and Cardiac Science stockholder approval of the transaction;

• declaration by the SEC of the effectiveness of the registration statement of which this joint proxy statement/ prospectus is a pa the absence of any stop order suspending such effectiveness, and the receipt and effectiveness of all necessary state securities law authorizations;

• absence of any order, injunction, decree or other action by any governmental entity that restrains, enjoins or otherwise prohibit the transaction or any pending action seeking to do the same;

11

### Cardiac Science Selected Historical Financial Data

The following selected historical financial data of Cardiac Science have been derived from the audited historical consolidated financial statements and related notes of Cardiac Science for each of the years in the five-year period ended December 31, 2004 and the unaudited historical consolidated financial statements and related notes for the three month periods ended March 31, 2004 and March 31, 2005, respectively. The information as of and for the three months ended March 31, 2004 and 2005 is unaudited and has been prepared on the same basis as Cardiac Science's annual consolidated financial statements. In the opinion of Cardiac Science's management, this quarterly information reflects all adjustments, consisting only of normal recurring adjustments, necessary for a fa presentation of the information for the periods presented. The results of operations for the three months ended March 31, 2005 are n necessarily indicative of the results that may be expected for the full year ending December 31, 2005, or any future period.

|  | Year Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2004 | 2005 |
|  | (In thousands, except percentages and per share data) | | | | | | |
| **Consolidated Statement of Operations Data:** | | | | | | | |
| Net revenue | $ 4,242 | $ 10,651 | $ 50,043 | $ 61,982 | $ 68,513 | $ 15,604 | $ 15,011 |
| Gross profit | 417 | 2,676 | 25,306 | 33,439 | 38,151 | 9,096 | 8,744 |
| Gross profit percentage | 10% | 25% | 51% | 54% | 56% | 58% | 58 |
| Operating expenses: | | | | | | | |
| Sales and marketing | 4,371 | 8,972 | 17,325 | 18,616 | 23,959 | 6,003 | 4,906 |
| Research and development | 8,248 | 8,575 | 6,053 | 5,538 | 6,027 | 1,669 | 1,457 |
| General and administrative | 5,159 | 6,935 | 11,474 | 14,720 | 19,241 | 4,166 | 5,198 |
| Acquired in-process research and development | 13,587 | — | — | — | — | — | — |
| Amortization of goodwill and intangibles | 1,063 | 1,740 | 2,111 | 1,656 | 1,931 | 503 | 403 |
| Amortization of restricted stock | 1,551 | — | — | — | — | — | — |
| Goodwill impairment charge | — | — | — | — | — | — | 47,269 |
| Impairment of assets | — | 1,438 | — | — | — | — | — |
| Gain on sales and other, net | — | — | — | — | (1,077) | — | — |
| Gain on settlement | — | — | (832) | — | — | — | — |
| Total operating expenses | 33,979 | 27,660 | 36,131 | 40,530 | 50,081 | 12,341 | 59,233 |
| Loss from operations | (33,562) | (24,984) | (10,825) | (7,091) | (11,930) | (3,245) | (50,489 |
| Interest income (expense) and other, net | 618 | (538) | (4,142) | (5,891) | (6,739) | (1,587) | (3,353 |
| Loss on sale of marketable securities | — | (707) | — | — | — | — | — |
| Minority interest in (income) loss of subsidiary | — | 16 | (33) | (48) | — | — | — |

Table of Contents

The following table sets forth the high and low sale prices for a share of Quinton common stock and for a share of Cardiac Science common stock, rounded to the nearest cent, for the periods indicated. The prices below are as reported on The Nasdaq National Market, based on published financial sources.

|  | Quinton Common Stock | | Cardiac Science Common Stock | |
| --- | --- | --- | --- | --- |
|  | High | Low | High | Low |
| **Year ending December 31, 2005** | | | | |
| Third Quarter (through July 28, 2005) | $ 9.18 | $ 7.93 | $ 1.21 | $ 1.00 |
| Second Quarter | 8.51 | 6.95 | 1.20 | 0.74 |
| First Quarter | 11.15 | 7.77 | 2.20 | 1.03 |
| **Year ended December 31, 2004** | | | | |
| Fourth Quarter | 10.99 | 8.54 | 2.27 | 1.58 |
| Third Quarter | 10.11 | 6.80 | 3.05 | 1.43 |
| Second Quarter | 14.80 | 9.29 | 4.20 | 1.97 |
| First Quarter | 12.24 | 7.87 | 5.33 | 3.72 |
| **Year ended December 31, 2003** | | | | |
| Fourth Quarter | 8.49 | 7.20 | 4.65 | 3.40 |
| Third Quarter | 8.85 | 7.20 | 4.99 | 2.54 |
| Second Quarter | 8.13 | 5.14 | 3.19 | 2.22 |
| First Quarter | 7.77 | 5.25 | 2.94 | 1.98 |

**Recent Market Prices**

The table below presents, as of February 28, 2005, the last trading day before we announced the transaction, July 14, 2005, the record date for Quinton's and Cardiac Science's special stockholders meetings, and July 28, 2005, the latest practicable trading day before the printing of this joint proxy statement/prospectus:

- the closing prices of Cardiac Science common stock on The Nasdaq National Market;
- the pro forma values per share of Newco common stock;
- the closing prices of Quinton common stock on The Nasdaq National Market; and
- the pro forma equivalent values per share of Quinton common stock.

|  | Cardiac Science Common Stock Closing Price | Newco Pro Forma Value Per Share | Quinton Common Stock Closing Price | Quinton Pro Forma Equivalent Value Per Share |
| --- | --- | --- | --- | --- |
| February 28, 2005 | $ 1.83 | $ 18.30(1) | $ 9.74 | $ 14.13(2) |
| July 14, 2005 | $ 1.07 | $ 10.70(1) | $ 8.24 | $ 8.26(2) |
| July 28, 2005 | $ 1.15 | $ 11.50(1) | $ 8.95 | $ 8.88(2) |

(1) The Newco pro forma value per share is calculated, for illustrative purposes only, by dividing the Cardiac common stock closing price on the relevant date by 0.10, the Cardiac Science exchange ratio. The Cardiac Science exchange ratio of 0.10 gives effect to an implied 1:10 reverse stock split to Cardiac Science stockholders. Consequently, the Newco pro forma values per share presented in the table above do not represent a premium to the Cardiac Science common stock prices presented in the table above because, as a result of the transaction, each share of Cardiac Science common stock outstanding immediately prior to completion of the transaction will represent the right to receive only one-tenth of one share of Newco common stock when the transaction is completed. Newco's common stock does not currently trade on any stock market. When it commences trading on The Nasdaq National Market, after the transaction is completed, Newco's common stock may not trade at prices that correlate to Cardiac Science's stock price before the transaction is completed.

23

Table of Contents

The discussion set forth below, subject to the limitations and qualifications set forth in this section, constitutes the opinion of Perkins Coie LLP for Quinton and Stradling Yocca Carlson & Rauth for Cardiac Science as to the material United States federal income tax consequences of the transaction that are applicable to holders of Quinton common stock and Cardiac Science common stock:

- No gain or loss will be recognized by the holders of Quinton common stock or Cardiac Science common stock upon their receipt of our common stock solely in exchange for their Quinton common stock or Cardiac Science common stock in the transaction;

- A holder of Quinton common stock or Cardiac Science common stock who receives cash in the transaction in lieu of a fractional share of our common stock will be treated as if the holder had received the fractional share and then had that share redeemed for cash. The holder will recognize gain or loss equal to the difference between the cash received and that portion of the holder's basis in our common stock attributable to the fractional share;

- The aggregate tax basis of our common stock received by each holder of Quinton common stock or Cardiac Science common stock in the transaction (including any fractional share that the holder will be treated as having received and then as having immediately redeemed for cash) will be the same as the aggregate tax basis of the Quinton common stock or Cardiac Science common stock surrendered in the exchange;

- The holding period of our common stock received by each holder of Quinton common stock or Cardiac Science common stock in the transaction will include the holding period of the Quinton common stock or Cardiac Science common stock surrendered in the exchange, if the holder held that Quinton common stock or Cardiac Science common stock as a capital asset at the time of the transaction; and

- Neither Quinton nor Cardiac Science will recognize gain as a result of the transaction; provided, however, that Cardiac Science may recognize cancellation of indebtedness income to the extent that the fair market value of our common stock and cash received by the senior note holders in exchange for the senior notes previously issued by Cardiac Sciences is less than the amount of such indebtedness (including accrued interest) that is surrendered.

This opinion has been rendered on the basis of certain assumptions, including assumptions regarding the absence of changes in existing facts and that the merger will be completed in accordance with the merger agreement. This opinion also has been rendered on the basis of statements and representations, including those contained in the merger agreement, the registration statement of which this proxy statement/ prospectus forms a part, and officers' certificates of Quinton and Cardiac Science, all of which must be true, correct and complete as of the effective date of the registration statement and must continue to be true, correct and complete at all relevant times thereafter, including as of the effective time of the transaction. If any of those statements, representations or assumptions is untrue, incorrect, or incomplete, the conclusions contained in the opinion referred to in this paragraph or set forth below could be adversely affected.

*Stockholders are urged to consult their own tax advisors as to the specific tax consequences to them of the transaction, including the applicability and effect of United States federal, state and local and foreign income and other tax laws in their particular circumstances.*

**Accounting treatment of the transaction**

We expect to account for the transaction as a purchase of Cardiac Science by Quinton for financial reporting and accounting purposes, in accordance with accounting principles generally accepted in the United States of America.

**Regulatory matters related to the transaction**

The transaction is subject to the requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, which prevents specified transactions from being completed until required information and materials are furnished to the Antitrust Division of the Department of Justice and the Federal Trade Commission and

90

Table of Contents

section entitled "Description of Newco Capital Stock Following the Transaction — Registration Rights" on page 128 for a more detailed description of these registration rights.

**Delisting and deregistration of Quinton and Cardiac Science common stock after the transaction and listing of our common stock**

If the transaction is completed, Quinton common stock and Cardiac Science common stock will be delisted from The Nasdaq National Market and will be deregistered under the Securities Exchange Act of 1934, as amended. We have applied to list our shares of common stock to be issued in the transaction on The Nasdaq National Market under the symbol "CSCX," and The Nasdaq National Market approval is subject to official notice of issuance prior to the effectiveness of the transaction.

92

Table of Contents

(d) any change by Cardiac in accounting principles or methods (other than as required by GAAP or Regulation S-X of the Exchange Act).

SECTION 5.12  *Transactions with Affiliates.* Since December 31, 2003, no event has occurred that would be required to be reported by Cardiac pursuant to Item 404 of Regulation S-K promulgated by the SEC. Cardiac has delivered to Quinton a list identifying all persons who may be deemed to be "affiliates" of Cardiac for purposes of Rule 145 under the Securities Act.

SECTION 5.13  *Litigation.* There is no material Action pending against, or to the Knowledge of Cardiac threatened against, Cardiac or any of its Subsidiaries or any of their respective assets or properties before any arbitrator or Governmental Entity.

SECTION 5.14  *Taxes.* (a) All material Tax returns, statements, reports and forms (collectively, the "Cardiac Returns") required to be filed with any Taxing authority by, or with respect to, Cardiac and its Subsidiaries were filed on a timely basis and were true, complete and correct except to the extent that the failure to file or be true, complete and correct would not, individually or in the aggregate, have a Cardiac Material Adverse Effect; (b) Cardiac and its Subsidiaries have timely paid all material Taxes shown as due and payable on the Cardiac Returns (other than Taxes which are being contested in good faith and for which adequate reserves are reflected on the Cardiac Financial Statements) except to the extent that the failure to pay would not, individually or in the aggregate, have a Cardiac Material Adverse Effect; (c) Cardiac and its Subsidiaries have made provision for all material Taxes payable by them for which no Cardiac Return has yet been filed except for inadequately reserved Taxes that would not, individually or in the aggregate, have a Cardiac Material Adverse Effect; (d) no Taxing authority has asserted or initiated (or, to the Knowledge of Cardiac, threatened to assert or initiate) in writing any action, suit, proceeding or claim against Cardiac or any of its Subsidiaries that, individually or in the aggregate, would have a Cardiac Material Adverse Effect; (e) there are no Liens for Taxes on the assets of Cardiac or any of its Subsidiaries other than Liens for Taxes not yet due and payable or that would not, individually or in the aggregate, have a Cardiac Material Adverse Effect; (f) except for any year for which the applicable statute of limitations has expired, neither Cardiac nor any of its Subsidiaries has been a member of an affiliated, consolidated, combined or unitary group other than one of which Cardiac was the common parent; (g) except for any year for which the applicable statute of limitations has expired, neither Cardiac nor any of its Subsidiaries is obligated by any contract, agreement or other arrangement to indemnify any other Person (other than Cardiac or any of its Subsidiaries) with respect to Taxes or to compensate any other Person for any Tax payment or Tax liability under a Tax sharing or similar agreement; (h) neither Cardiac nor any of its Subsidiaries has made any payments, is obligated to make any payments, or is a party to any contract, agreement or other arrangement that under any circumstances could obligate it to make any payments that will not be deductible under Code Sections 280G or 162(m); (i) neither Cardiac nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code; (j) neither Cardiac nor any of its Subsidiaries has engaged in a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction, as set forth in Treasury Regulations Section 1.6011-4(b)(2); and (k) neither Cardiac nor any of its Subsidiaries has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code (i) in the two (2) years prior to the date hereof, or (ii) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Mergers.

SECTION 5.15  *Employees and Employee Benefits.*

(a) Cardiac has made available to Quinton each material "employee benefit plan," as defined in Section 3(3) of ERISA, each material employment, severance or similar contract, plan, arrangement or policy and each other material plan or arrangement providing for compensation, bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation or insurance coverage (including any self-insured arrangements and, if applicable, related trust agreements), all amendments thereto

A-29

Table of Contents

has received Section 510(k) clearance(s) from the FDA clearing such device for commercial distribution. None of Cardiac's or its Subsidiaries' current medical devices (including any such device under development) are the subject of or require FDA premarket approval, pre-clinical or clinical trial.

(d) To the Knowledge of Cardiac, each medical device distributed, sold or leased, or service rendered, by Cardiac or any of its Subsidiaries complies in all material respects with all applicable product safety and electrical safety standards of each applicable product and electrical safety agency, commission, board or other Governmental Entity.

(e) Neither Cardiac nor any of its Subsidiaries, nor, to the Knowledge of Cardiac, any officer, employee or agent of Cardiac or any of its Subsidiaries, has made an untrue statement of a material fact or fraudulent statement to the FDA or any other Governmental Entity, failed to disclose a material fact required to be disclosed to the FDA or any other Governmental Entity, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to provide a basis for the FDA or any other Governmental Entity to invoke its policy respecting fraud, untrue statements, bribery and illegal gratuities or any similar policy.

(f) Other than as disclosed in the Cardiac Disclosure Letter, there are no FDA warning letters, recalls (either voluntary or mandatory), seizures, revocations of prior FDA approval, internal stop-ships, banned or administratively detained products or other enforcement actions or sanctions of the FDA in connection with any medical devices currently manufactured, produced, tested, developed, processed, labeled, stored or distributed by or on behalf of Cardiac or any of its Subsidiaries.

(g) Cardiac and each of its Subsidiaries has obtained all necessary foreign government agency licenses, approvals, permits or authorizations for sale and distribution of its medical devices, as applicable, to each foreign country or jurisdictions in which such medical device is currently sold, leased, marketed or otherwise commercially distributed and is in compliance with applicable Laws of such countries and/or jurisdictions, except where any failure to so comply would not reasonably be expected to have, individually or in the aggregate, a Cardiac Material Adverse Effect.

SECTION 5.19    *Intellectual Property.*

(a) All patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; registered trademarks and applications therefor; and registered copyrights and applications therefor owned or controlled by Cardiac or its Subsidiaries (collectively, "Cardiac Registered Intellectual Property"), together with any other type of rights in Intellectual Property that are owned or controlled by Cardiac or any of its Subsidiaries and that (x) relates to any Cardiac product or (y) is otherwise material to the research, development, manufacturing or commercialization of any Cardiac product, are collectively referred to herein as "Cardiac Intellectual Property Rights". Section 5.19 of the Cardiac Disclosure Letter lists all Cardiac Registered Intellectual Property. All Cardiac Intellectual Property Rights are either (i) owned by, or subject to a valid license or a valid obligation of assignment to, Cardiac or its Subsidiaries free and clear of all mortgages, liens, security interests, leases, pledges, encumbrances, equities, claims, charges, options, written restrictions, rights of first refusal, title retention agreements or other exceptions to title which affect the Cardiac Intellectual Property Rights or restrict the use by Cardiac or any of its Subsidiaries of the Cardiac Intellectual Property Rights in any material way ("Cardiac IP Liens"), or (ii) controlled by Cardiac or its Subsidiaries free and clear (to the Knowledge of Cardiac) of all Cardiac IP Liens. Cardiac and its Subsidiaries are the sole legal and beneficial owners of all the Cardiac Intellectual Property Rights. There are no actions pending or, to the Knowledge of Cardiac, threatened with regard to the ownership or control by Cardiac or any of its Subsidiaries of any of the Cardiac Intellectual Property Rights. To the Knowledge of Cardiac and its Subsidiaries, the Cardiac Intellectual Property Rights have not been, and are not being, infringed. To the Knowledge of Cardiac and its Subsidiaries, the Cardiac Intellectual Property rights are valid and enforceable. To the Knowledge of Cardiac and its Subsidiaries, there are no facts or circumstances that could impair the validity or enforceability of any of the Cardiac Intellectual Property Rights. Neither Cardiac nor its Subsidiaries has received any communications challenging the validity or enforceability of the Cardiac Intellectual Property Rights or their ownership of Cardiac Intellectual Property Rights. There are no pending or, to the Knowledge of Cardiac or its Subsidiaries, threatened claims that

A-33