UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD C. HUTCHINS,          )
        PLAINTIFF            )
                             )
        v.                   )   C.A. No. 04-30126-MAP
                             )
CARDIAC SCIENCE, INC.,       )
ET AL.,                      )
        DEFENDANTS           )

MEMORANDUM AND ORDER REGARDING CROSS
MOTIONS FOR SUMMARY JUDGMENT
AND OTHER MISCELLANEOUS RELIEF
(Dkt. Nos. 66, 67, 87, 105, 120, 127, 129, 134, 139, 141,
149, 151, 154, 163, 165, 170, 175, 187, and 198)

September 27, 2006

PONSOR, D.J.

## I.  INTRODUCTION

This is a suit brought by pro se Plaintiff Donald C.

Hutchins against Cardiac Science, Inc. ("Cardiac Science")

and Complient Corporation ("Complient").  Plaintiff alleges

that Cardiac Science is liable for copyright and patent

infringement, abuse of process, and tortious interference

with contract, and that Complient is liable for fraud,

fraudulent misappropriation and sale of patent, and breach

of contract.  Defendants deny Plaintiff's allegations and

have asserted counterclaims seeking damages for breach of

contract, abuse of process, tortious interference with
contract, and interference with prospective advantage.

On January 4, 2006, the court heard argument on nine
motions, including Complient's and Plaintiff's respective
motions for summary judgment.[1]  Since oral argument,
Plaintiff has filed a number of additional motions, as well
as an amended notice of removal of <u>Complient Corp. v. Donald</u>
<u>C. Hutchins, et al.</u>, Hampden County Superior Court Civil
Action No. 05-1115 ("the Hampden County collection action")
and a second amended complaint.  Complient, the plaintiff in
the Hampden County collection action, opposes removal and
has filed a motion to remand.  Complient has also moved to
strike Plaintiff's second amended complaint.

For the reasons set forth below, the court will: allow

---

[1] On June 23, 2005, the court allowed Cardiac Science's
motion for summary judgment on every claim brought against it
by Plaintiff and every declaratory judgment claim brought by
Cardiac Science against Plaintiff.  Citing Fed. R. Civ. P.
60(b)(3), Plaintiff has filed a motion for relief from the
court's refusal to reconsider this ruling.  (<u>See</u> Dkt. No.
108.)

This  motion  will  be  considered  in  a  forthcoming
memorandum and order in connection with two other motions
concerning Cardiac Science: Plaintiff's motion for relief from
an order denying his motion for a temporary restraining order
(Dkt. No. 107); and Plaintiff's motion for sanctions against
counsel for Cardiac Science (Dkt. No. 191).

Complient's Motion for Summary Judgment (Dkt. No. 66); deny
Complient's Motion for Default Judgment (Dkt. No. 67); deny
Plaintiff's Motion for Summary Judgment (Dkt. No. 87); deny
Plaintiff's Motion for Declaratory Judgment (Dkt. No. 105);
deny, as moot, Plaintiff's Motion to Enjoin Cardiac Science
to Disclose the Identity of the Current Licensee (Dkt. No.
120); deny, as moot, Plaintiff's Motion to Join Stradling,
Yocca, Carlson & Rauth (Dkt. No. 127); deny Plaintiff's
Motion to Join Steven Lindseth (Dkt. No. 129); deny, as
moot, Plaintiff's Motion for Removal (Dkt. No. 134); deny
Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 139);
deny Plaintiff's Motion to Strike (Dkt. No. 141); allow
Complient's Motion to Remand (Dkt. No. 149); deny
Plaintiff's Second Motion for Declaratory Judgment (Dkt. No.
151); deny Plaintiff's Motion to Join CPR Limited
Partnership ("CPR L.P.") (Dkt. No. 154); allow Plaintiff's
Motion to Withdraw his Motion to Join Stradling, Yocca,
Carlson & Rauth (Dkt. No. 163); deny Plaintiff's Motion for
Sanctions against Counsel for Complient (Dkt. No. 165); deny
Plaintiff's Motion for Partial Summary Judgment (Dkt. No.
170); deny Plaintiff's Motion to join Axentis LLC

("Axentis") (Dkt. No. 175); deny Plaintiff's Motion to Define Complient (Dkt. No. 187); and allow Complient's Motion to Strike Plaintiff's Second Amended Complaint (Dkt. No. 198).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The court will begin by addressing Complient's Motion for Summary Judgment; the facts below therefore appear in the light most favorable to Plaintiff, the non-moving party. See Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 8 (1st Cir. 2006) (citation omitted).[2]

On June 1, 1994, Plaintiff and his closely-held company, CPR Prompt Corporation ("CPR Prompt"), entered into a license agreement (the "License Agreement") with County Line Limited Partnership ("County Line"), a venture company under the direction of Jon and Steven Lindseth. (See Dkt. No. 91, Martinelli Aff.) Under the terms of this agreement,

---

[2] Given Plaintiff's pro se status, the court, in creating this factual summary, has "attempted to parse the record and set forth the facts as favorable to [Plaintiff] as h[is] filings permit." Swallow v. Fetzer Vineyards, 46 Fed. Appx. 636, 639 (1st Cir. 2002) (citation omitted). That being said, "conclusory allegations, improbable inferences, and unsupported speculation" have not been considered. Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (citation omitted). In addition, uncontroverted, material facts of record set forth by Complient have been deemed admitted pursuant to Local Rule 56.1.

Plaintiff and his company provided County Line with an
exclusive license to various intellectual properties,
including CPR Prompt® -- a device designed to instruct
individuals in the performance of cardiopulmonary
resuscitation.[3]  (See Dkt. No. 91, Ex. E, License
Agreement.)

In return, Plaintiff received an up-front payment of
$100,000 and royalty payments on CPR Prompt® sales.  (Id. at
§§ 3.1-3.4.)  Pursuant to § 3.10 of the License Agreement,
County Line also agreed to assign its interest to an

---

[3] CPR Prompt® is the embodiment of U.S. Patent No.
4,583,524 ("the '524 patent"), which the U.S. Patent and
Trademark Office ("PTO") issued to Plaintiff on April 22,
1986.  The device is also claimed in U.S. Patent Reexamination
No. 34,800 ("the '800 patent"), which the PTO issued to
Plaintiff on November 29, 1994.
    In addition, Plaintiff owns U.S. Patent No. 5,913,685
(filed June 24, 1996) (issued June 22, 1999) ("the '685
patent"), which discloses an electronic device "to provide
guidance to rescue personnel trained in CPR for resuscitating
a victim under an emergency condition." '685 patent, col.9
ll.46-48.
    Plaintiff also holds one trademark registration -- "CPR
Prompt" -- and two copyright registrations -- U.S. Copyright
No. TX-u-210-208, which covers the device's script and word
list, and U.S. Copyright No. TX-u-213-859, which pertains to
its assembler software program -- that are relevant to this
litigation.

"Affiliate"[4] that would

> cause each partner of such Affiliate who purchases
> or otherwise acquires a partnership interest of
> such Affiliate directly from such Affiliate to
> agree to pay CPR-PROMPT seven and one-half percent
> (7.5%) of the net proceeds of any sale of any or
> all of such partnership interest to any person or
> entity which is not an Affiliate to such partner.

(License Agreement § 3.10 (noting that "[i]f such Affiliate

conducts a public offering . . . , no person or entity

purchasing stock in such offering or from such Affiliate

thereafter shall be required to agree to make such

payments").)

On September 19, 1994, County Line assigned all of its

rights and obligations under the License Agreement to CPR

L.P.,[5] an Ohio entity that initially had two partners:

---

[4] (See License Agreement § 1.1 (defining "Affiliate" as
"any person or entity that directly, or indirectly through one
or more intermediaries, controls, is controlled by or is under
common control with first mentioned person or entity").)

[5] (See Dkt. No. 66, Ex. C, Lindseth Aff., Ex. 1, Agreement
of Limited Partnership.)  Plaintiff maintains that he has
never acknowledged or agreed to this assignment.  (See Dkt.
No. 84, Pl.'s Mem. Controverting Complient's Statement of
Undisputed Facts 2 (noting that although the September 19,
1994 assignment included two lines for Plaintiff's signature,
Plaintiff did not sign the document); see also Dkt. No. 40.,
Pl.'s Am. Compl. ¶ 30 ("Hutchins never signed or accepted the
validity of the Agreement dated September 19, 1994.").)
Complient takes the position that the License Agreement
did not require Plaintiff's acknowledgment or agreement.

Catalog Products, Inc. ("Catalog Products"), a 1% limited partner, and County Line itself, the 99% general partner.[6]

In December, 1997, County Line's corporate successor[7] transferred its general partnership interest in CPR L.P. to CPR Prompt LLC, which subsequently converted to Complient, a Delaware corporation.  Like the previous general partners, Complient retained a 99% partnership interest in CPR L.P. and performed various services related to the License Agreement.  Specifically, Complient "supplied Hutchins with sales reports, royalty payments, patent license fee payments and all other transactions covered by the License Agreement."  (Dkt. No. 89, Pl.'s Statement of Undisputed Facts in Supp. Pl.'s Mot. Summ. J. ¶ 3.)

On November 23, 1999, Plaintiff attempted to terminate the License Agreement by issuing a "Notice of Termination,"

---

[6] In a services agreement dated September 19, 1994, Steven W. Lindseth signed on behalf of County Line, the general partner of CPR L.P., and on behalf of Catalog Products, the general partner of County Line.  (Dkt. No. 66, Ex. C, Lindseth Aff., Ex. 2, Services Agreement 4.)

[7] The record does not indicate the name of County Line's corporate successor or when this entity assumed County Line's general partnership interest.

alleging a breach of § 3.10.[8]  Five days later, on November
28, 1999, Plaintiff issued a "Final Notice of Termination"
in which he claimed the same misconduct.

On December 15, 1999, Complient responded on behalf of
CPR L.P. and County Line and asserted that no breach of §
3.10 had occurred.[9]  Complient further advised Plaintiff
that if he did not reply by December 31, 1999, Complient
would consider his termination notices null.  Plaintiff did
not respond and later acknowledged that his efforts to
terminate the License Agreement were unsuccessful.

The next significant action occurred in January of
2001, when Plaintiff, represented by counsel at the time,
informed Complient of his belief that the License Agreement
entitled CPR Prompt to "7.5% of the proceeds of any sale by
any partner/member/shareholder of Complient . . . and not
simply on Complient's interest in CPR [L.P.]."  (Dkt. No.

---

[8] The License Agreement provides that in the event of a
material breach by one party, the other party may terminate
the agreement by giving ninety days written notice.  (License
Agreement § 8.2.)

[9] Complient's response seems to have come six months
before the corporation was actually created.  (See Dkt. No.
84, Ex. 1, Complient Corp. v. Donald C. Hutchins, et al., No.
CV 04 540066, Compl. ¶¶ 12, 13.)

40, Ex. N, Letter from Gary E. Martinelli, counsel for

Plaintiff, to Steven W. Lindseth, President, Complient at 3

(Jan. 15, 2001).)  In a letter to Steven Lindseth,

Plaintiff's counsel provided the following rationale for

Plaintiff's position:

> In the course of the drafting of the License
> Agreement, you informed Don Hutchins that,
> inasmuch as County Line had separate lines of
> business including Christmas tree stands and
> birdhouses, you intended to form a new entity to
> be controlled by County Line for the purposes of
> conducting the business to be built around the
> invention covered by the License Agreement.  You
> indicated that the new entity would raise venture
> capital from outside investors.
>
> Accordingly, Section 3.10 was incorporated into
> the License Agreement providing for the creation
> of an "Affiliate" and for the payment of 7.5% of
> the proceeds of any sale by a "partner" (intended
> to include County Line and any outside investors)
> of the Affiliate to CPR Prompt.  Consistent with
> this, Section 4.9(d) of the License Agreement
> provided that the Affiliate would provide and
> update the names and addresses of the investor
> partners to CPR Prompt . . . .
>
> [Instead,] County Line [seems to have] proceeded
> with two affiliated companies, one to hold the
> rights under the License Agreement (CPR [L.P.])
> and another (now Complient Corporation) to
> actually raise venture funding, to conduct the
> business and to own CPR [L.P.].  It appears that
> [Complient's] thinking is that while CPR Prompt
> may be entitled to 7.5% of the proceeds to be
> derived from the sale of CPR [L.P.], CPR Prompt is
> not entitled to 7.5% of the proceeds to be derived

9

from the sale of Complient . . . .

This interpretation of the License Agreement is completely at odds with the understanding of the parties at the time the License Agreement was executed.  The intent was that one "Affiliate" be the holder of the License Agreement, the repository of the venture funding and the operating company.  The discussion in Section 3.10 of the consequences of a public offering or a merger would be irrelevant absent this conclusion as would be the undertaking in Section 4.9(d) to provide and update the names of other investors in the Affiliate.[10]  It is also totally inconsistent with the discussions held with you leading up to the execution of the License Agreement . . . . Finally, it is inconsistent with the early drafts of the License Agreement in which County Line itself was to be not only the licensee but also the investment vehicle.  The notion of assigning the license to an affiliate was developed late in our discussions when you sought to separate bird feeder / Christmas tree stand operations from the CPR Prompt business.

(Id. at 1-3 (emphasis in original).)

In conclusion, Plaintiff's counsel requested an

---

[10] This provision provides:

[F]or the purposes of Section 3.10, the Affiliate referred to therein shall provide CPR-PROMPT with a list of the names and addresses and resulting ownership percentage of each of the partners or shareholders of such Affiliate and shall update such list whenever such Affiliate sells or otherwise issues additional partnership or equity interests.

(License Agreement § 4.9(d).)

10

explanation

> as to how and why CPR [L.P] was relegated to a
> dark corner of Complient's corporate structure
> when the premise under which the License Agreement
> we entered into was that the Affiliate, i.e. CPR
> [L.P], would be the vehicle which would grow the
> CPR business and the businesses (now the
> businesses of Complient) that were related to it.

(Id. at 3.)

In February of 2001, CPR L.P. responded by filing a

demand for arbitration with the American Arbitration

Association ("AAA").  (Dkt. No. 84, Ex. 3, Demand for

Arbitration ¶ 15; see also id. at ¶ 8 (citing the License

Agreement's mandatory arbitration provision found in §

8.2).)  That same month, Complient, in its capacity as

general partner of CPR L.P., brought an action, captioned

Complient v. CPR Prompt, et al., No. 429394 ("Complient I"),

against Plaintiff's company and Plaintiff in the State of

Ohio, Cuyahoga County Court of Common Pleas, seeking a

declaratory judgment as to the construction and effect of §

3.10.  (See Dkt. No. 66, Ex. D, Complient's Compl. for

Declaratory J. 6.)

While Plaintiff contends that "it was economically

impossible for Hutchins to defend both actions,"[11] the

record reflects that Plaintiff did attempt to represent CPR

Prompt[12] and that he tendered an answer and asserted

counterclaims and cross-claims on his own behalf in the Ohio

action.[13]    However, the courts of Ohio do not permit a

corporation to appear <u>in propria persona</u>.  See <u>Perez v.</u>

<u>Bush</u>, 631 N.E.2d 192, 194 (Ohio Com. Pl. 1993) (citing <u>Union</u>

<u>Sav. Ass'n. v. Home Owners Aid, Inc.</u>, 262 N.E.2d 558, 560

(Ohio 1970)).  Consequently, on May 30, 2001, the Ohio court

in <u>Complient I</u> entered the following default judgment

against CPR Prompt:

> Pursuant to Section 3.10 of the License Agreement,
> in the event that the partners of CPR L.P.,
> including, but not limited to . . . Complient . .
> . , sell all [o]r part of their respective
> partnership interest in CPR L.P. to an unrelated
> third party, CPR Prompt is entitled to 7.5% of the
> net proceeds of that sale.  <u>Section 3.10 of the</u>
> <u>License Agreement does not entitle CPR Prompt to</u>

---

[11] (Dkt. No. 84, Pl.'s Mem. Controverting Complient's
Statement of Undisputed Facts 3.)

[12] See <u>Hutchins v. Lindseth</u>, No. 01-cv-30120-KPN, slip op.
at 4 n.2 (D. Mass. Dec. 17, 2001) ("At oral argument . . . ,
Plaintiff explained that he appeared pro se in the Ohio action
and attempted to represent [his company] as well."), <u>aff'd</u> No.
02-1212, slip op. (1st Cir. Aug. 12, 2002).

[13] (<u>See</u> Dkt. No. 66, Ex. E, Hutchins' Answer & Countercl.
& Cross-cl.)

12

> **7.5% of the sale of any or all assets of any other
> entity than CPR L.P.**

(Dkt. No. 66, Ex. F, Default J. Entry (May 30, 2001)
(emphasis added).)

On September 5, 2001, the same court allowed
Complient's motion for summary judgment against Plaintiff
without comment. (Dkt. No. 66, Ex. F, Summ. J. Entry (Sept.
5, 2001).)[14]

In the summer of 2001, Plaintiff, _pro se_, brought a
two-count action in this court against the Lindseths and
five of Complient's institutional shareholders under the
Racketeer Influenced and Corrupt Organization (RICO) Act, 18
U.S.C. §§ 1961 _et seq_.  On December 17, 2001, Magistrate
Judge Kenneth P. Neiman allowed the defendants' motion to

---

[14]  Plaintiff now takes the position that he prevailed in
the Demand for Arbitration.    (Pl.'s Mem.  Controverting
Complient's Statement of Undisputed Facts 4 ("The arbitrators
found CPR L.P.'s claims to be bogus and when the arbitrators
pushed Complient for additional evidence, CPR L.P. withdrew
from the Arbitration.   The arbitrators agreed with Hutchins'
reading of § 3.10.").)
      This is a somewhat curious characterization of the
arbitration proceedings, given that Plaintiff sued the AAA in
this court for negligence and breach of contract.    See
Hutchins v. Am. Arbitration Ass'n, No. 03-cv-30181-MAP, slip
op. at 2 (D. Mass. Jan. 22, 2004) (dismissing Plaintiff's
claim under the doctrine of arbitral immunity), aff'd No. 04-
1167, slip op. (1st Cir. Sept. 14, 2004).

dismiss, finding that Plaintiff had failed to satisfy his
burden of establishing personal jurisdiction.  Hutchins v.
Lindseth, No. 01-CV-30120-KPN, slip op. at 9-10 (D. Mass.
Dec. 17, 2001), aff'd No. 02-1212, slip op. (1st Cir. Aug.
12, 2002).

Meanwhile, unbeknownst to Plaintiff, Complient and CPR
L.P. entered into an Asset Purchase Agreement ("APA") with
Cardiac Science on October 21, 2003.  (Dkt. No. 89, Pl.'s
Statement of Undisputed Facts Supp. Pl.'s Mot. Summ. J. 3.)
Under the terms of the APA, Complient, as "the sole general
partner of CPR L.P." (Dkt. No. 66, Ex. C, Lindseth Aff., Ex.
3, Asset Purchase Agreement 1), caused CPR L.P. to convey to
Cardiac Science all of its "assets, properties, rights, and
interests," including the License Agreement (id. at § 1.1A).
Complient also transferred to Cardiac Science "substantially
all of [its] assets, properties, rights and interests," but
retained its general partnership interest in CPR L.P. (Id.
at § 1.2(i).)

In return, Complient received $47 million in Cardiac
Science common stock.  (Dkt. No. 40, Ex. H, Wedbush Morgan

14

Securities Report 4, Oct. 29, 2003.)[15]  According to
Plaintiff, in November of 2003, Cardiac Science began to
manufacture and sell products covered by Plaintiff's patents
and bearing the CPR Prompt® trademark.  (Dkt. No. 40, Ex.
L., Hutchins Aff. ¶ 12, July 1, 2004.)

In the spring of 2004, Plaintiff noticed that he had
not received any royalty payments or reports from Complient
since the previous summer.  (Id. at ¶ 8.)[16]  When Plaintiff
called Complient's Cleveland headquarters he discovered that
CPR L.P.'s general partner was no longer in business.  (Id.)

Plaintiff subsequently contacted the law firm of Fish &
Richardson and learned that Complient, for the first time
since 1995, had recently failed to pay certain fees related
to Plaintiff's patents.  Under the circumstances, Plaintiff
concluded that Complient had abandoned his intellectual
properties, and he began discussing the possibility of

---

[15] As will be discussed, a portion of the total amount of
Cardiac Science stock was held in escrow to cover any claims
for indemnification made by Cardiac Science against Complient.

[16] This assertion seems somewhat inconsistent with the
copy of a check from Complient to Plaintiff's company dated
December 4, 2003, which Plaintiff attached as an exhibit to
his amended complaint.  (See Dkt. No. 40, Ex. K, Check No.
053045.)

licensing these properties to another entity.  (<u>Id.</u> at ¶
9.)[17]

On April 29, 2004, Plaintiff received a phone call from
a representative of Cardiac Science, who informed Plaintiff
that Cardiac Science had acquired his intellectual
properties.  (<u>Id.</u> at ¶ 11.)  After familiarizing himself
with the terms of the APA, Plaintiff concluded that the 7.5%
exit payment described in § 3.10 of the License Agreement
had been triggered.  On July 2, 2004, in response to Cardiac
Science's refusal to recognize his right to an equity
interest of $3,525,000, Plaintiff filed his original
complaint in this action, alleging copyright and patent
infringement, negligence, and breach of contract on the part
of Cardiac Science.

On July 28, 2004, Cardiac Science issued a demand for
indemnity to Complient based upon Plaintiff's complaint.
Complient responded by bringing a second action against
Plaintiff and his company in the Cuyahoga County Court of

_____

[17] When these discussions broke down, Plaintiff sued that
entity in this court alleging claims for breach of contract,
patent and copyright infringement.  <u>See</u> <u>Hutchins v. Zoll Med.
Corp.</u>, 430 F. Supp. 2d 24 (D. Mass. 2006) (allowing
defendant's motion for summary judgment).

16

Common Pleas, captioned <u>Complient v. Hutchins, et al.</u>, No.
540066 ("<u>Complient II</u>"), asserting claims for tortious
interference with contract and abuse of process.  In its
<u>Complient II</u> complaint, Complient also sought a declaratory
judgment regarding the construction and effect of § 3.10 of
the License Agreement and § 1.2(i) of the APA.

   According to Plaintiff, Steven Lindseth and his
attorneys

> recognized that it would be difficult and cost
> prohibitive for [Plaintiff] to conduct a defense
> from 800 miles away.  Recognizing that [Plaintiff]
> could not afford representation, they presumed
> that CPR Prompt would lose by default and that
> they could use <u>res judicata</u> for leverage against
> [Plaintiff's] <u>pro se</u> personal defense.

(Dkt. No. 90, Hutchins Aff. ¶ 11, Sept. 6, 2005.)

   On September 3, 2004, the day after Complient served
Plaintiff with the <u>Complient II</u> complaint, Plaintiff filed a
motion to join Complient in this action.  During a hearing
six days later, this court denied Plaintiff's motion for
failure to comply with Local Rule 15.1.[18]  Plaintiff

---

   [18] The court also heard argument on three other motions,
including Cardiac Science's motion to dismiss, which the court
allowed with respect to Plaintiff's negligence claims, but
otherwise denied.

subsequently filed an amended motion to join Complient,

which the court allowed on November 18, 2004.

Pursuant to that ruling, Plaintiff filed an eight-count

amended complaint on December 22, 2004, asserting claims of

fraud (Count IV), fraudulent misappropriation and sale of

patent (Count VI), and breach of contract (Count VIII)

against Complient, and claims of copyright infringement

(Count I), patent infringement by means of sales (Count II),

patent infringement by means of manufacture (Count III),

abuse of process (Count VI), and tortious interference with

contract (Count VII) against Cardiac Science.

On January 26, 2005, the Ohio court in <u>Complient II</u>

entered a default judgment against CPR Prompt, finding

> (a)  that CPR Prompt ha[d] not effectively
>       terminated the License Agreement . . . ;
>
> (b)  that the partnerships interests in CPR L.P.
>       were not sold to Cardiac Science . . .
>       pursuant to the [APA] . . . ; and
>
> (c)  that the 7.5% payment provision of Section
>       3.10 of the License Agreement was not
>       triggered by virtue of the [APA].

(Dkt. No. 66, Ex. H, Default J. Entry (Jan. 26, 2005).)

On May 16, 2005, Complient filed its answer to

Plaintiff's amended complaint and brought counterclaims

against Plaintiff for tortious interference with the APA
(Count I) and abuse of process (Count II).  Because these
counterclaims were identical to "claims" Complient brought
in the Complient II action, Plaintiff did not offer a timely
response.

On July 29, 2005, Complient filed a motion for summary
judgment on the claims brought against it by Plaintiff and a
motion for default judgment on its counterclaims against
Plaintiff.  Plaintiff filed an answer to Complient's
counterclaims on August 22, 2005 and a memorandum opposing
Complient's motion for default judgment the following day.

On August 24, 2005, Plaintiff offered his opposition to
Complient's motion for summary judgment.  That same day, the
Complient II court granted Complient's motion for summary
judgment against Plaintiff "on the grounds of res judicata
and the License Agreement and the [APA]."  (Dkt. No. 98, Ex.
A., Summ. J. Entry (Aug. 24, 2005).)[19]

-------

[19] On September 29, 2005, the Ohio court in Complient II
entered judgment against Plaintiff and his company, jointly
and severally, in the amount of $278,384.00.  (Dkt. No. 207,
Ex. A, Final J. (Sept. 29, 2005).)  On July 19, 2006, the same
court also awarded attorney fees and costs to Complient in the
amount of $95,662.82.  (Dkt. No. 207, Ex. B, J. Entry (July
19, 2006).)

### III. CROSS MOTIONS FOR SUMMARY JUDGMENT

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Johnson v. Gordon, 409 F.3d 12, 16-17 (1st Cir. 2005) (citation omitted). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In cases where both parties have moved for summary judgment, the basic summary judgment framework remains intact. De Jesus-Rentas v. Baxter Pharm. Servs. Corp., 400 F.3d 72, 74 (1st Cir. 2005) (citation omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (citation omitted).

While the court must alternately draw all reasonable inferences in each nonmovant's favor, each nonmovant "must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor