'with respect to each issue on which [it] has the burden of proof.'" Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 39 (1st Cir. 2005) (citing DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Ultimately, an alleged factual dispute must be capable of affecting the suit's outcome to withstand an otherwise properly supported motion for summary judgment. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

A. Complient's Motion for Summary Judgment (Dkt. No. 66).

1. Count IV: Fraud.

Under Massachusetts law, a plaintiff alleging fraud must show: (1) that the defendant knowingly made at least one false statement; (2) that the statement was made with the intent to deceive; (3) that the statement was material to the plaintiff's decision to enter into an agreement; (4) that the plaintiff reasonably relied on the statement; and (5) Plaintiff's reliance was the proximate cause of his injury. Zyla v. Wadsworth, Div. of Thomson Corp., 360 F.3d 243, 254 (1st Cir. 2004) (applying Massachusetts law)

21

(citations omitted).

In an effort to make this showing, Plaintiff claims that Complient: knowingly misled Cardiac Science as to the proper construction of the License Agreement; failed to provide Plaintiff with notice regarding the APA; neglected to seek Plaintiff's permission to transfer his intellectual properties; and falsely represented to Cardiac Science that such properties were under CPR L.P.'s control. (Dkt. No. 40, Am. Compl. ¶¶ 56-59.)

Unfortunately for Plaintiff, none of these acts can support a claim for fraud since none of Complient's allegedly false statements were directed to him. Cf. Movitz v. Home Depot U.S.A., Inc., 82 Fed. Appx. 230, 231 (1st Cir. 2003) (applying New Hampshire law) (noting plaintiff's failure to assert that defendant "misrepresented any facts to him"). Moreover, Plaintiff does not allege, as he must, that he relied on any of Complient's purported misrepresentations. Rogers v. Nstar Elec., 389 F. Supp. 2d 100, 108 (D. Mass. 2005) ("The common law claim for fraud . . . requires that the plaintiff show that he relied to his detriment on a false representation of a material fact by

22

the defendants.") (emphasis in original).

In short, because the alleged misrepresentations were made to Cardiac Science rather than Plaintiff, Count IV fails as a matter of law, and Complient is entitled to summary judgment.

    2.    <u>Count V: Fraudulent Misappropriation and Sale of Patent</u>.

In support of his contention that Complient is liable for its fraudulent misappropriation and sale of the '685 patent, Plaintiff asserts that Complient "deceived Cardiac Science to believe that Cardiac Science purchased [the '685 patent] as part of the [APA]." (Am. Compl. ¶ 62.) As previously noted, to set forth a viable claim for fraud, a plaintiff must point to misrepresentations made to him. In light of Plaintiff's failure to do so, Count V cannot survive Complient's motion for summary judgment.

    3.    <u>Count VIII: Breach of Contract</u>.

Plaintiff contends that Complient breached the License Agreement by: (1) failing to provide written notice regarding certain business decisions; (2) neglecting to make royalty payments, send quarterly reports, or pay patent fees; and (3) refusing to transfer 7.5% of the proceeds it

23

received from Cardiac Science pursuant to the APA.  (Am. Compl. ¶¶ 85-93.)  In accordance with the choice-of-law provision in the License Agreement, these allegations will be analyzed under the laws of Ohio.  (See License Agreement § 9.6.)

### Failure to Notify.

According to Plaintiff, Complient was obligated to provide him with written notice regarding the transfer of his intellectual properties, the closure of its Cleveland office, and the decision to stop selling CPR Prompt® products.  Unfortunately for Plaintiff, no such duties appear in the License Agreement,[20] and courts cannot "read[] terms into instruments when these terms do not otherwise exist."  Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc., 804 N.E.2d 979, 993 (Ohio App. 4 Dist. 2004) (citation omitted); see also Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co., 544 N.E.2d 920, 923 (Ohio 1989) ("Intentions not expressed in the writing are deemed to have no existence

---

[20] The only provisions of the License Agreement that address the question of notice involve the Licensee's right to grant sublicenses and each party's right to terminate the agreement.  (See License Agreement §§ 2.1, 8.2.)

24

. . . ." (citation omitted)); <u>Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.</u>, 807 N.E.2d 953, 962 (Ohio App. 6 Dist. 2004) ("[A party] simply cannot be liable for failing to perform in good faith and fair dealing an obligation that was not imposed upon it by the [contract]."). Consequently, Complient's motion for summary judgment with respect to Plaintiff's failure to notify allegations must be allowed.

<u>Royalty Payments, Quarterly Reports, and Patent Fees</u>.

Under the terms of the License Agreement, the Licensee must: make "minimum royalty payments" on an annual basis (License Agreement § 3.4); issue quarterly reports setting forth specific sales information (<u>id.</u> at § 3.5); and pay for "all acts reasonably necessary to maintain, sustain, reexamine, reissue, or extend the Licensed Patents" (<u>id.</u> at § 4.4). Plaintiff asserts that since September of 2003, Complient has not fulfilled these obligations.

This claim suffers from the undisputed fact that Complient's obligations under the License Agreement ceased with the execution of the APA on October 21, 2003. (<u>See</u> Dkt. No. 88, Pl.'s Mem. Support Pl.'s Mot. Summ. J. 3 ("Th[e] APA effectively transferred the Complient

25

Corporation's interest . . . in the June 1, 1994 License Agreement . . . to Cardiac Science, Inc.") While the record suggests that certain patent annuity payments were not paid in November, 2004 (see Dkt. No. 97, Ex. 6, Letter from Gail Brumble, Annuity Coordinator, Fish & Richardson, to Donald C. Hutchins (Feb. 8, 2005)), there is no indication that Complient failed to make royalty payments, issue quarterly reports, or pay patent fees on a timely basis.[21] Ultimately, because no reasonable juror could find that Complient breached any of these duties, summary judgment is appropriate with respect to this allegation.

### The 7.5% Payment Provision.

The gravamen of Plaintiff's breach of contract claim is that Complient impermissibly withheld 7.5% of the stock it received from Cardiac Science in exchange for Plaintiff's intellectual properties. According to Plaintiff, the APA

> triggered the terms of Section 3.10[, which] . . . clearly require that the stockholders of the Complient Corporation pay the LICENSOR, namely Hutchins, seven and one-half percent (7-1/2) of

---

[21] (See Dkt. No. 60, Ex. 1, Hutchins Aff. ¶ 16, June 24, 2005 (acknowledging that Cardiac Science made a royalty payment on behalf of Complient for sales in the third quarter of 2003 pursuant to § 2.1(c) of the APA).)

the net proceeds of any sale to a non-affiliated
entity.

(Hutchins Aff. ¶ 3, Sept. 6, 2001.)

Complient contends that two courts of competent jurisdiction have already entered judgments that preclude such an argument. It cites the conclusion of Complient I, prior to the APA, that the 7.5% payment provision could only be triggered by Complient's sale of its partnership interest in CPR L.P., and the Complient II court's determination that because Complient did not sell its partnership interest in CPR L.P., the 7.5% payment provision was not triggered.

Plaintiff retorts that Complient's invocation of res judicata is unwarranted in light of its failure to meet its burden of establishing that the issues in question were actually litigated or that the parties to the litigation were in privity. While Plaintiff's argument may ultimately prove persuasive to the Supreme Court of Ohio, it cannot forestall summary judgment here.

The full faith and credit statute, 28 U.S.C. § 1738, requires a federal court to give state-court judgments the same preclusive effect they would be given under the law of the state in which the judgments were entered. Torromeo v.

27

Town of Fremont, N.H., 438 F.3d 113, 115-16 (1st Cir. 2006), (citing Migra v. Warren City Sch. Dist. Bd. of Ed., 465 U.S. 75, 81 (1984)), petition for cert. filed, 75 U.S.L.W. 3036 (U.S. July 21, 2006) (NO. 06-112). In this case, the state-court judgments in question were entered by Ohio courts; thus the law of Ohio determines the extent of their preclusive effect.

In Grava v. Parkman Twp., 653 N.E.2d 226 (Ohio 1995), the Supreme Court of Ohio explained that the doctrine of res judicata encompasses "both claim preclusion (historically called estoppel by judgment in Ohio) and issue preclusion (traditionally known as collateral estoppel)." Id. at 228 (citations omitted). In order for issue preclusion to apply, the party asserting it "must show that the parties in the prior action were identical to, or at least in privity with, the parties in the new action, and that the issue in question was actually litigated and necessarily decided in the earlier action." Kalia v. Kalia, 783 N.E.2d 623, 630 (Ohio App. 11 Dist. 2002) (citing Ft. Frye Teachers Ass'n., OEA/NEA v. State Employment Relations Bd., 692 N.E.2d 140, 144 (Ohio 1998)), appeal denied, 787 N.E.2d 1231 (Ohio

28

2003).[22]

If the default judgments against CPR Prompt were the only judgments at issue, Plaintiff's claim that the construction of § 3.10 of the License Agreement was not "actually litigated" would be quite formidable. While Ohio's intermediate courts have applied the doctrine of collateral estoppel to default judgments inconsistently, compare N. Dayton Truck Serv. v. Terrell, No. 7447, 1982 WL 3691, at *2 (Ohio App. 2 Dist. Mar. 15, 1982) (concluding that default judgment had no preclusive effect because "no issue was actually and necessarily litigated"), with Corydon

---

[22] A litigant invoking claim preclusion must establish:

(1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action.

Hapgood v. City of Warren, 127 F.3d 490, 493 (6th Cir. 1997), cert. denied, 523 U.S. 1046 (1998), cited with approval in Portage Cty. Bd. of Commrs. v. Akron, 846 N.E.2d 478, 495 (Ohio 2006).
In light of its conclusion that Plaintiff is collaterally estopped from contesting the construction of § 3.10, the court need not discuss whether estoppel by judgment applies as well.

29

<u>Palmer Dental Soc. v. Johnson, Johnson & Assocs., Inc.</u>, No. 87 C.A. 121, 1988 WL 21334, at *2 (Ohio App. 7 Dist. Feb. 11, 1988) (noting that issue preclusion "has been applied to judgments by default" (citations omitted)), persuasive authority suggests that the preclusive effect of default judgments should be confined to cases in which (1) the plaintiff presented "admissible evidence apart from his pleadings," (2) the state court actually made "findings of fact and conclusions of law . . . sufficiently detailed to support the application of the collateral estoppel doctrine in the subsequent proceeding," and (3) "the circumstances . . . would make it equitable to do so," <u>In re Robinson</u>, 242 B.R. 380, 387 (Bkrtcy. N.D. Ohio 1999) (finding that the unsettled state of the law compelled the court to "use its best judgment in anticipating how the Supreme Court of Ohio would rule if confronted with the issue"); <u>see also</u> <u>In re Sweeney</u>, 276 B.R. 186, 193, 194 (6th Cir. B.A.P. 2002) (adopting the <u>Robinson</u> test after determining that intermediate Ohio courts only give default judgments preclusive effect if they contain "express findings").

    In rendering default judgments against CPR Prompt, it

seems clear that what <u>Complient I</u> and <u>Complient II</u> found would be insufficient to support the application of the collateral estoppel doctrine in a subsequent proceeding against Plaintiff's corporation, CPR Prompt.[23]

    Likewise, if the onus was on Complient to establish privity between Plaintiff and CPR Prompt, it seems unlikely it could do so. Although Ohio courts frequently have found privity between individuals and their closely-held corporations, <u>see, e.g.</u>, <u>Keeley & Assoc., Inc. v. Integrity Supply, Inc.</u>, 696 N.E.2d 618, 621 (Ohio App. 10 Dist. 1997) (finding that the plaintiff corporation and its sole shareholder and director "shared a common identity for purposes of the transaction underlying this litigation"), "[t]he question of privity centers on whether the new party had adequate representation in the prior action," <u>Grant Fritzsche Ent., Inc. v. Fritzsche</u>, 667 N.E.2d 1004, 1006

---

[23] Indeed, each court seems to have found nothing more than a perfection of service against CPR Prompt and CPR Prompt's failure to respond within the time prescribed by the Ohio Rules of Civil Procedure. (<u>See</u> Dkt. No. 66, Ex. F, Default J. Entry (May 30, 2001); Dkt. No. 66, Ex. H., Default J. Entry (Jan. 26, 2005).)

31

(Ohio App. 12 Dist. 1995).[24] In each Cuyahoga County action against CPR Prompt, neither Plaintiff nor his company had <u>any</u> representation.

Based on the foregoing, the problem, from Plaintiff's perspective, is not the default judgments entered against his company, but rather the summary judgments entered against him personally. While the law of Ohio may be somewhat unsettled as to the preclusive effect of a default judgment on subsequent litigation between the parties, there is no doubt that an action that concludes with summary judgment has been "actually litigated" for purposes of collateral estoppel. See <u>A-1 Nursing Care of Cleveland, Inc. v. Florence Nightingale Nursing, Inc.</u>, 647 N.E.2d 222, 224 (Ohio App. 8 Dist. 1994); <u>accord</u> <u>Exhibitors Poster</u>

---

[24] While <u>Leonard v. Bank One Youngstown, Ohio</u>, No. 96-C.A.-42, 1997 WL 816538 (Ohio App. 7 Dist. Dec. 24, 1997), <u>appeal denied</u>, 692 N.E.2d 620 (Ohio 1998), does state that privity can be established if the sole shareholder "controlled the earlier action," <u>id.</u> at *4 (citing <u>Latham v. Wells Fargo Bank, N.A.</u>, 896 F.2d 979 (5th Cir. 1990)), the Fifth Circuit case <u>Leonard</u> relies upon for that proposition makes it clear that "for res judicata purposes, . . . the non-party's control must be such as to place his interests before the court," <u>Latham</u>, 896 F.2d at 983 ("Adequate representation must do the same thing; if it does not, there can be no bar, even for entities as closely aligned as [the plaintiff] and the corporations are here.").

Exch., Inc. v. Nat'l Screen Serv. Corp., 421 F.2d 1313, 1319 (5th Cir. 1970), cert. denied, 400 U.S. 991 (1971) ("It would be strange indeed if a summary judgment could not have collateral estoppel effect.  This would reduce the utility of this modern device to zero . . . .  Indeed, a more positive adjudication is hard to imagine.").

The court need not give credence to Plaintiff's characterization of the Cuyahoga County proceedings as "biased" or "chaotic" to be somewhat disturbed by this result.  Plaintiff's "choice" to represent himself and his closely-held company in Ohio appears to have greatly reduced any chance to prevail on his view of the proper construction of the License Agreement.[25]  Given his appearance, however, the summary judgment entries by Ohio courts against Plaintiff constitute adjudications on the merits with full preclusive effect.

---

[25] As one commentator points out, there is a "growing realization that those who appear in court without lawyers are, as a general matter, only 'choosing' to do so in the most formal sense.  Rather, that 'choice' is a product of their economic situation and the cost of counsel.  Richard Zorza, The Disconnect between the Requirements of Judicial Neutrality and those of the Appearance of Neutrality when Parties Appear Pro Se: Causes, Solutions, Recommendations, and Implications, 17 Geo. J. Legal Ethics 423, 425 (2004).

This is not to say that had Plaintiff been afforded such an opportunity he would have emerged victorious. Indeed, putting aside the issue of <u>res judicata</u>, it is worth noting that Plaintiff's construction of § 3.10 appears untenable.

As previously noted, Plaintiff takes the position that § 3.10 of the License Agreement was triggered when Complient and CPR L.P. sold their respective interests in the License Agreement to Cardiac Science. Complient claims that the execution of the APA did not implicate the 7.5% payment provision found in § 3.10 due to the fact that Complient retained its interest in CPR L.P.

"The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." <u>Foster Wheeler Enviresponse, Inc. v. Franklin County</u>, 678 N.E.2d 519, 526 (Ohio 1997) (citation omitted). To ascertain the intent of parties to a written contract, a court must look first to "the language of the instrument itself, and there can be no implication inconsistent with the express terms thereof." <u>Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.</u>, 714 N.E.2d 898, 901

34

(Ohio 1999), reconsideration denied by 717 N.E.2d 1107 (Ohio 1999). While effect should be given to all of a written instrument's words "if this can be done by any reasonable interpretation," Mapletown Foods, Inc. v. Motorists Mut. Ins. Co., 662 N.E.2d 48, 49 (Ohio App. 3d 1995), "a contract provision is not to be wholly disregarded because it is inconsistent with other provisions, unless no other reasonable construction is possible," Eagle v. Fred Martin Motor Co., 809 N.E.2d 1161, 1173 (Ohio App. 9 Dist. 2004).

Plaintiff contends that the intent of the parties to the License Agreement can best be gleaned by examining earlier drafts of the document, which, he claims, show that the assignment of the license to an affiliate was intended solely to accommodate County Line's desire to separate its new CPR Prompt business from its existing bird feeder and Christmas tree stand operations. According to Plaintiff, these earlier drafts make it clear that the goal of the License Agreement was to give Plaintiff an equity interest in the "investment vehicle," which turned out to be Complient.

Unfortunately for Plaintiff, under the principle of

contract integration, "where the parties' intent is sought to be ascertained from several writings, a prior writing will be rejected in favor of a subsequent one if the latter writing contains the whole of the parties' agreement." TRINOVA Corp. v. Pilkington Bros., P.L.C., 638 N.E.2d 572, 575 (Ohio 1994), order clarified by 640 N.E.2d 1144 (Ohio 1994); see also Rhodes v. Rhodes Indus., Inc., 595 N.E.2d 441, 446 (Ohio App. 8 Dist. 1991) (citing the "salutary effects of barring evidence of prior negotiations which vary or contradict the express language of a written agreement"). In this case, the License Agreement contains an integration clause, which in clear and unambiguous terms provides:

> This Agreement supercedes all prior negotiations, agreements and understandings between LICENSOR and LICENSEE and constitutes the entire agreement between LICENSOR and LICENSEE as to the subject matter hereof.

(License Agreement § 9.8.) Consequently, the earlier drafts of the License Agreement cannot be considered in attempting to ascertain the parties' intent.

Plaintiff next argues against adopting Complient's interpretation of § 3.10 on the ground that doing so would deprive § 4.9(d) of any meaning. As previously noted, §

36

4.9(d) requires the Affiliate to keep Plaintiff abreast of the names and ownership percentages of its investors. While this provision does seem to suggest that the parties anticipated some future change in the Affiliate's owners, neither § 4.9(d) nor any other provision of the License Agreement required County Line (or its progeny) to sell its interest in the Affiliate. Accordingly, the court cannot say that the plain language of § 3.10, which only imposes upon Affiliate partners an obligation to pay Plaintiff a percentage of the net proceeds from the sale of a "partnership interest," renders § 4.9(d) meaningless.

Plaintiff's final argument, the one he has fixated upon throughout this litigation, seems to stem from his belief that an inventor should profit from the sale of his intellectual property. As a general proposition, this seems beyond dispute. However, when that inventor agrees to sell his intellectual property, a court cannot construct the contract that effectuates the sale on the basis of what it believes would be fairest or most advantageous to the inventor. As the Supreme Court of Ohio recently reiterated:

> Cases of contractual interpretation should not be decided on the basis of what is "just" or

equitable. This concept is applicable even where a party has made a bad bargain, contracted away all his rights, and has been left in the position of doing the work while another may benefit from the work. Where various written documents exist, it is the court's duty to interpret their meaning, and reach a decision by using the usual tools of contractual interpretation (e.g., the written documents, the intent of the parties, and the acts of the parties) and not by a determination of what is fair, equitable, or just.

N. Buckeye Educ. Council Group Health Benefits Plan v. Lawson, 814 N.E.2d 1210, 1216 (Ohio 2004) (quoting Ervin v. Garner, 267 N.E.2d 769, 774 (Ohio 1971), reconsideration denied by 818 N.E.2d 712 (Ohio 2004); see also Foster Wheeler Enviresponse, 678 N.E.2d at 526 ("A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.'" (citations omitted)); Cline v. Rose, 645 N.E.2d 806, 809 n.2 (Ohio App. 3 Dist. 1994) ("Courts are not authorized to make for parties contracts which they did not make for themselves." (citation omitted)).

In sum, the court finds that even if Plaintiff's proffered construction of § 3.10 of the License Agreement was not barred by the doctrine of collateral estoppel, summary judgment on Count Eight of his amended complaint

would still be required. Thus Defendant is entitled to judgment both substantively and by operation of the Ohio decisions.

B.    Plaintiff's Motion for Summary Judgment (Dkt. No. 87).

In moving for summary judgment against Complient, Plaintiff asserts that Complient is liable for tortious interference with contract based upon its decision to sue him and his company a second time in the Cuyahoga County Court of Common Pleas. In order to establish the elements of a tortious interference claim, a litigant must prove that: "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Draghetti v. Chmielewski, 626 N.E.2d 862, 868 (Mass. 1994) (citations omitted).

In this case, Plaintiff has not alleged that Complient knowingly induced Cardiac Science to break its contract with Plaintiff. In fact, Count VII does not allege any wrongdoing on the part of Complient, but focuses exclusively

39

on misconduct allegedly perpetrated by Cardiac Science. Accordingly, Plaintiff's request for summary judgment with respect to Count VII must be denied.

In light of its decision to allow Complient's motion for summary judgment as to Counts Four, Five, and Eight, the court will naturally deny Plaintiff's motion with respect to these counts as well.

### IV. MOTIONS FOR OTHER MISCELLANEOUS RELIEF

A.  Complient's Motion for Default Judgment (Dkt. No. 67).

In support of this motion, Complient asserts that Plaintiff is liable for: (1) tortious interference with contract based on his decision to sue Cardiac Science despite the fact that he knew such a suit could prevent or at least delay a payment due Complient under the APA; and (2) abuse of process for filing baseless fraud-related claims against Complient, as well as a breach of contract claim barred by the doctrine of res judicata.  Because Plaintiff failed to file a timely response to these claims, Complient submits that it is entitled to a default judgment against Plaintiff on its two-count counterclaim pursuant to Fed. R. Civ. P. 55(b)(2).