Execution Copy

**ASSET PURCHASE AGREEMENT**

**by and among**

**CARDIAC SCIENCE, INC.,**

**COMPLIENT CORPORATION**

**and**

**CPR LIMITED PARTNERSHIP**

---

**Dated as of October 21, 2003**

---

EXHIBIT 3-1

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | PURCHASE AND SALE OF ASSETS | 1 |
| 1.1 | Sale and Transfer of Seller Assets | 1 |
| 1.1A | Sale and Transfer of CPR L.P. Assets | 4 |
| 1.1B | Acquired Assets | 4 |
| 1.2 | Retained Assets | 4 |
| 1.3 | Assignability and Consents | 5 |
| ARTICLE II | LIABILITIES | 7 |
| 2.1 | Assumption of Liabilities | 7 |
| 2.2 | Retained Liabilities | 8 |
| ARTICLE III | PURCHASE PRICE | 10 |
| 3.1 | Payment | 10 |
| 3.2 | Satisfaction of Certain Indebtedness | 11 |
| 3.3 | Purchase Price Allocation | 11 |
| ARTICLE IV | CLOSING | 12 |
| 4.1 | General | 12 |
| 4.2 | Documents to be Delivered by Seller | 12 |
| 4.3 | Documents to be Delivered by Buyer | 13 |
| 4.4 | Documents to be Delivered by Buyer and Seller | 13 |
| 4.5 | Other Documents to be Delivered | 14 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES | 14 |
| 5.1 | Representations and Warranties of Seller | 14 |
| 5.2 | Representations and Warranties of Buyer | 25 |
| 5.3 | General | 27 |
| ARTICLE VI | CONDITIONS TO CLOSING | 27 |
| 6.1 | Conditions to Buyer's Obligations | 27 |
| 6.2 | Conditions to Seller's Obligations | 28 |
| ARTICLE VII | COVENANTS OF SELLER | 29 |
| 7.1 | Confidentiality | 29 |
| 7.2 | Maintenance of Insurance | 29 |
| 7.3 | Trade Names | 29 |
| 7.4 | Maintenance of, and Access to, Records | 29 |
| 7.5 | Name Change Filings | 29 |

# TABLE OF CONTENTS
(continued)

Page

7.6 Plant Closing Obligations ........................................................................................... 30
7.7 Further Assurances; Customer and Supplier Relationships; Assertion of Claims. ..... 30
7.8 {Intentionally omitted.} ............................................................................................. 30
7.9 Non-Competition ........................................................................................................ 31
7.10 Accounts Receivable .................................................................................................. 32
7.11 Material Adverse Audit Adjustment .......................................................................... 32

ARTICLE VIII  COVENANTS OF BUYER ................................................................................. 32

8.1 Maintenance of, and Access to, Records ................................................................... 32
8.2 Closing ........................................................................................................................ 33

ARTICLE IX  CERTAIN ADDITIONAL COVENANTS ............................................................ 33

9.1 Expenses; Transfer Taxes ........................................................................................... 33
9.2 Press Releases and Disclosure .................................................................................... 33
9.3 Cooperation in the Defense of Claims ....................................................................... 33
9.4 Regulatory Approvals ................................................................................................. 33
9.5 Employee Matters ....................................................................................................... 33
9.6 Restrictions on Transfer; Lock-up .............................................................................. 34
9.7 Fairness ....................................................................................................................... 35
9.8 {Intentionally omitted.} ............................................................................................. 35
9.9 2002 Audit .................................................................................................................. 35

ARTICLE X  ESCROW .................................................................................................................. 36

10.1 Escrow Arrangements ................................................................................................ 36
10.2 Escrow Funds ............................................................................................................. 36

ARTICLE XI  INDEMNIFICATION .............................................................................................. 37

11.1 Indemnification by Buyer ........................................................................................... 37
11.2 Indemnification by Seller ........................................................................................... 37
11.3 Notice of Claim; Right to Participate in and Defend Third Party Claim ................... 38
11.4 Time Limitations on Claims for Indemnification ...................................................... 39
11.5 Submission of Claims ................................................................................................ 39
11.6 Maximum and DeMinimis Amounts ......................................................................... 39
11.7 Exclusions .................................................................................................................. 40
11.8 Exclusive Remedy ...................................................................................................... 40
11.9 Tax Effect of Indemnification Payments ................................................................... 40

ARTICLE XII  MISCELLANOUS ................................................................................................. 40

12.1 Amendments ............................................................................................................... 40
12.2 Entire Agreement ........................................................................................................ 40

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 12.3 | Governing Law; Venue and Jurisdiction | 40 |
| 12.4 | Notices | 40 |
| 12.5 | Counterparts | 41 |
| 12.6 | Assignment | 41 |
| 12.7 | Waivers | 41 |
| 12.8 | Third Parties | 41 |
| 12.9 | Schedules, Addenda and Exhibits | 42 |
| 12.10 | Headings | 42 |
| 12.11 | Certain Definitions | 42 |
| 12.12 | Remedies Not Exclusive | 42 |
| 12.13 | Gender and Number | 42 |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of October 21, 2003 (the "*Effective Date*" or the "*Closing Date*"), is between Complient Corporation, a Delaware corporation ("*Seller*"), CPR Limited Partnership, an Ohio limited partnership ("*CPR L.P.*"), and Cardiac Science, Inc., a Delaware corporation ("*Buyer*").

## W I T N E S S E T H:

WHEREAS, Seller presently conducts the business (the "*Business*") of marketing, selling and distributing automated external defibrillators ("*AEDs*"), AED training devices, cardiopulmonary resuscitation ("*CPR*") prompting aids and training devices, first-aid kits, accessories for the foregoing items, and training services with respect to the foregoing. (collectively, the "*Products and Services*");

WHEREAS, Seller owns more than 99% of the outstanding capital stock of SOS International, Inc., a Delaware corporation ("*SOS*"), and SOS presently conducts the business of leasing and servicing emergency oxygen tanks and providing related training and services (the "*Oxygen Business*");

WHEREAS, Seller is the sole general partner of CPR L.P., owning a 99% general partnership interest therein, and Seller uses the assets and rights owned by CPR L.P. in a certain specific line of the Business;

WHEREAS, Seller desires to sell to Buyer, and to cause CPR L.P. to sell to Buyer, and Buyer desires to purchase and acquire from Seller and CPR L.P., respectively, upon the terms and subject to the conditions hereinafter set forth, (i) substantially all of the assets, properties, rights and interests of Seller (other than the capital stock of SOS which Seller holds and any assets, properties, rights and interests which Seller may have relating to the Oxygen Business), and (ii) all of the assets, properties, rights and interests of CPR L.P., in consideration of certain payments by Buyer and the assumption by Buyer of certain liabilities and obligations of Seller and CPR L.P. specifically disclosed in this Agreement; and,

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained and other good and valuable consideration had and received, Buyer and Seller, on the basis of, and in reliance upon, the representations, warranties, covenants, obligations and agreements set forth in this Agreement, and upon the terms and subject to the conditions contained herein, hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

**1.1**   **Sale and Transfer of Seller Assets.**  Effective as of the Effective Date (as hereinafter defined), Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, convey, assign and deliver to Buyer, on a going concern basis, all of the assets, properties, rights and interests owned, used, occupied or held by or for the benefit of Seller, wherever situated, as the same shall exist as of the Effective Date, and wherever situated, including, without limitation, the following, but excluding, however, the Retained Assets (as defined below):

(a) <u>Cash and Cash Equivalents</u>. All cash, cash equivalents and marketable securities, including cash on hand, cash in transit and cash, cash-equivalents and marketable securities in lock boxes or on deposit with or held by any financial institution more fully set forth on <u>Schedule 1.1(a)</u> attached hereto, but not including any such cash items used or held for use in the Oxygen Business;

(b) <u>Prepaids</u>. All prepaid expenses, advance payments, deposits, surety accounts and other similar assets, including, without limitation, prepaid deposits with suppliers and utilities, more fully set forth on <u>Schedule 1.1(b)</u> attached hereto (collectively, the "***Prepaids***");

(c) <u>Inventory</u>. All inventories of products, work-in-process, finished goods, raw materials, software, hardware, supplies and parts (collectively, "***Inventory***" or "***Inventories***"), including, without limitation, all Inventories located at the facilities listed on <u>Schedule 1.1(c)</u> hereto;

(d) <u>Accounts Receivable</u>. All accounts receivable (including royalties receivable), any payments received with respect thereto after the Effective Date, unpaid interest accrued on any such accounts receivable and any security or collateral relating thereto (collectively, "***Accounts Receivable***");

(e) <u>Fixed Assets</u>. All tangible personal property, plant and equipment, including, without limitation, buildings, structures, fixtures, machinery and equipment, dies, jigs, molds, patterns, tools, tooling, production fixtures, maintenance machinery and equipment, office furniture and office equipment, other furnishings, trucks, automobiles and other vehicles and transportation equipment, leasehold improvements and construction-in-process, and all tangible personal property set forth on <u>Schedule 1.1(e)</u> hereto (collectively, the "***Fixed Assets***");

(f) <u>Fee Property</u>. All real property rights and interests of any kind whatsoever owned by Seller (collectively, the "***Fee Property***");

(g) <u>Leased Property</u>. All rights and interests under the real and personal property lease agreements (the "***Lease Agreements***") more particularly described on <u>Schedule 1.1(g)</u> hereto, which descriptions are incorporated herein by reference (the premises subject to the Lease Agreements being hereinafter collectively referred to as the "***Leased Property***"), and all leasehold improvements;

(h) <u>Intellectual Property</u>. All inventions, discoveries, trademarks, service marks, patents, trade names, domain names, copyrights, know-how, intellectual property, software, computer files, shop rights, licenses, developments, research data, designs, technology, discoveries, trade secrets, test procedures, processes, research data, formulas and other confidential information, intellectual and similar intangible property rights, whether or not patentable (or otherwise subject to legally enforceable restrictions or protections against unauthorized third party usage), and any and all applications for, and extensions, divisions, continuations, continuations-in-part, and reissuances of, any of the foregoing, and rights therein, including, without limitation, (i) the names "Complient," "CPR Prompt," and all related trade names and trademarks, (ii) the intellectual and intangible property rights described on the <u>Schedule 1.1(h)</u> hereto, (iii) the production methods, formulas, know-how and technical expertise relating to the manufacture or provision of Products and Services, (iv) all data contained in the Complient Training Management System ("TMS") and "MasterTrak" system, and (v) all source code relating to the Complient Training Management System and "MasterTrak" system (collectively, the "***Intangibles***"); provided, however, that Buyer shall not

{GAM3274.DOC;3}                    -2-

acquire any rights hereunder with respect to the name "SOS International", "SOS Technologies" or any variations thereon (the "*Retained Names*"); and provided, further, that Seller shall be entitled to continue to have the name "Complient Corporation" as its corporate name in its Certificate of Incorporation to the extent provided in Section 7.5);

(i) Business Records. All books and records, including, without limitation, all files, invoices, forms, accounts, correspondence, customer lists, customer data, production records, technical, accounting, manufacturing and procedural manuals, employment records, studies, reports or summaries relating to any Environmental Requirements (as hereinafter defined), and other books and records relating to the operation of any of the Acquired Assets (as hereinafter defined) or other assets or properties, and any confidential information which has been reduced to writing or other tangible medium (collectively, the "*Business Records*");

(j) Rights Under Agreements and Warranties. All rights, claims and benefits of Seller in, to or under any (i) (A) employee confidentiality agreements entered into by Seller and (B) confidentiality or secrecy agreements entered into by Seller with third parties that relate to the use or disclosure of information (the "*Confidentiality Agreement Rights*"); and (ii) express or implied warranties from the suppliers of goods or services;

(k) Catalogs and Advertising Materials. All promotional and advertising materials, including, without limitation, all catalogs, brochures, plans, supplier lists, manuals, handbooks, equipment and parts lists, dealer and distributor lists, and, subject to Sections 1.2(c) and 7.4, labels and packaging materials;

(l) Purchase Orders. All unfilled purchase and sale orders (including releases of quantities pursuant thereto);

(m) Contracts. Subject to Section 1.2 and 1.3, all rights, benefits and interests of Seller in and to all licenses, leases, contracts, agreements, commitments and undertakings;

(n) Permits. All licenses, permits, approvals, variances, waivers or consents (collectively, the "*Permits*"), to the extent transferable, issued by any foreign, United States, state or local governmental entity or municipality or subdivision thereof or any authority, department, commission, board, bureau, agency, court or instrumentality (collectively, "*Governmental Authorities*");

(o) {Intentionally omitted.}

(p) Goodwill. The goodwill of Seller as a going concern, other than any goodwill relating to the Oxygen Business; and

(q) Miscellaneous. Except for the Retained Assets (as hereinafter defined), all other assets, properties, rights and interests of Seller, of every kind, nature and description, whether tangible or intangible, real, personal or mixed, and wherever situated, including, without limitation, those assets, properties, rights and interests set forth on the Interim Balance Sheet (as hereinafter defined), all of which are to be sold, transferred, conveyed, assigned and delivered to Buyer on the Effective Date pursuant to this Agreement.

**1.1A  Sale and Transfer of CPR L.P. Assets.** Effective as of the Effective Date (as hereinafter defined), Buyer shall purchase and acquire from CPR L.P., and CPR L.P. shall sell, transfer, convey, assign and deliver to Buyer, on a going concern basis, all of the assets, properties, rights and interests of CPR L.P. as the same shall exist as of the Effective Date, and which consist of that certain License Agreement dated as of June 1, 1994, among CPR-Prompt Corporation, a Massachusetts corporation, Donald C. Hutchins, and Seller (as assignee of the original licensee thereunder, County Line Limited Partnership) (the "*CPR Prompt License*"), and all of the going-concern value of the business of selling products covered by the patents licensed under the CPR Prompt License, and any accounts receivable arising from sales of products covered by such patents (collectively, the "*CPR L.P. Assets*");

**1.1B  Acquired Assets.** All of the assets, properties, rights and interests owned, used, occupied or held by or for the benefit of the Seller or CPR L.P. which are to be sold, transferred, conveyed, assigned and delivered by Seller or CPR L.P. to Buyer on the Effective Date as contemplated herein, including without limitation, those described in Sections 1.1(a) through 1.1(s) and Section 1.1A above, but excluding the Retained Assets, are referred to herein collectively as the "*Acquired Assets*."

**1.2  Retained Assets.** Anything in Section 1.1 to the contrary notwithstanding, the following assets (collectively, the "*Retained Assets*") shall be retained by Seller, and Buyer shall in no way be construed to have purchased or acquired (or to be obligated to purchase or to acquire) any interest whatsoever in any of the following:

(a)  <u>Designated Assets</u>. Any of the assets, properties, rights and/or interests, owned, used, occupied or held by or for the benefit of Seller which are identified on <u>Schedule 1.2(a)</u> hereto (collectively, the "*Designated Assets*");

(b)  <u>Non-Assigned Contracts</u>. All of the rights and interests, and all of the liabilities and obligations, of Seller in, under or pursuant to any license, lease, contract, agreement, commitment or undertaking which is identified on <u>Schedule 1.2(b)</u> hereto (collectively, the "*Non-Assigned Contracts*");

(c)  <u>Retained Names</u>. The Retained Names;

(d)  <u>Employee Plan Assets</u>. The rights of Seller under, and any funds and property held in trust or any other funding vehicle pursuant to, any "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*")) or any other bonus, stock option, stock appreciation, stock purchase, severance, termination, lay-off, leave of absence, disability, workers compensation, pension, profit sharing, retirement, vacation or holiday pay, insurance, deferred compensation or other employee or welfare benefit plan, agreement or arrangement of Seller applicable to Seller's past, present or future employees (collectively, "*Employee Plans*");

(e)  <u>Corporate Records, Treasury Shares, Etc</u>. Seller's minute books, stock records, stock ledger, corporate seal, tax returns, and other similar books and records originals of which Seller is required to maintain under applicable laws, and any shares of capital stock of Seller held in the treasury of Seller, and all rights of Seller arising under or in connection with this Agreement;

(f) <u>Certain Rights</u>. All rights of Seller under all covenants not to sue, agreements not to assert claims, settlement agreements, and all rights of Seller under all policies of insurance;

(g) <u>Oxygen Business</u>. All shares of capital stock of SOS held by Seller, and all assets, properties, contracts, licenses, rights and interests, whether personal or real, tangible or intangible, which are used or held for use in connection with the Oxygen Business; and

(h) <u>Other Assets</u>. Any assets, rights or properties specifically identified in <u>Schedule 1.2(h)</u> hereto as being retained by Seller or not transferred to Buyer.

(i) <u>CPR Agreements, Etc</u>. Seller's general partnership interest in CPR L.P., and Seller's rights, interests and obligations under the Agreement of Limited Partnership of CPR L.P. dated as of September 19, 1994 (the "***CPR Partnership Agreement***"), and under the Services Agreement dated as of September 19, 1994, between Seller (as assignee of County Line Limited Partnership) and CPR L.P. (the "***CPR Services Agreement***").

**1.3  Assignability and Consents.**

(a) <u>Required Consents</u>. <u>Schedule 1.3(a)</u> sets forth a list of all Acquired Assets, including Contracts, Permits and Lease Agreements, which are non-assignable or non-transferable or cannot be subleased to Buyer without the consent of some other individual, partnership, corporation, association, joint stock company, trust, joint venture, limited liability company or Governmental Authority (collectively, "***Person***"), other than any such consent the failure of which to be obtained could not reasonably be expected to result in a material adverse effect on the Business as a whole (collectively, the "***Material Consents***"). Except with respect to Restricted Contracts (as defined below), Seller shall take, or cause to be taken by others, all commercially reasonable actions required to obtain or satisfy, at the earliest practicable date, all consents, novations, approvals, authorizations, requirements (including filing and registration requirements), waivers and agreements ("***Consents***") from any Persons necessary to authorize, approve or permit the full and complete sale, conveyance, assignment, sublease or transfer of the Acquired Assets, and to consummate and make effective the transactions contemplated by this Agreement and to continue such efforts as may be required for up to 180 days after the Effective Date to facilitate the full and expeditious transfer of legal title, or the sublease, as the case may be, of the Acquired Assets; provided, however, that Seller shall not be required to pay any sum of money for, or incur any material expense to obtain, any Consent; provided further, that Seller shall not be required to seek Consents with respect to the assignment of contracts included among the Acquired Assets which are cancelable by the other party(ies) thereto at will or upon notice of thirty (30) days or less (other than assistance with respect to Restricted Contracts as provided in Section 1.3(c)), or which merely provide pay-as-you-go services, or contracts for the purchase by Seller of products or services for which a substitute is readily available on similar terms and pricing. Buyer shall cooperate with Seller in all reasonable respects in obtaining Consents hereunder, including providing Seller with access to the books and records of the Business and the services of the appropriate personnel of Buyer in order to request such Consents.

(b) <u>Nonassignable Items</u>. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an Agreement to sell, convey, assign, sublease or transfer any Acquired Assets, including Contracts, Permits and Lease Agreements, if (i) an attempted sale, conveyance, assignment, sublease or transfer thereof, without the consent of another party thereto or a Governmental Authority would constitute a breach of, or in any way affect the rights of Seller or Buyer with respect to such Acquired Asset and (ii) such consent has not been

obtained ("***Nonassignable Items***"). Seller and Buyer shall each use all reasonable efforts and cooperate in all reasonable respects with each other to obtain and satisfy all Consents and to resolve all impracticalities of sale, conveyance, assignment, sublease or transfer necessary to convey to Buyer all Nonassignable Items, in accordance with Sections 1.3(a) and 1.3(c). If any such Consents are not obtained and satisfied or if an attempted sale, conveyance, assignment, sublease or transfer would be ineffective, Seller shall cooperate with Buyer in any reasonable arrangement designed by Buyer to provide for Buyer the benefits thereunder, including but not limited to having Buyer act as agent for Seller thereunder, or having Seller enforce at Buyer's expense any and all rights of Seller against the other party thereto, or requiring Seller and its Affiliates promptly to pay to Buyer when received all monies and other items of value received by Seller and such Affiliates under any such Nonassignable Item.

(c)     Effect of Certain Cancellations.

(i)      As used in this Agreement, the term "***Restricted Contract***" means a contract of Seller with a customer for the sale of Products and/or Services to such customer, which contract by its terms provides in effect that Seller may not assign its rights thereunder to Buyer without the consent of such customer, provided that no contract is a Restricted Contract for purposes of this Section 1.3(c) if the customer thereunder is Medtronic Inc. or any of its Affiliates.

(ii)     For a period of at least 90 days after the Effective Date, Buyer (A) shall perform each Restricted Contract in accordance with the terms thereof, and (B) shall take all commercially reasonable actions required in order to obtain the written consent of the customer under each Restricted Contract to the assignment of such Restricted Contract to Buyer. Seller shall cooperate with Buyer in obtaining such consents hereunder.

(iii)    If, within 90 days after Buyer has requested a customer in writing to give such customer's written consent to the assignment of its Restricted Contract to Buyer, and such customer shall neither have given such consent nor terminated such Restricted Contract, then Buyer may elect, after such 90-day period and before the first anniversary of the Effective Date, to terminate such Restricted Contract by delivering written notice of such termination to such customer and, simultaneously, a copy of such notice to Seller, and such Restricted Contract shall thereupon become a Terminated Contract for purposes hereof. If such Terminated Contract results in an indemnification payment to Buyer hereunder and, during what would have been the remaining term of such Terminated Contract, Buyer or any of its Affiliates sells to such customer any products or services that are the same as or substantially similar to those which were the subject of such Terminated Contract ("***Subsequent Sales***"), then Seller shall be entitled to reimbursement from Buyer of an amount equal to such indemnification payment by Seller hereunder or the amount of Buyer's or such Affiliate's gross profit derived from such Subsequent Sales during such remaining term, whichever is less.

(iv)     If, within 12 months after the Effective Date, the customer under a Restricted Contract (which customer has not previously given its written consent to an assignment of such Restricted Contract) shall terminate such Restricted Contract in writing, then such Restricted Contract shall thereupon become a Terminated Contract for purposes hereof, provided that Buyer shall have performed such Restricted Contract in accordance with the terms thereof. If such Terminated Contract results in an indemnification payment to Buyer hereunder and, during what would have been the remaining term of such Terminated Contract, Buyer or any of its Affiliates sells to such customer any products or services that are the same as or substantially similar to those which

were the subject of such Terminated Contract, then Seller shall be entitled to reimbursement from Buyer of an amount equal to such indemnification payment by Seller hereunder or the amount of Buyer's or such Affiliate's gross profit derived from such Subsequent Sales during such remaining term, whichever is less.

(v) If the total annualized revenues under all Terminated Contracts exceeds $100,000, then Buyer shall be entitled to indemnification pursuant to Section 11.2(a) hereof, solely out of the General Escrow Fund and not from Seller, in an amount equal to the aggregate gross profit which would have accrued to Buyer under all Terminated Contracts over the respective remaining periods thereof had they not been so terminated, but only to the extent, if any, that such gross profit would have derived from annualized revenues under all Terminated Contracts in excess of $100,000 in the aggregate. For purposes of this Section 1.3(c), gross profit and revenue shall be determined in accordance with GAAP on a basis consistent with Seller's past practice.

## ARTICLE II

## LIABILITIES

**2.1 Assumption of Liabilities.** On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume, effective as of the Effective Date, and shall thereafter pay, perform and discharge promptly as and when due in accordance with the respective terms thereof, the following, and only the following, liabilities and obligations of Seller (collectively, the "*Assumed Liabilities*"):

(a) Lease; Contracts. All liabilities and obligations of Seller arising under the terms of the Lease Agreements (other than those relating to Oxygen Business) as well as the other contracts (included under Section 1.1(n)) included among the Acquired Assets, and the CPR Prompt License (collectively, the "*Assumed Contracts*") (other than those incurred in connection with the Oxygen Business but only to the extent such liabilities and obligations arise or accrue after the Effective Date in the ordinary and normal course and consistent with the representations, warranties, covenants, obligations and agreements set forth in this Agreement; provided, however, that Buyer shall not assume or be responsible for any such liabilities or obligations which arise from breaches thereof or defaults thereunder by Seller, all of which liabilities and obligations shall constitute Retained Liabilities (as hereinafter defined).

(b) Accounts Payable. Seller's accounts payable reflected on the Interim Balance Sheet (as defined below) (other than those incurred in connection with the Oxygen Business), and accounts payable incurred by Seller in the ordinary course of business (other than the Oxygen Business) between the date of the Interim Balance Sheet and the Effective Date, in each case to the extent remaining unpaid as of the Effective Date (the "*Assumed Accounts Payable*") provided, however, that any and all fees and expenses for professional services and expenses arising out of or in connection with this transaction, whenever incurred, shall not be assumed by Buyer and shall be retained by Seller.

(c) Accrued Expenses. Seller's accrued expenses arising out of operations in the ordinary course (other than those arising in connection with the Oxygen Business) as reflected on the Interim Balance Sheet, and expenses for such items accrued in the ordinary course of business (other than the Oxygen Business) through the Effective Date in accordance with GAAP, in each case to the extent reflected on the books and records of Seller and remaining unpaid as of the Effective Date,

including accruals for state sales and franchise taxes, medical direction, commissions, and warranty charges and fees (the "Assumed Expenses" and, together with the Assumed Accounts Payable, the "Assumed Balance Sheet Liabilities"). The Assumed Expenses shall not include any indebtedness for borrowed money (including indebtedness incurred in the Oxygen Business), or any legal, accounting or financial advisory fees incurred by Seller in connection with the transactions contemplated by this Agreement.

(d)     Deferred Revenues. Seller's deferred revenues arising out of its prepaid contracts in the ordinary course (other than those arising in connection with the Oxygen Business) as reflected on the Interim Balance Sheet and as reported in accordance with GAAP.

(e)     Outstanding Orders. Liabilities to Seller's customers incurred by Seller in the ordinary course of business (other than the Oxygen Business) for nondelinquent orders outstanding as of the Effective Date reflected on Seller's books (other than liabilities arising out of any breach or default occurring prior to the Effective Date).

(f)     Warranty. Liabilities to Seller's customers under written warranty agreements given by Seller to its customers in the ordinary course of business (other than the Oxygen Business) prior to the Effective Date (other than liabilities arising out of any breach or default occurring prior to the Effective Date, and other than liabilities arising out of any personal injury or damage to property).

**2.2     Retained Liabilities.** Except as provided in Section 2.1, Seller shall retain, and Buyer shall not assume, or be responsible or liable with respect to, any liabilities or obligations of, Seller whether or not associated with, or arising from, any of the Acquired Assets, and whether fixed, contingent or otherwise, known or unknown (collectively referred to hereinafter as the "*Retained Liabilities*"), including, without limitation, but subject to Section 2.1, the following:

(a)     Pre-Closing. All liabilities and obligations relating to, based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Effective Date, or the ownership, possession, use, operation or sale or other disposition prior to the Effective Date of any Products and Services or any of the Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Effective Date, with the Business);

(b)     Liabilities Relating to the Sale of Acquired Assets. All liabilities and obligations of Seller or any of its Affiliates, or their respective directors, officers, shareholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated hereby, whether incurred prior to, at, or subsequent to the Effective Date, including, without limitation, all finder's or broker's fees and expenses, and any and all fees and expenses of any attorneys, accountants or other professionals retained by or on behalf of Seller or any of its Affiliates;

(c)     Employee-Related Liabilities. All liabilities and obligations to any persons at any time employed by Seller or its Affiliates or their respective predecessors-in-interest at any time or to any such person's spouses, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such persons' employment by Seller or its Affiliates or their respective predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all liabilities and obligations arising (i) under any Employee Plans, (ii) under any employment, wage and hour restriction, equal

opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements, or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d) Litigation. All liabilities and obligations relating to any litigation, action, suit, claim, investigation or proceeding pending on the date hereof, or constituted hereafter, based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, or otherwise relating to, the Business as operated by Seller or any of its Affiliates (or any of their respective predecessors-in-interest), or the ownership, possession, use, operation, sale or other disposition prior to the Effective Date of any Products or any of the Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Effective Date, with the Business);

(e) Product, Environmental and Safety Liability. All liabilities and obligations relating to the Acquired Assets (or any other assets, properties, rights or interests) and connected with, arising out of or relating to (i) any dispute for services rendered or goods manufactured and sold prior to the Effective Date, including, without limitation, product liability claims, and claims for personal injury and property damage, (ii) toxic and hazardous substances (all as hereinafter defined), (iii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person, or (iv) compliance with any laws relating to any of the foregoing;

(f) Taxes. All liabilities and obligations of Seller or any of its Affiliates (or any of their respective predecessors-in-interest) for any Taxes (as hereinafter defined) due or becoming due by reason of (i) the conduct of the Business prior to the Effective Date, or (ii) the ownership, possession, use, operation, purchase, acquisition, sale or disposition prior to the Effective Date of any Products or any of the Acquired Assets, including, without limitation, (A) Taxes attributable to the sale of inventory and employee withholding tax obligations; (B) Taxes imposed on, or accruing as a result of the purchase and sale of the Acquired Assets hereunder; and (C) Taxes attributable to, or resulting from, recapture of depreciation or other tax benefit items, or otherwise arising from the transactions contemplated by this Agreement;

(g) Breach of Agreement. All liabilities and obligations, known or unknown, fixed, contingent or otherwise, the existence of which is a breach of any representation, warranty, covenant, obligation or agreement of Seller set forth in this Agreement or in any of the other documents or agreements contemplated hereby;

(h) Liabilities Relating to Retained Assets. All liabilities and obligations relating to, based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, any and all assets, properties, rights and interests which are not being acquired by Buyer hereunder, including, without limitation, the Retained Assets;

(i) Post-Effective Date. All liabilities and obligations incurred by Seller or its Affiliates or their respective directors, officers, shareholders, agents or employees after the Effective Date other than as a result of a breach by Buyer of this Agreement or any of the other documents or agreements contemplated hereby;

(j) Shutdown Costs. Any liabilities or obligations relating to, based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, the shutdown of any of the operations and facilities utilized by Seller, including, without limitation, any

{GAM3274.DOC;3}                    -9-

action which could be construed as a "plant closing" or "mass layoff," as those terms are defined in the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 ("*WARN*"), or any "employment loss," as defined in WARN, which any employee of Seller or any of its Affiliates may suffer or may be deemed to suffer.

(k)     Oxygen Debt. Liability for principal, interest or otherwise for any indebtedness of Seller or SOS incurred in connection with the Oxygen Business and liability arising under any promissory notes or security agreements evidencing or securing any such indebtedness (collectively, the "*Oxygen Debt*").

(l)     Certain Obligations. All obligations of Seller under all covenants not to sue, agreements not to assert claims, settlement agreements, and all obligations of Seller under all policies of insurance.

(m)     CPR Agreements. All obligations of Seller arising under the CPR Partnership Agreement, and all obligations of CPR L.P. or Seller arising under the CPR Services Agreement.

## ARTICLE III

## PURCHASE PRICE

**3.1     Payment.**

(a)     In full consideration for the transfer of the Acquired Assets, but subject to the escrow procedures described in subsection (b) of this Section 3.1, Buyer shall (i) assume the Assumed Liabilities as of the Effective Date, and (ii) issue and deliver to Seller a total purchase price (the "*Purchase Price*") consisting of ten million two hundred fifty thousand (10,250,000) shares of Buyer's Common Stock, par value $0.001 per share (the "*Buyer Shares*"). On the Effective Date, Buyer shall deliver to Seller certificates registered in the name of Seller representing 8,200,000 duly authorized, validly issued, fully paid and nonassessable Buyer Shares (the "*Closing Share Amount*").

(b)     On the Effective Date, Buyer shall allocate from the Buyer Shares to be issued to Seller pursuant to Section 3.1(a), and shall deliver to U.S. Bank (the "*Escrow Agent*"), into escrow, (i) certificates registered in the name of Seller representing 1,025,000 duly authorized, validly issued, fully paid and nonassessable Buyer Shares (the "*General Escrow Shares*"), and (ii) certificates registered in the name of Seller representing an additional 1,025,000 duly authorized, validly issued, fully paid and nonassessable Buyer Shares (the "*Oxygen Escrow Shares*" and, together with the General Escrow Shares, the "*Escrow Shares*"). The General Escrow Shares shall be received, held and disbursed by the Escrow Agent in accordance with the terms of Article X and of an Escrow Agreement in the form of Exhibit A attached hereto which Buyer, Seller and the Escrow Agent shall execute and deliver on the Effective Date (the "*General Escrow Agreement*"). The Oxygen Escrow Shares shall be received, held and disbursed by the Escrow Agent in accordance with the terms of Article X and of an Escrow Agreement in the form of Exhibit B attached hereto which Buyer, Seller and the Escrow Agent shall execute and deliver on the Effective Date (the "*Oxygen Escrow Agreement*" and, together with the General Escrow Agreement, the "*Escrow Agreements*").

(c)     On the Effective Date, Buyer and Seller shall execute and deliver a

Registration Rights and Lock-up Agreement in the form of Exhibit C attached hereto (the "***Registration Rights and Lock-up Agreement***") pursuant to which Buyer shall grant Seller certain registration rights with respect to all of the Buyer Shares included in the Purchase Price, including those deliverable to Seller on the Effective Date and those deliverable to the Escrow Agent on the Effective Date, and under which certain Buyer Shares shall be subject to certain resale limitations, all upon the terms and conditions therein.

**3.2  Satisfaction of Certain Indebtedness.** On or prior to the Effective Date, Seller shall take such actions as may be required to fully pay, satisfy and discharge all of the indebtedness of Seller, if any, listed or described on Schedule 3.2 and to secure the release as of the Effective Date of all Liens, if any, on the Acquired Assets relating thereto.

**3.3  Purchase Price Allocation.** The Purchase Price represents the amount agreed upon by the parties to be the aggregate fair market value of the Acquired Assets for purposes of Section 1060 of the Code, and shall be allocated among the Acquired Assets in accordance with the fair market values of the Acquired Assets, which the parties have agreed are or shall be as set forth on the Schedule 3.3 which shall be reasonably prepared by Buyer from the books and records of Seller on a basis consistent with the accounting and tax methods, conventions and procedures employed by Seller prior to the Effective Date, submitted by Buyer to Seller within 30 days after the Effective Date, for (and shall be subject to) Seller's review and written approval (which shall not be unreasonably withheld) and shall thereupon be attached to this Agreement as Schedule 3.3. Any excess of the Purchase Price, as so adjusted, over the fair market value of such assets shall be allocated to goodwill and identifiable intangibles as may be determined by Buyer. As part of its preparation of Schedule 3.3, Buyer shall determine and state separately therein the fair market value of the CPR L.P. Assets as a whole as set forth in Section 1.1A. Each of the parties shall report the purchase and sale of the Acquired Assets, including, without limitation, in all Federal, foreign, state, local and other Tax returns and reports prepared and filed by or for either of Seller and Buyer, in accordance with the allocation finally set forth on such Schedule 3.3, unless otherwise specifically required by law.