## ARTICLE IV

## CLOSING

4.1     **General.**  As used in this Agreement, the "*Closing*" shall mean the time at which Seller consummates the sale, assignment, transfer and delivery of the Acquired Assets to Buyer as provided herein by the execution and delivery by Seller of the documents and instruments referred to in Section 4.2 against delivery by Buyer of the documents and payments provided in Sections 3.1 and 4.3, and Seller, Buyer and the other Persons referred to herein deliver the additional documents referred to in Sections 4.4 and 4.5.  The Closing shall take place simultaneously with the execution and delivery of this Agreement by the parties hereto on the Effective Date, by the exchange of executed counterparts via telecopier or electronic mail on the Effective Date (with executed original counterparts to be delivered forthwith upon such exchange by Federal Express).  Legal title, equitable title and risk of loss with respect to the Acquired Assets shall not pass to Buyer until the Acquired Assets are transferred at the Closing, which transfer, once it has occurred, shall be deemed effective for tax, accounting and other computational purposes as of 12:01 A.M. (Pacific Time) on the Effective Date.

4.2     **Documents to be Delivered by Seller.**  At the Closing, Seller shall deliver to Buyer:

(a)     Copies of (i) the resolutions of the Boards of Directors of Seller, authorizing and approving this Agreement and all other transactions and agreements contemplated hereby, (ii) Seller's Certificate of Incorporation, and (iii) Seller's Bylaws, all certified by the corporate Secretary or Assistant Secretary of Seller to be true, correct, complete and in full force and effect and unmodified as of the Effective Date;

(b)     Two bills of sale, one duly executed by Seller and the other duly executed by CPR L.P., transferring the Acquired Assets to Buyer, free and clear of any and all liens, equities, claims, prior assignments, mortgages, charges, security interests, pledges, conditional sales contracts, collateral security arrangements and other title retention arrangements, restrictions or encumbrances whatsoever (collectively, "*Liens*");

(c)     An opinion, dated as of the Effective Date, of Calfee, Halter & Griswold LLP, counsel to Seller, addressed to Buyer, in the form attached hereto as Exhibit D;

(d)     Instruments of assignment to Buyer of all trademarks, domain names, trade names, service marks, copyrights and patents (and all applications for, and extensions and reissuances of, any of the foregoing and rights therein) identified on Schedule 1.1(h);

(e)     The certificate required by Section 6.1(g);

(f)     Good standing certificates (in long form, where available) for Seller from the Delaware Secretary of State and from the secretaries of state or other appropriate franchise tax authorities in each jurisdiction in which Seller is qualified to do business as a foreign corporation, dated not more than ten days prior to the Effective Date;

(g)     An incumbency certificate of the officers of Seller;

(h)     Releases, including, without limitation, termination statements under the Uniform Commercial Code of any financing statements filed against any Acquired Assets,



evidencing discharge, removal and termination of all Liens to which the Acquired Assets are subject in connection with the indebtedness, if any, described in Schedule 3.2 which releases shall be effective at or prior to the Effective Date, together with evidence satisfactory to Buyer that the indebtedness, if any, described on such Schedule shall have been satisfied and extinguished;

(i) Such other deeds, bills of sale, endorsements, assignments, affidavits, and other good and sufficient instruments of sale, assignment, conveyance and transfer (including, without limitation, such affidavits, releases and other instruments necessary for the issuance of the Title Insurance Policies) in form and substance reasonably satisfactory to Buyer and its counsel, as are required to effectively vest in Buyer good and marketable title in and to all of the Acquired Assets, free and clear of any and all Liens;

(j) Effective possession of all contracts still effective on the Effective Date and all expired and terminated contracts which have provisions surviving such expiration and/or termination; and

(k) Instruments of assignment to Buyer of all Lease Agreements set forth on Schedule 1.1(g).

4.3 **Documents to be Delivered by Buyer.** On the Effective Date, Buyer shall deliver to Seller and, in the case of Section 4.3(f), to CPR L.P.:

(a) A copy of (i) the resolutions of the Board of Directors of Buyer authorizing and approving this Agreement and all other transactions and agreements contemplated hereby, (ii) Buyer's Certificate of Incorporation, and (iii) Buyer's Bylaws, all certified by the Secretary of Buyer to be true, correct, complete and in full force and effect and unmodified as of the Effective Date;

(b) The certificate required by Section 6.2(f);

(c) An opinion, dated the Effective Date, of Stradling Yocca Carlson & Rauth, counsel to Buyer, addressed to Seller, in the form attached hereto as Exhibit E;

(d) A long-form good standing certificate for Buyer from the Secretary of State of Delaware, dated not more than ten days prior to the Effective Date;

(e) An Incumbency Certificate of the officers of Buyer;

(f) An Instrument of Assumption of the Assumed Liabilities to each of Seller and CPR L.P.; and

(g) The certificate or certificates representing the 8,200,000 Buyer Shares deliverable to Seller on the Effective Date pursuant to Section 3.1(a) with the appropriate restrictive legends.

4.4 **Documents to be Delivered by Buyer and Seller.** On the Effective Date, Buyer and Seller shall execute and deliver:

(a) The Registration Rights and Lock-up Agreement.

4.5     **Other Documents to be Delivered.** On the Effective Date:

(a)     Buyer, Seller and Escrow Agent shall execute and deliver the Escrow Agreements;

(b)     Buyer shall deliver to the Escrow Agent the certificates representing the Escrow Shares pursuant to Section 3.1(b);

(c)     Buyer, Seller and specified officers of Seller shall execute and deliver the Conditions of Employment Agreements.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

5.1     **Representations and Warranties of Seller.** Subject only to those exceptions and qualifications listed and described (including an identification by section reference to the representations and warranties to which such exceptions and qualifications relate) on the Disclosure Schedule attached to this Agreement, the Seller hereby represents and warrants to Buyer that:

(a)     <u>Organization and Standing; Power and Authority</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full corporate power and authority to operate the Business, to own or lease the Acquired Assets, to carry on the Business as now being conducted, and to enter into and perform this Agreement and the transactions and other agreements and instruments contemplated by this Agreement. Except as disclosed on <u>Schedule 5.1(a)</u>, Seller has no subsidiary corporations, owns no interest, direct or indirect, in any other business enterprise, firm or corporation, and is the only business enterprise, firm or corporation through which the Business (or any business competing with or similar to the Business) is conducted, or which owns, leases or uses assets related to the Business. Seller is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the ownership or lease of the Acquired Assets or the operation of the Business requires such qualification, except where any failure to be so qualified would not result in a Material Adverse Effect. This Agreement and all other agreements and instruments executed and delivered or to be executed and delivered by Seller in connection herewith (collectively, the "*Transaction Documents*") have been, or upon execution thereof will be, duly executed and delivered by Seller. The Transaction Documents have been duly approved by the Board of Directors of Seller, and, subject to the approval of the stockholders of Seller in accordance with Delaware law, constitute or will upon execution and delivery constitute the valid and binding obligations of Seller, enforceable in accordance with their respective terms.

(b)     <u>Certificate and By-Laws</u>. The copies of the Certificate of Incorporation of Seller, certified by the Secretary of State of Delaware, and the By-Laws of Seller, included in the <u>Schedule 5.1(b)</u> attached to this Agreement are true, correct and complete as of the Effective Date.

(c)     <u>Conflicts; Defaults</u>. Neither the execution and delivery of the Transaction Documents nor the performance by Seller of the transactions contemplated hereby or thereby, will (i) violate, conflict with, or constitute a default under, any of the terms of Seller's Certificate of Incorporation, or Seller's By-Laws, or, except as set forth on <u>Schedule 5.1(c)</u>, any provisions of, or result in the acceleration of any obligation under, any material contract, sales commitment, license,

purchase order, security agreement, mortgage, note, deed, lien, lease, agreement or instrument, including, without limitation, the Contracts, or any order, judgment or decree, relating to the Business or the Acquired Assets, or by which Seller or the Acquired Assets are bound, (ii) result in the creation or imposition of any Liens or Claims (as hereinafter defined) in favor of any third Person or entity upon any of the Acquired Assets, (iii) violate any law, statute, judgment, decree, order, rule or regulation of any Governmental Authority, (iv) constitute an event which, after notice or lapse of time or both, would result in such violation, conflict, default, acceleration, or creation or imposition of Liens or Claims, (v) constitute an event which, after notice of lapse of time or otherwise would create, or cause to be exercisable or enforceable, any option, agreement or right of any kind to purchase any of the Acquired Assets. Except as set forth on Schedule 5.1(c), no consent, novation, approval, filing or authorization will be required to be obtained or satisfied for the continued performance by Buyer following the Effective Date of any contract, agreement, commitment or undertaking included in the Acquired Assets, the failure of which to be obtained would result in a Material Adverse Effect. Seller is not in violation of or in default under its Certificate of Incorporation or Bylaws, or any provision of any contract, sales commitment, license, purchase order, security agreement, mortgage, note, deed, lien, lease, agreement or instrument, including without limitation, the Contracts, or any order, judgment or decree, relating to the Business or the Acquired Assets, or by which Seller or the Acquired Assets is bound, or in the payment of any of Seller's monetary obligations or debts relating to the Business, and there exists no condition or event which, after notice or lapse of time or both, would result in any such violation or default. For purposes of this Agreement the term "*Material Adverse Effect*" is deemed to mean claims reasonably expected to result in liability greater than $25,000 individually and $50,000 collectively.

(d) Acquired Assets; Title to the Acquired Assets. Except for the Retained Assets, the Acquired Assets are the only assets, properties, rights and interests used by Seller in connection with the Business. The Acquired Assets to be conveyed to Buyer under this Agreement constitute all of the assets, properties, rights and interests necessary to conduct the Business in substantially the same manner as conducted by Seller prior to the date of this Agreement. All of the Acquired Assets used in connection with the operation of the Business (including, without limitation, the material tangible assets reflected on the Interim Balance Sheet) are in good operating condition and repair and are adequate and sufficient for the uses to which they are being put in the Business prior to the Effective Date, subject to normal wear and tear and routine maintenance in the ordinary course of business. Seller has good, marketable and exclusive title to, and the valid and enforceable power and unqualified right to use and transfer to Buyer, each of the Acquired Assets, whether located at the Seller's facilities or at the facilities of its customers or suppliers, and the Acquired Assets are free and clear of all Liens and Claims of any kind or nature whatsoever, except for Permitted Liens (as hereinafter defined). The consummation of the transactions contemplated by this Agreement (including, without limitation, the transfer or assignment of the Acquired Assets, and all rights and interests therein, to Buyer as contemplated herein) will not adversely affect such title or rights, or any terms of the applicable agreements (whether written or oral) evidencing, creating or granting such title or rights, subject to the obtaining of such consent as may be required by the terms of any contract included among the Acquired Assets with respect to the assignment thereof to Buyer hereunder. None of the Acquired Assets are subject to, or held under, any mortgage, security agreement, conditional sales contract or other title retention agreement, other than operating leases or capitalized leases disclosed in Schedule 5.1(d) hereto. Seller has the right under valid and existing leases to occupy, use or control all properties and assets leased by it and included in the Acquired Assets in the manner in which Seller has been doing so prior to the Effective Date. The delivery to Buyer of the instruments of transfer of ownership contemplated by this Agreement will vest good, marketable and exclusive title (as to all Acquired Assets owned by Seller) or full right to possess and

use (as to all Acquired Assets not owned by Seller) to the Acquired Assets in Buyer, free and clear of all Liens and Claims of any kind or nature whatsoever, except for (i) current real estate Taxes or governmental charges or levies which are a Lien but not yet due and payable, (ii) Liens disclosed as securing specified liabilities on the Year-End Balance Sheet or the Interim Balance Sheet and notes thereto with respect to which no default exists, (iii) Liens disclosed on Schedule 5.1(d) attached hereto, and (iv) minor imperfections of title, if any, none of which are substantial in amount, or materially detract from the value or impair the use of the property subject thereto or the operation of the Business and which have arisen only in the ordinary and normal course of business consistent with past practice (the Liens described in clauses (i), (ii), (iii) and (iv) being collectively referred to herein as "***Permitted Liens***").

(e) Real Property. Schedule 1.1(f) and 1.1(g) hereto contain a true, correct and complete list of all instruments and agreements creating any interest or right in real property relating to the Business, or owned, leased or occupied by Seller, and all easements, buildings, structures, fixtures and improvements. True, correct and complete copies of the instruments and agreements identified in such Schedules have been made available to Buyer. Each such instrument and agreement is in full force and effect and, is a legal, binding, and enforceable obligation of Seller and, to the knowledge of Seller, each other party thereto, and no event has occurred which constitutes or, with the giving of notice or passage of time, or both, would constitute a material default or breach thereunder by Seller. Seller has the right to quiet enjoyment of all real property subject to leaseholds under any such instruments, for the full term of each such lease and any renewal option related thereto. There has been no disturbance of or challenge to the Seller's quiet possession under each such lease. Neither the whole nor any portion of any real property leased or occupied by Seller has been condemned, requisitioned or otherwise taken by any Governmental Authority, and, to the knowledge of Seller, no such condemnation, requisition or taking is threatened or contemplated. All buildings, structures, fixtures and appurtenances comprising part of the real properties of Seller, are adequate and suitable for the purposes to which they are being put by Seller prior to the Effective Date.

(f) Lease. The Lease Agreements set forth on Schedule 1.1(g) have not, except as indicated on such Schedule, been modified, altered, terminated or revoked, and are in full force and effect. Seller, as the present tenant or sublandlord under the aforesaid Lease Agreements, is not in default under, or in breach of, any of the terms of the Lease Agreements in any material respect, and there are no existing facts or conditions which could give rise to any such breach or default by Seller, or any claim against Seller, under the Lease Agreements.

(g) Contracts. Schedule 5.1(g) hereto contains a complete list or description of (i) each license, contract, agreement, commitment and undertaking (whether written or oral) (A) relating to the Business and to which Seller or CPR L.P. is a party (1) which involves the purchase of inventories or the sale of Products and Services, and involves aggregate future payments in excess of $10,000, or which extends for a period of more than three (3) months, or (2) which does not involve the purchase of inventories or the sale of Products and Services, and involves aggregate future payments in excess of $10,000 or extends for a period of more than three (3) months, (B) between Seller and any distributors, manufacturers' agents or selling agents used or retained in connection with the Business, or pursuant to which Seller sells or distributes Products and/or Services, in each case described in this subsection (B) regardless of the size or term or such licenses, contracts, agreements, commitments and undertakings, (ii) each loan or credit agreement, security agreement, guaranty, indenture, mortgage, pledge or other agreement or instrument evidencing indebtedness of Seller, to which Seller is a party, (iii) any conditional sale or other title retention agreement,

{GAM3274.DOC;3}                                                -16-

equipment obligation, or lease purchase agreement involving (in the aggregate) amounts in excess of $1,000 individually and $10,000 in the aggregate relating to the Business and to which Seller is a party, (iv) any power of attorney given by Seller to any Person, firm or corporation or otherwise relating to the Business or the Acquired Assets, (v) any non-competition, restrictive covenant or other agreement that restricts Seller or any other entity from conducting the Business anywhere in the world, (vi) each contract, agreement, commitment or undertaking presently in effect, whether or not fully performed, between Seller and any current or former officer, director, consultant or other employee (or group thereof) retained or employed in connection with the Business, or any current or former shareholder (or group of shareholders) of Seller, and (vii) any other contract, agreement, commitment or undertaking which, in the Seller's reasonable good faith judgment, is material to the condition (financial or otherwise), results of operations, properties, assets, liabilities or business of the Business (the items described in clauses (i) through (vii) being herein collectively referred to as the "*Contracts*"). Seller and CPR L.P. have performed in all material respects all obligations required to be performed by them, respectively, to date under the Contracts, and neither Seller nor CPR L.P., nor, to the knowledge of Seller (except as set forth in Schedule 5.1(l)), any other party to any Contract has breached in any material respect or improperly terminated any Contract or is in default in any material respect under any Contract by which it is bound, and there exists no condition or event which after notice or lapse of time or both, would constitute any such breach, termination or default. Except as set forth on Schedule 5.1(g), neither Seller nor CPR L.P. is a party to, and the Business does not involve, any contracts, agreements, commitments or undertakings which are subject to the Federal Acquisition Regulations, Chapter 48 of the Code of Federal Regulations and all agency supplements thereto, the Cost Accounting Standards set forth in Chapter 4 of the Code of Federal Regulations, or the Cost Principles set forth in Chapter 31 of the Code of Federal Regulations. To the knowledge of Seller, each of the Contracts is in full force and effect and, assuming the same is a legal, binding and enforceable obligation of or against each party thereto other than Seller or CPR L.P., is a legal, binding and enforceable obligation of Seller or CPR L.P., respectively. Except as set forth on Schedule 5.1(g), Seller does not have, in connection with the Business, outstanding Contracts, including Contracts with officers, employees, agents, consultants, advisors, salesmen, sales representatives, distributors or dealers, that are not cancellable by Seller on notice of not longer than 30 days without liability, penalty or premium. Any other provision of this Agreement notwithstanding, Seller makes no representation or warranty that any customer or supplier of the Business prior to the Effective Date will continue or be willing to continue to do business with Buyer after the Effective Date.

(h) Financial Statements. Attached hereto as Exhibit F are the following financial statements (collectively, together with the notes thereto, the "*Financial Statements*"):

(i) the unaudited Balance Sheet of Seller (the "*Interim Balance Sheet*") as of August 31, 2003 (the "*Balance Sheet Date*"), and the unaudited Statement of Income of Seller for the eight (8) months ended August 31, 2003 (collectively, together with any accompanying description of audit adjustments thereto, the "*Interim Financial Statements*");

(ii) (A) the unaudited Balance Sheet (the "*Year-End Balance Sheet*") of Seller as of December 31, 2002, the unaudited Statement of Income for the year ended December 31, 2002, and the unaudited Statement of Cash Flows for the year ended December 31, 2002 (collectively, the "*Year-End Financial Statements*"), and (B) the audited Balance Sheet of Seller as of December 31, 2001, the audited Statement of Income for the year ended December 31, 2001, and the audited Statement of Cash Flows for the year ended December 31, 2001, together with the footnotes thereto and the report thereon by Deloitte LLP, certified public accountants (collectively,

the "*Audited Financial Statements*");

    (iii) Each of the Financial Statements is prepared from the books and records kept by Seller for the Business and fairly presents, in all material respects, the financial position of Seller as of the date thereof and the results of Seller's operations and Seller's cash flows for the period then ended in accordance with generally accepted accounting principles consistently applied ("*GAAP*"), except, in the case of the Year-End Financial Statements and the Interim Financial Statements, for the absence of footnotes and other presentation items required by GAAP and, in the case of the Interim Financial Statements, for the absence of normal recurring year-end adjustments which would not be material in the aggregate, and except as otherwise disclosed on Schedule 5.1(h)(iii) hereto. Except as set forth in the Schedule 5.1(h)(iii), since the Balance Sheet Date there has been no material adverse change in the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of Seller or any event or condition of any character which has materially and adversely affected, or which is reasonably likely to materially and adversely affect, the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of Seller. The Interim Balance Sheet reflects all properties and assets, real, personal or mixed, which are currently used in connection with the Business and required to be reflected on a balance sheet prepared in accordance with GAAP.

    (i) <u>Liabilities</u>. Seller has no liabilities or obligations of a kind required to be reflected in financial statements prepared in accordance with GAAP, whether absolute, accrued, contingent or otherwise, related to or connected with the Business or the Acquired Assets, including, without limitation, liabilities for Taxes, unusual forward or long-term commitments, or unrealized or anticipated losses from any unfavorable conditions or occurrences, or from write-downs or write-offs of assets (including Inventories and Accounts Receivable), except for those (i) reflected or reserved against in the Interim Financial Statements, or (ii) incurred or accrued since the Balance Sheet Date in the ordinary and normal course of the Seller's business, or (iii) set forth on Schedule 5.1(i) hereto, or (iv) otherwise fairly disclosed in this Agreement or the Schedules hereto.

    (j) <u>Accounts Receivable; Collection; Trade Payables</u>. The accounts receivable reflected on the Interim Balance Sheet and accounts receivable arising after the date of the Interim Balance Sheet and reflected on the books and records of Seller represent valid obligations arising from sales actually made or services actually performed. The accounts receivable reflected on the Interim Balance Sheet are stated thereon in accordance with GAAP, including allowances for doubtful accounts that are sufficient under GAAP. To the knowledge of Seller, none of such accounts receivable is subject to any valid contest, claim or right of setoff other than returns, discounts or credits in the ordinary course of business. Schedule 5.1(j) sets forth an aged listing by Customer of the Accounts Receivable that are outstanding as of October 16, 2003. Seller has not experienced or suffered undue delay in its payment of its liabilities and obligations to its trade creditors (including suppliers) or trade debt.

    (k) <u>Inventories</u>. All of the Inventories are of a quality and quantities usable in the ordinary and normal course of business, and there are no damaged or obsolete items or items of below standard quality included therein, except with respect to which adequate reserves have been set forth on the Interim Balance Sheet. The Inventory is valued on the Interim Balance Sheet on a first-in first-out basis and such value reflects writeoffs or writedowns for damaged or obsolete items, or items of below standard quality, in accordance with the historical inventory policy and practices of Seller, a complete and accurate description of which is included in the Financial Statements. The Inventory is not (as of the date hereof) excessive in kind or amount in light of the ordinary and

normal course of conduct and reasonably anticipated needs of the Business. Set forth on Schedule 5.1(k) is a copy of Seller's perpetual inventory report as of the dates set forth in such report.

(l) <u>Litigation</u>. Except as set forth on the Schedule 5.1(l) Seller is not subject to any order of, or written agreement or memorandum or understanding with, any Governmental Authority, and there exists no litigation, action, suit, claim or proceeding pending, or, to the knowledge of Seller, any litigation, action, suit, investigation, claim or proceeding threatened against or affecting Seller, the Business or the Acquired Assets, or any employee associated with the Business or the Acquired Assets, or which would affect the transactions contemplated by this Agreement, at law or in equity or before any Governmental Authority, including, without limitation, claims for product warranty, product liability, anti-trust, unfair competition, price discrimination or other liability or obligation relating to Products, whether manufactured or sold by Seller or any of its predecessors-in-interest in respect of the Business, or which would adversely affect the transactions contemplated by this Agreement. Set forth on Schedule 5.1(l) is a description of (i) all litigation, actions, suits, investigations, claims and proceedings asserted, brought or threatened against Seller or predecessors-in-interest in respect of the Business during the five-year period preceding the Effective Date, together with a description of the outcome or present status thereof, and (ii) all judgments, orders, decrees, writs or injunctions entered into by or against Seller.

(m) <u>Suppliers</u>. Seller is not involved in any material controversy with any of the suppliers to the Business. Schedule 5.1(m) sets forth a true, correct and complete list of (i) Seller's suppliers which, during the nine (9) months ended September 30, 2003, individually accounted for $10,000 or more of Seller's orders for the purchase of raw materials, supplies, equipment or parts. Except for the suppliers listed in Schedule 5.1(m), Seller has not had any supplier from whom it purchased more than 5% of the goods or services purchased by Seller during the period from January 1, 2003 to September 30, 2003. Seller has not been advised in writing by any supplier listed on Schedule 5.1(m) that such supplier was or is intending to terminate its relationship with Seller.

(n) <u>Regulatory Compliance</u>. Except as set forth on the Schedule 5.1(n) the Business has been conducted, the Acquired Assets have been maintained and Seller is currently in compliance in all material respects with all applicable laws (including, without limitation, all laws relating to zoning, building codes, civil rights, occupational health and safety, antitrust, consumer protection, currency exchange, equal opportunity, pensions, securities and trading-with-the-enemy). Seller is not in default under, and to the knowledge of Seller no event has occurred which, with the lapse of time or action by a third party, could result in default under, the terms of any judgment, decree, order, writ or injunction of any Governmental Authority, whether at law or in equity, by which Seller is bound.

(o) <u>Brokers, Finders and Agents</u>. Seller is not directly or indirectly obligated to anyone acting as a broker, finder or in any other similar capacity in connection with this Agreement or the transactions contemplated hereby.

(p) <u>Intellectual Property</u>. Schedule 5.1(p) attached hereto sets forth a complete and correct list (with an indication of the record owner and identifying number) of all patents, trademarks, service marks, trade names, domain names, and copyrights for which registrations have been obtained (and all pending and examined applications for, or extensions, divisions, continuations, continuations-in-part or reissuances of, any of the foregoing) which are owned by Seller. True, correct and complete copies of such patents, trademarks, service marks, trade names, domain names, and copyrights (and all pending and examined applications for, or extensions,

{GAM3274.DOC;3}                                    -19-

divisions, continuations, continuations in-part, or reissuances of, any of the foregoing) identified on such Schedule have been delivered to Buyer. Except as set forth in Schedule 5.1(p), Seller is the sole owner and has the exclusive right to use, free and clear of any payment, restriction or encumbrance, all such patents, trademarks, service marks, trade names, domain names and copyrights. Except as set forth in Schedule 5.1(p), no patents, trademarks, service marks, trade names, domain names, and copyrights (or pending and examined applications for, or extensions, divisions, continuations, continuations-in-part or reissuances of any of the foregoing) which are or have been used in the conduct of, or which relate to, the Business are owned otherwise than by Seller. There is no claim or demand of any Person pertaining to, or any proceedings which are pending or, to the knowledge of Seller, threatened, which challenge (i) the exclusive rights of Seller in respect of any patents, trademarks, service marks, trade names, domain names or copyrights (or pending and examined applications for, or extensions or reissuances of, any of the foregoing) which are owned by Seller, or (ii) the rights of Seller in respect of any processes, formulas, confidential information, trade secrets, software, know-how, engineering data, software technology or other intellectual property are owned by Seller. Except as set forth in Schedule 5.1(p), no patent, trademark, service mark, trade names, domain names, copyright, process, formulas, software, confidential information, trade secret, know-how, engineering data, technology or other intellectual property which is owned by Seller is subject to any outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority or any contract, agreement, commitment or undertaking with any Person, or infringes or, to the knowledge of Seller, is being infringed by others or is used by others (whether or not such use constitutes infringement). To the knowledge of Seller, the Business does not involve employment of any Person in a manner which violates any non-competition or non-disclosure agreement which such Person entered into in connection with any former employment. All patents, trademarks, service marks, trade names, domain names or copyrights (or pending and examined applications for, or extensions, divisions, continuations, continuations-in-part, or reissuances of, any of the foregoing) or processes, formulas, confidential information, trade secrets, know-how, engineering data, technology or other intellectual property, or rights thereto, owned or held, directly or indirectly by any officer, director, shareholder, employee or any Affiliate of Seller which are used in the Business have been, or prior to the Effective Date will have been, duly and effectively transferred to Seller. Set forth on Schedule 5.1(p) is a description of all litigation, actions, suits, investigations, claims and proceedings, asserted, brought or threatened against the Seller within the five years preceding the date hereof, together with a description of the outcome or present status thereof, relating to any patent, trademark, service mark, trade name, domain name, copyright, process, formula, confidential information, trade secret, know-how, engineering data, technology or other intellectual property. Seller is not engaged in any research or development activities involving reverse engineering, or in other development or production of products based upon designs or attributes of products manufactured or sold by Persons other than Seller. To the knowledge of Seller, (i) none of Seller's Products and Services, past and present, (ii) none of the Acquired Assets, and (iii) none of the methods used by Seller to make products infringe, or has infringed, any patent owned by a third party. Seller has not been notified in writing that any of Seller's products (past and present), the Acquired Assets or none of the methods used by Seller infringe any third party's copyright, trademark, service mark, trade name, domain name or trade secret.

(q) Permits. Schedule 5.1(q) attached hereto contains a true, correct and complete list of all material Permits issued to Seller. Seller has, and is in full compliance with, all Permits which are necessary or required for the operation of the Business as it is currently being operated and its present activities on its properties and facilities, all of which Permits are in full force and effect. Seller's operation of the business does not violate in any material respect any law, regulation or order of any Governmental Authority.

{GAM3274.DOC;3}                                      -20-

(r) <u>Employee Relations; Collective Bargaining Agreements</u>. There are no material controversies, including strikes, disputes, slowdowns or work stoppages, pending, or to the knowledge of Seller, threatened which involve any employees employed in connection with the Business. Seller has complied and is complying in all material respects with all laws relating to the employment of labor, including, without limitation, any provision thereof relating to wages, hours, collective bargaining, employee health, safety and welfare, and the payment of social security and similar taxes. Seller has not experienced any material labor difficulties, including, without limitation, strikes, slowdowns, or work stoppages, within the five-year period preceding the date hereof. Seller is not a party to any collective bargaining or union contract, and to the knowledge of Seller, there exists no current union organizational effort with respect to any of Seller's employees. Seller is in full compliance with the federal WARN Act and any applicable state plant-closing laws.

(s) <u>Employees and Employee Plans</u>. Schedule 5.1(s) attached hereto contains a true and complete list of (a) all employees of the Business as of the Effective Date, together with a description of their respective job titles, and (b) all Employee Plans and employment Contracts. Neither Seller nor any officers, directors, shareholders, employees or agents of Seller have taken any action directly or indirectly to obligate Seller to institute any Employee Plan applicable to employees of the Business other than those Employee Plans set forth in such Schedule, or to amend any such Employee Plan.

Each Employee Plan maintained or contributed to, currently or in the past, by Seller (or by any other corporation or trade or business the employees of which, together with the employees of Seller, are required by any of the rules contained in ERISA or the "Code" to be treated as if they were employed by a single employer) that is a group health plan (as such term is defined in Section 5000(b)(1) of the Code) has been operated in full compliance with the continuation overage requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code.

Additionally, each such Employee Plan (and each related trust, insurance contract, or fund) has been maintained, funded and administered in accordance with the terms of such Employee Plan and the terms of any applicable collective bargaining agreement and complies in form and in operation in all respects with the applicable requirements of ERISA, the Code, and other applicable laws.

(t) <u>Environmental and Safety Matters</u>. Except as set forth in <u>Schedule 5.1(t)</u> Seller has complied with, and the operation of the Business and the use and ownership of the Acquired Assets by Seller, are in compliance with all federal, state and local statutes, laws, ordinances, rules, regulations and orders relating to the protection of human health and safety, natural resources or the environment, including, but not limited to, air pollution, water pollution, noise control, on-site or off-site hazardous substance discharge, disposal or recovery, toxic or hazardous substances, training, information and warning provisions relating to toxic or hazardous substances, and employee safety relating to the Business or the Acquired Assets (collectively the "*Environmental Laws*"); and no written notice of violation of any Environmental Laws or of any permit, license or other authorization relating thereto has been received by or threatened in writing against Seller in connection with the Business, and to the knowledge of Seller, there is no factual basis for the giving of any such notice. Seller has not received any written notice or claim to the effect that Seller or the Business is or may be liable to any governmental authority or private party as a result of the release or threatened release of any toxic or hazardous substances in connection with the conduct or operation of the Business, and to the knowledge of Seller, there are no facts or circumstances that could reasonably be expected to give rise to such a claim. To the knowledge of Seller, none of the operations of Seller's Business or Seller and none of the Acquired Assets is the

subject of any federal, state or local investigation evaluating whether any remedial action is needed to respond to a release or a threatened release of any toxic or hazardous substances at any real properties leased, used or operated by Seller in connection with the Business or any other operations or activities of Seller. Seller has not, in connection with the conduct or operation of the Business, disposed, or had disposed of on its behalf, toxic or hazardous substances except in compliance with applicable Environmental Laws. For the purposes of this Agreement, "toxic or hazardous substances" shall include any material, substance or waste that, because of its quantity, concentration or physical or chemical characteristics, is deemed under any federal, state, local or regional statute, law, ordinance, regulation or order, or by any governmental agency pursuant thereto, to pose a present or potential hazard to human health or safety or the environment, including, but not limited to, (i) any material, waste or substance which is defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601, et seq.), as amended, and its related state and local counterparts, (ii) asbestos and asbestos containing materials and polychlorinated biphenyls, and (iii) any petroleum hydrocarbon including oil, gasoline (refined and unrefined) and their respective constituents and any wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy.

    (u) <u>Changes in Circumstances</u>. Except as disclosed in the <u>Schedule 5.1(u)</u> since the Balance Sheet Date, Seller has not (i) sold, transferred or otherwise disposed of any properties or assets outside the ordinary and normal course of business or for less than fair market value; (ii) mortgaged, pledged or subjected to any Lien, any of the Acquired Assets; (iii) acquired any property or assets outside the ordinary and normal course of business; (iv) sustained any material damage, loss or destruction of or to the Acquired Assets (whether or not covered by insurance); (v) entered into any transaction, or otherwise conducted the Business, other than in the ordinary and normal course; (vi) granted any salary increase or bonus or permitted any advance to any officer, director or employee, instituted or granted any general salary increase to the employees of Seller or entered into any new, or altered or amended any existing, Employee Plan or any employment or consulting agreement; (vii) made any borrowing, whether or not in the ordinary and normal course of business, issued any commercial paper or refinanced any existing borrowings; (viii) paid any obligation or liability (fixed or contingent), other than in the ordinary and normal course of business, discharged or satisfied any Lien, or settled any claim, liability or suit pending or threatened; (ix) entered into any licenses or leases; (x) made any loans or gifts; (xi) modified, amended, cancelled or terminated any contracts or commitments under circumstances which, to the knowledge of Seller, would materially and adversely affect the condition (financial or otherwise), results of operations, business, properties, assets, liabilities or prospects of Seller; (xii) declared or paid, or become obligated to declare or pay, any dividend or disbursed or become obligated to disburse cash except in the ordinary and normal course; (xiii) made capital expenditures or commitments in excess of an aggregate of $25,000 for additions to property, plant or equipment; (xiv) written down, or have been required by GAAP to write down, the value of any Inventory, or written off as uncollectible any notes or Accounts Receivable or any portion thereof, except to the extent of any reserves reflected on the Interim Balance Sheet; (xv) cancelled any other debts or claims or waived any rights of substantial value other than in the ordinary course of business; (xvi) made any material change in any method of accounting or accounting practice; (xvii) paid, accrued or incurred, other than in the ordinary course of business, any management or similar fees to any Related Party (as hereinafter defined) or made any other payment or incurred any other liability to a Related Party or paid any amounts to or in respect of, or sold or transferred any assets to, any company or other entity, a substantial portion of the equity ownership interest of which is owned by Seller or a Related Party individually or as a group; (xviii) suffered any change in the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of Seller, except for usual and normal changes in

the ordinary course of business which have not, individually or in the aggregate had a Material Adverse Effect; or (xix) agreed to, or obligated itself to, do anything identified in (i) through (xviii) above. For purposes of this Agreement, a "*Related Party*" is any trust, corporation or any other entity in which Seller or any of its Affiliates has a material interest.

(v) Taxes.

(i) Seller has prepared and duly filed or caused to be duly filed all Tax Returns required to be filed with any Governmental Authority. All Taxes owed to any Governmental Authority by Seller, and all claims, demands, assessments, judgments, costs and expenses connected therewith, have been paid in full (whether or not shown on any Tax Return), other than any Taxes which are not yet due or which, if due, are not yet delinquent, or are being contested in good faith by appropriate proceedings, and for which adequate reserves are reflected in the face of the Interim Financial Statements as adjusted for the passage of time through the Effective Date in accordance with the past custom and practice of the Seller in filing its Tax Returns. Seller is not the current beneficiary of any extension of time within which to file any Tax Return. Seller is not a party to any action or proceeding, nor to the knowledge of Seller, is any such action or proceeding contemplated or threatened, for the assessment or collection of any Taxes, and no deficiency notices or reports have been received by Seller in respect of any Tax which have not been paid in full or otherwise finally resolved. No Tax Returns of Seller have been audited by any such Governmental Authority, except for those set forth in Schedule 5.1(v).

(ii) Through the date hereof, Seller does not have any liability for Taxes in excess of the amount reserved or provided for on the face of the Interim Balance Sheet (but excluding, for this purpose only, any liability reflected thereon for deferred taxes to reflect timing differences between tax and financial account methods) and Taxes arising since the date of the Interim Balance Sheet in the ordinary course of business determined in accordance with the past custom and practice of the Seller in filing its Tax Returns.

(iii) No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no security interests on any of the assets of the Seller that arose in connection with any failure (or alleged failure) to pay any Tax on or before the due date thereof.

(iv) Except to the extent set forth in the Schedule 5.1(v) there are no outstanding agreements or waivers extending the statutory period of limitation applicable to any Tax Return for any period. Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party, and all forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(v) None of the Assumed Liabilities is an obligation to make a payment that will not be deductible under Section 280G of the Code. Seller is not a party to any Tax allocation or sharing agreement, nor (A) has Seller ever been a member of an affiliate group filing a consolidated return, (B) does Seller have any liability for the Taxes of any person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise. Seller has not, with regard to the Acquired Assets, filed a consent to the application of Section 341(f)(2) of the Code.

(vi) For the purposes of this Agreement: (i) *"Tax"* or *"Taxes"* means all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, customs duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or foreign), and (ii) *"Tax Return"* means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(w) Insurance. Schedule 5.1(w) contains a list of all insurance policies (specifying the location, insured, insurer, amount of coverage, type of insurance and policy number) maintained by Seller. All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Effective Date have been paid to the extent the same are due on or before the Effective Date, and no notice of cancellation or termination has been received with respect to any such policy. To the knowledge of Seller, Seller has no valid unasserted claims under such insurance policies.

(x) Absence of Certain Commercial Practices. To the knowledge of Seller, neither Seller nor any officer, director, employee or agent of Seller (or any Person acting on behalf of any of the foregoing) has given or agreed to give (i) any gift or similar benefit of more than nominal value to any Customer, supplier, Governmental Authority (including any governmental employee or official) or any other Person who is or may be in a position to help, hinder or assist Seller, the Business or the Person giving such gift or benefit in connection with any actual or proposed transaction relating to the Business, which gifts or similar benefits would individually or in the aggregate subject Seller or any officer, director, employee or agent of Seller to any fine, penalty, cost or expense or to any criminal sanctions, (ii) receipts from or payments to any governmental officials or employees, (iii) commercial bribes or kick-backs, (iv) political contributions, or (v) any receipts or disbursements in connection with any unlawful boycott, in any such case which would cause Seller to be in violation of any applicable law. To the knowledge of Seller, no such gift or benefit is required in connection with the operation of the Business to avoid any fine, penalty, cost, expense or material adverse change in the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of Seller or the Business.

(y) Bank Accounts. Schedule 5.1(y) attached hereto sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which the Company maintains any safe deposit boxes or accounts (specifying the identifying numbers), and the names of all persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

(z) Books and Records. The books and records of Seller maintained in connection with the Business (including, without limitation, (i) books and records relating to the purchase of materials and supplies, manufacture or processing of products, sales of products, dealings with customers, invoices, customer lists, inventories, supplier lists, personnel records and taxes, and (ii) computer software and data in computer readable and human readable form used to maintain such books and records together with the media on which such software and data are stored and all documentation relating thereto) accurately record all transactions relating to the Business in all material respects, and have been maintained consistent with good business practice.

(aa) {Intentionally omitted.}

(bb) <u>Loss Contracts</u>. To the knowledge of Seller, there are no outstanding contracts, agreements, commitments or undertakings relating to the Business that individually or in the aggregate are expected to result in any material loss to Seller or the Business.

(cc) <u>Copies of Documents</u>. Seller has made available to Buyer true, correct and complete copies of all contracts, agreements and other documents listed in the Schedules to, or referenced in, this Agreement, and all modifications and amendments thereto.

(dd) <u>Insider Interests</u>. Except as set forth in <u>Schedule 5.1(dd)</u>, no officer, director or employee of Seller or any Subsidiary has any material interest in any property, real or personal, tangible or intangible, including without limitation, inventions, patents, trademarks or trade names, used in or pertaining to the Business.

(ee) <u>Disclosure</u>. No representation or warranty made by Seller contained in this Agreement or in any other writing furnished pursuant hereto contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they were or are made, not misleading.

(ff) <u>Warranty Costs</u>. Schedule 5.1(ff) sets forth a description of all litigation, actions, suits, investigations, claims and proceedings asserted, brought or threatened against Seller within the last four (4) years preceding the date of this Agreement, together with a description of the outcome or present status thereof, relating to any claim for warranty costs involving amounts in excess of $10,000, individually or in the aggregate. Claims for warranty costs (individually or in the aggregate) during the twelve month period ended September 30, 2003 did not exceed $10,000, and there are no outstanding or threatened claims for any such costs which would exceed $10,000 (individually or in the aggregate). As used herein, "*warranty costs*" means the costs and expenses of servicing, repairing, returning and/or replacing, or allowances for service, repair, return or replacement, of defective or allegedly defective or improperly selected or shipped Products or parts or components thereof manufactured or sold by Seller and the costs of materials and expenses of replacing materials or correcting any jobs or materials inadequately performed or manufactured by Seller, together with such legal liability, if any, as may exist in connection with sales of Products, whether such costs and expenses relate to or arise out of claims or causes of action which assert causes sounding in tort, contract or warranty, or any combination of the foregoing.

5.2 **Representations and Warranties of Buyer.** Buyer represents and warrants to Seller that:

(a) <u>Organization and Standing; Corporate Power and Authority</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full corporate power and authority to own its properties and assets and carry on its business as presently being owned and conducted and to make and perform this Agreement and perform the transactions contemplated by this Agreement. Buyer is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the ownership of its assets or the operation of the Business requires such qualification, except where any failure to be so qualified would not have a material adverse effect on Buyer. This Agreement and all other agreements and instruments executed and delivered by Buyer in connection herewith have been duly executed and delivered by Buyer. This Agreement and the transactions and other agreements and instruments contemplated by this Agreement have been duly approved by the Board of Directors of Buyer (approval of Buyer's shareholders not being required), and constitute the valid and binding

obligations of Buyer, enforceable in accordance with their respective terms.

(b) <u>Conflicts; Defaults; Consents</u>. Neither the execution and delivery of this Agreement or any of the other agreements and instruments executed or to be executed in connection herewith by Buyer, nor the performance by Buyer of its obligations hereunder or thereunder, will (i) violate, conflict with or constitute a breach or default under any of the terms of Buyer's Certificate of Incorporation or Bylaws, each as amended, or any provisions of, or result in the impairment of any material right or benefit of Buyer under, any material contract or agreement to which Buyer is a party or by which Buyer or any material part of its assets are bound, or (ii) violate any law, statute, judgment, decree, order, rule or regulation of any Governmental Authority, or (iii) constitute an event which, after notice or lapse of time or both, would result in such a violation, conflict, breach, default, impairment. Except for the filing of a registration statement under the Securities Act of 1933, as amended, and the regulations thereunder (the "*1933 Act*") with respect to the Buyer Shares to be issued to Seller pursuant to Section 3.1(a) and related blue-sky and stock exchange filings as provided in the Registration Rights and Lock-up Agreement, no consent of, approval of, or filing with any Governmental Authority or any other person is required in connection with the execution, delivery or performance by Buyer of this Agreement or any other agreement or instrument to be executed and delivered by Buyer in connection herewith, or the consummation by Buyer of any of the transactions contemplated hereby or thereby.

(c) <u>Brokers, Finders and Agents</u>. Buyer is not directly or indirectly obligated to anyone as a broker, finder or in any other similar capacity in connection with this Agreement or the transactions contemplated hereby.

(d) <u>Disclosure</u>. No representation or warranty made by Buyer contained in this Agreement or in any other writing furnished pursuant hereto contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they were or are made, not misleading.

(e) <u>Buyer Shares</u>. All of the Buyer Shares to be issued and delivered to Seller and the Escrow Agent pursuant to Section 3.1 have been duly authorized for issuance and, when issued and delivered by Buyer in accordance with this Agreement, will be validly issued, fully paid, non-assessable, free of preemptive rights and not subject to any Liens, restrictions on transfer or voting, restrictions on receipt of dividends (if any), except for restrictions under the 1933 Act and any applicable state securities laws and resale limitations specifically set forth in the Registration Rights and Lock-up Agreement, and, after notice of issuance, such Buyer Shares will be authorized for quotation on the Nasdaq National Market. Since December 31, 2002, Buyer has not changed or established a record date for changing the number of shares of its Common Stock issued or outstanding as a result of any stock split, stock dividend, recapitalization, reclassification, split-up, combination of shares or similar transaction or event with respect to the outstanding Common Stock of Buyer, other than relating to any changes in shares allocated to stock option plans of Buyer.

(f) <u>Exchange Act Filings</u>. Buyer has timely filed all material documents required to be filed by it with the Securities and Exchange Commission ("*SEC*") pursuant to the 1934 Act ("*SEC Documents*"). As of their respective filing dates, the SEC Documents complied in all material respects with the requirements of the Securities Exchange Act of 1934, as amended, and none of the SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading except to the extent corrected by a