(xiii) any Liability arising out of any Proceeding commenced after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing but after November 1, 2003;

(xiv) any Liability arising out of or resulting from the Seller's compliance or noncompliance with any Legal Requirement or Order of any Governmental Body;

(xv) and Liability of the Seller under the Complient Corporation Purchase Agreement;

(xvi) any Liability of the Seller based upon the Seller's acts or omissions occurring after the Closing;

(xvii) any Liability arising out of or relating to that certain matter titled Donald C. Hutchins v. Cardiac Science (CIV 04-30126-MAP) (U.S.D.C. Mass) (the "Hutchins Case");

(xviii) and any Liability arising out of or relating to any claim (whenever asserted) of breach or noncompliance with the terms and conditions of the CPR License Agreement in the period prior to the Closing.

## 2.5   ALLOCATION

The Purchase Price shall be allocated in accordance with Part 2.5. After the Closing, the parties shall make consistent use of the allocation, fair market value and useful lives specified in Part 2.5 for all Tax purposes and in all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code. The Buyer shall prepare and deliver IRS Form 8594 to the Seller within forty-five (45) days after the Closing Date to be filed with the IRS. In any Proceeding related to the determination of any Tax, neither the Buyer nor the Seller shall contend or represent that such allocation is not a correct allocation.

## 2.6   CLOSING

The purchase and sale provided for in this Agreement (the "Closing") will take place via facsimile commencing at 10:00 a.m. (local time) on August 11, 2004, immediately following the execution and delivery of this Agreement, or such other date and time as the parties hereto may agree.

## 2.7   CLOSING OBLIGATIONS

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

EXHIBIT 7-2

(a) the Seller shall deliver to the Buyer:

(i) a bill of sale for all of the Assets that are Tangible Personal Property in the form of Exhibit 2.7(a)(i) (the "Bill of Sale") executed by the Seller;

(ii) an assignment of all of the Assets that are intangible personal property in the form of Exhibit 2.7(a)(ii), which assignment shall also contain the Buyer's undertaking and assumption of the Assumed Liabilities (the "Assignment and Assumption Agreement") executed by the Seller;

(iii) assignments of all Intellectual Property Assets and separate assignments of all registered Marks, Patents and Copyrights in the form of Exhibit 2.7(a)(iii) executed by the Seller;

(iv) an assignment of all of the Seller's rights and obligations under the CPR Prompt License Agreement to the extent assignable to the Buyer;

(v) such other deeds, bills of sale, assignments, consents, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by the Buyer, each in form and substance reasonably satisfactory to the Buyer and its legal counsel and executed by the Seller; and

(vi) evidence reasonably satisfactory to the Buyer that all Encumbrances on the Assets (including, without limitation, the Encumbrances in favor of HSBC Bank USA, as Agent and Silicon Valley Bank), other than Permitted Encumbrances have been released.

(vii) a listing of all of the Seller's accounts payable outstanding as of the Closing to the Persons listed on Exhibit 2.7(a)(vii) (the "Payables List");

(viii) a Secretary's certificate attesting as to (i) the incumbency of officers of the Seller executing this Agreement, (ii) resolutions of the Board of Directors of the Seller approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and (iii) a good standing certificate of the Seller as issued by the Delaware Secretary of State as of a recent date; and

(ix) evidence reasonably satisfactory to the Buyer that the entities listed in Exhibit 2.7(ix) have been notified as to the change in title to the Assets located at such entity's places of business.

(b) The Buyer shall deliver to the Seller:

(i) the Cash Purchase Price, by wire transfer to an account specified by the Seller in writing delivered to the Buyer at least three (3) Business Days prior to the Closing Date; and

(ii) the Bill of Sale and Assignment and Assumption Agreement executed by the Buyer.

3. <u>Representations and Warranties of the Seller.</u> Except as set forth in the Disclosure Letter, the Seller represents and warrants to the Buyer, as of the date hereof, as follows:

3.1 ORGANIZATION AND GOOD STANDING

(a) The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Seller Contracts to which it is a party, except where the failure to have such powers or authority would not, individually or in the aggregate, have a material adverse effect on the Seller. The Seller is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification, except where such failures to be so qualified or licensed and in good standing would not, individually or in the aggregate, have a material adverse effect on the Seller.

3.2 ENFORCEABILITY; AUTHORITY; NO CONFLICT

(a) Upon the execution and delivery by the Seller of this Agreement and each other agreement to be executed or delivered by the Seller at the Closing (collectively, the "<u>Seller's Closing Documents</u>"), each of the Seller's Closing Documents will constitute the legal, valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except as the same may be restricted, limited or delayed by (i) applicable bankruptcy or other laws affecting creditor's rights generally, and (ii) general principles of equity relating to the availability of equitable remedies (whether such agreements are sought to be enforced in a proceeding at law or in equity). The Seller has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement and the Seller's Closing Documents, and such action has been duly authorized by all necessary corporate action.

(b) Except as set forth in Part 3.2(b), and except for such instances that would not be expected to have a material adverse effect on the Assets or the Business, neither the execution and delivery of this Agreement by the Seller nor the consummation or performance of any of the Contemplated Transactions by the Seller will, directly or indirectly (with or without notice or lapse of time):

(i) Breach any provision of any of the Seller's Governing Documents;

(ii)     Breach or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any Legal Requirement or any Order to which the Seller, the Business or any of the Assets, may be subject;

(iii)    contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by the Seller and relates to the Assets or to the Business;

(iv)    Breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Seller Contract listed in Part 3.20(a);

(v)     result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets; or

(vi)    result in any stockholder of the Seller having the right to exercise dissenters' appraisal rights.

(c)     Except as set forth in Part 3.2(c), the Seller is not required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

3.3    [Intentionally Omitted]

3.4    FINANCIAL RECORDS

The Seller has delivered to the Buyer: (a) monthly invoice registers for the period November 1, 2003 through May 31, 2004, which report in complete detail the sales transactions related to the Business completed by the Seller during such period; (b) current Inventory records reporting the Seller's current product costs, including complete bill of materials information; and (c) Inventory units on hand as at April 30, 2004 (collectively, items (a), (b) and (c) are the "Financial Records"). All of the Financial Records are true, accurate and complete in all material respects and reflect all material transactions with respect thereto for the period covered thereby.

3.5    BOOKS AND RECORDS

The books of account and other financial Records of the Seller relating to the Business, all of which have been made available to the Buyer, are complete and correct in all material respects and represent actual, bona fide transactions and have been maintained in accordance with sound business practices and the requirements of Section

13(b)(2) of the Exchange Act (regardless of whether the Seller is subject to that Section or not), including the maintenance of an adequate system of internal controls.

### 3.6   SUFFICIENCY OF ASSETS

Except as set forth in Part 3.6, the Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by the Seller and (b) include all of the operating assets of the Seller used by the Seller in connection with the Business.

### 3.7   DESCRIPTION OF OWNED REAL PROPERTY

No real property is being transferred or sold pursuant to this Agreement.

### 3.8   DESCRIPTION OF LEASED REAL PROPERTY

Part 3.8 contains a correct legal description, street address and tax parcel identification number of all tracts, parcels and subdivided lots in which the Seller has a leasehold interest and which relate to the Business, and an accurate description (by location, name of lessor, date of Lease and term expiry date) of all Real Property Leases.

### 3.9   TITLE TO ASSETS; ENCUMBRANCES

(a)   The Seller own good and transferable title to all of the Assets free and clear of any Encumbrances other than those described in Part 3.9. The Seller warrants to the Buyer that, at the time of Closing, all of the Assets shall be free and clear of all Encumbrances, other than minor imperfections to title, if any, none of which are substantial in amount, or materially detract from the value or impair the use of the property subject thereto or the operation of the Business and those identified on Part 3.9 as acceptable to the Buyer (collectively, "Permitted Encumbrances").

(b)   Except as disclosed in Part 3.9, all Tangible Personal Property used in the Business is in the possession of the Seller and is in good repair and good operating condition, ordinary wear and tear excepted.

### 3.10   [Intentionally Omitted]

### 3.11   [Intentionally Omitted]

### 3.12   INVENTORIES

The Seller is not in possession of any Inventory not owned by the Seller. All of the Inventories have been valued at the lower of cost or market value on a first in, first out basis. Inventories now on hand were purchased in the Ordinary Course of Business of the Seller.

3.13   NO UNDISCLOSED LIABILITIES

Except as set forth in Part 3.13, the Seller does not have any Liability relating to the Business or the Assets which has not already been disclosed by the Seller other than such Liabilities that could not reasonably be expected to have a material adverse effect on the Business or the Assets.

3.14   TAXES

The Seller has filed or caused to be filed on a timely basis all Tax Returns and all reports with respect to Taxes that are or were required to be filed pursuant to applicable Legal Requirements. All Tax Returns and reports filed by the Seller are true, correct and complete in all material respects. There are no Encumbrances on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Tax, and the Seller does not have any Knowledge of any basis for assertion of any claims attributable to Taxes which, if adversely determined, would result in any such Encumbrance.

3.15   NO MATERIAL ADVERSE CHANGE

Since November 1, 2003 there has not been any material adverse change in the business, operations, prospects, assets, results of operations or condition (financial or other) of the Business or the Assets, and, to the Knowledge of the Seller, no event has occurred or circumstance exists that may result in such a material adverse change.

3.16   EMPLOYEE BENEFITS

There are no Liabilities relating to any Employee Plans of the Seller which have or could give rise to any Encumbrances on the Business or the Assets.

3.17   COMPLIANCE WITH LEGAL REQUIREMENTS; GOVERNMENTAL AUTHORIZATIONS

(a)   Except as set forth in Part 3.17(a), the Seller is, and at all times since November 1, 2003 has been, in full compliance with each Legal Requirement that is or was applicable to the conduct or operation of the Business or the ownership or use of any of the Assets, except to the extent that a failure to comply could not be reasonably expected to have a material adverse effect on the Business or the Assets.

(b)   Part 3.17(b) contains a complete and accurate list of each Governmental Authorization that is held by the Seller with respect to the Business or that otherwise relates to the Assets. Each Governmental Authorization listed or required to be listed in Part 3.17(b) is valid and in full force and effect. Except as set forth in Part 3.17(b):

(i) the Seller is, and at all times since November 1, 2003, has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.17(b), except where the failure to comply could not reasonably be expected to have a material adverse effect on the Business or the Assets;

(ii) to the Knowledge of the Seller, no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.17(b) or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.17(b);

(iii) the Seller has not received, at any time since November 1, 2003, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Governmental Authorization or (B) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Governmental Authorization; and

(iv) since November 1, 2003, all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.17(b) have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies, except to the extent that failures to make such filings could not reasonably be expected to have a material adverse effect on the Business or the Assets.

The Governmental Authorizations listed in Part 3.17(b) collectively constitute all of the Governmental Authorizations necessary to permit the Seller to lawfully conduct and operate the Business in the manner in which it currently conducts and operates the Business and to permit the Seller to own and use the Assets in connection with the Business in the manner in which the Seller currently owns and uses the Assets in connection with the Business.

3.18   LEGAL PROCEEDINGS; ORDERS

(a) Except as set forth in Part 3.18(a), there is no pending or, to the Seller's Knowledge, threatened Proceeding:

(i) by or against the Seller or that otherwise relates to or may affect the Business or any of the Assets; or

(ii) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of the Seller, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such Proceeding. The Seller has delivered to the Buyer copies of all pleadings, correspondence and other documents relating to each Proceeding listed in Part 3.18(a). There are no Proceedings listed or required to be listed in Part 3.18(a) that could have a material adverse effect on the business, operations, assets, condition or prospects of the Seller with respect to the Business or upon the Assets.

(b) Except as set forth in Part 3.18(b):

(i) there is no Order to which the Seller, the Business or any of the Assets is subject; and

(ii) to the Knowledge of the Seller, no officer, director, agent or employee of the Seller is subject to any Order that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity or practice relating to the Business.

(c) Except as set forth in Part 3.18(c):

(i) The Seller is, and, at all times since November 1, 2003, has been in compliance with all of the terms and requirements of each Order to which it or any of the Assets is or has been subject;

(ii) to the Knowledge of the Seller, no event has occurred or circumstance exists that is reasonably likely to constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Seller, the Business, or any of the Assets is subject; and

(iii) the Seller has not received, at any time since November 1, 2003, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any Order to which the Seller, the Business, or any of the Assets is or has been subject.

3.19   ABSENCE OF CERTAIN CHANGES AND EVENTS

Except as set forth in Part 3.19, since November 1, 2003, the Seller has conducted the Business only in the Ordinary Course of Business and there has not been any:

(a) damage to or destruction or loss of any Asset that materially and adversely affects the Business, whether or not covered by insurance;

(b) sale (other than sales of Inventories in the Ordinary Course of Business), lease or other disposition of any Asset (including the Intellectual Property Assets) or the creation of any Encumbrance on any Asset;

(c) indication by any significant customer or supplier of the Business of an intention to discontinue or change the terms of its relationship with the Seller;

(d) material change in the accounting methods used by the Seller; or

(e) Contract by the Seller to do any of the foregoing.

3.20 CONTRACTS; NO DEFAULTS

(a) Part 3.20(a) contains an accurate and complete list, and the Seller has delivered to the Buyer accurate and complete copies of each Seller Contract applicable to the Business and/or the Assets.

(b) Except as set forth in Part 3.20(b), the Seller has not nor may it acquire any rights under, and the Seller has not nor may it become subject to any obligation or liability under, any Contract that relates to the Business or any of the Assets.

(c) Except as set forth in Part 3.20(c):

(i) to the Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with or result in a Breach of, or give the Seller or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Seller Contract that is being assigned to or assumed by the Buyer;

(ii) to the Seller's Knowledge, no event has occurred or circumstance exists under or by virtue of any Contract that (with or without notice or lapse of time) would cause the creation of any Encumbrance affecting any of the Assets; and

(iii) the Seller has not given to or received from any other Person, at any time since November 1, 2003, any notice or other communication (whether oral or written) regarding any actual, alleged, possible or potential violation or Breach of, or default under, any Contract which is being assigned to or assumed by the Buyer.

(d) There are no renegotiations of, attempts to renegotiate or outstanding rights to renegotiate any material amounts paid or payable to the Seller under current or completed Contracts with any Person having the contractual or statutory right to demand or require such renegotiation and no such Person has made written demand for such renegotiation.

(e) The Seller has made all royalty payments payable under the CPR Prompt License Agreement.

(f) The Seller has not made, used or sold any devices, disclosed and claimed in, U.S. Patent No. 5,913,685.

3.21 [Intentionally Omitted]

3.22 ENVIRONMENTAL MATTERS

Except as disclosed in Part 3.22, to the Seller's Knowledge, the Seller is not in violation of any applicable statute, law or regulation relating to the Environment or occupational health and safety which violation could reasonably be expected to have a material adverse effect on the Seller, the Business or the Assets. The Seller has not received any notice or claim to the effect that the Seller or the Business is or may be liable to any governmental authority or private party as a result of the release or threatened release of any toxic or hazardous substances in connection with the conduct or operation of the Business, and none of the operations of the Business or the Seller and none of the Assets is the subject of any federal, state or local investigation evaluating whether any remedial action is needed to respond to a release or a threatened release of any toxic or hazardous substances at any of the real properties owned or leased in connection with the Business.

3.23 EMPLOYMENT COMPLIANCE

The Seller has, with respect to the Business, complied in all material respects with all Legal Requirements relating to employment practices, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining and other requirements of Law, the payment of social security and similar Taxes and occupational safety and health. The Seller is not liable for the payment of any Taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the Legal Requirements described in the foregoing sentence.

3.24 INTELLECTUAL PROPERTY ASSETS

(a) The term "Intellectual Property Assets" means all intellectual property owned or licensed (as licensor or licensee) by the Seller for use solely in the Business, in which the Seller has a proprietary interest, including:

(i) all names, assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications relating solely to the Business (collectively, "<u>Marks</u>"), together with the goodwill of the Business symbolized by the Marks;

(ii) all patents, patent applications and inventions and discoveries that may be patentable relating solely to the Business (collectively, "<u>Patents</u>");

(iii) all registered and unregistered copyrights in both published works and unpublished works relating solely to the Business (collectively, "<u>Copyrights</u>");

(iv) all rights in mask works;

(v) all know-how, trade secrets, confidential or proprietary information, customer lists, Software, technical information, data, process technology, plans, drawings and blue prints relating solely to the Business (collectively, "<u>Trade Secrets</u>"); and

(vi) all rights in internet web sites and internet domain names relating solely to the Business (collectively "<u>Net Names</u>").

(b) Part 3.24(b) contains a complete and accurate list, and the Seller has delivered to the Buyer accurate and complete copies, of all the Seller Contracts relating to the Intellectual Property Assets, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available Software programs under which the Seller is the licensee. There are no outstanding and, to the Seller's Knowledge, no threatened disputes or disagreements with respect to any such Contract.

(c) Except as set forth in Part 3.24(c), to the Seller's Knowledge, the Intellectual Property Assets are all those necessary for the operation of the Business as it is currently conducted. The Seller is the owner or licensee of all right, title and interest in and to each of the Intellectual Property Assets, free and clear of all Encumbrances, other than such Encumbrances that could not reasonably be expected to have a material adverse effect on the Business, and has the right to use without payment to a Third Party all of the Intellectual Property Assets, other than in respect of licenses listed in Part 3.24(c).

(d) (i) Part 3.24(d) contains a complete and accurate list of all Patents.

(ii) No Patent is involved in any interference, reissue, reexamination, or opposition Proceeding.

(iii) Except as set forth in Part 3.24 (d), to the Seller's Knowledge, (A) no Patent is infringed or has been challenged or threatened in any way

and (B) none of the products manufactured or sold, nor any process or know-how used, by the Seller infringes or is alleged to infringe any patent or other proprietary right of any other Person in connection with the Business.

 (e) (i) Part 3.24(e) contains a complete and accurate list of all Marks.

  (ii) No Mark is involved in any opposition, invalidation or cancellation Proceeding and, to the Seller's Knowledge, no such action is threatened with respect to any of the Marks.

  (iii) To the Seller's Knowledge, there is no potentially interfering trademark or trademark application of any other Person.

  (iv) To the Seller's Knowledge, no Mark is infringed or has been challenged or threatened in any way. To the Seller's Knowledge, none of the Marks used by the Seller infringes or is alleged to infringe any trade name, trademark or service mark of any other Person.

  (v) The Marks have been in continuous use by the Seller during the period from November 1, 2003 to the date of the Closing.

 (f) (i) Part 3.24(f) contains a complete and accurate list of all Copyrights.

  (ii) To the Seller's Knowledge, no Copyright is infringed or, to the Seller's Knowledge, has been challenged or threatened in any way. To the Seller's Knowledge, none of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any Third Party or is a derivative work based upon the work of any other Person.

 (g) (i) The Seller has taken all commercially reasonable precautions to protect the secrecy, confidentiality and value of all Trade Secrets. To the Seller's Knowledge, the Trade Secrets are not part of the public knowledge or literature and have not been used, divulged or appropriated either for the benefit of any Person (other than the Seller) or to the detriment of the Seller. To the Seller's Knowledge, no Trade Secret is subject to any adverse claim or has been challenged or threatened in any way or infringes any intellectual property right of any other Person.

  (ii) The Seller has good title to and an absolute right to use the Trade Secrets.

 (h) (i) Part 3.24(h) contains a complete and accurate list of all Net Names.

      (ii) No Net Name is involved in any dispute, opposition, invalidation or cancellation Proceeding and, to the Seller's Knowledge, no such action is threatened with respect to any Net Name.

      (iii) To the Seller's Knowledge, no Net Name is infringed or has been challenged, interfered with or threatened in any way. To the Seller's Knowledge, no Net Name infringes, interferes with or is alleged to interfere with or infringe the trademark, copyright or domain name of any other Person.

 3.25 BROKERS OR FINDERS

Neither the Seller nor any of its Representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the Contemplated Transactions.

 3.26 DISCLOSURE

  No representation or warranty or other statement made by the Seller or in this Agreement, the Disclosure Letter, any supplement to the Disclosure Letter or other documents delivered in connection with the Contemplated Transactions contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

4. <u>Representations and Warranties of the Buyer</u>

The Buyer represents and warrants to the Seller as follows:

 4.1 ORGANIZATION AND GOOD STANDING

The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now conducted.

 4.2 AUTHORITY; NO CONFLICT

  (a) Upon the execution and delivery by the Buyer of this Agreement, and each other agreement to be executed and delivered by the Buyer at Closing (collectively, the "<u>the Buyer's Closing Documents</u>"), each of the Buyer's Closing Documents will constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as the same may be restricted, limited or delayed by (i) applicable bankruptcy or other laws affecting creditors' rights generally, and (ii) general principles of equity relating to the availability of equitable remedies (whether such agreements are sought to be enforced in a proceeding at law or in equity). The Buyer has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Buyer's Closing Documents

# EXHIBIT A-3

and to perform its obligations under this Agreement and the Buyer's Closing Documents, and such action has been duly authorized by all necessary corporate action.

(b) Neither the execution and delivery of this Agreement by the Buyer nor the consummation or performance of any of the Contemplated Transactions by the Buyer will, directly or indirectly (with or without notice or lapse of time):

(i) Breach any provision of the Buyer's Governing Documents;

(ii) Breach or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any Legal Requirement or any Order to which the Buyer may be subject; or

(iii) Breach any Contract to which the Buyer is a party or by which the Buyer may be bound.

The Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

4.3 CERTAIN PROCEEDINGS

There is no pending Proceeding that has been commenced against the Buyer and that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions. To the Buyer's Knowledge, no such Proceeding has been threatened.

4.4 BROKERS OR FINDERS

Neither the Buyer nor any of its Representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Contemplated Transactions.

5. [Intentionally Omitted]

6. [Intentionally Omitted]

7. [Intentionally Omitted]

8. [Intentionally Omitted]

9. Tax Matters

9.1 TRANSACTION TAXES