The Buyer and the Seller shall each be responsible, and indemnify and hold harmless the other party, for 50% of any and all excise, value added, registration, stamp, property, documentary, transfer, sales, use and similar Taxes, levies, charges and fees (including all real estate transfer taxes) incurred, or that may be payable to any taxing authority, in connection with, the transactions (including without limitation the sale, transfer, and delivery of the Assets) contemplated by this Agreement; the Buyer and the Seller shall use their reasonable efforts to cooperate with each other to obtain exemptions from such Taxes or to otherwise legally minimize such Taxes. The Seller shall timely file all Tax Returns that are required to be filed after the Closing Date relating to such Taxes. Notwithstanding the foregoing, each party shall be responsible for its own income, capital gain or other similar Taxes due in connection with the transactions (including without limitation the sale, transfer, and delivery of the Assets) contemplated by this Agreement.

9.2     STRADDLE PERIODS

All Non-Income Taxes in respect of the Assets that relate to periods beginning prior to the Closing Date and ending after the Closing Date ("Straddle Periods") shall be pro rated as follows: the portion of the Straddle Period Non-Income Taxes allocable to the tax period ending on or before the Closing Date (the "Pre-Closing Straddle Period") and to the portion of the Straddle Period Non-Income Taxes allocable to the tax period beginning after the Closing Date (the "Post-Closing Straddle Period"), as applicable, shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Pre-Closing Straddle Period or Post-Closing Straddle Period, respectively, and the denominator of which is the number of days in the entire Straddle Period. The Buyer shall have the right to prepare or cause to be prepared all Straddle Period Non-Income Tax Returns. If the Buyer elects, by delivery of written statement to the Seller no later than sixty (60) days prior to the due date for a given Straddle Period Non-Income Tax Return, not to exercise its rights in the preceding sentence, the Seller shall prepare or cause to be prepared any Straddle Period Non-Income Tax Returns that the Buyer elects not to prepare. The party preparing a Straddle Period Non-Income Tax Return (the "Preparing Party") shall provide each such return to the other party for review and comment not less than ten business days in advance of the due date thereof, and the Preparing Party shall make all changes reasonably requested by the other party. After making such revisions, the Preparing Party shall deliver to the other party a statement setting forth the amount of payment to which such Preparing Party is entitled under this Section 9.2, together with supporting evidence as is reasonably necessary to calculate the proration amount, and such other party shall pay to the Preparing Party its prorated portion of the Tax shown to be due on each such return not more than five business days after the delivery of such statement and supporting evidence.

9.3     OTHER TAXES


EXHIBIT 7-3

Except as provided in Section 9.1 and Section 9.2, (i) the Seller shall be responsible for and shall pay any and all Taxes with respect to the Assets and the Business relating to all periods (or portions thereof) ending on or prior to the Closing Date and (ii) the Buyer shall be responsible for and shall pay any and all Taxes with respect to the Assets and the Business relating to all periods (or portions thereof) beginning after the Closing Date and Taxes arising on the Closing Date.

### 9.4   TREATMENT OF INDEMNITY PAYMENTS

All payments made pursuant to any indemnification obligations under this Agreement, will be treated as adjustments to the purchase price for Tax purposes and such agreed treatment will govern for purposes of this Agreement, unless otherwise required by law.

### 9.5   COOPERATION

To the extent permitted by applicable law, the Buyer and the Seller shall use their reasonable efforts to cooperate with each other to obtain exemptions from such Taxes or to otherwise legally minimize such Taxes

## 10.   Additional Covenants

### 10.1   ACCOUNTS PAYABLE

The Seller shall, as soon as practicable after the Closing but no later than five (5) business days after the Closing, pay the Persons listed on Payables List the amounts listed therein.

### 10.2   AVAILABILITY OF THE ASSETS

After the Closing, the Seller shall permit the Buyer, or its authorized representative, upon receipt of reasonable notice from the Buyer, access to the Assets in the Seller's possession during the Seller's normal business hours of operation.

### 10.3   REPORTS AND RETURNS

The Seller shall as soon as commercially practicable after the Closing prepare and file all reports and returns required by Legal Requirements relating to the Business.

### 10.4   ASSISTANCE IN PROCEEDINGS

The Seller will cooperate with the Buyer and its counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or

transaction on or before the Closing Date involving the Seller and the Assets or the Business. The Buyer shall, subject to any rights of the Buyer under Article 11 hereof, reimburse the Seller for all of the Seller's reasonable costs incurred in connection with any assistance provided by the Seller pursuant to this Section 10.4.

### 10.5 NONCOMPETITION, NONSOLICITATION AND NONDISPARAGEMENT

(a) <u>Noncompetition by the Seller</u>. Subject to Section 10.5(e) below, for a period of three (3) years after the Closing Date, the Seller shall not anywhere in the world, directly or indirectly invest in, own, manage, operate, finance or control any manufacturing activity relating to CPR manikins ("<u>Competing Business</u>"), provided, however, that the Seller may purchase or otherwise acquire up to (but not more than) three percent (3%) in the aggregate, of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) engaged in a Competing Business if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b) <u>Nonsolicitation.</u> For a period of three (3) years after the Closing Date, the Seller shall not directly or indirectly:

(i) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of the Buyer or any of its subsidiaries (collectively, the "<u>Buyer Group</u>") to cease doing business with any member of the Buyer Group or in any way interfere with its relationship with any member of the Buyer Group; or

(ii) hire, retain or attempt to hire or retain any employee of any member of the Buyer Group or in any way interfere with the relationship between any member of the Buyer Group and any of their respective employees; provided, however, that the Seller shall not be prohibited from employing an employee of the Buyer if such employee (A) independently seeks employment with the Seller or (B) has been terminated or otherwise released from employment with the Buyer; provided further, however, that the prohibition shall not apply to (i) employees not involved in the Business, and (ii) general solicitations of employment not specifically directed towards the Buyer's employees.

(d) <u>Nondisparagement</u>. After the Closing Date, the Seller will not disparage any member of the Buyer Group or any of such members of the Buyer Group's stockholders, directors, officers or employees.

(e) <u>Permitted Activities</u>. Notwithstanding any of the foregoing provisions in this Section 10.5, no provision in this Section 10.5 shall in any way limit or restrict the Seller's ability to purchase from any supplier whatsoever or resell CPR products and accessories (including, without limitation, CPR manikins and lung bags) and certain derivations thereof (including, without limitation, for internal training

purposes); provided, however, so long as the Buyer makes available and supplies CPR manikins and lung bags to the Seller on commercially reasonable terms (including, but not limited to, terms with respect to timing, availability, price) on a timely basis, the Seller shall first offer to purchase such products from the Buyer before purchasing from any other supplier.

(f) <u>Modification of Covenant</u>. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 10.5(a) through (d) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 10.5 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 10.5 is reasonable and necessary to protect and preserve the Buyer's legitimate business interests and the value of the Assets and to prevent any unfair advantage conferred on the Seller.

10.6   CUSTOMER AND OTHER BUSINESS RELATIONSHIPS

After the Closing, the Seller will cooperate with the Buyer in its efforts to continue and maintain for the benefit of the Buyer those business relationships of the Seller with respect to the Business existing prior to the Closing and relating to the Business to be operated by the Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others, and the Seller will satisfy the Retained Liabilities in a manner that is not detrimental to any of such relationships. Neither the Seller nor any of its respective officers or employees shall disparage the name or Business of the Buyer.

10.7   RETENTION OF AND ACCESS TO RECORDS

After the Closing Date, the Buyer shall retain those Records of the Seller delivered to the Buyer for a period of up to seven (7) years (based on the date of such Records). The Buyer also shall provide to the Seller and its Representatives reasonable access thereto, during normal business hours and upon reasonable prior notice, to enable them to prepare financial statements or tax returns or deal with tax audits. After the Closing Date, the Seller shall provide the Buyer and its Representatives reasonable access to Records that are Excluded Assets, during normal business hours and upon reasonable prior notice, as is reasonably necessary to allow the Buyer to obtain information with respect to claims, demands, audits, suits or matters of a similar nature made by or against the Buyer as the new owner and operator of the Business to the extent that such matters relate to the operation of the Business prior to the Closing Date.

10.8   BULK SALES LAWS

The Buyer and the Seller hereby waive compliance with the bulk-transfer provisions of the Uniform Commercial Code (or any similar law) ("Bulk Sales Laws") in connection with the Contemplated Transactions.

10.9   FURTHER ASSURANCES

The parties shall cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

11.   Indemnification; Remedies

11.1   SURVIVAL

All representations, warranties, covenants and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter and any certificate or document delivered pursuant to this Agreement shall survive the Closing and the consummation of the Contemplated Transactions for a period of nine (9) months; provided that the representations and warranties set forth in Section 3.14 shall survive until 90 days following the expiration of the applicable statute of limitations (and any waivers or extension thereof) with respect thereto.

11.2   INDEMNIFICATION BY THE SELLER

The Seller hereby agrees to indemnify and hold harmless the Buyer and every subsidiary, affiliate, officer, director or agent of the Buyer, and the successors and assigns of each of them, from any and all Adverse Consequences arising out of or relating to:

(i)   an Event of Breach;

(ii)   any Liability arising out of the ownership or operation of the Business or the Assets from and after November 1, 2003 and prior to the Closing, other than the Assumed Liabilities; and

(iii)   any Retained Liabilities.

11.3   INDEMNIFICATION BY THE BUYER

The Buyer hereby agrees to indemnify and hold harmless the Seller and every subsidiary, affiliate, officer, director or agent of the Seller, and the successors and assigns of each of them, from any and all Adverse Consequences arising out of or relating to:

(i)   an Event of Breach;

(ii)  any Liability arising out of the ownership or operation of the Business or the Assets from and after the Closing, other than the Retained Liabilities; and

(iii) the Assumed Liabilities.

11.4   CERTAIN OTHER AGREEMENTS

Notwithstanding anything herein to the contrary, the indemnification obligations of the parties hereto shall apply only to the extent and after the amounts for which a party has suffered losses due to Adverse Consequences hereunder exceed $25,000 in the aggregate. To the extent, and only to the extent, required by law, each indemnified party hereunder will use commercially reasonable efforts to mitigate Adverse Consequences resulting from, arising out of, or caused by an Event of Breach; provided, however, that nothing herein shall impose, create, supplement, reduce, change or affect in any way any burden of proof, burden of persuasion or any other procedural or substantive requirement or law in the prosecution of its rights hereunder.

11.5   NOTICES OF DEMAND, ETC.

Each indemnified party hereunder agrees that upon its obtaining actual knowledge of facts indicating that there may be a basis for a colorable claim for indemnity under the provisions hereof, including but not limited to receipt by it of notice of any demand, assertion, claim, action or proceeding, judicial or otherwise, by any third party, it will give prompt notice thereof in writing to the indemnifying party. The indemnifying party shall thereupon be obligated to defend, contest or otherwise protect the indemnified party against any such demand, assertion, claim, action or proceeding, at the indemnifying party's sole cost and expense. The indemnified party shall have the right, but not the obligation, to participate at its own expense in the defense thereof by counsel of the indemnified party's choice. In the event that the indemnifying party fails timely to defend, contest or otherwise protect against such demand, assertion, claim, action or proceeding, the indemnified party shall have the right to do so, including without limitation, the right to make any compromise or settlement thereof, and the indemnified party shall have the right to recover the entire cost thereof from the indemnifying party, including without limitation, reasonable attorneys' fees, disbursements and amounts paid as a result of such demand, assertion, claim, action or proceeding.

12.   Confidentiality

12.1   DEFINITION OF CONFIDENTIAL INFORMATION

(a)   As used in this Article 12, the term "Confidential Information" includes any and all of the following information of the Seller or the Buyer, that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically or

otherwise, or otherwise made available by observation, inspection or otherwise by either party (the Buyer on the one hand or the Seller on the other hand) or its Representatives (collectively, a "Disclosing Party") to the other party or its Representatives (collectively, a "Receiving Party"):

    (i)    all information that is a trade secret under applicable trade secret or other law;

    (ii)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, Software and computer software and database technologies, systems, structures and architectures;

    (iii)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

    (iv)    all notes, analyses, compilations, studies, summaries and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, upon any information included in the foregoing.

    (b)    Any trade secrets of a Disclosing Party shall also be entitled to all of the protections and benefits under applicable trade secret law and any other applicable law. If any information that a Disclosing Party deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Article 12, such information shall still be considered Confidential Information of that Disclosing Party for purposes of this Article 12 to the extent included within the definition. In the case of trade secrets, each of the Buyer and the Seller hereby waives any requirement that the other party submit proof of the economic value of any trade secret or post a bond or other security.

12.2    RESTRICTED USE OF CONFIDENTIAL INFORMATION

    (a)    Each Receiving Party acknowledges the confidential and proprietary nature of the Confidential Information of the Disclosing Party and agrees that such Confidential Information (i) shall be kept confidential by the Receiving Party; (ii)

shall not be used for any reason or purpose other than to evaluate and consummate the Contemplated Transactions; and (iii) without limiting the foregoing, shall not be disclosed by the Receiving Party to any Person, except in each case as otherwise expressly permitted by the terms of this Agreement or with the prior written consent of an authorized representative of the Seller with respect to Confidential Information of the Seller (each, a "Seller Contact") or an authorized representative of the Buyer with respect to Confidential Information of the Buyer (each, a "Buyer Contact"). Each of the Buyer and the Seller shall disclose the Confidential Information of the other party only to its Representatives who require such material for the purpose of evaluating the Contemplated Transactions and are informed by the Buyer or the Seller, as the case may be, of the obligations of this Article 12 with respect to such information. Each of the Buyer and the Seller shall (iv) enforce the terms of this Article 12 as to its respective Representatives; (v) take such action to the extent necessary to cause its Representatives to comply with the terms and conditions of this Article 12; and (vi) be responsible and liable for any breach of the provisions of this Article 12 by it or its Representatives.

(b) From and after the Closing, the provisions of Section 12.2(a) above shall not apply to or restrict in any manner the Buyer's use of any Confidential Information of the Seller relating directly to the Business.

(c) The provisions of Section 12.2(a) above shall not apply to or restrict disclosure if such disclosure is required by law.

12.3   EXCEPTIONS

Section 12.2(a) does not apply to that part of the Confidential Information of a Disclosing Party that a Receiving Party demonstrates (a) was, is or becomes generally available to the public other than as a result of a breach of this Article 12 or the Confidentiality Agreement by the Receiving Party or its Representatives; (b) was or is developed by the Receiving Party independently of and without reference to any Confidential Information of the Disclosing Party; or (c) was, is or becomes available to the Receiving Party on a nonconfidential basis from a Third Party not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting disclosure. Subject to the provisions set forth in Section 10.5, nothing herein shall prohibit the Seller from the continued use of any information related to both the Business and the other business conducted by Seller, or related solely to the Business, for internal purposes.

12.4   LEGAL PROCEEDINGS

If a Receiving Party becomes compelled in any Proceeding or is requested by a Governmental Body having regulatory jurisdiction over the Contemplated Transactions to make any disclosure that is prohibited or otherwise constrained by this Article 12, the Receiving Party shall provide the Disclosing Party with prompt notice of such compulsion or request so that it may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Article 12. In the

absence of a protective order or other remedy, the Receiving Party may disclose that portion (and only that portion) of the Confidential Information of the Disclosing Party that, based upon advice of the Receiving Party's counsel, the Receiving Party is legally compelled to disclose or that has been requested by such Governmental Body, provided, however, that the Receiving Party shall use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom any Confidential Information is so disclosed. The provisions of this Section 12.4 do not apply to any Proceedings between the parties to this Agreement.

12.5  [Intentionally Omitted]

12.6  ATTORNEY-CLIENT PRIVILEGE

The Disclosing Party is not waiving, and will not be deemed to have waived or diminished, any of its attorney work product protections, attorney-client privileges or similar protections and privileges as a result of disclosing its Confidential Information (including Confidential Information related to pending or threatened litigation) to the Receiving Party, regardless of whether the Disclosing Party has asserted, or is or may be entitled to assert, such privileges and protections. The parties (a) share a common legal and commercial interest in all of the Disclosing Party's Confidential Information that is subject to such privileges and protections; (b) are or may become joint defendants in Proceedings to which the Disclosing Party's Confidential Information covered by such protections and privileges relates; (c) intend that such privileges and protections remain intact should either party become subject to any actual or threatened Proceeding to which the Disclosing Party's Confidential Information covered by such protections and privileges relates; and (d) intend that after the Closing the Receiving Party shall have the right to assert such protections and privileges. No Receiving Party shall admit, claim or contend, in Proceedings involving either party or otherwise, that any Disclosing Party waived any of its attorney work-product protections, attorney-client privileges or similar protections and privileges with respect to any information, documents or other material not disclosed to a Receiving Party due to the Disclosing Party disclosing its Confidential Information (including Confidential Information related to pending or threatened litigation) to the Receiving Party.

13.  General Provisions

13.1  EXPENSES

Except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions, including all fees and expense of its Representatives.

13.2  PUBLIC ANNOUNCEMENTS

The Buyer and the Seller agree to consult with each other before issuing any press release or making any public statements with respect to this Agreement or the transactions contemplated hereby; provided that the foregoing shall not prohibit either party from making any public announcements that are required by any Legal Requirement.

### 13.3   NOTICES

All notices, Consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses or facsimile numbers and marked to the attention of the person (by name or title) designated below (or to such other address or facsimile number or person as a party may designate by notice to the other parties):

<u>Seller</u>:
Cardiac Science, Inc..
1900 Main Street, Suite 700
Irvine, California 92614
Attention: Chief Financial Officer
Fax no.: (949) 951-7315
Telephone no.: (949) 797-3800
E-mail address: rdegreef@cardiacscience.com

with a copy to:
Stradling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660
Attention: Shivbir S. Grewal, Esq.
Fax no.: (949) 725-4100
Telephone no.: (949) 725-4000
E-mail address: sgrewal@sycr.com

<u>Buyer</u>:
The Aristotle Corporation
96 Cummings Point Road
Stamford, CT 06902
Attention: President
Fax no.: (203)358-0179
Telephone no.: (203) 358-8000
E-mail address: slapin@ihc-geneve.com

with a copy to:
The Aristotle Corporation
Attention: General Counsel
96 Cummings Point Road
Stamford, Connecticut 06902
Fax No. (203)358-0179
E-mail address: wsmith@ihc-geneve.com

with a copy to:
The Aristotle Corporation
Attention: Chief Financial Officer
901 Janesville Avenue
Fort Atkinson, WI 53538
Fax no.: (920) 568-5576
Telephone no.: (920) 568-5576
E-mail address: int@eNasco.com

13.4   JURISDICTION; SERVICE OF PROCESS

Any Proceeding arising out of or relating to this Agreement or any Contemplated Transaction may be brought in the appropriate federal or state courts located in Orange County, California, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any Proceeding arising out of or relating to this Agreement or any Contemplated Transaction in any other court. The parties agree that either or both of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the first sentence of this section may be served on any party anywhere in the world.

13.5   [Intentionally Omitted]

13.6   WAIVER; REMEDIES CUMULATIVE

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in

writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

### 13.7 ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including any letter of intent and any confidentiality agreement between the Buyer and the Seller) and constitutes (along with the Disclosure Letter, exhibits and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

### 13.8 [Intentionally Omitted]

### 13.9 ASSIGNMENTS, SUCCESSORS AND NO THIRD-PARTY RIGHTS

No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, which consent will not be unreasonably withheld, except that the Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Subsidiary of the Buyer and may collaterally assign its rights hereunder to any financial institution providing financing in connection with the Contemplated Transactions; provided, however, that such assignment by the Buyer shall not relieve it of any of its obligations hereunder. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 13.9.

### 13.10 SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 13.11 CONSTRUCTION

The headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Articles," "Sections" and "Parts" refer to the corresponding Articles, Sections and Parts of this Agreement and the Disclosure Letter.

### 13.12  TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### 13.13  GOVERNING LAW

This Agreement will be governed by and construed under the laws of the State of California without regard to conflicts-of-laws principles that would require the application of any other law.

### 13.14  EXECUTION OF AGREEMENT

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

Buyer: THE ARISTOTLE CORPORATION

By: _____
Name: _____
Title: _____

Seller: CARDIAC SCIENCE, INC.

By: _____
Name: _Roderick de Greef_____
Title: _Chief Financial Officer_

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

Buyer: THE ARISTOTLE CORPORATION

By: _____
Name: STEVEN B. LAPIN
Title: PRES + COO

Seller: CARDIAC SCIENCE, INC.

By: _____
Name: _____
Title: _____

43